Case No. 23-55013

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GHP MANAGEMENT CORPORATION, et al.,

*Plaintiffs-Appellants*,

v.

CITY OF LOS ANGELES, et al.,

*Defendants-Appellees*.

## APPELLANTS' OPENING BRIEF

On Appeal from the United States District Court
for the Central District of California
Honorable Dean D. Pregerson, District Judge
Case No. 2:21-cv-06311-DDP-JEM

Douglas J. Dennington (SBN 173447)
ddennington@rutan.com
Jayson A. Parsons (SBN 330458)
jparsons@rutan.com
**RUTAN & TUCKER, LLP**
18575 Jamboree Road, 9th Floor
Irvine, CA 92612
Telephone: 714-641-5100

*Attorneys for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

GHP MANAGEMENT CORPORATION, a California corporation, has no parent corporation and is not a publicly traded corporation.

918 BROADWAY ASSOCIATES, LLC, a Delaware limited liability company, is owned in part by Palmer Broadway, L.P., and also in part by LR Broadway Holdings, LLC, and issues no shares.

LR 9TH & BROADWAY, LLC, a California limited liability company, is owned in part by Palmer Broadway, L.P., and also in part by L&R Investment Company, and issues no shares.

PALMER TEMPLE STREET PROPERTIES, LLC, a California limited liability company, is owned in part by Da Vinci Apartments, LLC, and issues no shares.

PALMER/CITY CENTER II, a California limited partnership, issues no shares.

PALMER BOSTON STREET PROPERTIES I, LP, a Delaware limited partnership, issues no shares.

PALMER BOSTON STREET PROPERTIES II, LP, a Delaware limited partnership, is owned in part by Palmer Boston Street Properties II, Inc., a California corporation, and issues no shares.

PALMER BOSTON STREET PROPERTIES III, a California Limited

Partnership, is owned in part by Orsini III, LLC, a Delaware limited liability company, and issues no shares.

BRIDEWELL PROPERTIES, LIMITED, a California Limited Partnership, is owned in part by Pasadena Park Place, LLC, a Delaware limited liability company, and issues no shares.

PALMER ST. PAUL PROPERTIES, LP, a Delaware limited partnership, is owned in part by Piero Properties, Inc., a California corporation, and issues no shares.

PALMER/SIXTH STREET PROPERTIES, L.P., a California limited partnership, is owned in part by Piero Properties II, LLC, a Delaware limited liability company, and issues no shares.

FIGTER LIMITED, a California Limited Partnership, is owned in part by Figter, Inc., a California corporation, and issues no shares.

WARNER CENTER SUMMIT, LTD,, a California Limited Partnership, is owned in part by Summit Warner Center Apartments, LLC, a Delaware limited liability company, and also in part by Palmer-Warner Center, LTD., a California Limited Partnership, and issues no shares.

PALMER/THIRD STREET PROPERTIES, L.P., a California limited partnership, is owned in part by Visconti Apartments, LLC, a Delaware limited liability company, and issues no shares.

## OTHER ENTITIES HOLDING INTERESTS IN PLAINTIFFS

MALIBU CONSULTING CORP., is a California corporation that issues no shares except to principals of the firm.

PALMER/CITY CENTER II, INC., is a California corporation that issues no shares except to principals of the firm.

PALMER BOSTON STREET PROPERTIES, I, INC., is a California corporation that issues no shares except to principals of the firm.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...................................................... 1

INTRODUCTION ............................................................................................... 1

JURISDICTIONAL STATEMENT ...................................................................... 2

STATEMENT OF ISSUES ................................................................................... 3

STATEMENT OF THE CASE .............................................................................. 4

    I.     Background ....................................................................................... 4

          A.    The Status Quo – For Nearly 150 Years, Unlawful
               Detainer Proceedings Represented the Sole Legal
               Remedy in California for Landlords to Timely
               Effectuate Their Fundamental Property Right to
               Exclude Defaulting Tenants ....................................................... 4

          B.    At the Outset of the Pandemic, The City
               Fundamentally Disrupted the Relationship
               Between Tenants and Their Landlords by
               Indefinitely Suspending the Landlords' Right to
               Initiate Unlawful Detainer Proceedings .................................... 6

          C.    The City's Eviction Moratorium Caused
                Appellants to Sustain Millions of Dollars in Rent
                Losses with No Way to Evict Non-Paying Tenants
                in Order to Re-Let the Units to Paying Tenants ...................... 8

    II.    Procedural History ........................................................................... 9

          A.    Plaintiffs-Appellants Sue the City ............................................ 9

          B.    The District Court Grants Intervenors' Motion to
               Intervene .................................................................................. 10

          C.    The District Court Grants the City's and
               Intervenors' Motions to Dismiss ............................................. 11

          D.    Further Proceedings Prior to Appeal ...................................... 13

**Page**

SUMMARY OF THE ARGUMENT ................................................................... 13

STANDARDS OF REVIEW .............................................................................. 16

ARGUMENT ...................................................................................................... 17

I.      Appellants Plead Facts Sufficient to State a Physical *Per Se* Taking ............................................................................................. 17

        A.      Takings Overview ................................................................ 17

        B.      Plaintiffs Plausibly Plead that the City's Eviction Moratorium Deprived Them of a Fundamental Property Right—Their Right to Exclude .............................. 20

                a.      The Right to Exclude is the Touchstone of Physical Takings ............................................................ 20

                b.      The City's Eviction Moratorium Deprived Appellants of Their Right to Exclude Nonpaying, Holdover Tenants .................................... 21

        C.      *Yee v. City of Escondido* Does Not Control This Case ...................................................................................... 24

                a.      *Yee*—a Mobile Home Rent Control Case— is Limited to Its Narrow Facts and Unusual Circumstances ..................................................... 24

                b.      Yee Does Not Establish an "Open-Door" Exception to Physical Takings Liability ..................... 27

        D.      This Court's Decision in *Ballinger v. City of Oakland* is Likewise of No Moment ................................. 29

        E.      A Strong Majority of the Supreme Court Has Now Recognized that COVID-19 Eviction Moratoria Intrude on Landlords' Fundamental Right to Exclude ................................................................................ 31

II.     Plaintiffs Sufficiently Plead a Regulatory Taking in the Alternative ......................................................................................... 33

A. The Economic Impact of the Eviction Moratorium on Appellants Has Been Severe ............................................... 35

B. The Eviction Moratorium Frustrated Appellants' Distinct Investment-Backed Expectations ............................. 38

C. The Character of the Eviction Moratorium is Much More Akin to a Physical Invasion than a Mere "Adjustment" of Benefits and Burdens Between Appellants and Their Tenants ................................................ 40

III. The District Court Should Not Have Granted the Motion to Intervene ....................................................................... 42

A. The District Court Should Not Have Allowed Intervenors into the Litigation as a Matter of Right .............. 43

 a. Intervenors Cannot Claim a Significantly Protectable Interest Where Appellants Seek Only Just Compensation from the City ....................... 44

 b. The Payment of Just Compensation Will Not "Practically Impair" Intervenors Non-Existent Protectable Interest ........................................ 47

 c. The City Adequately Represents the Intervenors' Interests Because They Share the Same Ultimate Objective ....................................... 48

B. The District Court Abused Its Discretion by Allowing Permissive Intervention in the Alternative ................................................................... 52

C. The Remedy .......................................................................... 53

CONCLUSION .................................................................................... 54

STATEMENT OF RELATED CASES ................................................. 55

ADDENDUM OF STATUTORY AUTHORITY ................................. 56

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ............................ 57

**Page**

CERTIFICATE OF SERVICE ............................................................. 58

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*301, 712, 2103 & 3151 LLC v. City of Minneapolis*,
  27 F.4th 1377 (8th Cir. 2022) .............................................................................29

*Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*,
  141 S. Ct. 2485 (2021)...........................................................................32, 33, 41

*Allied Concrete & Supply Co. v. Baker*,
  904 F.3d 1053 (9th Cir. 2018) .............................................................................17

*Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*,
  500 F. Supp. 3d 1088 (C.D. Cal. 2020), *aff'd*, 10 F.4th 905 (9th
  Cir. 2021), *cert. denied*, 142 S. Ct. 1699 (2022) ...............................................39

*Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*,
  No. 20-56251 (9th Cir. Jan. 14, 2021), ECF No. 26 .........................................22

*Arakaki v. Cayetano*,
  324 F.3d 1078 (9th Cir. 2003) ...............................................................48, 49, 50

*Armstrong v. United States*,
  364 U.S. 40 (1960)................................................................................................2

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................16

*Ballinger v. City of Oakland*,
  24 F.4th 1287 (9th Cir. 2022), *cert. denied*, 142 S. Ct. 2777 (2022) .....29, 30, 31

*Baptiste v. Kennealy*,
  490 F. Supp. 3d 353 (D. Mass. 2020)................................................................39

*Barbaccia v. Santa Clara Cnty.*,
  451 F. Supp. 260 (N.D. Cal. 1978)....................................................................34

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................16

**Page(s)**

**FEDERAL CASES (CONT.)**

*California ex rel. Lockyer v. United States*,
   450 F.3d 436 (9th Cir. 2006) .................................................................44

*Cedar Point Nursery v. Hassid*,
   141 S. Ct. 2063 (2021)................................... 2, 14, 18, 21, 23, 24, 26, 28, 30, 31

*City of Monterey v. Del Monte Dunes Monterey, LTD.*,
   526 U.S. 687 (1999).................................................................................42

*City of Oakland v. BP PLC*,
   969 F.3d 895 (9th Cir. 2020) .................................................................34

*Coal. for ICANN Transparency, Inc. v. Verisign, Inc.*,
   611 F.3d 495 (9th Cir. 2010) .................................................................16

*Coal. to Defend Affirmative Action v. Brown*,
   674 F.3d 1128 (9th Cir. 2012) ...............................................................16

*Colony Cove Properties, LLC v. City of Carson*,
   888 F.3d 445 (9th Cir. 2018) .........................................................34, 35, 36, 37

*Colony Cove Properties, LLC v. City of Carson*,
   No. CV14-3242-PSG-PJWx, 2015 WL 12860484 (C.D. Cal. 2015).................36

*Cook v. Reinke*,
   484 F. App'x 110 (9th Cir. 2012) (unpublished)..............................................22

*Cooper v. Newsom*,
   13 F.4th 857 (9th Cir. 2021) .......................................................45, 46

*Donnelly v. Glickman*,
   159 F.3d 405 (9th Cir. 1998) .......................................................44, 45

*F.C.C. v. Florida Power Corp.*,
   480 U.S. 245 (1987)................................................................22, 28

*Freedom from Religion Found., Inc. v. Geithner*,
   644 F.3d 836 (9th Cir. 2011) .................................................................44

**Page(s)**

**FEDERAL CASES (CONT.)**

*Gompper v. VISX, Inc.*,
  298 F.3d 893 (9th Cir. 2002) .............................................34

*Gospel Missions of Am. v. City of Los Angeles*,
  328 F.3d 548 (9th Cir. 2003) ............................................22

*Greene v. United States*,
  996. F.2d 973 (9th Cir. 1993) ...........................................45

*Guggenheim v. City of Goleta*,
  638 F.3d 1111 (9th Cir. 2010) (en banc) ...........................39

*Heights Apartments v. Walz*,
  30 F.4th 720 (8th Cir. 2022) ........................ 14, 23, 24, 26, 27, 30, 31

*Hodel v. Irving*,
  481 U.S. 704 (1987).....................................................35, 41

*Horne v. U.S. Dep't of Agric.*,
  750 F.3d 1128 (9th Cir. 2014), *rev'd sub nom. Horne*, 576 U.S.
  350 (2015)................................................................28, 29

*Kaiser Aetna v. United States*,
  444 U.S. 164 (1979).........................................................19

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
  480 U.S. 470 (1987).....................................................36, 37

*Knick v. Twp. of Scott*,
  139 S. Ct. 2162 (2019)......................................................42

*League of United Latin Am. Citizens v. Wilson*,
  131 F.3d 1297 (9th Cir. 1997) ........................................49, 50

*Lindsey v. Normet*,
  405 U.S. 56 (1972)...........................................................4

*Lingle v. Chevron*,
  544 U.S. 528 (2005)........................... 17, 18, 19, 20, 21, 41

**Page(s)**

**FEDERAL CASES (CONT.)**

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982)...................................... 2, 14, 17, 18, 20, 21, 22, 28, 33, 41

*Lucas v. South Carolina Coastal Council*,
  505 U.S. 1003 (1992).............................................................17, 19, 37

*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*,
  960 F.3d 603 (9th Cir. 2020) ...............................................16, 50, 51

*Penn Central Transportation Co. v. New York City*,
  438 U.S. 104 (1978)...................................... 19, 20, 34, 35, 36, 37, 40

*Perry v. Proposition 8 Official Proponents*,
  587 F.3d 947 (9th Cir. 2009) ............................................................52

*Sierra Club v. EPA*,
  995 F.2d 1478 (9th Cir. 1993) .........................................................44

*Sw. Ctr. For Biological Diversity v. Berg*,
  268 F.3d 810 (9th Cir. 2001) ...........................................................48

*United States v. Alisal Water Corp.*,
  370 F.3d 915 (9th Cir. 2004) ...........................................................46

*United States v. Causby*,
  328 U.S. 256 (1946)........................................................................19

*United States v. Gen. Motors Corp.*,
  323 U.S. 373 (1945)........................................................................20

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
  655 F.3d 1039 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2713 (2012) .................3

*Yee v. City of Escondido*,
  503 U.S. 519 (1992)..................................... 12, 14, 22, 24, 25, 26, 27, 28, 29, 30

**CALIFORNIA CASES**

*Childs v. Eltinge*,
  29 Cal.App.3d 843 (1979) .................................................................4

<u>**Page(s)**</u>

**CALIFORNIA CASES (CONT.)**

*Green v. Smith*,
  261 Cal.App.2d 392 (1968) .................................................................5

**FEDERAL STATUTES**

28 U.S.C.
  section 1291 .................................................................................3
  section 1331 .................................................................................2
  section 1367 .................................................................................2

42 U.S.C.
  section 1983 .................................................................................2

**CALIFORNIA STATUTES**

Civil Code
  section 789.3 ...............................................................................4
  section 1951.2 (West 2010) .........................................................5

Code of Civil Procedure
  sections 1159 *et seq.* .................................................................4, 5
  section 1167 .................................................................................5
  section 1167.1 .............................................................................5
  section 1167.3 .............................................................................5

**FEDERAL RULES**

Federal Rules of Appellate Procedure
  rule 4(a)(1)(A) ............................................................................2

Federal Rules of Civil Procedure
  rule 12(b)(6) ...............................................12, 16, 23, 33, 34
  rule 23(b)(1)(B) .........................................................................11
  rule 24 .......................................................................................43
  rule 24(a) ...............................................................11, 16, 44, 47
  rule 24(b)(1)(B) .........................................................................52
  rule 24(b)(2) ...............................................................................17
  rule 26(a)(2)(D) .........................................................................37

<u>**Page(s)**</u>

**CONSTITUTIONAL PROVISIONS**

California Constitution Article I section 19.................................................................2

United States Constitution Fifth Amendment..............................................2, 17, 19

**PERIODICALS**

Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L.
Rev. 730 (1998) ..................................................................................................20

**INTRODUCTION**

In response to the COVID-19 pandemic, the City of Los Angeles enacted one of the most severe residential eviction moratoria in the country. Nonpaying tenants who purportedly were impacted by the pandemic were effectively immunized from facing eviction proceedings for years on-end. Indeed, only two months ago (in February 2023) did the City finally end the "emergency proclamation," thus requiring resumption of rent payments—but landlords still cannot evict for almost another year for much of the rent accrued between 2021 to 2023. Moreover, the City's patently illusory promise that these tenants must pay "someday" is a hollow one; the eviction moratorium lured tenants into moral hazard, as some lessees have racked up tens of thousands of dollars in back rents (if not more) that they likely will never have the means to pay. Unfortunately, the fallout from the moratorium cannot be traced to a handful of irresponsible tenants—at the time of filing their complaint in August 2021, Appellants alone were owed nearly $20 million by defaulting renters whom they could not evict.

To be perfectly clear, Appellants do not challenge the wisdom of the City's policy choice and did not seek to invalidate the eviction moratorium in the court below. Instead, Appellants demand only one thing: just compensation for the City's "taking" of their fundamental right to exclude nonpaying, holdover tenants from their apartment communities. In short, the City's eviction moratorium constitutes a

forced occupation of private property at the behest of the City. The issue is limited to merely one of damages (in takings parlance, "just compensation") as mandated by the Fifth Amendment to the United States Constitution and Article I, section 19 of the California Constitution.

As the Supreme Court has long recognized, the Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). And physical takings, particularly, are "special," because "the right to exclude . . . is a fundamental element of the property right, that cannot be balanced away." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 (1982); *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2077–78 (2021). That is precisely the case here.

## JURISDICTIONAL STATEMENT

The district court had original subject matter jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983, and supplemental jurisdiction over state law claims under 28 U.S.C. § 1367. On December 29, 2022, the district court entered its final judgment dismissing Plaintiffs' complaint with prejudice after Plaintiffs filed a Notice of Intent to Not Amend signaling their election to stand on the complaint. ER-4–8. Plaintiffs timely filed a Notice of Appeal on January 4, 2023. ER-213–215; Fed. R. App. P. 4(a)(1)(A).

This Court has jurisdiction under 28 U.S.C. § 1291. *See WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1058 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2713 (2012) (the Ninth Circuit "frequently review[s] dismissals without prejudice for failure to state a claim where a plaintiff elects not to amend and appeal standing on the complaint").

## STATEMENT OF ISSUES

1.      Did the district court err in holding that the City of Los Angeles's eviction moratorium—a regulation that indefinitely prohibited landlords from recovering physical possession of their residences from defaulting, holdover tenants—does not constitute a *per se* physical taking as a matter of law?

2.      Did the district court err in applying a mathematical, formulaic requirement that Appellants plead expert appraisal testimony concerning a specific diminution in value amount at the pleading stage as a prerequisite to litigating their regulatory taking claim as an alternative takings theory?

3.      Did the district court err in granting Intervenors' Motion to Intervene despite Intervenors having no significantly protectable interest in whether the City pays Appellants just compensation, and merely because of a speculative belief that if Appellants are ultimately successful on their claim to compensation, the City might have terminated its moratorium earlier than Intervenors wanted?

## STATEMENT OF THE CASE

### I.   <u>Background</u>

In March 2020, the City of Los Angeles adopted an eviction moratorium ("Eviction Moratorium") that divested landlords throughout the City, including Appellants, of their fundamental right to exclude others from their respective properties. This radical upsetting of the status quo constitutes an uncompensated taking of private property, as the Moratorium effectively transferred a property right from Appellants—the right to exclude—to tenants in default.

### A.   The Status Quo – For Nearly 150 Years, Unlawful Detainer Proceedings Represented the Sole Legal Remedy in California for Landlords to Timely Effectuate Their Fundamental Property Right to Exclude Defaulting Tenants

In 1872, the California Legislature enacted its unlawful detainer statutes to provide for an expedited summary process for property owners seeking to regain possession of real property from defaulting tenants. *See Childs v. Eltinge*, 29 Cal.App.3d 843, 853 (1979); *Lindsey v. Normet*, 405 U.S. 56, 71 (1972). The idea was simple: Property owners would give up their common law right to evict defaulting tenants through "self-help" measures, and in exchange would be guaranteed an expeditious legal process to remove the tenant in what is known as a summary unlawful detainer proceeding. *See Eltinge*, 29 Cal.App.3d at 853; *see also* Cal. Civ. Code § 789.3 (prohibiting landlords from disabling utilities, locking out tenants, and removing tenants' personal belongings, among other things); § 1159

(prohibiting any type of "forcible entry" to regain possession).

The statutory scheme for unlawful detainers in California is set forth in Code of Civil Procedure §§ 1159 *et seq.* To regain possession, a property owner must serve the tenant with a notice to pay rent or quit, wait the requisite time after service (typically three days), then initiate a summary process eviction action in court by serving the tenant with a summons and complaint. *Id.* §§ 1167, 1167.1, 1167.3.

While the statutory scheme for unlawful detainers restricts how property owners regain possession of their property, the proceedings provide a reliable and expedited process to recover possession. These legal assurances necessarily undergird the rights and obligations of the parties in each and every residential lease agreement in California. The unlawful detainer provisions are also necessary for landlords to mitigate damages from a defaulting tenant by re-letting the premises to a paying tenant. *See Green v. Smith*, 261 Cal.App.2d 392, 396 (1968) ("It has been the policy of the courts to promote the mitigation of damages . . . . A plaintiff cannot be compensated for damages which he could have avoided by reasonable effort or expenditures."); *see also* Cal. Civ. Code § 1951.2 (West 2010) (providing a statutory duty requiring landlords to mitigate damages after tenant's breach for nonpayment, with legislative committee comments citing *Green* to note that "[t]he general principles that govern mitigation of damages apply" in such circumstances).

**B.** **At the Outset of the Pandemic, The City Fundamentally Disrupted the Relationship Between Tenants and Their Landlords by Indefinitely Suspending the Landlords' Right to Initiate Unlawful Detainer Proceedings**

Despite nearly 150 years of history and certainty behind the unlawful detainer process in California, the City radically altered landlord-tenant relationships by adopting its Eviction Moratorium at the outset of the COVID-19 pandemic. Among other changes, the Eviction Moratorium prohibited landlords from evicting (or "endeavoring to evict") tenants financially impacted by the pandemic for the non-payment of rent, any "no fault" reasons otherwise available to landlords to terminate tenancies, and any "unauthorized occupants or pets." ER-202-03 at ¶¶ 46, 48. The Eviction Moratorium imposed no procedural obligation on the part of tenants to either "attest" to their pandemic-related qualification for protection, nor did it require tenants to even notify their landlords of their intent to withhold payment of rent in light of the Moratorium. ER-203 at ¶ 48.

The Moratorium also failed to provide any tribunal or mechanism for owners to contest a tenant's assumed qualification for protection. ER-203-04 at ¶ 49. The only way a landlord could test a tenant's qualification (or to even compel the tenant to provide documentation) would be to file an unlawful detainer action and hope the tenant does not provide any evidence of qualification for protection. Of course, if the landlord guesses incorrectly and the tenant does ultimately meet the extraordinarily low threshold for protection, it will be too late—because the City

also provided tenants with an exclusive private cause of action to assert against landlords for violations of the Moratorium, a landlord would assume grave risk of civil and criminal penalties just to ascertain whether a tenant is entitled to protection. ER-203-04 at ¶ 49 (explaining that a tenant may file an action for civil penalties of up to $10,000 per violation, plus an additional $5,000 for tenants who are elderly or disabled). "[W]hile landlords have been stripped of all remedies and any tribunal to adjudicate grievances, such as a court to protect their rights, tenants are free to go to court to assert monetary claims against their landlords." ER-204 at ¶ 49.

Finally, while briefing this appeal, the City opted to not renew its emergency declaration, thus causing prospective eviction protections to expire as of February 1, 2023. *See* MJN-10–11 (Appellants' Motion for Judicial Notice, Ex. B, filed concurrently herewith). Even though there are no longer eviction protections for rents coming due after February 1, 2023, the repayment period for back rents owed is stretched out to August 1, 2023 for rents that were not paid between March 1, 2020 and September 30, 2021, while rents not paid between October 1, 2021 and January 31, 2023, are not due until February 1, 2024. MJN-5 (Ex. A). So, if a tenant failed to pay rent beginning in March 2020, but resumed rent payments on February 1, 2023, then eviction proceedings cannot begin until August 1, 2023 if they failed to repay. Since eviction proceedings can take several months, it is not unreasonable to conclude that some property owners in the City, including

Appellants, must wait nearly four years to actually remove certain tenants for unpaid rents due years earlier.

### C. The City's Eviction Moratorium Caused Appellants to Sustain Millions of Dollars in Rent Losses with No Way to Evict Non-Paying Tenants in Order to Re-Let the Units to Paying Tenants

With the stroke of a pen, the City engaged in a radical restructuring of long-settled expectations of the laws relating to evictions between landlords and tenants. This has not come without significant costs to property owners throughout the City, including Appellants, which are the manager and owners of 13 different apartment communities located within the jurisdictional limits of the City of Los Angeles. ER-191-97 at ¶¶ 9–22. As such, they were subject to the City's Eviction Moratorium. ER-200-01 at ¶¶ 39–42.

As of the filing of Plaintiffs' complaint in *August 2021*, Plaintiffs had sustained rent losses approaching $20,000,000. ER-191-97 at ¶¶ 10–22. As clearly alleged in the complaint, these losses were specifically attributable to "numerous tenants" taking advantage of the Moratorium "to withhold payment of rent." ER-191-97 at ¶¶ 10–22. Paragraph 51 of the complaint explains:

> Plaintiffs contend that the Eviction Moratorium has actually and proximately caused rent losses in the amount of nearly $20 million, to date. Had Plaintiffs retained the ability to institute unlawful detainer proceedings against any tenants that failed to timely pay their contractual agreements, these losses would be minimal. Plaintiffs would also have been able to replace defaulting tenants with other, paying tenants. Presently, however, Plaintiffs have been required to allow defaulting

tenants to accrue millions of dollars in back rents, and have been prevented from physically removing any defaulting tenants and replacing them with paying tenants. In adopting the Eviction Moratoria, the City fully understood that tenants would not have the means to pay all back rent (to the tune of tens of thousands of dollars) by the time the Eviction Moratoria and one-year grace period expired. Indeed, Plaintiffs are informed and believe, and based thereon allege, that the City orchestrated a regulatory regime to provide a compulsory and de facto rent forgiveness to be foisted on landlords throughout the City, including Plaintiffs.

ER-204.

Appellants also alleged in the court below that in addition to millions of dollars of foregone rents, they "also suffered on the order of several millions of dollars in lost interest and late fees" as a result of the City's restrictions. ER-205 at ¶ 53. Importantly, Appellants have alleged that they have suffered further financial losses at the hands of the City by "the refusal of lending institutions to finance and/or refinance loans on Plaintiffs' apartment community properties." ER-205 at ¶ 54. Therefore, Appellants ultimately allege that their respective properties have "suffered millions of dollars in damages" as a direct consequence of the Moratorium, and that the regulation "has resulted in a severe diminution in value of Plaintiffs' properties in an amount to be proven at trial." ER-205 at ¶¶ 55, 56.

## II. **Procedural History**

### A. **Plaintiffs-Appellants Sue the City**

After suffering many millions of dollars of lost rents as a direct result of the City's Eviction Moratorium, and suffering the consequent diminution of value to

their properties on the order of lost rents, foregone interest and late fees, and missed refinancing opportunities at historically low rates, Plaintiffs-Appellants sued the City. *See generally* ER-186-212. The complaint alleges three causes of action arising exclusively under federal and state takings jurisprudence, including both a *per se* theory based on physical occupation (ER-205-08 at ¶¶ 57–67), and a regulatory taking theory (ER-208-11 at ¶¶ 68–78).

### B. The District Court Grants Intervenors' Motion to Intervene

Early in the litigation, the district court considered and granted a motion to intervene as defendants made by three non-profit groups purporting to represent the rights and interests of tenants in the City. Specifically, the non-profit intervenors included the Alliance for Community Empowerment ("ACCE"), Strategic Actions for a Just Economy ("SAJE"), and the Coalition for Economic Survival ("CES") (collectively, "Intervenors"). The district court found that ACCE intends to "engage[] in 'ground-up organizing to build a strong people's movement to create transformative community change,'" by, among other things, "'helping families stay in their homes, preserv[e] affordable housing, and push[] for equitable housing practices . . . in Los Angeles.'" ER-26. SAJE, in turn "advocates for 'tenant rights, healthy housing, and equitable development in South Los Angeles.'" ER-27. CES, for its part, is "'dedicated to organizing low and moderate-income people to win economic and social justice throughout the greater Los Angeles Area.'" ER-27.

In granting Intervenors' motion to intervene *as a matter of right* pursuant to F.R.C.P. 24(a), the court believed its analysis to be "guided by 'practical and equitable considerations,'" and that it must "generally construe the Rule to apply 'broadly in favor of proposed intervenors.'"  ER-28 (quoting *Wilderness Soc'y v. USFS*, 630 F.3d 1173, 1179 (9th Cir. 2011)).  The court below thus entertained, and ultimately accepted, the Intervenors' argument—couched in terms of pragmatism but finding its basis in simple speculation:

> [A] declaratory judgment in Plaintiffs' favor could be used by other landlords to obtain injunctive relief, or compel the City to, in the face of overwhelming liability for compensatory payments, end the emergency declaration and terminate the Moratorium earlier than COVID and its attendant economic effects would otherwise dictate.

ER-29; *see also* ER-32 (concluding that the resolution of this case "could affect the viability of the Moratorium's eviction protections").  "The result, Proposed Intervenors argue, would be an 'outbreak of eviction proceedings,' a rise in homelessness, and increased risk of the spread of COVID-19."  ER-29–30.  The court noted in a footnote that even if Intervenors could not intervene as a matter of right, it "would grant permission to intervene pursuant to Fed. R. Civ. P. 23(b)(1)(B)," *i.e.*, permissive intervention.  ER-33 at n.2.

## C.  The District Court Grants the City's and Intervenors' Motions to Dismiss

In late 2021, the City and Intervenors moved separately to dismiss the case,

primarily on Rule 12(b)(6) grounds. The district court heard oral argument and took the matter under submission on January 24, 2022. ER-24. Ten months later, the district court issued an order granting both City's and Intervenors' motions to dismiss, without prejudice. *See generally* ER-9–23.

In holding that Plaintiffs-Appellants failed to state a plausible claim on their *per se* taking theory, the district court relied on *Yee v. City of Escondido*, 503 U.S. 519 (1992). The court broadly read *Yee*—a mobile home rent control case—keying its analysis to two capacious lines in the decision, and holding essentially that because landlords "invite" tenants onto their property via a lease, subsequent regulation of that relationship is rendered immune from *per se* takings claims. *See* ER-12–13. The court also "decline[d] Plaintiffs' invitation to read the tea leaves" regarding recent Supreme Court authority that strongly indicates that six justices of the Supreme Court believe COVID-19 eviction moratoria constitute physical, *per se* takings. ER-15.

The district court also found that Plaintiffs-Appellants failed to plausibly assert a regulatory taking. *See* ER-16–22. In doing so, the court held that Plaintiffs-Appellants plausibly asserted that the City's Eviction Moratorium interferes with investment-backed expectations (ER-19–20), but found that regarding the character of the government action, the City's Eviction Moratorium "is geared toward promoting the common good," and that Plaintiffs-Appellants failed to plead "any

particular diminution in value, or specific pre- or post-Moratorium values from which a level of diminution could be calculated."  ER-18 (citing *Colony Cove Properties, LLC v. City of Carson*, 888 F.3d 445 (9th Cir. 2018)).

### D.    Further Proceedings Prior to Appeal

Plaintiffs-Appellants elected to stand on their complaint and filed a Notice of Intent to Not Amend with the district court.  ER-6–8.  On December 29, 2022, the district court entered its final judgment dismissing Plaintiffs-Appellants' complaint with prejudice.  ER-4–5.  Plaintiffs-Appellants timely appealed.  ER-213–215.

## SUMMARY OF THE ARGUMENT

In the court below, Plaintiffs-Appellants asserted both a physical *per se* takings claim and regulatory takings claim in the alternative against the City of Los Angeles's Eviction Moratorium.  Plaintiffs-Appellants also opposed a Motion for Intervention by Intervenors.  The district court granted both the Motion for Intervention and the City's and Intervenors' Motions to Dismiss and issued orders reflecting the same.  The Argument on appeal challenges both of the district court orders.

*First*, Appellants Argument summarizes the law relating to takings, namely, that where a regulation goes "too far," the government becomes obliged to pay the burdened property owner just compensation.  For physical takings, the right to exclude is paramount; the touchstone for identifying when a physical taking has

occurred is whether the government has appropriated an owner's right to exclude. *Loretto,* 458 U.S. at 435. Physical takings, like all takings, obtain regardless of the public interests that the taking purports to serve.

In this case, Plaintiffs-Appellants have stated facts sufficient to satisfy pleading standards that the City of Los Angeles appropriated Appellants' right to exclude nonpaying, holdover tenants from their apartment communities. But for the City's Eviction Moratorium, Appellants could have, and would have, initiated eviction proceedings pursuant to California's unlawful detainer process. Instead, Appellants could not evict, and have suffered significant losses and reduction in fair market value relating to lost rents, foregone interest and fees, and missed financing and refinancing opportunities. Therefore, the Eviction Moratorium constitutes a *per se* physical taking, because it forced Appellants' acquiescence into the continuing occupation of their properties by nonpaying, holdover tenants.

This Court should follow the only federal circuit opinion to address this precise issue on an identical procedural posture, *Heights Apartments v. Walz*, 30 F.4th 720 (8th Cir. 2022), which rejected a broad application of *Yee v. City of Escondido*, 503 U.S. 519 (1992), which is a mobile home rent control case with a holding that is based on unusual circumstances and narrow facts. The *Heights Apartments* instead found the Supreme Court's opinion in *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2074 (2021), to apply. *Cedar Point Nursery*, in turn,

reaffirms the Supreme Court's physical takings doctrine.

*Second*, Appellants likewise state facts sufficient to claim in the alternative that the City's Eviction Moratorium constitutes a regulatory taking. The district court below properly found that the Moratorium frustrates distinct investment-backed expectations. However, Appellants also sufficiently pled that they suffered economic impact resulting from the Moratorium, and that the character of the Moratorium is more akin to a physical invasion than a mere tinkering with the benefits and burdens of economic life.

*Finally*, it is plainly evident that Intervenors' Motion to Intervene should not have been granted. The Intervenors, which are comprised of three tenants-rights groups, cannot claim a significantly protectable interest in litigation in which Appellants solely seek just compensation from the City and do not otherwise mount a judicial challenge to, or seek to enjoin, the Moratorium. Any interests stated by Intervenors are speculative and require a cascade of assumptions, which this Court has held to not rise to the level sufficient to allow intervention as of right. The district court also committed an abuse of discretion by holding in the alternative, without any analysis, that it "would have" granted permissive intervention because Intervenors cannot assert any "claim" or "defense" that bears any relation to whether the City owes Appellants just compensation.

## STANDARDS OF REVIEW

The district court dismissed Plaintiffs' *per se* and regulatory takings claims pursuant to Fed. R. Civ. P. 12(b)(6). ER-9–23. This Court "review[s] de novo a district court's order granting a motion to dismiss under Rule 12(b)(6)." *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1133 (9th Cir. 2012).

A complaint must meet a standard of "plausibility." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Plausibility "is not akin to a 'probability requirement,'" but instead requires only something "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). In addition, when considering the sufficiency of a complaint on a motion to dismiss "[a]ll allegations of material fact are taken as true and are construed in the light most favorable to [the plaintiff]." *Coal. for ICANN Transparency, Inc. v. Verisign, Inc.*, 611 F.3d 495, 501 (9th Cir. 2010).

As for the Motion to Intervene, a district court's decision under Fed. R. Civ. P. 24(a) regarding intervention as a matter of right is reviewed de novo. *See Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 620 (9th Cir. 2020). A district court's decision concerning permissive intervention pursuant to

Fed. R. Civ. P. 24(b)(2) is reviewed for an abuse of discretion. *See Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1060 (9th Cir. 2018).

## ARGUMENT

### I.    Appellants Plead Facts Sufficient to State a Physical *Per Se* Taking

### A.    Takings Overview

The Takings Clause embodied in the Fifth Amendment proscribes the taking of private property for public use without just compensation. *Lingle v. Chevron,* 544 U.S. 528, 536 (2005).    While once understood only to apply to "direct appropriations" of private property (*i.e.*, involuntary government acquisitions through the eminent domain process), modern takings jurisprudence carves out two distinct categorical rules for *per se* takings, as well as a third, factually-intensive inquiry for a regulation which does not trigger one of the *per se* rules but nevertheless, in the words of Justice Oliver Wendell Holmes, "goes too far." *Id.* at 537 (quoting *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415 (1922)).

The first categorical rule for *per se* takings relates to government-compelled occupations of private property against the will of the property owner.    *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992) ("[R]egulations that compel the property owner to suffer a physical 'invasion' of his property" require payment of just compensation "no matter how minute the intrusion, and no matter how weighty the public purpose behind it.").    This rule was most famously articulated by Justice Thurgood Marshall in *Loretto v. Teleprompter Manhattan*

*CATV Corp.* where, writing for Court majority, he explained:

> The historical rule that a permanent physical occupation of another's property is a taking has more than tradition to commend it. Such an appropriation is perhaps the most serious form of invasion of an owner's property interests. To borrow a metaphor, *cf. Andrus v. Allard,* 444 U.S. 51, 65–66 (1979), the government does not simply take a single "strand" from the "bundle" of property rights: it chops through the bundle, taking a slice of every strand.

458 U.S. 419, 435 (1982).

The doctrine of "physical takings" offers a simple, bright-line rule; if the government occupies—or authorizes others to occupy—private property to *any* degree, then it must pay compensation regardless of the public interest that the occupation purports to serve. Indeed, as *Loretto* itself notes, the Supreme Court's long line of cases addressing the physical occupation rule has "uniformly . . . found a taking to the extent of the occupation, *without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner.*" *Id.* at 434–35 (emphasis added); *see also Lingle*, 544 U.S. at 538 ("[W]here government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation.").

Furthermore, as recently clarified by the Supreme Court in *Cedar Point Nursery v. Hassid*, "[t]he duration of an appropriation—just like the size of the appropriation—bears only on the amount of compensation." 141 S. Ct. 2063, 2074 (2021) (cleaned up). So long as a claimant can show the requisite occupation

regardless of its duration or severity, questions regarding physical takings liability boil down to a question of, "How much?" *See, e.g.*, *Kaiser Aetna v. United States,* 444 U.S. 164, 176 (1979) (holding government imposition of navigational servitude opening public access to private pond constitutes *per se* physical taking and emphasizing that a property owner's "right to exclude others" represents "one of the most essential sticks in the bundle of rights that are commonly characterized as property"); *United States v. Causby*, 328 U.S. 256, 265 (1946) (easement of flight requires compensation under Fifth Amendment).

Similar to the rule for physical occupations, but nonetheless a distinct doctrine, the Supreme Court has also found a categorical, *per se* taking where the government regulation or action "completely deprive[s] an owner of '*all* economically beneficial us[e]' of her property." *Lingle*, 544 U.S. at 538 (discussing second categorical rule set forth in *Lucas*). As the *Lucas* Court suggested, the "total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation." *Id.* at 539.

Outside of these two categorical *per se* takings, regulations are evaluated under a multi-factor inquiry to determine whether the government has gone "too far," and thus effect a taking of private property. *Lingle*, 544 U.S. at 538–39. This essentially "ad hoc" factual inquiry was first articulated in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978), and is colloquially

referred to as the "*Penn Central* test." Three factors are generally considered: (1) the "economic impact of the regulation on the claimant," (2) the "extent to which the regulation has interfered with distinct investment-backed expectations," and (3) the "character of the government action" (*i.e.*, whether it is tantamount to a government invasion or occupation or, instead, merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good"). *Id.* at 124; *see also Lingle*, 544 U.S. at 538–39.

As noted above, Plaintiffs assert both a categorical "physical occupation" taking and a *Penn Central* regulatory taking in this action.

### B. Plaintiffs Plausibly Plead that the City's Eviction Moratorium Deprived Them of a Fundamental Property Right—Their Right to Exclude

#### a. The Right to Exclude is the Touchstone of Physical Takings

The right to exclude is the "sine qua non" of property ownership. Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730 (1998). Without it, property ownership ceases to be anything but a token title, as the "owners" of such property could not control its use or disposition. *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945). The fundamental nature of the right to exclude and its relation to property rights throughout our economic and social systems has been reaffirmed time and again in the courts. In *Loretto*, Justice Marshall echoed the Court's consistent refrain that "[t]he power to exclude has traditionally been

considered one of the most treasured strands in an owner's bundle of property rights." 458 U.S. at 435. More recently, the Supreme Court in *Cedar Point Nursery*—a case finding a *per se* physical taking where a law authorized union organizers to access farm fields for up to three hours per day, 120 days a year—mentioned the right to exclude no fewer than *thirteen times*. 141 S. Ct. at 2072–79. In short, frustrating an owner's right to exclude offers perhaps the simplest touchstone as a means to assess whether a physical taking has occurred and just compensation is owed. *Lingle*, 544 U.S. at 539 (noting that the "common touchstone" among takings theories is that "[e]ach aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain").

> **b.** The City's Eviction Moratorium Deprived Appellants of Their Right to Exclude Nonpaying, Holdover Tenants

By enacting its Eviction Moratorium, the City appropriated Appellants' right to exclude nonpaying, holdover tenants from their respective premises. ER-206 at ¶ 61. This appropriation constitutes a *per se* physical taking obligating just compensation because, but for the Moratorium, Appellants would have and could have removed nonpaying tenants and replaced them with paying tenants—*i.e.*, Appellants would have exercised their right to exclude holdover tenants from their properties after the tenants' material breach of their respective leases. Instead, the City's Eviction Moratorium directly precluded Appellants' removal of holdover

tenants pursuant to well-established unlawful detainer laws.  ER-204 at ¶ 51.

The City's Eviction Moratorium thus forced Appellants to acquiesce in the physical occupation by holdover tenants of their property regardless of whether tenants paid rent.  These holdover tenants are precisely the "interloper[s] with a government license" contemplated by *Florida Power Corp.*, as the apparent defining feature separating cases like *Yee v. City of Escondido* (distinguished below) from *Loretto*, which applies here.  *See F.C.C. v. Florida Power Corp.*, 480 U.S. 245, 252–53 (1987).  In fact, the City in companion litigation challenging the very ordinance at issue here made the judicial admission in its briefing on appeal[1] that all but decides the issue.  Said the City:

> As the district court noted, the City has *not* excused tenants from their obligation "to pay rent, and landlords remain free to sue in contract for back rent owed." . . . Indeed, the City ordinance preserves landlords' full "suite of contractual remedies." . . . To be clear, the City ordinance does not bar landlords from seeking judgments for rent today, though landlords are encouraged to choose, voluntarily, to work out payment plans to everyone's mutual benefit. LAMC 49.99.2(A); *see* SER-193 (suits allowed "at any time").

Answering Br. of City Appellees at 45, *Apartment Ass'n of Los Angeles Cnty., Inc.*

---

[1]   This Court has discretion to take judicial notice of statements made by parties in appellate briefing that is "binding on . . . this court." *See Gospel Missions of Am. v. City of Los Angeles*, 328 F.3d 548, 557 (9th Cir. 2003).  This includes briefing filed in other courts and not just the immediate appeal. *See, e.g., Cook v. Reinke*, 484 F. App'x 110, 112 (9th Cir. 2012) (unpublished) (taking judicial notice of statement made by party in a separate state trial court action and made binding).

*v. City of Los Angeles*, No. 20-56251 (9th Cir. Jan. 14, 2021), ECF No. 26.

In other words, the City's interpretation of its own ordinance in briefing before this Court admits that tenants who failed to pay rent and sought protections under the Eviction Moratorium were defaulting, holdover tenants who were lingering in the properties pursuant to government authorization—*i.e.*, *interlopers with a government license*. Only a tenant in default can be sued for breach of contract, as the City's attorneys have proclaimed on multiple occasions.

Moreover, in the only federal circuit court opinion to consider the exact issue presented by this appeal—and on an identical procedure posture—the Eighth Circuit in *Heights Apartments, LLC v. Walz* agreed that the plaintiffs there stated a *per se* physical occupation claim against a substantively identical eviction moratorium. 30 F.4th 720 (8th Cir. 2022), *denying rehearing and rehearing en banc*, 39 F.4th 479. In that case, the plaintiffs challenged a COVID eviction moratorium on several grounds, including, as here, that the moratorium constituted a *per se* taking for its deprivation of plaintiffs' right to exclude nonpaying tenants. *Id.* at 725. The government moved to dismiss under Rule 12(b)(6), which the district court granted. *Id.* On appeal, the Eighth Circuit reversed, holding that the Supreme Court's analysis in *Cedar Point Nursery* controlled the disposition of the appeal, and thus the plaintiffs there sufficiently pled a physical *per se* taking. *Id.* at 733. This was so, the court held, because plaintiffs had alleged that the regulations "forced

landlords to accept the physical occupation of their property regardless of whether tenants provided compensation." *Id.*

So too here. Appellants have certainly met the requisite pleading standards for stating a *per se* physical taking under *Cedar Point Nursery*. At Paragraph 61 of the complaint, Appellants assert:

> The Eviction Moratorium requires that Plaintiffs continue furnishing their properties—indefinitely—to defaulting and nonpaying tenants. Plaintiffs have no effective ability to mitigate losses or oust those in default. By precluding Plaintiffs' historic right to institute unlawful detainer proceedings, Defendants have deprived Plaintiffs of the means to physically remove defaulting tenants from their properties. Defendants have thus stripped from Plaintiffs the fundamental right to exclude—a right that "is 'one of the most treasured rights of property ownership.'" . . . The Eviction Moratorium thus constitutes "government-authorized physical invasions . . . requiring just compensation."

ER-206-07 at ¶ 61.

### C. *Yee v. City of Escondido* Does Not Control This Case

#### a. *Yee*—a Mobile Home Rent Control Case—is Limited to Its Narrow Facts and Unusual Circumstances

The court below interpreted the City's Eviction Moratorium as merely regulating the landlord-tenant relationship, as opposed to requiring landlords to submit to the physical occupation of their properties by holdover tenants in default. ER-16 ("A regulation affecting that pre-existing [landlord-tenant] relationship is not a per se taking."). In so doing, the court principally relied on *Yee v. City of Escondido*, 503 U.S. 519 (1992), reading that case as bluntly holding that once a

landlord chooses to rent to tenants, subsequent government action impacting that relationship can never effect a physical taking. ER-16. *Yee* cannot be stretched so far. Since the Supreme Court handed down *Yee*, state and federal courts have misunderstood the opinion as fabricating an escape hatch for local and state regulations affecting landlord-tenant relationships, wrongly placing imprimatur on laws that approximate physical occupation itself, as this case shows.

In *Yee*, the Supreme Court was asked to consider a narrow challenge to a local ordinance that, on its face, was limited to controlling rents for mobile home communities. 503 U.S. at 524. Petitioners' argument was nuanced and complex, claiming that the local ordinance, when considered in light of a state law that was not challenged, effected a physical taking because of the "unusual economic relationship" between park and mobile home owners—*i.e.*, a bilateral monopoly whereby mobile home owners cannot realistically move their chattel housing, and park owners cannot force the removal of the home nor control the identity of subsequent purchasers. *Id.* at 526–27. Thus, it was claimed, "the rent control ordinance transferred a discrete interest in land—the right to occupy the land indefinitely at submarket rent—from the park owner to the mobile home owner." *Id.* at 527. The Court rejected the argument, holding that the narrow claims pressed were more properly cognizable as regulatory as opposed to physical takings. *Id.*

But *Yee* also recognized that, like here, a landlord may very well succeed on

a physical taking claim where the government prevents the termination of tenancies or compels a landowner to continue to rent its property: "A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Yee*, 503 U.S. at 528 (citing *FCC v. Florida Power Corp.*, 480 U.S. 245, 251–52, n.6 (1987); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831–32 (1987)).

The Eighth Circuit in *Heights Apartments* clarified that physical takings claims like Appellants state here are governed by *Cedar Point Nursery* rather than *Yee*, which it held to be inapposite:

> Heights alleges the [regulations] effectuated physical takings because they forced landlords to accept the physical occupation of their property regardless of whether tenants provided compensation. The [government defendants] contend that no physical taking has occurred because landlords were not deprived of their right to evict a tenant. Rather, they argue, the [regulations] imposed only a restriction on when a landowner could evict a tenant, making it similar to *Yee v. City of Escondido*, 503 U.S. 519 (1992) (finding a rent control ordinance was not a physical taking). Since the parties briefed this issue, the Supreme Court decided *Cedar Point Nursery*, which is instructive in this case. . . . *Cedar Point Nursery* controls here and *Yee*, which the [government] Defendants rely on, is distinguishable.

30 F.4th at 733.

The *Heights Apartments* court found that the rent control regulation in *Yee* "limited the amount of rent that could be charged and *neither deprived landlords of their right to evict nor compelled landlords to continue leasing the property past the*

*leases' termination*." *Id.* (emphasis added). Instead, "[t]he landlords in *Yee* sought to exclude future or incoming tenants rather than existing tenants," which the court found to distinguish *Yee* from the case before it:

> Here, the [regulations] forbade the nonrenewal and termination of ongoing leases, even after they had been materially violated, unless the tenants seriously endangered the safety of others or damaged property significantly. According to Heights' complaint, the [regulations] "turned every lease in Minnesota into an indefinite lease, terminable only at the option of the tenant." Heights has sufficiently alleged that the [government] Defendants deprived Heights of its right to exclude existing tenants without compensation. The well-pleaded allegations are sufficient to give rise to a plausible per se physical takings claim under *Cedar Point Nursery*.

*Id.*

### b. Yee Does Not Establish an "Open-Door" Exception to Physical Takings Liability

*Yee* contains two references to the voluntary nature of the petitioners' behavior, namely, that the petitioners "voluntarily rented their land to mobile home owners," and that petitioners' tenants "were invited by petitioners, not forced upon them by the government"—in other words, petitioners opened the door to tenants thereby forfeiting the right to challenge the rent control regulation at issue in *Yee* on physical takings grounds. 503 U.S. at 527, 528. But the limited nature of this "voluntariness" language is plain and can hardly be said to create a bright-line exception to physical takings liability as the district court here believed. In *Yee*, the Court discussed features separating permissible economic regulations from laws that

operate as physical takings: "'The line which separates [*FCC v. Florida Power Corp.*, 480 U.S. 245 (1987)] from *Loretto* is the unambiguous distinction between a . . . lessee and an interloper with a government license.'" *Yee*, 503 U.S. at 532. The *Yee* Court did not disturb *Loretto*. *Loretto*, though, was a case involving a landlord-tenant relationship. Thus, if *Yee* truly contained a broad exception to physical takings liability based on a landlord merely opening the door to tenants, then *Yee* would have necessarily rendered *Loretto* dead letter. It did not. *See Cedar Point Nursery*, 141 S. Ct. at 2073.

To the contrary, the Supreme Court has rejected governments' reliance on the "open door" theory that City advanced below and the district court adopted. *Loretto* implicitly rejects such an argument: "[The government] notes that the law applies only to buildings used as rental property, and draws the conclusion that the law is simply a permissible regulation of the use of real property. We fail to see, however, why a physical occupation of one type of property but not another type is any less a physical occupation." 458 U.S. at 438–39.

And later, in *Horne v. Department of Agriculture*, the Supreme Court explicitly rejected the government's contention that a raisin reserve requirement did not constitute a taking "because raisin growers voluntary choose to participate in the raisin market." 576 U.S. 350, 365 (2015). *Horne* is particularly instructive because the Ninth Circuit relied on *Yee* in its own *Horne* opinion, including *Yee*'s

voluntariness language, to find that the challenged regulation did not constitute a taking, later reversed by the Supreme Court:

> At bottom, the reserve requirement is a use restriction applying to the Hornes insofar as they *voluntarily choose* to send their raisins into the stream of interstate commerce. The Secretary did not authorize a forced seizure of the Hornes' crops, but rather imposed a condition on the Hornes' use of their crops by regulating their sale. . . . *Yee v. City of Escondido*, 503 U.S. 519, 527–28 (1992) (holding municipal regulation of a mobile home park owners' ability to rent did not work a taking *where park owners voluntarily rented their land and thus acquiesced in the regulation*)[.]

*Horne v. U.S. Dep't of Agric.*, 750 F.3d 1128, 1142 (9th Cir. 2014) (emphasis added), *rev'd sub nom. Horne*, 576 U.S. 350 (2015).

    *Horne* is important for another reason. Despite that case arising from a takings claim relating to chattels, the Eighth Circuit nevertheless recognized recently in *301, 712, 2103 & 3151 LLC v. City of Minneapolis*, that *Horne* abrogated *Yee*'s voluntariness language: "This court, before *Horne*, applied *Yee*'s voluntariness rationale. . . . But, since *Horne*, this court has not cited *Yee*, while acknowledging *Horne* and its voluntary exchange principle." 27 F.4th 1377, 1383 (8th Cir. 2022).

### D. This Court's Decision in *Ballinger v. City of Oakland* is Likewise of No Moment

    The district court below cited this Court's opinion in *Ballinger v. City of Oakland*, 24 F.4th 1287, 1293 (9th Cir. 2022), *cert. denied*, 142 S. Ct. 2777 (2022), as further reason to hold that Appellants failed to state a physical takings claim. ER-

16.  In distinguishing *Heights Apartments*, the district court believed *Ballinger* to have affirmatively rejected *Cedar Point Nursery* in favor of applying *Yee* to all regulations affecting landlord-tenant relationships.  ER-15 at n.3.

However, the facts of *Ballinger* make plain that it is of little, if any, relevance. At base, *Ballinger* was not about the taking of real property, but the literal taking of money—*i.e.*, plaintiffs there claimed a local law prohibiting owner move-ins absent payment of relocation expenses to the displaced tenant "effected an unconstitutional *physical taking of their money* for a private rather than public purpose."  24 F.4th at 1291–92 (emphasis added).  This Court disagreed, holding that the relocation fee "was a regulation of the landlord-tenant relationship, not an unconstitutional taking of a specific and identifiable property interest."  *Id.* at 1292.  The *Ballinger* Court believed such a regulation to constitute a permissible transaction cost relative to the landlord-tenant relationship.  *Id.* at 1293.  Moreover, the relocation expenses were held to be more akin to a tax or a fee, as the owner was not deprived of "a specific and identifiable pool of money."  *Id.* at 1294, 1296.

This much is certain—in no way did *Ballinger* establish a sweeping doctrine throughout the entire Ninth Circuit that all regulations governing landlord-tenant relationships fall under the auspices of *Yee* as opposed to *Cedar Point Nursery*. Rather, in *Ballinger*'s discussion, the opinion is manifestly directed toward economic interests, noting that local governments have the power to regulate

landlord-tenant relationships including through "'ceilings on the rent the landowner can charge,'" "'rent control[s],'" "'[t]raditional zoning regulations,'" "fee provision[s]," and more broadly "legislative enactments 'regulating the economic relations of landlord and tenants.'" *Id.* at 1292–93 (cleaned up).

But *Ballinger* also doesn't apply for a more simple reason. Unlike Appellants here, the plaintiffs in *Ballinger* "*never asserted that there was a physical occupation of their property*." *Id.* at 1293 n.3 (emphasis added). Thus, the Court concluded, there was no possibility to claim that the government effected a taking by requiring the owners to submit to physical occupation. *Id.* (citing *Yee*, 503 U.S. at 527). Appellants in this case have focused with laser precision on the City's decision to force Appellants' acquiescence to the ongoing physical occupation of their properties. *Ballinger* simply is too far afield to be helpful here. Instead, this Court should find the entirely on-point decision in both facts and procedural posture by its sister circuit in *Heights Apartments* to be the lodestar and apply *Cedar Point Nursery*'s provisions.

### E. A Strong Majority of the Supreme Court Has Now Recognized that COVID-19 Eviction Moratoria Intrude on Landlords' Fundamental Right to Exclude

There is no question that the COVID-19 eviction moratoria adopted throughout the nation were unprecedented, particularly with respect to forcing landlords to indefinitely house non-paying, defaulting tenants. The City's Eviction

Moratorium was one of the worst in the country in terms of its three-year duration, overbreadth of application to virtually any tenant seeking a rent holiday, and government compulsion via exorbitant civil and criminal penalties. In the only Supreme Court decision to review a COVID-19 eviction moratorium, six justices of the Court found that the far less onerous CDC moratorium directly implicated the fundamental property right of "millions of landlords throughout the nation" to exclude defaulting tenants from their properties. *Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021).

In that case, the plaintiff association sought injunctive relief enjoining the enforcement of the CDC moratorium on the grounds that the CDC lacked the authority from Congress to enact such sweeping remedial measures. After finding the plaintiff associations were "virtually certain to succeed on the merits," the Court analyzed "the equities" attendant to the provisional relief requested, *i.e.*, the vacation of the district court's stay of its order enjoining the continued enforcement of the moratorium. *Id.* Finding the equities clearly balanced in *favor of landlords, and not the tenants the CDC purported to "protect*," the Court explained:

> The equities do not justify depriving the applicants of the District Court's judgment in their favor. The moratorium has put the applicants, along with millions of landlords across the country, at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery. Despite the CDC's determination that landlords should bear a significant financial cost of the pandemic, many landlords have modest means. And preventing them from evicting tenants who breach their leases

> intrudes on one of the most fundamental elements of property ownership—the right to exclude.

*Id.* (citing *Loretto*, 458 U.S. at 435).

The district court below accused Appellants of "reading the tea leaves" when referencing the Supreme Court's only decision on the identical subject matter. Not so. Appellants merely read the *per curiam* opinion of the Court that may very well have the last word on the subject. While *Alabama Ass'n of Realtors* did not address the issue of whether the CDC moratorium effected a *per se* physical taking, it did cite the Court's landmark "physical takings" decision—*Loretto*--when addressing the equities. If one were to "read the tea leaves," one might say the Supreme Court has taken the position that while government may under some circumstances possess the power to enact such sweeping remedial measures during times of emergency,[2] doing so may render the government liable for a *per se* physical taking, imposing upon the government the duty to pay "just compensation" for that which it takes.

## II. <u>Plaintiffs Sufficiently Plead a Regulatory Taking in the Alternative</u>

Appellants also sufficiently plead a regulatory taking claim in the alternative. As an initial matter, such claims should be rarely susceptible to dismissal under Rule 12(b)(6) because, as the Supreme Court and others have made abundantly clear, their

---

[2]   Indeed, the Supreme Court acknowledged that the CDC might very well be able to enact such a moratorium if Congress expressly allowed it to do so. *Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2490 (2021).

resolution depends on an "ad hoc" and intensely fact-based analysis. *Penn Central*, 438 U.S. at 124; *see also Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018); *cf. Barbaccia v. Santa Clara Cnty.*, 451 F. Supp. 260, 266 (N.D. Cal. 1978) ("[A]s this court has previously observed, the determination of whether a taking has occurred is essentially a factual one, and therefore not appropriate to a motion to dismiss."). Moreover, "the purpose of a motion under Rule 12(b)(6) is to test the formal sufficiency of . . . [a] claim for relief; the motion is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case." *City of Oakland v. BP PLC*, 969 F.3d 895, 910 (9th Cir. 2020).

Taking Appellants' allegations as true, as this Court must (*see Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002)), it is clear that the "well-pleaded complaint" rule is satisfied. Appellants plead sufficient facts to establish the three factors necessary under *Penn Central*: (1) the "economic impact of the regulation on the claimant," (2) the "extent to which the regulation has interfered with distinct investment-backed expectations," and (3) the "character of the government action" all militate in favor of finding that the City's Eviction Moratorium constitutes a regulatory taking in the alternative. 438 U.S. at 124.

### A. The Economic Impact of the Eviction Moratorium on Appellants Has Been Severe

The district court below relied on this Court's opinion in *Colony Cove* to hold

that Appellants failed to plead sufficient economic impact under *Penn Central* because "Plaintiffs' Complaint does not allege any particular diminution in value, or specific pre- or post-Moratorium values from which a level of diminution could be calculated." ER-18 (citing *Colony Cove*, 888 F.3d at 451).

*Colony Cove* is not dispositive here for at least two reasons. As an initial matter, *Colony Cove* cannot be said to establish a "set formula" requiring a regulatory taking claimant to allege any particular numeric diminution in value—to do so would fly in the face of *Penn Central* itself. In establishing the *Penn Central* factors, Justice Brennan made as much clear: "[T]his Court, quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government." 438 U.S. at 123. The inquiry is at bottom "essentially ad hoc." *Id.* To impose a requirement that a claimant allege any particular diminution in value at the pleadings stage would cause the "economic impact" prong to swallow the remaining *Penn Central* factors. This can't be right—and it isn't. In *Hodel v. Irving*, for example, the Supreme Court found a regulatory taking where a law stripped the rights of certain Native Americans to devise their property *despite no showing of economic harm or interference with* "*any specific distinct investment-backed expectations*," because "the character of the Government regulation here is extraordinary." 481 U.S. 704, 715–16 (1987). *Colony Cove* cannot stand for such

a proposition in light of the Supreme Court's repeated direction otherwise.

Secondly, *Colony Cove*'s procedural posture is wildly different from this case, as that appeal dealt with review of a district court's judgment after a trial in which the jury found a regulatory taking resulting from a mobile home rent control ordinance. 888 F.3d at 447. This Court reversed the judgment in part because the plaintiff produced "no evidence"—*after completion of a full-blown jury trial*— "allowing a comparison of the pre-deprivation and post-deprivation values of the Property." *Id.* at 451. Importantly, the district court in *Colony Cove* had earlier denied the government's motion to dismiss plaintiff's regulatory takings claim based on the "contention that due to [the government's] actions there was a 'substantial loss of property value and forced operating losses exceeding $4 million.'" *Colony Cove Properties, LLC v. City of Carson*, No. CV14-3242-PSG-PJWx, 2015 WL 12860484, at *6 (C.D. Cal. 2015) (quoting first amended complaint). In rejecting the government's argument that the plaintiff failed to state facts establishing a "sufficiently severe" economic impact, the district court held that because the "plaintiff has pled that there was *at least some negative economic impact from [the government's] actions*, this factor is dispositive." *Id.* (emphasis added).[3]

---

[3]  *Colony Cove* should not apply for a third reason—it is wrongly decided. In suggesting that the "economic impact" factor from *Penn Central* may be assessed by "'compar[ing] the value that has been taken from the property with the value that remains in the property,'" the Court relied on *Keystone Bituminous Coal Ass'n*

In any event, it would be perverse as a matter of policy to require a claimant to somehow quantify and prove diminution in property values at the pleadings stage before the plaintiff has had a chance to develop their case through discovery. This requirement would be especially acute in the context of takings challenges to complex regulatory schemes where diminution may not be evident without retaining expert witnesses and marshaling facts through the use of traditional discovery tools. In fact, this is not only a bad policy that will slam the courthouse doors shut on legitimate takings claimants, but it is likely not even permissible in light of the Federal Rules of Civil Procedure. Requiring Appellants to plead specific diminutions in value would necessarily also require them to plead expert appraisal testimony in the complaint, which, in turn, would require the premature and unilateral disclosure of expert witness testimony in direct violation of the mutual expert exchange requirements. *See* Fed. R. Civ. P. 26(a)(2)(D).

Turning to the allegations contained in Appellants' complaint, it is alleged

---

*v. DeBenedictis*, 480 U.S. 470, 497 (1987). But *Keystone* is a predecessor case to claims now governed by *Lucas v. South Carolina Coastal Council—i.e.*, categorial "complete diminution" takings claims. *See Lucas*, 505 U.S. 1003, 1016 (1992) ("The second situation in which we have found categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land." (citing *Keystone*)). In short, *Colony Cove* conflates a standard only relevant to assessing whether a complete diminution in value has occurred (in which case plaintiffs must, of course, assert numeric diminution pre- and post-regulation), with the "essentially ad hoc" inquiry advanced by *Penn Central*.

that the economic impact to Appellants "is severe and ruinous" because Appellants are contractually entitled to receive monthly rent from tenants and "cannot long survive if tenants are permitted to continue occupying the properties rent-free for a sustained and indefinite period of time." ER-208 at ¶ 71. The complaint also alleges that "Plaintiffs' tenants are over $20 million in arrears, to date," and that the "Eviction Moratorium effectively prevents Plaintiffs from bringing unlawful detainer actions to oust nonpaying tenants and mitigate further losses." ER-208-09 at ¶ 71. "In addition to rent losses, Plaintiffs have also suffered on the order of several millions of dollars in lost interest and late fees," and "related financial losses attributable to the refusal of lending institutions to finance and/or refinance loans on Plaintiffs' apartment community properties, specifically on account of the Eviction Moratorium." ER-205 at ¶¶ 53–54. Therefore, Appellants allege, "[t]he Eviction Moratorium has resulted in a severe diminution in value of Plaintiffs' properties in an amount to be proven at trial." ER-205 at ¶ 56.

### B. The Eviction Moratorium Frustrated Appellants' Distinct Investment-Backed Expectations

The court below correctly found that the City's Eviction Moratorium frustrated Appellants' distinct investment-backed expectations, thus militating in favor of plausibility for Appellants' claim of a regulatory taking. ER-19–20. So, too, should this Court. "To 'expect' can mean to anticipate or look forward to, but it can also mean 'to consider probable or certain,' and 'distinct' means capable of

being easily perceived, or characterized by individualizing qualities." *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (en banc). "'Distinct investment-backed expectations' implies reasonable probability, *like expecting rent to be paid*, not starry eyed hope of winning the jackpot if the law changes. A landlord buys land burdened by lease-holds in order to acquire a stream of income from rents and the possibility of increased rents or resale value in the future." *Id.* (emphasis added).

As the district court and others have found in the context of takings and other challenges to eviction moratoria, "[t]he regulatory environment existing prior to the pandemic . . . gave Plaintiffs little reason to expect that they might be barred from evicting tenants for nonpayment of rent." ER-20; *see also Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 390 (D. Mass. 2020) (regarding distinct investment-backed expectations factor: "this court finds that a reasonable landlord would not have anticipated a virtually unprecedented event like the COVID-19 pandemic and the ensuing six-month ban on evicting and replacing tenants who do not pay rent"); *cf. Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*, 500 F. Supp. 3d 1088, 1095 (C.D. Cal. 2020), *aff'd*, 10 F.4th 905 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 1699 (2022) (regarding Contracts Clause challenge to City's Eviction Moratorium: "the scope and nature of the COVID-19 pandemic, and of the public health measures necessary to combat it, have no precedent in the modern era, and []

no amount of prior regulation could have led landlords to expect anything like the blanket Moratorium").

Here, Appellants complain that the Eviction Moratorium "has undermined Plaintiffs' 'reasonable investment-backed expectations'" because Plaintiffs have "developed and/or purchased their properties with the 'objectively reasonable' expectation that they would be able to charge rent for units and have legal recourse if tenants failed to pay rent when contractually due." ER-209 at ¶ 72. The complaint also alleges that Plaintiffs made these investments "against the backdrop of California's unlawful detainer statutory scheme." ER-209 at ¶ 72. Furthermore, Appellants alleged that the potential for landlords to recover back rents owed at some point in the future is "illusory," and that the recovery on interest or late fees deprived Appellants of the constitutional right to the time value of money. ER-209 at ¶ 73. In light of the case law cited above, Appellants' allegations are more than sufficient to satisfy pleading standards on this *Penn Central* factor.

### C. The Character of the Eviction Moratorium is Much More Akin to a Physical Invasion than a Mere "Adjustment" of Benefits and Burdens Between Appellants and Their Tenants

Finally, with respect to the third inquiry—the "character of the government action"—there is no question the City's Eviction Moratorium directly intrudes on Appellants' "right to exclude," which, as discussed above, is the touchstone for physical takings claims. The Supreme Court has already weighed in on this

particular factor in *Alabama Ass'n of Realtors* when it found that the less onerous CDC moratorium "intrudes on one of the most fundamental elements of property ownership—the right to exclude." 458 U.S. at 435; *see also, Lingle*, 544 U.S. at 539 (explaining the third regulatory takings factor).

Despite the Supreme Court's proclamation, the district court in this case once again found that *Yee*'s "consent" exception somehow converts the government-compelled occupation of Appellants' properties by non-paying, defaulting tenants to a "public program adjusting the benefits and burdens of economic life to promote the common good." *See* ER-21–22.

In doing so, the district court necessarily equated the "three factor" ad hoc test to a dispositive requirement that landlords affirmatively demonstrate satisfaction of each and every factor, much like minimum elements necessary to establish a tort action. That is not the test, as discussed above. All three factors need not weigh in favor of the property owner before courts may find a regulatory taking. *See Hodel*, 481 U.S. at 715–16 (regulatory taking found exclusively based on the character of the government action). At bottom, the complaint in this case more than adequately pleads enough facts to establish the relatively low "plausibility" requirement for pleading purposes:

> Finally, the "character of the government action" is tantamount to a physical invasion of private property. . . . The Eviction Moratorium effectively requires that Plaintiffs allow their tenants to occupy their properties free of charge and requires Plaintiffs

> to allow their tenants to remain in possession for the foreseeable
> future.

ER-209–10, at ¶ 74.

By deciding as a matter of law that Appellants did not meet the pleading requirements on what the Supreme Court has held to be an ad hoc, factually-intensive analysis, the district court deprived Appellants of their constitutional right to a trial by jury on both liability for the taking and damages, *i.e.*, just compensation. *See City of Monterey v. Del Monte Dunes Monterey, LTD.*, 526 U.S. 687, 720-21 (1999) (holding property owner maintains right to trial by jury for both liability and damages on regulatory taking claim).

## III. The District Court Should Not Have Granted the Motion to Intervene

Appellants only seek to recover just compensation for the substantial losses they have sustained as a result of the City of Los Angeles's COVID-19 Eviction Moratorium. Asserting only as-applied takings claims under the United States and California Constitutions, Appellants did not request, and cannot obtain, declaratory or injunctive relief invalidating or enjoining the Eviction Moratorium. *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2179 (2019) ("Governments need not fear that our holding will lead federal courts to invalidate their regulations as unconstitutional [takings]," provided that "just compensation remedies are available.").

Even though Appellants only seek compensation from the City, the district

court below allowed Intervenors a seat at the table in this litigation *as a matter of right*. But intervention by right is wholly improper under the circumstances. At most, Intervenors represent concerned citizens who fear that a monetary judgment against the City, or a declaration of a taking of Appellants' property interests, might have motivated the City to prematurely rescind its Ordinance to avoid takings liability.[4]

Intervenors likewise should have not prevailed in the alternative on a claim of permissive intervention. Indeed, permissive intervention is completely improper where the named party with whom the intervenors seek to join forces is properly incentivized to defend itself in the litigation. The City has far more at stake than Intervenors (and their members) and all may rest assured that the City could adequately defend itself.

### A. The District Court Should Not Have Allowed Intervenors into the Litigation as a Matter of Right

Intervention as a matter of right is governed by Rule 24 of the Federal Rules of Civil Procedure. Such intervention "shall be permitted" when: (1) a federal statute confers the unconditional right to intervene in the action, or (2) the applicant claims an interest which may, as a practical matter, be impaired or impeded by disposition

---

[4] If that were the standard, nothing would separate Intervenors from any other concerned citizen who is concerned that a monetary judgment against the City might take dollars away from a public program the citizen wants the City to operate.

of the pending action, and that interest is not adequately represented by existing parties. *See* Fed. R. Civ. Proc. 24(a); *California ex rel. Lockyer v. United States*, 450 F.3d 436, 440 (9th Cir. 2006). The second criteria is relevant here.

In determining whether intervention as of right is appropriate, courts apply a four-part test: (1) the motion must be timely, (2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action, (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest, and (4) the applicant's interest must be inadequately represented by the parties to the action. *Sierra Club v. EPA*, 995 F.2d 1478, 1481 (9th Cir. 1993). The applicant bears the burden of showing that *all* of the four elements are met. *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 841 (9th Cir. 2011). Intervenors cannot satisfy the latter three elements.

        a. <u>Intervenors Cannot Claim a Significantly Protectable Interest Where Appellants Seek Only Just Compensation from the City</u>

"An applicant has a 'significant protectable interest' in an action if (1) it asserts an interest that is protected under some law,[5] and (2) there is a 'relationship' between its legally protected interest and the plaintiff's claims." *Donnelly v.*

---

5  Appellants will assume as much *arguendo* but without conceding the issue, particularly now that the Eviction Moratorium has expired prospectively as of February 1, 2023. MJN-5.

*Glickman*, 159 F.3d 405, 409 (9th Cir. 1998). "An applicant generally satisfies the 'relationship' requirement only if the resolution of the plaintiff's claims *actually will affect* the applicant." *Id.* at 410 (emphasis added); *see also Greene v. United States*, 996. F.2d 973, 976–78 (9th Cir. 1993) (holding that an applicant lacked a "significant protectable interest" in an action where the resolution of a plaintiff's claims would not affect the applicant directly).

While it is true that a significant protectable interest "will be found if a legally protected interest will suffer a practical impairment in the pending litigation," the Ninth Circuit has subsequently clarified that this interest cannot be predicated on remote possibilities and speculation. *Cooper v. Newsom*, 13 F.4th 857, 865 (9th Cir. 2021). As *Cooper* noted, "an intervenor's claimed interest cannot be 'several degrees removed from the [issues] that are the backbone of [the] litigation,'" and that "a would-be intervenor cannot 'rely on an interest that is wholly remote and speculative.'" *Id.* at 867 (quoting *United States v. Alisal Water Corp.*, 370 F.3d 915, 920 (9th Cir. 2004); *City of Emeryville v. Robinson*, 621 F.3d 1251, 1259 (9th Cir. 2010)).

That is precisely the case here. Intervenors' argument, which the court below adopted, was predicated on the speculative idea

> that a declaratory judgment in Plaintiffs' favor *could* be used by other landlords to obtain injunctive relief, or compel the City to, in the face of overwhelming liability for compensatory payments, end the emergency declaration and terminate the

> Moratorium earlier than COVID and its attendant economic effects would otherwise dictate.

ER-29 (quoting Mot. to Intervene at 14:21–28 (*see* ER-108)) (emphasis added).

Thus, the only argument that Intervenors can make is one that is "several degrees removed" from the "backbone" of present action, which is at base a claim for just compensation. *Compare Cooper*, 13 F.4th at 867, *with* ER-29 (citing and relying upon Intervenors' stated interests). For Intervenors' argument to have purchase, the Court must necessarily assume that (1) Appellants will ultimately be successful; (2) Appellants will secure a large just compensation award as a result of that success; (3) other landlords will also secure just compensation awards; (4) those awards will accrue to such a degree that the City would decide to rescind its eviction protections "prematurely"; and (5) Intervenors and similar tenants-rights groups would not successfully lobby the City to retain the protections, despite their prior successes in lobbying for the same. Only after each and all of these uncertainties comes to pass would Intervenors have a colorable claim. This type of contingent interest that depends on wholly uncertain future events is akin to that which this Court warned against in *Alisal Water Corp.*, as allowing intervention under these circumstances would create an "open invitation" for virtually any interest group to intervene in a lawsuit where just compensation (or perhaps any damages) might be awarded against a city. 370 F.3d at 920. After all, one of the explicit bases for Intervenors' motion also rested on the capacious notion that "[t]he City's liability

for a judgment here and in sure-to-follow cases by other landlords could cause a reduction in key services" due to subsequent impacts to the City's budget. ER-109. If that is the standard, then Rule 24(a) converts every district court into a town hall meeting.

        b.     <u>The Payment of Just Compensation Will Not "Practically Impair" Intervenors Non-Existent Protectable Interest</u>

Intervenors largely repeated their speculative arguments regarding this element in the court below, principally stating that "[a] finding that the Ordinances effect a taking here could very well open the floodgates to more takings lawsuits against the City, with the effect of pushing the City to sunset the protections prematurely." ER-108. Interestingly, Intervenors do not cite any actual, hard evidence to that effect in their briefing. *See* ER-108–110. The declaration of Joseph Delgado that is cited to prove as much doesn't even address the effects of the City supposedly rescinding the ordinance if Appellants are successful. *See* ER-123–126, at ¶¶ 11–18. The declaration of Larry Gross is couched in conditional and uncertain language: "If this lawsuit is successful and the Ordinances are deemed a taking, it would wreak havoc . . . . We fear it would lead to the end of the Ordinances[.]" ER-139, at ¶ 6. And finally, Cynthia Strathmann's declaration merely opines that "[i]f this lawsuit succeeds, we are fearful it will erode the foundation of the city's efforts to protect tenants and may result in a repeal of many or most of the Ordinance's provisions." ER-133, at ¶ 13. Even though courts must accept as true non-

conclusory allegations made in support of an intervention motion (*Sw. Ctr. For Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001)), the only thing these declarations can possibly establish is that the Intervenors "fear" the end of the Eviction Moratorium and that it is their belief that this lawsuit "may result" in its repeal, and nothing more.

In sum, Intervenors wholly failed to carry their burden that some significantly protectable interest exists, and moreover that this litigation will have any "practical effect" on—or shares any actual relation to—that non-existent interest. The court below was wrong to validate such conjecture and abstraction.

> c.     <u>The City Adequately Represents the Intervenors' Interests Because They Share the Same Ultimate Objective</u>

"This Court considers three factors in determining the adequacy of representation: (1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect." *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003). "The most important factor in determining the adequacy of representation is how the interest compares with the interests of existing parties." *Id.* So, when an applicant for intervention and an existing party "have the same ultimate objective," a presumption of adequate representation applies, and applicants must offer "a

compelling showing" to the contrary. *Id.* (citing *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1305 (9th Cir. 1997)). Importantly, "[t]here is also an assumption of adequacy when the government is acting on behalf of a constituency it represents. . . . In the absence of a '*very* compelling showing to the contrary,' it will be presumed that the state adequately represents its citizens when the applicant shares the same interest." *Id.* (quoting *United States v. City of Los Angeles*, 288 F.3d 391, 401 (9th Cir. 2002)) (emphasis added). "Where parties share the same ultimate objective, differences in litigation strategy do not normally justify intervention." *Id.*

This Court has routinely found that where a government defends the constitutionality of an enactment, it is safely presumed that it adequately represents the interests of those who fall under the enactment. For example, in *League of United Latin American Citizens*, the plaintiff brought a lawsuit challenging California's Proposition 187, which had been enacted by the voters. 131 F.3d at 1301. A public interest group brought a motion to intervene as of right, claiming— as Intervenors did here—that it participated in the drafting and sponsorship of the proposition and desired to intervene in support of its defense. *Id.* The district court denied the motion, and the Ninth Circuit affirmed. The Ninth Circuit noted in highly-persuasive dicta that intervenor-applicant's interests were adequately represented by the state defendants. *Id.* Given that the proposed intervenor's "ultimate objective" (*i.e.*, to ensure that Prop 187 was upheld and constitutional on

the merits) was identical to that of the state defendants, the Ninth Circuit noted, "the undisputed facts of this case do not even begin to rebut the presumption of adequacy . . . on the contrary, they bear it out." *Id.* at 1305. As such, there was "simply . . . no reason to believe . . . that [Governor] Wilson and [Attorney General] Lungren cannot be 'count[ed] on' . . . to argue vehemently in favor of the constitutionality of Prop 187." *Id.* at 1306. The same can be said for the City here.

Similarly, in *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603 (9th Cir. 2020), two environmental groups argued that they were entitled to intervene in an action challenging a city ordinance that barred the transport of coal through a commercial terminal. *Id*. at 607. In analyzing the issue, this Court emphasized that to establish inadequate representation, the intervenors needed to make a "very compelling showing" because: (1) a governmental entity (Oakland) was already acting on behalf of their interests in the action; and (2) intervenors and Oakland shared the same ultimate objective of upholding the Ordinance and Resolution. *Id.*; *see also Arakaki*, 324 F.3d at 1086 (a "very compelling showing" is required to rebut a "presumption of adequacy" when "the government is acting on behalf of a constituency it represents" or when the applicant and existing party "have the same ultimate objective").

The intervenors in *Oakland Bulk* advanced several arguments in support of an alleged inadequate representation, including arguments indistinguishable from those

made by Intervenors below. The Ninth Circuit rejected all such arguments.

For example, the Court held that the mere fact that the intervenors had a narrower focus than the City—*i.e.*, "a focus on health, safety and environmental protections, as opposed to Oakland's broader concerns that included such matters as the City's finances and its contractual relationship[s] —was "insufficient" to rebut the presumption of adequacy. *Oakland Bulk*, 960 F.3d at 620. Rather, a party seeking to intervene "must proffer sufficient 'evidence' to show that government will take [an] undesirable legal position." *Id.* ("Intervenors failed to offer persuasive evidence, at the time of their motion to intervene, that Oakland's broader interests would lead it to stake out an undesirable legal position. The presumption of adequacy thus remained intact." (citing *Prete v. Bradbury*, 438 F.3d 949, 957 (9th Cir. 2006)). Second, the Court rejected the argument that the city was neither positioned nor willing to make all of intervenors' arguments, finding such argument was unsupported by the record. *Id.* Finally, the Court rejected intervenors' argument that their expertise in environmental issues warranted intervention of right, finding that a city's lack of specialized knowledge is insufficient to rebut the presumption of adequacy absent an "evidentiary showing that the government could not obtain that knowledge through discovery or experts." *Id.* at 621 (citing *Prete*, 438 F.3d at 958–59).

In short, Intervenors failed to establish the "very compelling showing"

necessary to rebut two layers of presumptions that this Court is obligated to apply—namely, that the Intervenors and the City share the "same ultimate objective" of defending the Eviction Moratorium, and that the City is a government entity that is presumed to adequately represent its citizens, which necessarily includes Intervenors' members.

## B.  The District Court Abused Its Discretion by Allowing Permissive Intervention in the Alternative

Finally, the district court abused its discretion by holding that it "would grant permission to intervene" pursuant to Fed. R. Civ. P. 24(b)(1)(B).  ER-33 n.2.  The court did not provide any further reasoning for its alternative holding.  *Id.*

Permissive intervention may be allowed in the court's discretion when: (1) a federal statute confers a conditional right to intervene, or (2) the applicant's "*claim or defense*" and the main action involve a common question of law or fact, and (3) allowing intervention will not "unduly delay or prejudice the adjudication of the original parties' rights."  *Id.* (emphasis added).  The court may consider such matters as: (1) the nature and extent of the would-be intervenors' interests, (2) the legal position they seek to advance, and its probable relation to the merits of the case, (3) whether intervention will prolong or unduly delay the litigation, and (4) whether the intervenors' interests are adequately represented by other parties. *Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 955 (9th Cir. 2009).

Many of the reasons for rejecting intervention by right are equally applicable

to rejecting permissive intervention; the City and Intervenors share the same ultimate objective, and the City will adequately represent those interests in the litigation. It bears repeating once more: Appellants only seek just compensation from the City. They bring such claims under federal and state constitutional provisions guaranteeing their right to just compensation in the event the City appropriates their property rights. There is simply no "claim" or "defense" that Intervenors can offer this litigation that would serve to assist the court in adjudicating a takings claim. It was an abuse of discretion for the court below to hold in the alternative that it would have granted permissive intervention.

### C. The Remedy: This Court Should Excise Intervenors from this Litigation on Remand

Given that this case is merely at the pleadings stage and there remains ample time to correct the lower court's error, this Court should reverse the district court's order granting intervention and order removal of Intervenors as a defending party from this litigation on remand.

## CONCLUSION

For the foregoing reasons, the district court's judgment dismissing Appellants' complaint should be reversed, and further, the district court's order granting intervention should be reversed and remanded with instructions to excise Intervenors from the case moving forward.

Dated:  April 14, 2023                    RUTAN & TUCKER, LLP
                                          DOUGLAS J. DENNINGTON
                                          JAYSON A. PARSONS


                                          By: _____*/s/ Douglas J. Dennington*_____
                                          Douglas J. Dennington
                                          *Attorneys for Plaintiffs-Appellants*

## STATEMENT OF RELATED CASES

*El Papel, LLC v. City of Seattle*, No. 22-35656, is related to this case within the meaning of Circuit Rule 28-2.6. In *El Papel*, appellants challenge a city's COVID-related residential eviction moratorium on physical, *per se* takings grounds, as appellants do in part here. Oral argument was heard in *El Papel* on April 10, 2023 in Seattle before Judges Bybee, Forrest, and District Judge Gordon (D. Nev.).

*Jevons v. Inslee*, No. 22-35050, is related to this case within the meaning of Circuit Rule 28-2.6. In *Jevons*, appellants challenge a state's eviction moratorium in part by raising a physical, *per se* takings claim, as here. Oral argument was heard in *Jevons* on April 10, 2023 in Seattle before Judges Bybee, Forrest, and District Judge Gordon (D. Nev.).

# ADDENDUM OF STATUTORY AUTHORITY

# ARTICLE 14.6

# TEMPORARY PROTECTION OF TENANTS DURING COVID-19 PANDEMIC

**(Added by Ord. No. 186,585, Eff. 3/31/20; Amended in Entirety by Ord. No. 186,606, Eff. 5/12/20.)**

Section
49.99   Findings.
49.99.1   Definitions.
49.99.2   Prohibition on Residential Evictions.
49.99.3   Prohibition on Commercial Evictions.
49.99.4   Prohibition on Removal of Occupied Residential Units.
49.99.5   Retroactivity.
49.99.6   Affirmative Defense.
49.99.7   Private Right of Action for Residential Tenants.
49.99.8   Penalties.
49.99.9   Severability.

### SEC. 49.99. FINDINGS.

The City of Los Angeles is experiencing an unprecedented public health crisis brought by the Coronavirus, which causes an acute respiratory illness called COVID-19.

On March 4, 2020, the Governor of the State of California declared a State of Emergency in California as result of the COVID-19 pandemic. That same day, the Mayor also declared a local emergency.

On March 16, 2020, the Governor issued Executive Order N-28-20, which authorizes local jurisdictions to suspend certain evictions of renters and homeowners, among other protections. The Executive Order further authorizes the City of Los Angeles to implement additional measures to promote housing security and stability to protect public health and mitigate the economic impacts of the COVID-19 pandemic.

The economic impacts of COVID-19 have been significant and will have lasting repercussions for the residents of the City of Los Angeles. National, county, and city public health authorities issued recommendations, including, but not limited to, social distancing, staying home if sick, canceling or postponing large group events, working from home, and other precautions to protect public health and prevent transmission of this communicable virus. Residents most vulnerable to COVID-19, including those 65 years of age or older, and those with underlying health issues, have been ordered to self-quarantine, self-isolate, or otherwise remain in their homes. Non-essential businesses have been ordered to close. More recent orders from the Governor and the Mayor have ordered people to stay at home and only leave their homes to visit or work in essential businesses. As a result, many residents are experiencing unexpected expenditures or substantial loss of income as a result of business closures, reduced work hours, or lay-offs related to these government-ordered interventions. Those already experiencing homelessness are especially vulnerable during this public health crisis.

The COVID-19 pandemic threatens to undermine housing security and generate unnecessary displacement of City residents and instability of City businesses. Therefore, the City of Los Angeles has taken and must continue to take measures to protect public health, life, and property.

This ordinance temporarily prohibits evictions of residential and commercial tenants for failure to pay rent due to COVID-19, and prohibits evictions of residential tenants during the emergency for no-fault reasons, for unauthorized occupants or pets, and for nuisance related to COVID-19. This ordinance further suspends withdrawals of occupied residential units from the rental market under the Ellis Act, Government Code Section 7060, et seq.

### SEC. 49.99.1. DEFINITIONS.

The following words and phrases, whenever used in this article, shall be construed as defined in this section:

A. **Commercial Real Property.** "Commercial real property" is any parcel of real property that is developed and used either in part or in whole for commercial purposes. This does not include commercial real property leased by a multi-national company, a publicly traded company, or a company that employs more than 500 employees.

B. **Endeavor to Evict.** "Endeavor to evict" is conduct where the Owner lacks a good faith basis to believe that the tenant does not enjoy the benefits of this article and the Owner serves or provides in any way to the tenant: a notice to pay or quit, a notice to perform covenant or quit, a notice of termination, or any other eviction notice.

C. **Local Emergency Period.** "Local emergency period" is the period of time from March 4, 2020, to the end of the local

emergency as declared by the Mayor.

D.  **No-fault Reason.** "No-fault reason" is any no-fault reason under California Civil Code Section 1946.2(b) or any no-fault reason under the Rent Stabilization Ordinance.

E.  **Owner.** "Owner" is any person, acting as principal or through an agent, offering residential or Commercial Real Property for rent, and includes a successor in interest to the owner.

F.  **Residential Real Property.** "Residential real property" is any dwelling or unit that is intended or used for human habitation.

## SEC. 49.99.2. PROHIBITION ON RESIDENTIAL EVICTIONS.

A.  During the Local Emergency Period and for 12 months after its expiration, no Owner shall endeavor to evict or evict a residential tenant for non-payment of rent during the Local Emergency Period if the tenant is unable to pay rent due to circumstances related to the COVID-19 pandemic. These circumstances include loss of income due to a COVID-19 related workplace closure, child care expenditures due to school closures, health-care expenses related to being ill with COVID-19 or caring for a member of the tenant's household or family who is ill with COVID-19, or reasonable expenditures that stem from government-ordered emergency measures. Tenants shall have up to 12 months following the expiration of the Local Emergency Period to repay any rent deferred during the Local Emergency Period. Nothing in this article eliminates any obligation to pay lawfully charged rent. However, the tenant and Owner may, prior to the expiration of the Local Emergency Period or within 90 days of the first missed rent payment, whichever comes first, mutually agree to a plan for repayment of unpaid rent selected from options promulgated by the Los Angeles Housing Department ("LAHD") for that purpose. **(Amended by Ord. No. 187,122, Eff. 8/8/21.)**

B.  No Owner shall endeavor to evict or evict a residential tenant for a no-fault reason during the Local Emergency Period.

C.  No Owner shall endeavor to evict or evict a residential tenant based on the presence of unauthorized occupants or pets, or for nuisance related to COVID-19 during the Local Emergency Period.

D.  No Owner shall charge interest or a late fee on rent not paid under the provisions of this article.

E.  An Owner shall: (i) provide written notice to each residential tenant of the protections afforded by this article ("Protections Notice") within 15 days of the effective date of this ordinance; and (ii) provide the Protections Notice during the Local Emergency Period and for 12 months after its termination each time the Owner serves a notice to pay or quit, a notice to terminate a residential tenancy, a notice to perform covenant or quit, or any eviction notice, including any notice required under California Code of Civil Procedure Section 1161 and California Civil Code Section 1946.1. LAHD shall make available the form of the Protections Notice, which must be used, without modification of content or format, by the Owner to comply with this subparagraph. LAHD will produce the form of the Protections Notice in the most commonly used languages in the City, and an Owner must provide the Protections Notice in English and the language predominantly used by each tenant. **(Amended by Ord. No. 187,122, Eff. 8/8/21.)**

F.  No Owner shall influence or attempt to influence, through fraud, intimidation or coercion, a residential tenant to transfer or pay to the Owner any sum received by the tenant as part of any governmental relief program.

G.  Except as otherwise specified in this article, nothing in this section shall prohibit an Owner from seeking to evict a residential tenant for a lawful purpose and through lawful means.

## SEC. 49.99.3. PROHIBITION ON COMMERCIAL EVICTIONS.

During the Local Emergency Period and for three months thereafter, no Owner shall endeavor to evict or evict a tenant of Commercial Real Property for non-payment of rent during the Local Emergency Period if the tenant is unable to pay rent due to circumstances related to the COVID-19 pandemic. These circumstances include loss of business income due to a COVID-19 related workplace closure, child care expenditures due to school closures, health care expenses related to being ill with COVID-19 or caring for a member of the tenant's household or family who is ill with COVID-19, or reasonable expenditures that stem from government-ordered emergency measures. Tenants shall have up to three months following the expiration of the Local Emergency Period to repay any rent deferred during the Local Emergency Period. Nothing in this article eliminates any obligation to pay lawfully charged rent. No Owner shall charge interest or a late fee on rent not paid under the provisions of this article.

## SEC. 49.99.4. PROHIBITION ON REMOVAL OF OCCUPIED RESIDENTIAL UNITS.

No Owner may remove occupied Residential Real Property from the rental market under the Ellis Act, Government Code Section 7060, et seq., during the pendency of the Local Emergency Period. Tenancies may not be terminated under the Ellis Act until 60 days after the expiration of the Local Emergency Period.

### SEC. 49.99.5. RETROACTIVITY.

This article applies to nonpayment eviction notices, no-fault eviction notices, and unlawful detainer actions based on such notices, served or filed on or after the date on which a local emergency was proclaimed. Nothing in this article eliminates any obligation to pay lawfully charged rent.

### SEC. 49.99.6. AFFIRMATIVE DEFENSE.

Tenants may use the protections afforded in this article as an affirmative defense in an unlawful detainer action.

### SEC. 49.99.7. PRIVATE RIGHT OF ACTION FOR RESIDENTIAL TENANTS.

If an Owner violates Section 49.99.2, except for 49.99.2(E)(i), an aggrieved residential tenant may institute a civil proceeding for injunctive relief, direct money damages, and any other relief the Court deems appropriate, including, at the discretion of the Court, an award of a civil penalty up to $10,000 per violation depending on the severity of the violation. If the aggrieved residential tenant is older than 65 or disabled, the Court may award an additional civil penalty up to $5,000 per violation depending on the severity of the violation. The Court may award reasonable attorney's fees and costs to a residential tenant who prevails in any such action. The Court may award reasonable attorney's fees and costs to an Owner who prevails in any such action and obtains a Court determination that the tenant's action was frivolous. A civil proceeding by a residential tenant under this section shall commence only after the tenant provides written notice to the Owner of the alleged violation, and the Owner is provided 15 days from the receipt of the notice to cure the alleged violation. The remedies in this paragraph apply on the effective date of this section, and are not exclusive nor preclude any person from seeking any other remedies, penalties or procedures provided by law.

### SEC. 49.99.8. PENALTIES.

Upon the effective date of this section, an Owner who violates this article shall be subject to the issuance of an administrative citation as set forth in Article 1.2 of Chapter I of this Code. Issuance of an administrative citation shall not be deemed a waiver of any other enforcement remedies provided in this Code.

### SEC. 49.99.9. SEVERABILITY.

If any provision of this article is found to be unconstitutional or otherwise invalid by any court of competent jurisdiction, that invalidity shall not affect the remaining provisions of this article which can be implemented without the invalid provisions, and to this end, the provisions of this article are declared to be severable. The City Council hereby declares that it would have adopted this article and each provision thereof irrespective of whether any one or more provisions are found invalid, unconstitutional or otherwise unenforceable.

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**        23-55013

I am the attorney or self-represented party.

**This brief contains 13,070 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ **X** ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Douglas J. Dennington        **Date April 14, 2023**
*(use "*s/[typed name]*" to sign electronically-filed documents)*

# CERTIFICATE OF SERVICE

Case Name:   *GHP Management Corporation, et al. vs. City of Los Angeles, et al.*
No.    23-55013


I hereby certify that on April 14, 2023, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## APPELLANTS' OPENING BRIEF

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on [Date], at Irvine, California.


Patricia Johnson                          */s/ Patricia Johnson*
Declarant                                   Signature