No. 23-55013

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

**GHP MANAGEMENT CORPORATION, et al.,**
Plaintiffs and Appellants,

v.

**CITY OF LOS ANGELES**
Defendant and Appellee,

**STRATEGIC ACTIONS FOR A JUST ECONOMY, et al.,**
Intervenors, Defendants, and Appellees

_____

Appeal from the United States District Court
for the Central District of California
Case No. 2:21-cv-06311-DDP (JEMx)
Hon. Dean D. Pregerson

_____

**ANSWERING BRIEF**
_____

**HYDEE FELDSTEIN SOTO,** City Attorney (SBN 106866)
**DENISE C. MILLS,** Chief Deputy City Attorney (SBN 191992)
**SCOTT MARCUS,** Chief Assistant City Attorney (SBN 184980)
**JONATHAN H. EISENMAN,** Deputy City Attorney (SBN 279291)
200 North Spring Street, City Hall, Suite 1400, Los Angeles, CA 90012
(213) 978-2212 | Jonathan.Eisenman@lacity.org

*Attorneys for Defendant and Appellee*
CITY OF LOS ANGELES

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................... 2

TABLE OF AUTHORITIES ............................................................. 5

INTRODUCTION ............................................................................ 10

JURISDICTIONAL STATEMENT ............................................... 14

ISSUES ON APPEAL .................................................................... 15

STATEMENT OF THE CASE ....................................................... 16

    A.    The City of Los Angeles—like the County of Los Angeles and the State of California—enacts measures to keep tenants from being evicted while the COVID-19 pandemic required them to stay home. ............................................................... 16

    B.    Across the country, emergency tenant protections spawn a wave of litigation, including this case. ................................. 21

    C.    In line with virtually every other court to consider the issue, the district court dismisses landlord GHP's claim that the City's tenant protections effected a per se taking of its property, and dismisses the action entirely when GHP declines to amend its complaint to state a regulatory takings claim. ................................................................................... 24

SUMMARY OF ARGUMENT .................................................... 27

ARGUMENT .........................................................................................29

I.   There is a fatal justiciability problem with GHP's claim that the City effected takings by thwarting evictions of tenants in default: It appears that GHP never tried to evict those tenants in the first place. ............................................................................................30

II.  Regardless, GHP has no viable claim that the City effected a per se taking by creating a temporary affirmative defense against eviction, because limitations on a landlord's ability to evict invited tenants are analyzed as ad hoc regulatory takings. ......................37

     A.   *Yee v. City of Escondido* and its forebears hold that limitations on a landlord's ability to evict invited tenants, like those at issue in this case, are not per se takings. .........38

          1.   *Block v. Hirsh* holds that combined rent and eviction controls do not amount to takings—in 1921. ..............38

          2.   *Loretto v. Teleprompter Manhattan CATV Corp.* collects "substantial authority" to confirm governments' "broad power" to regulate "the landlord-tenant relationship in particular" without effecting a taking. ........................................................................41

          3.   *Federal Communication Commission v. Florida Power Corp.* teaches that when a property owner invites a tenant, measures that govern their relationship—including measures that require the owner to allow the tenant to remain at substantially reduced rent—do not amount to per se takings. ...........................................42

          4.   *Yee v. City of Escondido* holds that once a landlord invites tenants to lease property, a government can prevent the landlord from evicting those tenants for all kinds of reasons without effecting a per se taking. ......44

B.    The line of cases culminating in *Yee* demonstrates that the City hasn't effected a per se taking of GHP's property by temporarily providing—during a once-in-a-century emergency—an affirmative defense against eviction, for a limited range of defaults, and without excusing any rent debt. ....................................................................... 47

C.    The Supreme Court has neither questioned any of this authority nor given other courts license to disregard it ....... 53

D.    *Heights Apartments, LLC v. Walz*, the one decision that declined to apply *Yee* to COVID-19 eviction protections, produced a dissent from denial of rehearing that has proven more persuasive than the opinion itself. ............................ 56

III.  GHP's refusal to amend its pleadings, including to allege a viable regulatory taking, puts an end to this action decisively. .............. 62

A.    GHP failed to allege the requisite economic impact to make out a regulatory taking. ....................................................... 62

B.    GHP's decision to forgo amendment prevents it from seeking leave to allege an economic impact properly—or from asking for a remand to fix anything else that has doomed its complaint. ................................................................................ 66

CONCLUSION ................................................................... 67

APPENDIX ......................................................................... 68

1.    Los Angeles Municipal Code § 49.99 (2020) ............... 69

2.    Los Angeles Ordinance 187,736 (Jan. 27, 2023) ......... 75

3.    California Rules of Court Emergency Rule 1 ............. 79

4.    County of Los Angeles COVID-19 Tenant Protections Resolution (Sept. 28, 2021) ......................................... 96

CERTIFICATE OF COMPLIANCE ....................................... 124

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alabama Ass'n of Realtors v. Department of Health & Human Services,*
141 S. Ct. 2485 (2021) ................................................................ 54, 55

*Andrus v. Allard,*
444 U.S. 51 (1979) .............................................................................. 41

*Apartment Ass'n of L.A. Cnty., Inc. v. City of L.A.,*
10 F.4th 905 (9th Cir. 2021) ............................................................ 21

*Auracle Homes, LLC v. Lamont,*
478 F. Supp. 3d 199 (D. Conn. 2020) .............................................. 25

*Balser v. Dep't of Justice,*
327 F.3d 903 (9th Cir. 2003) ............................................................ 66

*Baptiste v. Kennealy,*
490 F. Supp. 3d 353 (D. Mass. 2020) ............................................. 25

*Birkenfeld v. City of Berkeley,*
550 P.2d 1001 (Cal. 1976) ................................................................ 18

*Blackburn v. Dare Cnty.,*
58 F.4th 807 (4th Cir. 2023) ............................................................ 63

*Block v. Hirsh,*
256 U.S. 135 (1921) .................................................................. *passim*

*Bridge Aina Le'a, LLC v. Haw. Land Use Comm'n,*
950 F.3d 610 (9th Cir. 2020) ...................................................... 29, 63

*Cedar Point Nursery v. Hassid,*
141 S. Ct. 2063 (2021) .............................................. 29, 53, 57, 58

*Christian Legal Soc'y v. Wu,*
626 F.3d 483 (9th Cir. 2010) ............................................................. 37

*Clapper v. Amnesty Int'l, USA,*
568 U.S. 398 (2013) ........................................................................ 35

*Colony Cove Properties LLC v. City of Carson,*
888 F.3d 445 (9th Cir. 2018) .............................. 15, 17, 63, 64

*CoreCivic, Inc. v. Candide Group, LLC,*
46 F.4th 1136 (9th Cir. 2022) ......................................................... 64

*Edgar A. Levy Leasing Co. v. Siegel,*
258 U.S. 242 (1922) ........................................................................ 42

*El Papel LLC v. Durkan,*
No. 2:20-cv-01323-RAJ-JRC, 2021 WL 4272323
(W.D. Wash. Sept. 15, 2021) ........................................................ 25

*Elmsford Apartment Assocs. v. Cuomo,*
469 F. Supp. 3d 148 (S.D.N.Y. 2020) ............................................. 25

*Farhoud v. Brown,*
No. 3:20-cv-2226-JR, 2022 WL 326092 (D. Or. Feb. 3, 2022) ............. 25

*Federal Communications Commission v. Florida Power Corp.,*
480 U.S. 245 (1987) .......................................... 42, 43, 44, 50

*Gallo v. District of Columbia,*
610 F. Supp. 3d 73 (D.D.C. 2022) .............................................. 25, 61

*Gonzales v. Inslee,*
504 P.3d 890 (Wash. Ct. App. 2022) ............................................. 25

*Heights Apartments, LLC v. Walz (Heights Apartments I),*
30 F.4th 720 (8th Cir. 2022) ..................................................... *passim*

*Heights Apartments, LLC v. Walz (Heights Apartments II),*
39 F.4th 479 (8th Cir. 2022) .............................................. 60, 61, 62

*Hodel v. Irving,*
481 U.S. 704 (1987) ................................................................. 64, 65

*Hodel v. Va. Surface Mining & Reclamation Ass'n,*
   452 U.S. 264 (1981) ............................................................... 31

*Home Building & Loan Ass'n v. Blaisdell,*
   290 U.S. 398 (1934) ...................................................... 41, 42

*Horne v. U.S. Department of Agriculture,*
   576 U.S. 350 (2015) ............................................................... 54

*Jevons v. Inslee,*
   561 F. Supp. 3d 1082 (E.D. Wash. 2021) ..................... 21, 25

*Knick v. Twp. of Scott,*
   139 S. Ct. 2162 (2019) ......................................................... 30

*Loretto v. Teleprompter Manhattan CATV Corp.,*
   458 U.S. 419 (1982) .................................................... *passim*

*Love Terminal Partners, L.P. v. United States,*
   889 F.3d 1331 (Fed. Cir. 2018) .......................................... 63

*Lucas v. S.C. Coastal Council,*
   505 U.S. 1003 (1992) ........................................................... 29

*Matorin v. Commonwealth,*
   No. 2084CV01334, 2020 WL 12847146
   (Mass. Super. Ct. Aug. 26, 2020) ....................................... 25

*McGinty v. Procter & Gamble Co.,*
   69 F.4th 1093 (9th Cir. 2023) ............................................ 30

*Murr v. Wisconsin,*
   582 U.S. 383 (2017) ............................................................... 63

*Pa. Coal Co. v. Mahon,*
   260 U.S. 393 (1922) ...................................................... 29, 39

*Pakdel v. City & Cnty. of S.F.,*
   141 S. Ct. 2226 (2021) ......................................................... 31

*Penn Central Transportation Co. v. City of New York,*
   438 U.S. 104 (1978) .............................................. 23, 30, 62

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
  490 U.S. 477 (1989) ............................................................... 56

*S. Cal. Rental Housing Ass'n v. Cnty. of San Diego*,
  550 F. Supp. 3d 853 (S.D. Cal. 2021) ................................... 25

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) .................................................................. 34

*Suitum v. Tahoe Reg'l Plan. Agency*,
  520 U.S. 725 (1997) ................................................................ 31

*Thomas v. Anchorage Equal Right Comm'n*,
  220 F.3d 1134 (9th Cir. 2000) ......................................... 33, 34

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*,
  513 U.S. 18 (1994) .................................................................. 56

*United States v. Sharpe*,
  470 U.S. 675 (1985) ................................................................ 55

*Vasquez v. Rackauckas*,
  734 F.3d 1025 (9th Cir. 2013) ............................................... 37

*W. Land Office, Inc. v. Cervantes*,
  220 Cal. Rptr. 784 (Cal. Ct. App. 1985) ............................... 32

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ................................................................ 35

*WildEarth Guardians v. U.S. Forest Serv.*,
  70 F.4th 1212 (9th Cir. 2023) ................................................ 34

*Williams v. Alameda Cnty.*,
  No. 3:22-cv-01274-LB, 2022 WL 17169833
  (N.D. Cal. Nov. 22, 2022) ......................................... 21, 25, 61

*Yee v. City of Escondido*,
  503 U.S. 519 (1992) ....................................................... *passim*

## Statutes

28 U.S.C. § 1291 ........................................................................14

28 U.S.C. § 1343 ........................................................................14

28 U.S.C. § 1367 ........................................................................14

42 U.S.C. § 1983 ........................................................................14

Cal. Civ. Proc. Code § 1179.03 ..............................................20

Cnty. of L.A. COVID-19 Tenant Protections Resolution (Sept. 28, 2021) ........................................................................................20

L.A. Mun. Code § 49.99.2 .............................. 17, 18, 32, 48

L.A. Mun. Code § 49.99.6 .......................................................18

L.A. Mun. Code § 49.99.7 .......................................................18

L.A. Ordinance 187,736.........................................................19

## Rules

Fed. R. App. P. 4.....................................................................14

Cal. Rules of Ct. Emergency R. 1.........................................20

## Other Authorities

Matthew Desmond, Opinion, *The Rent Eats First, Even During a Pandemic*, N.Y. Times (Aug. 29, 2020), https://www.nytimes.com/2020/08/29/opinion/sunday/coronavirus-evictions-superspreader.html [https://perma.cc/B9FV-VPC9] ...........50

## INTRODUCTION

Likely this audience noticed that while accusing the City of Los Angeles of enacting a law to mulct a group of landlords—the appellants—of over $100 million, the opening brief never actually cites to, or quotes from, the City's offending ordinance.  Probably this audience will also have guessed the reason for the omission:  The City's ordinance does not do now, and never did do, what the opening brief says.  By the opening brief's lights, the City blocked landlords en masse from evicting defaulting tenants, thereby taking landlords' property and giving it over to those tenants.  But the now-sunsetting Los Angeles Municipal Code section 49.99 did not, by itself, prevent a landlord from evicting *anyone*.

Instead, it created, temporarily, an affirmative defense against eviction for tenants in unlawful detainer proceedings.  The defense required a tenant both to plead and to prove that a failure to pay rent on time was due to a COVID-19-related hardship.  While meeting that burden would allow a tenant to delay eviction, however, it would not excuse the tenant's underlying rent debt.

What would an accurate accounting of the City's ordinance mean for the appellants' theory of the case?  (Call the appellants collectively "GHP," and make it a singular noun.)  For one, reckoning forthrightly with the ordinance would present a justiciability problem that GHP prefers to ignore.  Because GHP cannot claim the City took any property interest from it in the first place without showing *at least* (1) that it tried to terminate a leasehold that it claims the City took, but (2) that it was thwarted by a tenant's assertion of the City-provided affirmative defense.  Until then, the City has done nothing to take anything from GHP.

But what if one were inclined to overlook that the opening brief is written about a bogeyman instead of the actual ordinance?  To take the opening brief's arguments on that document's own terms?  In that case, GHP's project is to demonstrate that when a government limits a landlord's ability to evict a tenant, the government effects a per se taking of the landlord's property by allowing an unwanted tenant to stay there.  This is, one will realize before long, an absurd rule without a limiting principle.  Consider:  Does a 30-day notice requirement before a landlord can evict a defaulting tenant amount to a 30-day taking for

11

which the regulating government must compensate the landlord?  By GHP's reasoning, it need not suffer an unwanted tenant's presence for any time at all, so the answer should be "yes."

It will come as little surprise that the answer is actually "no."  The Supreme Court has recognized governments' ability to regulate evictions without effecting takings in a line of cases stretching back at least a century.  The Court has never questioned the validity of its precedent in that regard; it has never held that a tenant protection amounts to a per se taking.  It has instead "consistently affirmed," in cases like *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), "that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails."  Which is why the district court dismissed GHP's takings claim to the extent it rested on the theory that the City had per se taken GHP's property by potentially delaying it from undertaking some subset of evictions.

Of course, just as it's absurd to claim that any government-imposed obstacle to an eviction amounts to a per se taking, it's also

impractical to argue that a government could enfetter a landlord limitlessly in regulations without eventually effecting a taking. The way to figure out if a government has gone too far in regulating, though, is to ask whether it has effected a regulatory taking.

The district court observed that GHP could pursue a regulatory takings theory against the City, but noted correctly that GHP failed to allege the facts necessary to support that theory. Proving a regulatory taking requires showing how much a government's action diminished the regulated property's value, but GHP refused to allege a starting value against which to measure any diminution. It then declined to amend its complaint, preferring to argue in this Court that it need not allege how much it lost in property value in order to proceed with its claim. Adequately alleging its loss, GHP asserts, can await discovery.

No. Alleging the facts necessary to support a claim is a prerequisite to taking discovery. Besides, the allegation GHP omits—the value against which it is claiming a loss—is not something that GHP needs to discover from the City.

If the Court agrees that these deficiencies are fatal to GHP's complaint, should it allow GHP to amend? Again, no. GHP waived

amendment in the district court, and the opening brief didn't ask this Court for leave to amend, for *any* reason. GHP wants to pursue this action on its terms or not at all. But GHP's terms are insufficient even to show it has a justiciable case, never mind to make out its claims. The district court was correct to dismiss the action. This Court should affirm.

## JURISDICTIONAL STATEMENT

The plaintiffs in this case sued the City of Los Angeles for a violation of the United States Constitution's Fifth Amendment and its cognate provision in the California Constitution. They pursued their Fifth Amendment claim under 42 U.S.C. § 1983. (ER-205.) The district court therefore had subject-matter jurisdiction under 28 U.S.C. § 1343(a)(3) and 28 U.S.C. § 1367(a). It entered judgment on December 29, 2022. (ER-4–5.) The plaintiffs filed a timely notice of appeal (ER-214–15) on January 4, 2023. Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES ON APPEAL

I.    If a government provides tenants with an affirmative defense to eviction, must a tenant actually assert the defense against a landlord before the landlord can claim that the government took its property by preventing it from evicting the tenant?

II.    *Yee v. City of Escondido*, 503 U.S. 519 (1992) held that laws preventing a landlord from evicting invited tenants do not effect per se takings, while hypothesizing exceptions for laws that "compel a landowner over objection to rent his property" in the first place, or laws that compel a landlord "to refrain in perpetuity from terminating a tenancy." Does *Yee* preclude a landlord from claiming that a government effected a per se taking by granting tenants a limited affirmative defense against eviction?

III.    Under *Colony Cove Properties LLC v. City of Carson*, 888 F.3d 445 (9th Cir. 2018), its progeny, its progenitors, and similar cases across the courts of appeals, must a landowner allege both (1) the value taken from its property and (2) the value that remains in the property in order to state a claim for a regulatory taking?

## STATEMENT OF THE CASE

**A.      The City of Los Angeles—like the County of Los Angeles and the State of California—enacts measures to keep tenants from being evicted while the COVID-19 pandemic required them to stay home.**

No matter how frequently they are recounted in court filings, these background facts remain historic enough to bear repeating:  In the spring of 2020, a once-in-a-century pandemic forced countries around the world to take extraordinary measures to protect their populations.  To prevent COVID-19 from spreading, governments— including those of the State of California, the County of Los Angeles, and the City of Los Angeles—declared states of emergency, ordered businesses shut, and required people to stay home.  Anticipating the effects that freezing their economies would have on tenants, all three governments enacted temporary measures that affected the ordinary unlawful detainer process for evictions.

By the end of March 2020, the City had enacted Los Angeles Municipal Code section 49.99.  With revisions effective in mid-May of that year, section 49.99 established that during the locally-declared state of emergency, and for 12 months thereafter, no landlord could "endeavor to evict or evict a residential tenant" over rent that the

tenant failed to pay during the emergency—*if* the tenant's failure to pay was "due to circumstances related to the COVID-19 pandemic." L.A. Mun. Code § 49.99.2(A) (2020) (App. 71). Those circumstances included "loss of income due to a COVID-19 related workplace closure, childcare expenditure due to school closures, health-care expenses related to being ill with COVID-19 or caring for a member of the tenant's household of family who is ill with COVID-19, or reasonable expenditures that stem from government-ordered emergency measures." *Id.*

During the locally-declared emergency, the ordinance also limited landlords from evicting tenants "based on the presence of unauthorized persons or pets, or for nuisance related to COVID-19." L.A. Mun. Code § 49.99.2(C) (2020) (App. 71). And the ordinance allowed a covered tenant "up to 12 months" from the end of the emergency "to repay any rent deferred" during the emergency, while specifically leaving intact "any obligation to pay lawfully charged rent." L.A. Mun. Code § 49.99.2(A) (2020) (App. 71). The ordinance did, however, prohibit a landlord from charging late fees or interest on rent that was late due to

circumstances related to the COVID-19 pandemic. L.A. Mun. Code
§ 49.99.2(D) (2020) (App. 71).

Whatever policy section 49.99 was written to advance, as a matter
of California law, a municipal ordinance cannot prevent a landlord from
bringing an unlawful detainer action against its tenants. *Birkenfeld v.
City of Berkeley*, 550 P.2d 1001, 1017 (Cal. 1976). Thus, as a practical
matter, the ordinance's terms applied to landlords in only two ways.
First, the ordinance provided a tenant with "an affirmative defense in
an unlawful detainer action" if a landlord tried to evict the tenant for
defaulting on a rent payment. L.A. Mun. Code § 49.99.6 (2020)
(App. 72). Second, the ordinance created a private right of action
against a landlord who violated its terms, allowing a residential tenant
to sue "for injunctive relief, direct money damages, and any other relief
the Court deems appropriate, including, at the discretion of the Court,
an award of a civil penalty up to $10,000 per violation depending on the
severity of the violation." L.A. Mun. Code § 49.99.7 (2020) (App. 72).
That right of action also came with fee-shifting. *Id.*

But it wasn't one-way fee-shifting: "The Court may award
reasonable attorney's fees and costs" to a landlord "who prevails in any

such action and obtains a Court determination that the tenant's action was frivolous." *Id.* Moreover, a tenant couldn't bring an action under the ordinance without first giving a landlord written notice of the landlord's alleged violation, and "15 days from the receipt of the notice to cure the alleged violation." *Id.*

The City began to sunset section 49.99 in early 2023. It amended the ordinance in January so that its protections would start to wane at the end of that month. L.A. Ordinance 187,736 (Jan. 27, 2023) (App. 75–76). Since then, tenants have been unable to invoke the ordinance as a defense to eviction over any new default. *Id.* But—solely for the sake of avoiding eviction—the expiring ordinance allows tenants until August 1, 2023 to repay any rent debt accumulated between March 1, 2020 and September 30, 2021, and until February 1, 2024 to repay any rent debt accumulated between October 1, 2021 and January 31, 2023. *Id.* "For the sake avoiding eviction" is an important qualifier, because section 49.99 has never prohibited a landlord from suing a tenant *to collect* rent debt in e.g., a breach of contract action. The ordinance only limited and, for a short while longer, limits, some landlords' ability *to evict*.

Because the State and County governments also took tenant-protective steps simultaneously, the City's ordinance never operated in a vacuum: It was backstopped by other measures that limited landlords' ability to pursue unlawful detainer actions against COVID-19-affected tenants. California's Judicial Council, for example, promulgated a rule that prevented state courts from issuing summonses in unlawful detainer actions from April 6, 2020 until September 1, 2020. Cal. Rules of Ct. Emergency R. 1 (App. 79).

The day before the Judicial Council's rule lapsed, the California Legislature enacted, and then amended repeatedly, a series of laws that allowed tenants who declared "COVID-19-related financial distress" to avoid eviction as long as they repaid a percentage of the rent debt they accrued by specific deadlines. Cal. Civ. Proc. Code § 1179.03. The County of Los Angeles, too, imposed measures limiting landlords' ability to evict tenants over rent that went unpaid due to "Financial Impacts" that were "Related to COVID-19." *E.g.*, Cnty. of L.A. COVID-19 Tenant Protections Resolution (Sept. 28, 2021) (App 110.) The County's protections were expressly intended to set "minimum standards" everywhere in the County. *Id.* (App. 110.)

**B.    Across the country, emergency tenant protections spawn a wave of litigation, including this case.**

These kinds of measures—efforts that governments undertook to protect tenants in an emergency without modern precedent—provoked lawsuits nationally.  Some landlords argued that such measures modified the terms of their leases with their tenants, thereby violating the constitutional constraint against states "impairing the obligation of contracts."  U.S. Const., art. I, § 10; *e.g.*, *Apartment Ass'n of L.A. Cnty., Inc. v. City of L.A.*, 10 F.4th 905, 908–09 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 1699 (2022).  Others argued that the measures violated due process.  *E.g.*, *Williams v. Alameda Cnty.*, No. 3:22-cv-01274-LB, 2022 WL 17169833, at *16–17 (N.D. Cal. Nov. 22, 2022).  And some, like GHP, argued that the measures effected takings of their property by preventing them from evicting tenants who hadn't paid rent.  *E.g.*, *Jevons v. Inslee*, 561 F. Supp. 3d 1082, 1102–08 (E.D. Wash. 2021), *appeal pending*, No. 22-35050.

GHP alleged that as of the filing of its complaint, section 49.99 had "caused rent losses in the amount of nearly $20 million, to date." (ER-204 ¶ 51.)  That's because, according to GHP, section 49.99 stripped it of "the ability to institute unlawful detainer proceedings against any

tenants that failed to timely pay per their contractual agreements."
(*Id.*)  Had it been able to institute unlawful detainer proceedings
against defaulting tenants, it alleged, "these losses would be minimal."
(*Id.*)  And despite the fact that the ordinance explicitly does not forgive
any rent debt, GHP added that it was "informed and believed" that "the
City orchestrated a regulatory regime designed to provide a compulsory
and de facto rent forgiveness to be foisted on landlords throughout the
City."  (*Id.*)  Notably, GHP never alleged that it actually attempted to
initiate unlawful detainer proceedings against any defaulting tenant (or
that it otherwise attempted to sue for rent).[1]

From these allegations, GHP purported to state three claims.
First, it posited that the City's enactment of section 49.99 was
tantamount to a "physical occupation" of its property, requiring it to
"continue furnishing" rental units "indefinitely" to "defaulting and
nonpaying tenants."  (ER-206 ¶ 61.)  Such an occupation, GHP argued,
effected a per se taking of its property, entitling it to compensation

---

[1] Again, "GHP" here functions as a shorthand, reducing to a singular
noun a conglomeration of 14 corporate entities that own or manage 13
properties containing 4,822 rental units.  (ER-191–97 ¶¶ 9–22.)

under the Takings Clause in the Fifth Amendment to the United States Constitution. (*Id.*) Moreover, GHP asserted, forcing it "to accept unauthorized pets and family members" effected an additional per se taking. (ER-207 ¶ 63.)

Second, GHP claimed that section 49.99 "and the enforcement thereof"—though it never alleged facts constituting "the enforcement thereof"—effected an ad hoc, regulatory taking of its property under the principles set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978). (ER-208 ¶ 70.)

Third, GHP asserted that section 49.99 had effected a taking of its property under the California Constitution, which "has been interpreted congruently with the Takings Clause embodied in the Fifth Amendment to the United States Constitution." (ER-211 ¶ 81.)

For these three claims, GHP sought a declaration that it is entitled to "an award of 'just compensation' in an amount to be determined by jury," but which it earlier alleged to be "in excess of $100,000,000." (ER-190 ¶ 8, ER-212 ¶ 1.) It then sought damages in that amount, fees, and costs. (ER-212 ¶¶ 2, 3.)

The City moved to dismiss GHP's complaint.[2]

**C.  In line with virtually every other court to consider the issue, the district court dismisses landlord GHP's claim that the City's tenant protections effected a per se taking of its property, and dismisses the action entirely when GHP declines to amend its complaint to state a regulatory takings claim.**

The district court granted the City's motion.  (ER-9–23.)  It began by addressing GHP's assertion that by placing limits on its ability to evict defaulting tenants, the City had accomplished something tantamount to physically occupying GHP's property, i.e., a per se taking entitling GHP to compensation.  The district court noted that this theory is foreclosed by the Supreme Court's opinion in *Yee v. City of Escondido*, 503 U.S. 519 (1992).  (ER-12.)

In doing so, the district court joined the United States District Courts for the Northern District of California, the District of Columbia, the District of Oregon, the Eastern District of Washington, the Western

_____

[2] The district court previously allowed three other entities—the Alliance of Californians for Community Empowerment Action, the Coalition for Economic Survival, and Strategic Actions for a Just Economy—to intervene as defendants.  (ER-25–33.)  They, too, moved to dismiss GHP's complaint.  On appeal, GHP challenges the district court's order allowing those entities to intervene.  (AOB 42–53.)  They are filing a separate answering brief.

24

District of Washington, the Southern District of California, the District of Massachusetts, the District of Connecticut, and the Southern District of New York—along with the Washington Court of Appeals and the Massachusetts Superior Court—all of which concluded that similarly positioned landlords could not state per se takings claims (or that they would be unlikely to succeed in advancing them).[3]

GHP *could* still state a takings claim that turned on an ad hoc, regulatory takings theory—a result that *Yee* itself contemplated. Addressing that takings theory, the district court observed that GHP hadn't alleged all the elements ordinarily associated with a regulatory taking. Beginning with Justice Holmes's remark that "if regulation

---

[3] To avoid cluttering the text, the cases are *Williams*, 2022 WL 17169833 at *7–12; *Gallo v. District of Columbia*, 610 F. Supp. 3d 73, 87–88 (D.D.C. 2022); *Farhoud v. Brown*, No. 3:20-cv-2226-JR, 2022 WL 326092, *10 (D. Or. Feb. 3, 2022); *Jevons*, 561 F. Supp. 3d at 1102–08; *El Papel LLC v. Durkan*, No. 2:20-cv-01323-RAJ-JRC, 2021 WL 4272323, at *15–17 (W.D. Wash. Sept. 15, 2021), *appeal pending*, No. 22-35656; *S. Cal. Rental Housing Ass'n v. Cnty. of San Diego*, 550 F. Supp. 3d 853, 864–66 (S.D. Cal. 2021); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 387–88 (D. Mass. 2020); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 220–21 (D. Conn. 2020); *Elmsford Apartment Assocs. v. Cuomo*, 469 F. Supp. 3d 148, 162–64 (S.D.N.Y. 2020); *Gonzales v. Inslee*, 504 P.3d 890, 904–05 (Wash. Ct. App. 2022); *Matorin v. Commonwealth*, No. 2084CV01334, 2020 WL 12847146, *10 (Mass. Super. Ct. Aug. 26, 2020).

25

goes too far it will be recognized as a taking," the district court laid out the factors by which courts analyze whether a regulation has gone too far: its "economic impact on the claimant, the extent to which the regulation interferes with distinct investment-backed expectations, and the character of the government action." (ER-16–17, cleaned up.)

On that score, the district court noted, GHP did not allege facts adequate to show section 49.99's economic impact. That task requires "compar[ing] the value that has been taken from the property with the value that remains in the property;" it requires alleging both a numerator—a loss attributable to the government action—and a denominator—what it was lost *from*. (ER-18, cleaned up.) GHP alleged that its "tenants are $20 million in arrears," but it did so "in a vacuum." (*Id.*) That made its allegation insufficient to "demonstrate a significant economic impact, notwithstanding [GHP's] vague and conclusory allegation" that section 49.99 was ruinous. (*Id.*)

Having concluded that GHP's complaint contained insufficient facts to state a takings claim, the district court expressly declined to "reach the City's arguments that any takings claims are unripe, or that [GHP] lacks standing to assert any such claims." (ER-22–23 n.5.) It

26

granted GHP leave to amend. (ER-22–23.) Preferring instead to appeal, GHP declined to amend and asked that judgment be entered against it. (ER-7.) The district court obliged, and dismissed with prejudice. (ER-5.)

## SUMMARY OF ARGUMENT

The district court properly dismissed this action.

First, GHP doesn't have a justiciable takings claim against the City. *See* § I, *infra.* It hasn't alleged facts showing that a single one of its tenants raised Los Angeles Municipal Code section 49.99 successfully as a defense in an unlawful detainer action. If no tenant actually relied on the City ordinance to prevent an eviction, GHP can't very well proceed on the theory that the City—by application of that ordinance—took a leasehold in GHP's property and transferred it to a defaulting tenant. And because *at least* the State of California offered overlapping protections to the same effect as the City's, in a vacuum, there can be no injury traceable to the City's ordinance.

Second, even if GHP has a justiciable claim against the City, a per se takings claim fails as a matter of law on the facts of this case. *See* § II, *infra.* The Supreme Court has held, in a line of cases stretching

back over a century, that governments do not effect per se takings of landlords' property by enacting measures that control the terms under which landlords can evict tenants. That authority remains good law, which is why the overwhelming majority of courts to evaluate COVID-19 eviction protections have applied it, and in particular *Yee v. City of Escondido*, 503 U.S. 519 (1992), to hold that the protections do not give rise to per se takings.

Third, the same line of Supreme Court authority allows landlords to claim, on an ad hoc basis, that a limitation on their ability to evict tenants effects a regulatory taking. *See* § III, *infra*. But it is well established, in this Circuit and elsewhere, that demonstrating a regulatory taking requires a plaintiff to show the value remaining in its regulated property as against the property's value before being regulated. GHP refused to allege those facts, refused the district court's offer of leave to amend, and on appeal contends—without good reason— that it need not allege those facts. There is no reason to deviate from binding authority to allow GHP to proceed with an insufficiently alleged regulatory takings claim. This Court should affirm the district court's judgment of dismissal.

**ARGUMENT**

The basics of a takings claim are familiar.

A government has to compensate the owner of property that the government *literally* takes, i.e., by occupying it or by forcing the owner to submit to someone else's occupation. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021). A government also must compensate a property owner if it doesn't literally take property, but instead regulates it into total economic uselessness. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1028–31 (1992). These are per se takings: Proving that a government has done either of the preceding two things entitles a landowner to compensation with no further question. *Bridge Aina Le'a, LLC v. Haw. Land Use Comm'n*, 950 F.3d 610, 625 (9th Cir. 2020).

Less onerous regulation may still amount to a taking if it "goes too far." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). As the district court's order set out, determining whether a measure has gone too far— and so amounted to a regulatory taking—requires a court to weigh (1) "[t]he economic impact of the regulation," (2) "the extent to which the regulation has interfered with distinct investment-backed

expectations," and (3) "the character of the governmental action." *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978).[4]

Equally familiar is the standard of review that this Court applies to decide whether the district court properly dismissed GHP's takings claims. It reviews the district court's judgment of dismissal de novo and can affirm on any "proper ground." *McGinty v. Procter & Gamble Co.*, 69 F.4th 1093, 1096 (9th Cir. 2023).

Here are three such grounds.

## I. There is a fatal justiciability problem with GHP's claim that the City effected takings by thwarting evictions of tenants in default: It appears that GHP never tried to evict those tenants in the first place.

A corollary to the basic rule that "[a] property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it," *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2167 (2019), is that a property owner does not have an actionable Fifth Amendment takings claim until the government takes the

---

[4] GHP's California law takings claim stands or falls with its federal ones. GHP hasn't argued otherwise—and hasn't otherwise argued for the resuscitation of its California law claim.

property. If it sues before then, a property owner is "prematurely suing over a hypothetical harm." *Pakdel v. City & Cnty. of S.F.*, 141 S. Ct. 2226, 2230 (2021).

Which is exactly what GHP has done here. The easiest way to see this is to imagine a scenario more basic than one involving a web of 14 corporate entities asserting claims for compensation across 13 properties containing 4,822 rental units. Instead, imagine one landlord who owns one apartment inhabited by a couple of tenants. On GHP's theory of the case, the City, by virtue of section 49.99, took a property interest in the apartment (a leasehold) from the landlord and gave it to the tenants without compensating the landlord for it.

When, exactly, did the City do that?

Was it in March 2020, simply by virtue of enacting section 49.99? No; the ordinance on its face doesn't dispossess anyone of anything. *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 736 & n.10 (1997); *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 294–97 (1981). If the ordinance affects the hypothetical landlord at all, it's only as it is applied—and *when* it is applied.

31

So say that the tenants fail to pay April's rent.  Does section 49.99 apply then to take a leasehold from the landlord and give it to the tenants?  No.  The ordinance doesn't do anything automatically by virtue of a tenant's default.

In May, the landlord brings an unlawful detainer action against the defaulting tenants.  (Assume for the sake of this hypothetical that California's courts would have allowed this, though they would not have.  *See* p. 20, *supra*.)  Now has section 49.99 taken the landlord's property for the tenants' benefit?

Maybe that's closer.  But the answer remains "no," because section 49.99 *still* hasn't done any work.  And it's not a foregone conclusion that section 49.99 *will* do any work.  Section 49.99 provides an affirmative defense; the tenants aren't "assumed" to be entitled to its protection.  (*Contra* AOB 6.)  They could always fail to raise the section 49.99 defense in the unlawful detainer proceedings.  Or they could raise the defense but fail to prove that they were "unable to pay rent due to circumstances related to the COVID-19 pandemic."  L.A. Mun. Code § 49.99.2(A) (App. 71); *see W. Land Office, Inc. v. Cervantes*, 220 Cal.

Rptr. 784, 789 (Cal. Ct. App. 1985) (tenants generally have the burden of proving affirmative defenses by a preponderance of the evidence).

Only if the defaulting tenants avoid eviction by virtue of section 49.99 can the landlord plausibly say the City, by dint of the ordinance, (1) took a leasehold from the landlord and (2) transferred that property interest to the tenants without compensation. (To concede the landlord might plausibly *say* this is a taking is not to concede that it *is* a taking; it's only to say that it finally *looks* something like a taking.) In other words, for the landlord to claim that section 49.99 effected a taking of its property, it must be able to allege that section 49.99 thwarted its eviction of the tenants.

It follows that in the absence of the tenants' successful assertion of a section 49.99 defense, the landlord's takings claim presents serious standing or ripeness questions. *See Thomas v. Anchorage Equal Right Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc) ("Sorting out where standing ends and ripeness begins is not an easy task."). Those questions, inasmuch as they go to a federal court's authority to adjudicate the landlord's takings claim, have to be resolved in the landlord's favor before a court can consider the merits of the landlord's

claim. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 92–102 (1998).

A plaintiff needs standing to invoke a federal court's subject-matter jurisdiction. *WildEarth Guardians v. U.S. Forest Serv.*, 70 F.4th 1212, 1215 (9th Cir. 2023). To establish standing, "a plaintiff must show (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (cleaned up). As a constitutional doctrine, ripeness "is often treated under the rubric of standing." *Thomas*, 220 F.3d at 1138. It is "peculiarly a question of timing designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Id.* (cleaned up).

Call it a standing problem or a ripeness one, but because the landlord's putative injury (the taking of a leasehold) comes from the operation of section 49.99, the landlord has no injury-in-fact unless the tenants invoke, and the unlawful-detainer court applies, section 49.99.

34

Until then, the landlord has not suffered an actual injury, and "[a] threatened injury must be *certainly* impending"—which is hard to say of an injury that depends on the outcome of a court proceeding—"to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (cleaned up, italics added); *see Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013) (emphasizing the requirement that a future injury must be imminent to satisfy the injury-in-fact requirement); *id.* at 413–14 (a future injury is that much more speculative when it turns on "guesswork" as to how a court will exercise its judgment).

Indeed, it's all the more critical for the landlord to undertake an unlawful detainer action in this case if it wants to fault the City for a taking, because the tenants almost certainly would have overlapping eviction protections as between the City and the State. And that fact augurs a traceability problem for the landlord. Because if the tenants beat back an unlawful detainer action by resort to *California's* state-level protections (rather than by resort to section 49.99) then the landlord cannot very well say it was *the City* that took a leasehold and transferred it to the tenants. *See Clapper*, 568 U.S. at 410–11 (when

plaintiffs can only speculate which particular law might injure them, the injury cannot be fairly traced to one law or another).

Suffice it to say that if all of the preceding is true for one landlord with two defaulting tenants in a single apartment, then it is equally true for 14 landlords with an unknown number of defaulting tenants spread across 4,822 apartments. Whether it's one landlord or fourteen of them; a single apartment or nearly 5,000, before a City-created limitation on the ability to evict can possibly effect a taking, that limitation must actually be applied.

Undoubtedly GHP prefers simply to allege, as it did, that (1) the City passed an ordinance and (2) some tenants subsequently defaulted . . . therefore the City took GHP's property and should compensate GHP for the loss. But that ellipsis cannot substitute for the facts GHP must—and, for its reluctance to do so, likely cannot—allege: GHP's tenants must have relied on section 49.99 to prevail against it in unlawful detainer actions before GHP can come to federal court to argue that section 49.99 effected a taking—*by thwarting precisely those unlawful detainers*. (Whether a forestalled eviction ultimately amounts to a taking is a separate question. *See* § II, *infra*.)

36

The total absence of those allegations from the complaint means that the district court was right to dismiss it, even if the court did so for different reasons.

**II.      Regardless, GHP has no viable claim that the City effected a per se taking by creating a temporary affirmative defense against eviction, because limitations on a landlord's ability to evict invited tenants are analyzed as ad hoc regulatory takings.**

If GHP alleged that tenants had successfully employed section 49.99 against it, there would remain the question whether preventing it temporarily from evicting someone who "is unable to pay rent due to circumstances related to the COVID-19 pandemic" effects either a per se taking or a regulatory taking of GHP's property.  Start with a per se taking, since GHP's energy is principally focused there.[5]

---

[5] GHP's energy is *not* focused on arguing that it adequately pled any kind of takings claim arising from either the loss of interest and late fees or an inability to evict tenants with unauthorized pets or additional occupants.  To the extent GHP could have argued on appeal for a taking from those allegations, that argument is forfeited. *Vasquez v. Rackauckas*, 734 F.3d 1025, 1054 (9th Cir. 2013); *Christian Legal Soc'y v. Wu*, 626 F.3d 483, 485, 487 (9th Cir. 2010).

**A.** ***Yee v. City of Escondido* and its forebears hold that limitations on a landlord's ability to evict invited tenants, like those at issue in this case, are not per se takings.**

Governments have long had the ability to place restrictions on landlords' ability to evict tenants without having to compensate the landlords in return; never mind compensating the landlords on a per se basis. Section 49.99 fits comfortably within the line of cases from which that principle is distilled, including *Yee v. City of Escondido*, 503 U.S. 519 (1992), which the district court read to foreclose GHP's per se takings claim.

**1.** ***Block v. Hirsh* holds that combined rent and eviction controls do not amount to takings—in 1921.**

Begin with *Block v. Hirsh*, 256 U.S. 135 (1921). In the face of exploding rents after World War I, Congress imposed temporary rent regulation in Washington, D.C. *Id.* at 154. By Congress's act, "the right of a tenant to occupy" certain property was "to continue notwithstanding the expiration of his term, at the option of the tenant, subject to regulation by the Commission appointed by the act," for as long as the tenant "pays the rent and performs the conditions as fixed by the lease or as modified by the Commission." *Id.* at 153–54. The law

gave the property's owner the right to take possession for owner-
occupation with 30 days' notice. *Id.* at 154. Hirsh bought a building in
which Block lived, and sought possession of Block's rental unit for
himself—"but he did not see fit to give the thirty days' notice because he
denied the validity of the act." *Id.* at 154.

Hirsh may have denied the act's validity, but the Court did not.
Justice Holmes observed that an application of "the police power in its
proper sense" allows that "property rights may be cut down, and to that
extent taken, without pay." *Id.* at 155. The conditions for applying that
power were met. For one thing, "Congress has stated the
unquestionable embarrassment of Government and danger to the public
health in the existing condition of things." *Id.* at 156. For another,
"[t]he space in Washington is necessarily monopolized in comparatively
few hands, and letting portions of it"—that is, landlording—"is as much
a business as any other." *Id.* Given that "[h]ousing is a necessary of
life[,] [a]ll the elements of a public interest justifying some degree of
public control are present." *Id.* Having established that, "[t]he only
matter . . . open to debate is whether the statute goes too far."
Foreshadowing by eight months his more quoted remark in *Mahon*, 260

U.S. at 415, Justice Holmes wrote that "just as there comes a point at which the police power ceases and leaves only that of eminent domain, it may be conceded that regulations of the present sort"—rent and eviction controls—"pressed to a certain height might amount to a taking." *Block*, 256 U.S. at 156.

But not the regulations in *Block*. Noting that "[a] limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as permanent change," the Court allowed that limiting rents "will deprive [landlords] in part at least of the power of profiting by the sudden influx of people of Washington . . . and thus of a right usually incident to fortunately situated property—or a part of the value of [the landlord's] property." *Id.* at 157. Nevertheless, the Court observed, "the policy of restricting [excessive profits] has been embodied in taxation and is accepted." And if it is acceptable policy to limit rent increases, "[t]he preference given to the tenant in possession is almost a necessary incident of the policy." *Id.* Because "[i]f the tenant remained subject to the landlord's power to evict, the attempt to limit the landlord's demands [for higher rent] would fail." *Id.* at 157–58.

40

2. ***Loretto v. Teleprompter Manhattan CATV Corp.*** **collects "substantial authority" to confirm governments' "broad power" to regulate "the landlord-tenant relationship in particular" without effecting a taking.**

Consider next the Court's opinion in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), which affirmed "the traditional rule that a permanent physical occupation of property is a taking," while simultaneously refusing to "question the equally substantial authority upholding a State's broad power to impose appropriate restrictions upon an owner's *use* of his property." *Id.* at 441. That "substantial authority" included expressly the "power to regulate housing conditions in general and the landlord-tenant relationship in particular *without paying compensation for all economic injuries that such regulation entails*." *Id.* at 440 (italics added); *see Andrus v. Allard*, 444 U.S. 51, 65 (1979) (the government is not required "to regulate by *purchase*").

And among the cases listed as comprising that "substantial authority" were *Block*, which upheld a government's ability to impose eviction restrictions along with rent controls, 256 U.S. 157–58; *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934), which affirmed

a judgment under the emergency Minnesota Mortgage Moratorium Law that extended a mortgagor's redemption period by two years, 290 U.S. at 415–20, 448; and *Edgar A. Levy Leasing Co. v. Siegel*, 258 U.S. 242 (1922), which upheld a New York law that allowed a tenant to defend against an action for rent by arguing that the "rent is unjust and unreasonable, and that the agreement under which the same is sought to be recovered is oppressive," 258 U.S. at 248. *Loretto*, 458 U.S. at 440.

    **3.**    ***Federal Communication Commission v. Florida Power Corp.* teaches that when a property owner invites a tenant, measures that govern their relationship—including measures that require the owner to allow the tenant to remain at substantially reduced rent—do not amount to per se takings.**

Justice Marshall, who wrote the opinion in *Loretto*, five years later wrote for the Court in *Federal Communications Commission v. Florida Power Corp.*, 480 U.S. 245 (1987). Back in the early days of cable television, cable providers needed a place to string cable, and utilities already had poles everywhere. *Id.* at 247. Cable companies rented pole space from utility companies, but not every state regulated those rents. *Id.* Because the utilities had a monopoly on poles, cable companies accused them of overcharging. *Id.* Congress stepped in and, with the

42

Pole Attachments Act, empowered the FCC to set rates for pole

attachments. *Id.* at 248. The FCC then reformed a set of agreements to

cut three cable companies' rents from $6.24 per pole, $7.15 per pole, and

$5.50 per pole down to $1.79 per pole. *Id.* at 248–49. The Eleventh

Circuit held that this was a taking under *Loretto* for which the

government must compensate the utilities. *Id.* at 249–50.

The Court reversed. It noted first that "nothing in the Pole

Attachments Act as interpreted by the FCC in these cases gives cable

companies any right to occupy space on utility poles, or prohibits utility

companies from refusing to enter into attachment agreements with

cable operators." *Id.* at 251. In other words, nothing required utility

companies to permit the cable companies to occupy their poles in the

first instance—and *that* would have been a taking under *Loretto*.

The utility companies responded, "in essence," that the FCC *had*

required an occupation that the utility companies did not permit,

because the FCC allowed "a tenant invited to lease at a rent of $7.15 to

remain at the regulated rent of $1.79." *Id.* at 252. Rejecting this

characterization, the Court held that "it is the invitation, not the rent,

that makes the difference," and it was the utility companies, not the

43

FCC, that had extended the invitation in the first place.  *Id.*  That invitation made the cable companies "a commercial lessee" rather than "an interloper with a government license."  *Id.* at 252–53.

> **4.**   ***Yee v. City of Escondido* holds that once a landlord invites tenants to lease property, a government can prevent the landlord from evicting those tenants for all kinds of reasons without effecting a per se taking.**

Finally, there's GHP's bête noire, *Yee*.  The Yees owned mobile home parks in Escondido.  *Yee*, 503 U.S. at 523.  Mobile home park owners rent out land to tenants; the tenants own the physical structures—the not-very-mobile homes—that go on that land.  *Id.* Escondido enacted a rent control ordinance that reduced and then froze the rents the Yees could charge their tenants.  *Id.* at 524–25. Meanwhile, California had previously enacted a Mobilehome Residency Law limiting the bases on which a mobile home park owner could evict a tenant.  It also prevented park owners from refusing to rent to anyone who could afford it, meaning that a mobile home owner could sell a mobile home in situ and the park owner would have to take on the buyer as a new tenant (and resident).  *Id.* at 524.

The Yees sued Escondido in state court, asserting that "'the rent control law has had the effect of depriving the plaintiffs of all use and occupancy of their real property and granting to the tenants of mobilehomes presently in The Park, as well as the successors in interest of such tenants, the right to physically permanently occupy and use the real property of Plaintiff.'" *Id.* at 525 (original spelling and capitalization).

In the Supreme Court, the Yees argued that the combination of the Escondido ordinance and California state law subjected them to a unique injury. Under the California law, "the park owner cannot evict a mobile home owner or easily convert the property to other uses," and so, "the argument goes, the mobile home owner is effectively a perpetual tenant of the park." *Id.* at 526–27. Meanwhile, the Escondido ordinance freezes the rent the park owner can charge for the underlying land. The result is that the mobile home owner can sell, along with the mobile home, the right to a tenancy in the park "at below-market rent indefinitely." *Id.* at 527. The Yees argued that this "transferred a discrete interest in land—the right to occupy the land indefinitely at submarket rent—from the park owner to the mobile home owner," and

that it was "no less than a right of physical occupation of the park owner's land." *Id.*

The Court disagreed, unanimously. It began by observing that the Yees' argument, "while perhaps within the scope of our regulatory takings cases, cannot be squared easily with our cases on physical"— that is, per se—"takings." *Id.* "The government," the Court noted, "effects a physical taking only where it *requires* that landowner to submit to the physical occupation of his land." *Id.* (original italics). Correspondingly, "the Takings Clause requires compensation if the government authorizes a compelled physical invasion of property." *Id.*

"But the Escondido rent control ordinance, even when considered in conjunction with the California Mobilehome Residency Law, authorizes no such thing." *Id.* The Yees "voluntarily rented their land to mobile home owners," and "[a]t least on the face of the regulatory scheme, neither the city nor the State compels petitioners, once they have rented their property to tenants, to continue doing so." *Id.* at 527–28. The Yees could at least evict their tenants "with 6 or 12 months['] notice" to convert a park to a different use. *Id.* at 528. That was enough to conclude that the Yees, having invited their tenants to begin

with, could not claim to have been stripped of the right to exclude those tenants—"one of the most essential sticks in the bundle of rights that are commonly characterized as property"—on the face of the laws they were challenging. *Id.* (internal quotation marks omitted).

The regulations imposed on the Yees were instead like "ceilings on the rents the landowner can charge," or "require[ments] the landowner . . . accept tenants he does not like." *Id.* at 529. Governments can impose those sorts of regulations "without automatically having to pay compensation;" at most, they "are analyzed by engaging in the essentially ad hoc, factual inquiries necessary to determine whether a regulatory taking has occurred." *Id.* (cleaned up). (Supporting this proposition, the Court cited Justice Holmes's opinion in *Mahon*, but it just as well could have cited his opinion in *Block*.)

**B.    The line of cases culminating in *Yee* demonstrates that the City hasn't effected a per se taking of GHP's property by temporarily providing—during a once-in-a-century emergency—an affirmative defense against eviction, for a limited range of defaults, and without excusing any rent debt.**

Section 49.99 is of a piece with the regulations the Court has approved in over a century of its jurisprudence. In the face of "danger to the public health" in the "condition of things" when the City enacted

the ordinance—which was set to expire with the passing of the danger—the City exercised its police power.  *Block*, 256 U.S. at 156.

If a tenant asserted section 49.99's protections successfully against a landlord, the most that could be said from the ordinance's face is that the landlord would be temporarily unable to evict the tenant for a rent default "due to circumstances related to the COVID-19 pandemic."  L.A. Mun. Code § 49.99.2(A) (App. 71).  The landlord would retain the rights to sue for the overdue rent at any time, to evict the tenant for any new default occurring after the end of the emergency, and to evict the tenant for any rent remaining unpaid by a year from the emergency's end.  *Id.*  And while one might previously have been tempted to ask, "what if the City extends the emergency forever?" reality has passed that question by.  The emergency abated at the end of January 2023, which is why the City amended section 49.99 to reflect its own planned obsolescence.

This is exactly the kind of regulation of the landlord-tenant relationship that *Yee* and its forebears, all the way back to *Block*, hold *might* be ad hoc regulatory takings—not per se takings—if they are takings at all.  Landlords, including GHP, were not dragooned by the

48

City into accepting tenants in the first place; they invited those tenants to take possession of various rental units.  *Yee*, 503 U.S. at 527–28, 532. Having done so, they are required to submit to regulation of their relationships with those tenants, including changes to the circumstances under which the tenants can be evicted.  *Id.* at 528–29; *Loretto*, 458 U.S. at 440.

Regulatory adjustments to those circumstances cannot at a stroke turn invited tenants into "interlopers with a government license."  (AOB 22, cleaned up.)  If they did, giving Block the right to remain in Hirsh's building (for example) would have turned him into just such an interloper and required the government to compensate Hirsh for a per se taking.  *Block*, 256 U.S. at 153–54, 156–58; *cf. Loretto*, 458 U.S. at 440 (highlighting, from *Blaisdell*, that extending a defaulted mortgagor's right to redeem by two years wouldn't effect a per se taking).  Section 49.99 represents a temporary adjustment to the circumstances under which a tenant who raises it may be evicted, and it likewise doesn't transmute what had been an invited tenancy into a compelled occupation.  *See Yee*, 503 U.S. at 524, 527–28 (barring no-fault evictions doesn't effect a per se taking when the tenancies were

voluntary and the landlord could get out of them, with 6-to-12 months'
notice, by leaving the rental market); *Fla. Power Corp.*, 480 U.S. 252–53
(reducing the rent by 75 percent, and thus changing a key term in an
invited tenancy, doesn't convert the invited tenancy into a compelled
occupancy).[6]

GHP argues that at least the 12 courts to have reached this
conclusion when evaluating COVID-19 eviction protections have
misunderstood *Yee*, which (according to GHP) doesn't apply to facts like

---

[6] Ultimately, the application of section 49.99 is little different than
forcing a landlord to take a rent reduction while continuing to rent to a
tenant, because practically speaking, the ordinance does no more than
(1) reduce the rent that the landlord will collect from the tenant by (2)
the time-value of the money lost until the landlord can collect the rent,
evict the tenant, or both.

To be sure, GHP speculates that tenants will never repay the debt at
all. (AOB 1.) There are reasons to doubt GHP. *See, e.g.*, Matthew
Desmond, Opinion, *The Rent Eats First, Even During a Pandemic*, N.Y.
Times (Aug. 29, 2020), https://www.nytimes.com/2020/08/29/
opinion/sunday/coronavirus-evictions-superspreader.html
[https://perma.cc/B9FV-VPC9] (people will "skimp on other bills,"
including food, to pay rent). For now, it's enough to observe that it isn't
section 49.99 that prevents a landlord from collecting the debt, and
GHP hasn't alleged facts showing (1) that a single one of its tenants
successfully asserted section 49.99 against it, and (2) that it
subsequently failed to collect any of that tenant's overdue rent. *Cf. Yee*,
503 U.S. at 528 (with no allegations about how a law actually applied to
the plaintiff, a court's review is confined to the law's face).

these.  (AOB 25.)  How is that?  For starters, GHP declares, *Yee* applies

only in the strange world of mobile-home-park rent controls.  (AOB 25.)

But while it's true that the Yees argued the taking they suffered *was*

*evinced* by the price premium that mobile home owners could get for

selling mobile homes in rent-controlled parks, the alleged taking itself

was the purported perpetual tenancy in the park that allowed the

mobile home owners to realize that price premium.  *See Yee*, 503 U.S.

at 527 (the allegedly taken property interest was "the right to occupy

the land indefinitely at a submarket rent"); *id*. at 530 (whether a mobile

home seller realizes a price premium "has nothing to do with whether

the ordinance causes a *physical* taking").

Alternately, GHP suggests, *Loretto* preemptively and "implicitly

rejects" a reading of *Yee* that allows such a "broad exception to physical

takings liability based on a landlord merely opening the door to

tenants."  (AOB 28.)  The part of *Loretto* to which GHP points to make

this argument does not say what GHP thinks it does.  The alleged (and,

it turns out, actual) taking in *Loretto* was the placement of cable

television equipment on an apartment building.  458 U.S. at 438.  In

response to the contention that this physical occupation amounted to a

per se taking, the cable company argued that a law allowing it to place equipment "applies only to buildings used as rental property," and drew "the conclusion that the law is simply a permissible regulation of the use of real property." *Id.* at 438–39.  The Court rejected this argument, because it failed to see "why a physical occupation of one type of property but not another type is any less a physical occupation." *Id.* at 439.[7]

This passage from *Loretto*, and the footnote that follows it, stand only for the proposition that a government cannot condition the ability to rent out property on a landlord's submission to a third party's uncompensated physical occupation; that physical occupation remains a taking. *Id.* at 439 & n.17.  But this does not speak at all to the relationship between the landlord and the tenants, who are not uninvited occupants, or to a government's ability to regulate that relationship. *See Yee*, 503 U.S. at 531–32 (explaining the same thing).

---

[7] One might fairly question GHP's assumption that "physical takings liability" is the rule, rather than itself the exception to the principle that governments have a tremendous degree of latitude to regulate businesses—even if those businesses happen to trade in real-property rentals. *Block*, 256 U.S. at 155–56.

Regulating that relationship is all the City has done here. Under *Yee*, section 49.99 does not affect a per se taking of GHP's property.

## C. The Supreme Court has neither questioned any of this authority nor given other courts license to disregard it.

Since it failed to distinguish *Yee*, GHP argues that the case has been limited or abrogated sub silentio by other Supreme Court decisions. Or, it insinuates, a single sentence in a per curiam emergency order should function as license for other courts to ignore *Yee* and declare COVID-19 eviction protections to be per se takings.

If the Court limited or abrogated *Yee*, it didn't see fit to recognize that fact as late as 2021, when it cited the case in *Cedar Point Nursery*, 141 S. Ct. at 2072. For that matter, *Cedar Point Nursery*'s holding is consistent with *Yee*: The case distinguishes a regulation that forces a property owner to allow union organizers onto its property in the first instance (a taking) from regulations that govern the property owner's treatment of people whom it invited (not a taking). *Cedar Point Nursery*, 141 S. Ct. at 2076–77.

Given that the Court cited *Yee* in 2021 without expressing any hint of disapproval or concern, it should not be a surprise that the Court

didn't limit *Yee* by implication, as GHP suggests, in *Horne v. U.S. Department of Agriculture*, 576 U.S. 350 (2015). *Horne* held that the Department of Agriculture couldn't require raisin growers to give it title to a certain quantity of raisins in exchange for the growers' ability to participate in the raisin market. 576 U.S. at 354, 361, 364–67. It's a stretch to say that *Horne* speaks to the same questions as *Yee*: A government regulating the relationship between a landlord and a tenant whose possession the landlord invited is not the same thing as a government demanding that the landlord give the government title to property in exchange for being able to rent property to other tenants.

Both less direct and less convincing than an argument from *Horne*, however, are GHP's musings about the meaning of a sentence in the Supreme Court's per curiam order in *Alabama Ass'n of Realtors v. Department of Health & Human Services*, 141 S. Ct. 2485 (2021). That case came to the Court on a request to vacate a district court's stay of its own judgment that the Centers for Disease Control had exceeded its statutory authority by enacting an eviction moratorium. *Id.* at 2486–88. The Court vacated the stay. *Id.* at 2488. Near the end of its order, when discussing the equities bearing on the stay, the Court wrote that

"preventing [landlords] from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude." *Id.* at 2489. It followed the sentence with a citation to *Loretto*.

Of this sentence, GHP observes, "[i]f one were to 'read the tea leaves,' one might say the Supreme Court has taken the position that while government may under some circumstances possess the power to enact such sweeping remedial measures during times of emergency, doing so may render the government liable for a per se taking." (AOB 33, italics and footnote omitted.) It's fair to ask: Whatever its merit, what is this Court supposed to do with GHP's observation? Disregard *Yee* and any other authority that performs a reasoned takings analysis and instead declare the City to have effected a per se taking of GHP's property? *But see United States v. Sharpe*, 470 U.S. 675, 694 n.6 (1985) (Marshall, J., concurring in the judgment) ("Legal reasoning hardly consists of finding isolated sentences in wholly different contexts and using them to overrule sub silentio prior holdings," italics omitted).

The Supreme Court itself exercises both a "customary refusal to be bound by dicta" and a "customary skepticism toward per curiam

dispositions that lack the reasoned consideration of a full opinion." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 24 (1994). If this Court lacks the Supreme Court's customary skepticism, though, it still has both (1) the Supreme Court's admonition that it should "leav[e] to th[at] Court the prerogative of overruling its own decisions," *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) and (2) a century's worth of those decisions, including *Yee*, from which to conclude that section 49.99 did not work a per se taking.

D. ***Heights Apartments, LLC v. Walz*, the one decision that declined to apply *Yee* to COVID-19 eviction protections, produced a dissent from denial of rehearing that has proven more persuasive than the opinion itself.**

In the end, the best authority GHP has for escaping *Yee* is the Eighth Circuit's panel decision in *Heights Apartments, LLC v. Walz* (*Heights Apartments I*), 30 F.4th 720 (8th Cir. 2022). (AOB 25–26.) It is GHP's best authority because it appears, at least so far, to be the *only* authority holding that *Yee* does not preclude a landlord from bringing a per se takings claim over a COVID-19 eviction protection.

The *Heights Apartments I* panel was reviewing a series of Minnesota executive orders and a law that required landlords

temporarily to forbear from evicting tenants with overdue rent. *Id.* at

724–25. A landlord argued that this limitation on the ability to evict

"forced landlords to accept the physical occupation of their property

regardless of whether tenants provided compensation." *Id.* at 733.

Minnesota argued "that no physical taking has occurred because

landlords were not deprived of their right to evict a tenant;" that the

Minnesota measures "imposed only a restriction on when a landlord

could evict a tenant," as in *Yee*. *Id.*

The panel provided a précis of *Cedar Point Nursery*, writing that

the Supreme Court in that case "determined a California regulation

requiring agricultural employers to permit 'union organizers onto their

property for up to three hours per day, 120 days per year' was a per se

physical taking under the Fifth and Fourteenth Amendments." *Heights

Apartments I*, 30 F.4th at 733 (quoting *Cedar Point Nursery*, 141 S. Ct.

at 2069, 2072, italics omitted.) The panel continued, "[t]he Court

explained: 'Whenever a regulation results in a physical appropriation of

property, a per se taking has occurred.'" *Id.* (quoting *Cedar Point

Nursery*, 141 S. Ct. at 2072, italics omitted.) The panel concluded by

noting that "[i]t is immaterial whether the physical invasion is

'permanent or temporary,' 'intermittent as opposed to continuous,' or whether the government is directly invading the land or allowing a third party to do so." *Id.* (quoting *Cedar Point Nursery*, 141 S. Ct. at 2074–76).

It is worth pausing here to observe (again) that none of this is inconsistent with *Yee*, because (again) the point of *Yee* is that tenants are *invited by the landlord* and so—unlike *Cedar Point Nursery*'s union organizers—are not invaders. Still, the *Heights Apartments I* panel opined that "*Cedar Point Nursery* controls here and *Yee* . . . is distinguishable." *Heights Apartments I*, 30 F.4th at 733. But the *Heights Apartments I* panel did not then actually distinguish *Yee*; it instead summarized *Yee*'s facts incorrectly.

First, the panel wrote that "[t]he rent controls in *Yee* limited the amount of rent that could be charged and neither deprived landlords of their right to evict nor compelled landlords to continue leasing the property past the leases' termination." *Heights Apartments I*, 30 F.4th at 733. That's only half true, because while the Escondido ordinance in *Yee* "limited the amount of rent that could be charged," the Court analyzed that ordinance in conjunction with the California Mobilehome

Residency Law. *That* law prevented park owners from evicting tenants for no-fault reasons and—this was the whole point of the Yees' argument—therefore allowed mobile home owners to sell the right to occupy park land indefinitely (the Yees claimed) at below-market rent. *Yee*, 503 U.S. at 527.

Then, the panel wrote that "[t]he landlords in *Yee* sought to exclude future or incoming tenants rather than existing tenants." *Heights Apartments I*, 30 F.4th at 733. This is just wrong. The Yees' complaint was that the Escondido ordinance and the California law granted both "the tenants of mobilehomes presently in The Park" and "the successors in interest of such tenants" the "right to physically permanently occupy" the Yees' property. *Yee*, 503 U.S. at 525.

Following this mistaken two-sentence account of *Yee* and its three-sentence summary of *Cedar Point Nursery*, the *Heights Apartments I* panel offered only a few conclusory sentences. It held briskly that the landlord had "sufficiently alleged" that Minnesota had deprived it "of its right to exclude existing tenants without compensation." *Heights Apartments I*, 30 F.4th at 73.

That this brief has called the panel's decision "*Heights Apartments I*" is a clue that it wasn't the end of things. Four judges subsequently dissented from the denial of rehearing en banc. Judge Colloton—writing for himself, Chief Judge Smith, Judge Loken, and Judge Kelly—observed accurately that "the panel decision on the Takings Clause misreads the most analogous decision of the Supreme Court on the matter of per se takings." *Heights Apartments, LLC v. Walz* (*Heights Apartments II*), 39 F.4th 479, 480 (8th Cir. 2022) (italics omitted). "The panel thought the objecting landlords" in *Yee* "sought only 'to excluded future or incoming tenants rather than existing tenants.'" *Id.*

That wasn't true, *Yee*, 503 U.S. at 525, and the Supreme Court held—as to the existing tenants—"that the disputed laws did not effect a per se taking, because the landlords 'voluntarily rented their land to mobile home owners,' and a landlord who wished to 'change the use of his land' could 'evict his tenants, albeit with 6 or 12 months['] notice.'" *Heights Apartments II*, 39 F.4th at 480 (italics omitted). Because the *Heights Apartments I* panel proceeded from the mistaken premise that *Yee* had nothing to do with existing tenants, it "never addressed why

the scheme in *Yee* that allowed a landlord to evict existing tenants only for limited reasons after up to 12 months' notice did not constitute a per se taking, while a temporary eviction moratorium during a pandemic ostensibly does." *Heights Apartments II*, 39 F.4th at 480.

Little wonder that while *Heights Apartments I* is among the most frequently cited cases in GHP's opening brief, *Heights Apartments II* is referenced only once, glancingly, in a subsequent-history clause appended to a citation of *Heights Apartments I*. (AOB x, 23.) Meanwhile, given the panel's mistreatment of the law in *Heights Apartments I*, and the *Heights Apartments II* dissenters' explanation of exactly what was wrong with panel's opinion, it is not surprising that no court outside the Eighth Circuit appears to have followed *Heights Apartment I*. But at least two district courts, in line with the dissenters, expressly rejected *Heights Apartment I*'s treatment of *Yee*, and applied *Yee* to conclude that a COVID-19 eviction protection did not effect a per se taking of landlords' property. *Williams*, 2022 WL 17169833, at *11–12; *Gallo*, 610 F. Supp. 3d at 87–89.

Judge Colloton and the *Heights Apartments II* dissenters, along with the 12 courts to apply *Yee* to COVID-19 eviction protections, got it

right:  There is no reason "why the scheme in *Yee* that allowed a landlord to evict existing tenants only for limited reasons after up to 12 months' notice [would] not constitute a per se taking, while a temporary eviction moratorium during a pandemic [would]."  *Heights Apartments II*, 39 F.4th at 480.

## III.   GHP's refusal to amend its pleadings, including to allege a viable regulatory taking, puts an end to this action decisively.

Its per se takings claim foreclosed by *Yee* and its predecessors, GHP might still have alleged a regulatory taking.  *Yee*, 503 U.S. at 529. The district court concluded correctly that it failed to allege the facts necessary to state such a claim.

### A.   GHP failed to allege the requisite economic impact to make out a regulatory taking.

Deciding whether a measure has effected a regulatory taking involves what the Supreme Court has called "essentially ad hoc, factual inquiries."  *Penn Cent.*, 438 U.S. at 124.  Nonetheless, that Court's "decisions have identified several factors that have particular significance."  *Id.*  One of those factors is "[t]he economic impact of the regulation on the claimant."  *Id.*  In this Circuit and in others, the economic impact of a regulation is typically measured by comparing the

value taken from property with the value that remains. *E.g.*, *Bridge Aina Le'a, LLC*, 950 F.3d at 630–31; *Blackburn v. Dare Cnty.*, 58 F.4th 807, 812 (4th Cir. 2023), *cert. pending*, No. 22-1048; *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1343 (Fed. Cir. 2018). Finding a regulatory taking usually requires concluding that the value taken constituted a significant amount of the property's value. *See Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018) (a reduction in value of up to 92.5 percent may still be insufficient to establish a regulatory taking).

GHP, though, alleged only its monetary losses. (ER-191–97 ¶¶ 10–22.) It alleged nothing against which to compare those losses. (ER-18.) Even if monetary losses were somehow a proxy for "the value taken from the property," the "test for regulatory taking *requires* us to compare the value that has been taken from the property with the value that remains in the property," meaning that GHP still has to answer "the critical question[]" of "how to define the unit of property 'whose value is to furnish the denominator of the fraction.'" *Murr v. Wisconsin*, 582 U.S. 383, 395 (2017) (italics added). Or: To what should a court

compare GHP's losses to determine if they're indicative of a regulation gone too far—which is, at bottom, the purpose of this exercise?

As it did in the district court, GHP contends that the ad hoc nature of the regulatory takings test means that the answer can be "nothing;" that it needn't allege any kind of denominator; that claiming a large loss in a vacuum is enough and that authority to the contrary is just wrong. (*Compare* AOB 34–38 *with* ER-18.) Assuming this Court could ignore its own decision in, e.g., *Colony Cove*—it cannot, *CoreCivic, Inc. v. Candide Group, LLC*, 46 F.4th 1136, 1141 (9th Cir. 2022)—GHP hasn't really offered a reason why the Court *should* ignore its own decision.

It is no answer to say that in a case preceding *Colony Cove*, the Supreme Court itself "found a regulatory taking where the law stripped the rights of certain Native Americans to devise their property *despite no showing of economic harm*." (AOB 35, original italics.) That case, *Hodel v. Irving*, 481 U.S. 704 (1987), long precedes *Colony Cove*, and so cannot serve as a basis for a panel of this Court to depart from *Colony Cove*. *CoreCivic*, 46 F.4th at 1141. Then there's the fact that GHP misreads *Irving*. The Supreme Court in that case did *not* find a

regulatory taking without a showing of economic harm.  It noted expressly that "[t]here is no question that the relative economic impact [of an escheat provision] upon the owners of these property rights can be substantial," *Irving*, 481 U.S. at 714, and then weighed the economic harm it found against the other *Penn Central* factors to find a regulatory taking, *id.* at 715–16.

Nor is it an answer that *Colony Cove* came to the Court in a different procedural posture than does this case.  It's doubtless true that the record after a trial in *Colony Cove* contained more *evidence* by which to evaluate *Penn Central*'s economic-harm factor.  (AOB 36.)  But that doesn't excuse GHP's failure at the pleading stage to allege facts constituting a denominator from which that harm could be inferred.  It is no more "perverse" to ask for those allegations at the pleading stage than it is to ask a plaintiff to allege any other kind of facts that it can later develop through discovery.  And GHP's own finances are certainly more within its ken at the outset of a lawsuit than are, e.g., innuendos about the City's reasons for enacting section 49.99—but that didn't stop GHP from alleging "on information and belief" that the City designed

the ordinance "to provide a compulsory and de facto rent forgiveness to be foisted on landlords throughout the City." (ER-204 ¶ 51.)

It isn't hard to imagine why GHP would prefer only to allege numbers that look large in the abstract if its goal is to show that it was made to shoulder a crippling economic burden. GHP's preferences, however, do not control the facts it is required to plead. And here it failed to plead a necessary one.

## B. GHP's decision to forgo amendment prevents it from seeking leave to allege an economic impact properly—or from asking for a remand to fix anything else that has doomed its complaint.

In the normal course of things, GHP's failure to allege a denominator for the economic-harm inquiry could be remedied with an amendment to its pleadings. Not so here. GHP forwent the leave to amend that the district court offered it, standing on its pleadings in order to invoke this Court's jurisdiction. (ER-7.) In any event, GHP's opening brief did not seek leave to amend—for *any* reason—thereby forfeiting the request. *Balser v. Dep't of Justice*, 327 F.3d 903, 911 (9th Cir. 2003). Consequently, any pleading deficiency—not only one related to GHP's failure to allege economic harm—is no longer recoverable. The Court can now put an end to this litigation. It should.

## CONCLUSION

The Court should affirm the district court's judgment of dismissal.

Respectfully submitted,

Dated:  July 14, 2023

LOS ANGELES CITY ATTORNEY'S OFFICE
Hydee Feldstein Soto
Denise C. Mills
Scott Marcus
Jonathan H. Eisenman

 s/ Jonathan H. Eisenman
Jonathan H. Eisenman

# APPENDIX

ORDINANCE NO. **186606**

An ordinance amending Article 14.6 of Chapter IV of the Los Angeles Municipal Code regarding tenant protections during the COVID-19 pandemic

## THE PEOPLE OF THE CITY OF LOS ANGELES
## DO ORDAIN AS FOLLOWS:

Section 1. Article 14.6 of Chapter IV of the Los Angeles Municipal Code is amended in its entirety to read as follows:

## ARTICLE 14.6

## TEMPORARY PROTECTION OF TENANTS DURING COVID-19 PANDEMIC

## SEC. 49.99. FINDINGS.

The City of Los Angeles is experiencing an unprecedented public health crisis brought by the Coronavirus, which causes an acute respiratory illness called COVID-19.

On March 4, 2020, the Governor of the State of California declared a State of Emergency in California as result of the COVID-19 pandemic. That same day, the Mayor also declared a local emergency.

On March 16, 2020, the Governor issued Executive Order N-28-20, which authorizes local jurisdictions to suspend certain evictions of renters and homeowners, among other protections. The Executive Order further authorizes the City of Los Angeles to implement additional measures to promote housing security and stability to protect public health and mitigate the economic impacts of the COVID-19 pandemic.

The economic impacts of COVID-19 have been significant and will have lasting repercussions for the residents of the City of Los Angeles. National, county, and city public health authorities issued recommendations, including, but not limited to, social distancing, staying home if sick, canceling or postponing large group events, working from home, and other precautions to protect public health and prevent transmission of this communicable virus. Residents most vulnerable to COVID-19, including those 65 years of age or older, and those with underlying health issues, have been ordered to self-quarantine, self-isolate, or otherwise remain in their homes. Non-essential businesses have been ordered to close. More recent orders from the Governor and the Mayor have ordered people to stay at home and only leave their homes to visit or work in essential businesses. As a result, many residents are experiencing unexpected expenditures or substantial loss of income as a result of business closures, reduced work hours, or lay-offs related to these government-ordered interventions. Those already experiencing homelessness are especially vulnerable during this public health crisis.

1

The COVID-19 pandemic threatens to undermine housing security and generate unnecessary displacement of City residents and instability of City businesses. Therefore, the City of Los Angeles has taken and must continue to take measures to protect public health, life, and property.

This ordinance temporarily prohibits evictions of residential and commercial tenants for failure to pay rent due to COVID-19, and prohibits evictions of residential tenants during the emergency for no-fault reasons, for unauthorized occupants or pets, and for nuisance related to COVID-19. This ordinance further suspends withdrawals of occupied residential units from the rental market under the Ellis Act, Government Code Section 7060, et seq.

## SEC. 49.99.1. DEFINITIONS.

The following words and phrases, whenever used in this article, shall be construed as defined in this section:

A. **Commercial Real Property**. "Commercial real property" is any parcel of real property that is developed and used either in part or in whole for commercial purposes. This does not include commercial real property leased by a multi-national company, a publicly traded company, or a company that employs more than 500 employees.

B. **Endeavor to Evict**. "Endeavor to evict" is conduct where the Owner lacks a good faith basis to believe that the tenant does not enjoy the benefits of this article and the Owner serves or provides in any way to the tenant: a notice to pay or quit, a notice to perform covenant or quit, a notice of termination, or any other eviction notice.

C. **Local Emergency Period**. "Local emergency period" is the period of time from March 4, 2020, to the end of the local emergency as declared by the Mayor.

D. **No-fault Reason**. "No-fault reason" is any no-fault reason under California Civil Code Section 1946.2(b) or any no-fault reason under the Rent Stabilization Ordinance.

E. **Owner**. "Owner" is any person, acting as principal or through an agent, offering residential or Commercial Real Property for rent, and includes a successor in interest to the owner.

F. **Residential Real Property**. "Residential real property" is any dwelling or unit that is intended or used for human habitation.

2

## SEC. 49.99.2. PROHIBITION ON RESIDENTIAL EVICTIONS.

A.     During the Local Emergency Period and for 12 months after its expiration, no Owner shall endeavor to evict or evict a residential tenant for non-payment of rent during the Local Emergency Period if the tenant is unable to pay rent due to circumstances related to the COVID-19 pandemic. These circumstances include loss of income due to a COVID-19 related workplace closure, child care expenditures due to school closures, health-care expenses related to being ill with COVID-19 or caring for a member of the tenant's household or family who is ill with COVID-19, or reasonable expenditures that stem from government-ordered emergency measures. Tenants shall have up to 12 months following the expiration of the Local Emergency Period to repay any rent deferred during the Local Emergency Period. Nothing in this article eliminates any obligation to pay lawfully charged rent. However, the tenant and Owner may, prior to the expiration of the Local Emergency Period or within 90 days of the first missed rent payment, whichever comes first, mutually agree to a plan for repayment of unpaid rent selected from options promulgated by the Housing and Community Investment Department ("HCID") for that purpose.

B.     No Owner shall endeavor to evict or evict a residential tenant for a no-fault reason during the Local Emergency Period.

C.     No Owner shall endeavor to evict or evict a residential tenant based on the presence of unauthorized occupants or pets, or for nuisance related to COVID-19 during the Local Emergency Period.

D.     No Owner shall charge interest or a late fee on rent not paid under the provisions of this article.

E.     An Owner shall: (i) provide written notice to each residential tenant of the protections afforded by this article ("Protections Notice") within 15 days of the effective date of this ordinance; and (ii) provide the Protections Notice during the Local Emergency Period and for 12 months after its termination each time the Owner serves a notice to pay or quit, a notice to terminate a residential tenancy, a notice to perform covenant or quit, or any eviction notice, including any notice required under California Code of Civil Procedure Section 1161 and California Civil Code Section 1946.1. HCID shall make available the form of the Protections Notice, which must be used, without modification of content or format, by the Owner to comply with this subparagraph. HCID will produce the form of the Protections Notice in the most commonly used languages in the City, and an Owner must provide the Protections Notice in English and the language predominantly used by each tenant.

F.     No Owner shall influence or attempt to influence, through fraud, intimidation or coercion, a residential tenant to transfer or pay to the Owner any sum received by the tenant as part of any governmental relief program.

3

G.    Except as otherwise specified in this article, nothing in this section shall prohibit an Owner from seeking to evict a residential tenant for a lawful purpose and through lawful means.

## SEC. 49.99.3. PROHIBITION ON COMMERICAL EVICTIONS.

During the Local Emergency Period and for three months thereafter, no Owner shall endeavor to evict or evict a tenant of Commercial Real Property for non-payment of rent during the Local Emergency Period if the tenant is unable to pay rent due to circumstances related to the COVID-19 pandemic. These circumstances include loss of business income due to a COVID-19 related workplace closure, child care expenditures due to school closures, health care expenses related to being ill with COVID-19 or caring for a member of the tenant's household or family who is ill with COVID-19, or reasonable expenditures that stem from government-ordered emergency measures. Tenants shall have up to three months following the expiration of the Local Emergency Period to repay any rent deferred during the Local Emergency Period. Nothing in this article eliminates any obligation to pay lawfully charged rent. No Owner shall charge interest or a late fee on rent not paid under the provisions of this article.

## SEC. 49.99.4. PROHIBITION ON REMOVAL OF OCCUPIED RESIDENTIAL UNITS.

No Owner may remove occupied Residential Real Property from the rental market under the Ellis Act, Government Code Section 7060, *et seq.*, during the pendency of the Local Emergency Period. Tenancies may not be terminated under the Ellis Act until 60 days after the expiration of the Local Emergency Period.

## SEC. 49.99.5. RETROACTIVITY.

This article applies to nonpayment eviction notices, no-fault eviction notices, and unlawful detainer actions based on such notices, served or filed on or after the date on which a local emergency was proclaimed. Nothing in this article eliminates any obligation to pay lawfully charged rent.

## SEC. 49.99.6. AFFIRMATIVE DEFENSE.

Tenants may use the protections afforded in this article as an affirmative defense in an unlawful detainer action.

## SEC. 49.99.7. PRIVATE RIGHT OF ACTION FOR RESIDENTIAL TENANTS.

If an Owner violates Section 49.99.2, except for 49.99.2(E)(i), an aggrieved residential tenant may institute a civil proceeding for injunctive relief, direct money damages, and any other relief the Court deems appropriate, including, at the discretion of the Court, an award of a civil penalty up to $10,000 per violation depending on the severity of the violation. If the aggrieved residential tenant is older than 65 or disabled, the Court may award an additional civil penalty up to $5,000 per violation depending on

4

the severity of the violation. The Court may award reasonable attorney's fees and costs to a residential tenant who prevails in any such action. The Court may award reasonable attorney's fees and costs to an Owner who prevails in any such action and obtains a Court determination that the tenant's action was frivolous. A civil proceeding by a residential tenant under this section shall commence only after the tenant provides written notice to the Owner of the alleged violation, and the Owner is provided 15 days from the receipt of the notice to cure the alleged violation. The remedies in this paragraph apply on the effective date of this section, and are not exclusive nor preclude any person from seeking any other remedies, penalties or procedures provided by law.

## SEC. 49.99.8. PENALTIES.

Upon the effective date of this section, an Owner who violates this article shall be subject to the issuance of an administrative citation as set forth in Article 1.2 of Chapter I of this Code. Issuance of an administrative citation shall not be deemed a waiver of any other enforcement remedies provided in this Code.

## SEC. 49.99.9. SEVERABILITY.

If any provision of this article is found to be unconstitutional or otherwise invalid by any court of competent jurisdiction, that invalidity shall not affect the remaining provisions of this article which can be implemented without the invalid provisions, and to this end, the provisions of this article are declared to be severable. The City Council hereby declares that it would have adopted this article and each provision thereof irrespective of whether any one or more provisions are found invalid, unconstitutional or otherwise unenforceable.

Sec. 2. **URGENCY CLAUSE.** The City Council finds and declares that this ordinance is required for the immediate protection of the public peace, health, and safety for the following reasons: the City of Los Angeles and its residents are suffering significant risk to life and property due to the devastating effects of COVID-19, and the protections afforded in this ordinance are vital to mitigate those risks. The Council, therefore, adopts this ordinance to become effective upon publication pursuant to Los Angeles City Charter Section 253.

5

Sec. 3.  The City Clerk shall certify to the passage of this ordinance and have it published in accordance with Council policy, either in a daily newspaper circulated in the City of Los Angeles or by posting for ten days in three public places in the City of Los Angeles: one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall; one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall East; and one copy on the bulletin board located at the Temple Street entrance to the Los Angeles County Hall of Records.

Approved as to Form and Legality

MICHAEL N. FEUER, City Attorney

By _____

DAVID MICHAELSON
Chief Assistant City Attorney

Date ___5 / 6 / 2020_____

File No(s). 20-0147-S19, 20-0479, 20-0522

M:\Muni Counsel\ORDINANCES\Final Revised Draft Ordinance Amending LAMC Article 14.6 Re Tenant Protections 5.6.20.docx

The Clerk of the City of Los Angeles hereby certifies that the foregoing ordinance was passed by the Council of the City of Los Angeles, **by a vote of not less than three-fourths** of all its members.

CITY CLERK                                              MAYOR

Ordinance Passed 05/06/2020                    Approved 05/07/2020

187736

**ORDINANCE NO. _____**

An ordinance amending Article 14.6 of Chapter IV of the Los Angeles Municipal Code to sunset eviction protections related to the COVID-19 Pandemic and adding Article 11 to Chapter XX of the Los Angeles Municipal Code to waive fees, fines, and penalties, as specified.

**THE PEOPLE OF THE CITY OF LOS ANGELES
DO ORDAIN AS FOLLOWS:**

Section 1. The sixth paragraph of Section 49.99 of Article 14.6 of Chapter IV of the Los Angeles Municipal Code is amended to read as follows:

This ordinance temporarily prohibits evictions of residential tenants for failure to pay rent due to COVID-19 and prohibits evictions of residential tenants for no-fault reasons, for unauthorized occupants or pets, and for nuisance related to COVID-19. This ordinance also regulates certain evictions pursuant to the Ellis Act, Government Code Section 7060, et seq.

Sec. 2. Subsection A of Section 49.99.2 of Article 14.6 of Chapter IV of the Los Angeles Municipal Code is amended to read as follows:

A.     Until January 31, 2023, no Owner shall endeavor to evict or evict a residential tenant for non-payment of rent if the tenant is unable to pay rent due to circumstances related to the COVID-19 pandemic. These circumstances include loss of income due to a COVID-19 related workplace closure, child care expenditures due to school closures, health-care expenses related to being ill with COVID-19 or caring for a member of the tenant's household or family who is ill with COVID-19, or reasonable expenditures that stem from government-ordered emergency measures.

Rental arrears accumulated between March 1, 2020, and September 30, 2021, under this subsection must be paid by August 1, 2023. Rental arrears accumulated between October 1, 2021, and January 31, 2023, under this subsection must be paid by February 1, 2024. Unless the COVID-19 Tenant Relief Act, Code of Civil Procedure Section 1179.01 et seq. applies, an Owner may bring an action to recover possession of residential rental property following the tenant's default in the payment of rent according to these timeframes.

Nothing in this article eliminates any obligation to pay lawfully charged rent.

Sec. 3. Subsection B of Section 49.99.2 of Article 14.6 of Chapter IV of the Los Angeles Municipal Code is amended to read as follows:

B.     Until January 31, 2023, no Owner shall endeavor to evict or evict a residential tenant for a no-fault reason, unless the eviction is undertaken to comply with

1

a governmental agency's order to vacate, order to comply, order to abate, or any other order that necessitates the vacating of residential rental property.

1.    Following January 31, 2023, no-fault evictions to install a resident manager may proceed only when an on-site manager is required by law or the terms of a regulatory agreement unless a Declaration of Intent to Evict for Resident Manager occupancy was delivered to the Los Angeles Housing Department before March 4, 2020.

2.    An Owner shall provide 60 days' written notice to any tenant in possession of a rental unit subject to the Rent Stabilization Ordinance on whom the owner previously served written notice terminating the tenancy for a no-fault reason under Los Angeles Municipal Code Section 151.09. The tenant may file an appeal under Los Angeles Municipal Code Section 151.09.G for relocation assistance based on a change in disability status if applicable.

Sec. 4. Subsection C of Section 49.99.2 of Article 14.6 of Chapter IV of the Los Angeles Municipal Code is amended to read as follows:

C.    Until January 31, 2024, no Owner shall endeavor to evict or evict a residential tenant based on the presence of unauthorized occupants or pets necessitated by COVID-19. Prior to evicting a residential tenant based on the presence of unauthorized occupants or pets, the Owner shall serve a 30-day notice to cure.

Sec. 5. Section 49.99.2.E of Article 14.6 of Chapter IV of the Los Angeles Municipal Code is repealed.

Sec. 6. Section 49.99.3 of Article 14.6 of Chapter IV of the Los Angeles Municipal Code is repealed.

Sec. 7. Section 49.99.4 of Article 14.6 of Chapter IV of the Los Angeles Municipal Code is amended to read as follows:

### SEC. 49.99.4. REMOVAL OF OCCUPIED RESIDENTIAL UNITS.

No Owner may bring an action to recover possession of occupied residential real property under the Ellis Act, Government Code Section 7060 et seq. until April 1, 2023. Owners must comply with Sections 151.22 through 151.28 of Article 1, Chapter 15 of the Los Angeles Municipal Code to demolish or withdraw rental units subject to the Rent Stabilization Ordinance from rental housing use.

2

Sec. 8. Article 11 is added to Chapter XX of the Los Angeles Municipal Code as follows:

## ARTICLE 11

## WAIVER OF NONCOMPLIANCE AND RELATED INSPECTION FEES, FINES, AND PENALTIES

### SEC. 201. WAIVER OF FEES, FINES, AND PENALTIES.

The Los Angeles Housing Department and Department of Building and Safety shall waive noncompliance or related inspection fees, fines, or penalties imposed between March 4, 2020, and January 31, 2023, due to a landlord's inability to comply with a governmental agency's order to vacate, order to comply, or order to abate, or any other similar order because of an inability to evict under Article 14.6 of Chapter IV of the Los Angeles Municipal Code.

Sec. 9. **URGENCY CLAUSE.** The City Council finds and declares that this ordinance is required for the immediate protection of the public peace, health, and safety for the following reasons: the City of Los Angeles and its residents are suffering significant risk to life and property due to the devastating effects of COVID-19, and the protections afforded in this ordinance are vital to mitigate those risks. The Council, therefore, adopts this ordinance to become effective upon publication pursuant to Los Angeles City Charter Section 253.

3

Sec. 10.  The City Clerk shall certify to the passage of this ordinance and have it published in accordance with Council policy, either in a daily newspaper circulated in the City of Los Angeles or by posting for ten days in three public places in the City of Los Angeles: one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall; one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall East; and one copy on the bulletin board located at the Temple Street entrance to the Los Angeles County Hall of Records.

Approved as to Form and Legality

MICHAEL N. FEUER, City Attorney

By _____

ELAINE ZHONG
Deputy City Attorney

Date _____ 11 | 18 | 22 _____

File No(s). ___ 21-0042-S3 _____

M:\Muni Counsel\ORDINANCES\Revised Draft Ordinance Amending LAMC Article 14.6 Re COVID-19 Tenant Protections.docx

The Clerk of the City of Los Angeles hereby certifies that the foregoing ordinance was passed by the Council of the City of Los Angeles, **by a vote of not less than three-fourths** of all its members.

CITY CLERK                          MAYOR

_____          _____

Ordinance Passed_January 20, 2023_          Approved _____
                                                    01/25/2023

Published Date: 01/27/2023
Ordinance Effective Date: 01/27/2023

**Appendix I**
**Emergency Rules Related to COVID-19**

**Emergency rule 1.  Unlawful detainers**

**(a)  Application**

Notwithstanding any other law, including Code of Civil Procedure sections 1166, 1167, 1169, and 1170.5, this rule applies to all actions for unlawful detainer.

**(b)  Issuance of summons**

A court may not issue a summons on a complaint for unlawful detainer unless the court finds, in its discretion and on the record, that the action is necessary to protect public health and safety.

**(c)  Entry of default**

A court may not enter a default or a default judgment for restitution in an unlawful detainer action for failure of defendant to appear unless the court finds both of the following:

(1)   The action is necessary to protect public health and safety; and

(2)   The defendant has not appeared in the action within the time provided by law, including by any applicable executive order.

**(d)  Time for trial**

If a defendant has appeared in the action, the court may not set a trial date earlier than 60 days after a request for trial is made unless the court finds that an earlier trial date is necessary to protect public health and safety. Any trial set in an unlawful detainer proceeding as of April 6, 2020 must be continued at least 60 days from the initial date of trial.

**(e)  Sunset of rule**

This rule will remain in effect through September 1, 2020, or until amended or repealed by the Judicial Council. Notwithstanding Code of Civil Procedure section 1170.5 and this subdivision, any trial date set under (d) as of September 1, 2020, will remain as set unless a court otherwise orders.

1    *(Subd (e) amended effective August 13, 2020.)*
2
3    *Emergency Rule 1 amended effective August 13, 2020.*
4
5    **Emergency rule 2.  Judicial foreclosures—suspension of actions**
6
7    Notwithstanding any other law, this rule applies to any action for foreclosure on a
8    mortgage or deed of trust brought under chapter 1, title 10, of part 2 of the Code of Civil
9    Procedure, beginning at section 725a, including any action for a deficiency judgment, and
10   provides that, through September 1, 2020, or until this rule is amended or repealed by the
11   Judicial Council:
12
13   (1)    All such actions are stayed, and the court may take no action and issue no
14          decisions or judgments unless the court finds that action is required to further the
15          public health and safety.
16
17   (2)    The period for electing or exercising any rights under that chapter, including
18          exercising any right of redemption from a foreclosure sale or petitioning the court
19          in relation to such a right, is extended.
20
21   *Emergency Rule 2 amended effective August 13, 2020.*
22
23                         **Advisory Committee Comment**
24
25   The provision for tolling any applicable statute of limitations, in prior subdivision (2), has been
26   removed as unnecessary because the tolling provisions in emergency rule 9 apply to actions
27   subject to this rule.
28
29
30   **Emergency rule 3.  Use of technology for remote appearances**
31
32   **(a)    Remote appearances**
33
34   Notwithstanding any other law, in order to protect the health and safety of the public,
35   including court users, both in custody and out of custody defendants, witnesses, court
36   personnel, judicial officers, and others, courts must conduct judicial proceedings and
37   court operations as follows:
38
39   (1)    Courts may require that judicial proceedings and court operations be
40          conducted remotely.
41
42   (2)    In criminal proceedings, courts must receive the consent of the defendant to
43          conduct the proceeding remotely and otherwise comply with emergency rule

5. Notwithstanding Penal Code sections 865 and 977 or any other law, the court may conduct any criminal proceeding remotely. As used in this rule, "consent of the defendant" means that the consent of the defendant is required only for the waiver of the defendant's appearance as provided in emergency rule 5. For good cause shown, the court may require any witness to personally appear in a particular proceeding.

    (3)    Conducting proceedings remotely includes, but is not limited to, the use of video, audio, and telephonic means for remote appearances; the electronic exchange and authentication of documentary evidence; e-filing and e-service; the use of remote interpreting; and the use of remote reporting and electronic recording to make the official record of an action or proceeding.

**(b)    Sunset of rule**

This rule will remain in effect until 90 days after the Governor declares that the state of emergency related to the COVID-19 pandemic is lifted, or until amended or repealed by the Judicial Council.

**Emergency rule 4.  Emergency Bail Schedule  [Repealed]**
*Emergency rule 4 repealed effective June 20, 2020.*

**Emergency rule 5.  Personal appearance waivers of defendants during health emergency**

**(a)    Application**

Notwithstanding any other law, including Penal Code sections 865 and 977, this rule applies to all criminal proceedings except cases alleging murder with special circumstances and cases in which the defendant is currently incarcerated in state prison, as governed by Penal Code section 977.2.

**(b)    Types of personal appearance waivers**

    (1)    With the consent of the defendant, the court must allow a defendant to waive his or her personal appearance and to appear remotely, either through video or telephonic appearance, when the technology is available.

    (2)    With the consent of the defendant, the court must allow a defendant to waive his or her appearance and permit counsel to appear on his or her behalf. The court must accept a defendant's waiver of appearance or personal appearance when:

1             (A)    Counsel for the defendant makes an on the record oral representation
2                     that counsel has fully discussed the waiver and its implications with the
3                     defendant and the defendant has authorized counsel to proceed as
4                     counsel represents to the court;
5
6             (B)    Electronic communication from the defendant as confirmed by
7                     defendant's counsel; or
8
9             (C)    Any other means that ensures the validity of the defendant's waiver.
10

11   **(c)**   **Consent by the defendant**
12

13       (1)    For purposes of arraignment and entry of a not guilty plea, consent means a
14             knowing, intelligent, and voluntary waiver of the right to appear personally in
15             court. Counsel for the defendant must state on the record at each applicable
16             hearing that counsel is proceeding with the defendant's consent.
17

18       (2)    For purposes of waiving time for a preliminary hearing, consent also means a
19             knowing, intelligent, and voluntary waiver of the right to hold a preliminary
20             hearing within required time limits specified either in Penal Code section
21             859b or under emergency orders issued by the Chief Justice and Chair of the
22             Judicial Council.
23

24       (3)    The court must accept defense counsel's representation that the defendant
25             understands and agrees with waiving any right to appear unless the court has
26             specific concerns in a particular matter about the validity of the waiver.
27

28   **(d)**   **Appearance through counsel**
29

30       (1)    When counsel appears on behalf of a defendant, courts must allow counsel to
31             do any of the following:
32

33             (A)    Waive reading and advisement of rights for arraignment.
34

35             (B)    Enter a plea of not guilty.
36

37             (C)    Waive time for the preliminary hearing.
38

39       (2)    For appearances by counsel, including where the defendant is either
40             appearing remotely or has waived his or her appearance and or counsel is
41             appearing by remote access, counsel must confirm to the court at each
42             hearing that the appearance by counsel is made with the consent of the
43             defendant.

**(e)**     **Conduct of remote hearings**

    (1)     With the defendant's consent, a defendant may appear remotely for any pretrial criminal proceeding.

    (2)     Where a defendant appears remotely, counsel may not be required to be personally present with the defendant for any portion of the criminal proceeding provided that the audio and/or video conferencing system or other technology allows for private communication between the defendant and his or her counsel. Any private communication is confidential and privileged under Evidence Code section 952.

**(f)**     **Sunset of rule**

    This rule will remain in effect until 90 days after the Governor declares that the state of emergency related to the COVID-19 pandemic is lifted, or until amended or repealed by the Judicial Council.


**Emergency rule 6. Emergency orders: juvenile dependency proceedings**

**(a)**     **Application**

    This rule applies to all juvenile dependency proceedings filed or pending until the state of emergency related to the COVID-19 pandemic is lifted.

**(b)**     **Essential hearings and orders**

    The following matters should be prioritized in accordance with existing statutory time requirements.

    (1)     Protective custody warrants filed under Welfare and Institutions Code section 340.

    (2)     Detention hearings under Welfare and Institutions Code section 319. The court is required to determine if it is contrary to the child's welfare to remain with the parent, whether reasonable efforts were made to prevent removal, and whether to vest the placing agency with temporary placement and care.

    (3)     Psychotropic medication applications.

    (4)     Emergency medical requests.

(5) A petition for reentry of a nonminor dependent.

(6) Welfare and Institutions Code section 388 petitions that require an immediate response based on the health and safety of the child, which should be reviewed for a prima facie showing of change of circumstances sufficient to grant the petition or to set a hearing. The court may extend the final ruling on the petition beyond 30 days.

**(c)** **Foster care hearings and continuances during the state of emergency**

(1) A court may hold any proceeding under this rule via remote technology consistent with rule 5.531 and emergency rule 3.

(2) At the beginning of any hearing at which one or more participants appears remotely, the court must admonish all the participants that the proceeding is confidential and of the possible sanctions for violating confidentiality.

(3) The child welfare agency is responsible for notice of remote hearings unless other arrangements have been made with counsel for parents and children. Notice is required for all parties and may include notice by telephone or other electronic means. The notice must also include instructions on how to participate in the court hearing remotely.

(4) Court reports

  (A) Attorneys for parents and children must accept service of the court report electronically.

  (B) The child welfare agency must ensure that the parent and the child receive a copy of the court report on time.

  (C) If a parent or child cannot receive the report electronically, the child welfare agency must deliver a hard copy of the report to the parent and the child on time.

(5) Nothing in this subdivision prohibits the court from making statutorily required findings and orders, by minute order only and without a court reporter, by accepting written stipulations from counsel when appearances are waived if the stipulations are confirmed on the applicable Judicial Council forms or equivalent local court forms.

(6) If a court hearing cannot occur either in the courthouse or remotely, the hearing may be continued up to 60 days, except as otherwise specified.

(A)  A dispositional hearing under Welfare and Institutions Code section 360 should not be continued more than 6 months after the detention hearing without review of the child's circumstances. In determining exceptional circumstances that justify holding the dispositional hearing more than 6 months after the child was taken into protective custody, the impact of the state of emergency related to the COVID-19 pandemic must be considered.

i.  If the dispositional hearing is continued more than 6 months after the start date of protective custody, a review of the child must be held at the 6-month date. At the review, the court must determine the continued necessity for and appropriateness of the placement; the extent of compliance with the case plan or available services that have been offered; the extent of progress which has been made toward alleviating or mitigating the causes necessitating placement; and the projected likely date by which the child may return home or placed permanently.

ii.  The court may continue the matter for a full hearing on all dispositional findings and orders.

(B)  A judicial determination of reasonable efforts must be made within 12 months of the date a child enters foster care to maintain a child's federal title IV-E availability. If a permanency hearing is continued beyond the 12-month date, the court must review the case to determine if the agency has made reasonable efforts to return the child home or arrange for the child to be placed permanently. This finding can be made without prejudice and may be reconsidered at a full hearing.

(7)  During the state of emergency related to the COVID-19 pandemic, previously authorized visitation must continue, but the child welfare agency is to determine the manner of visitation to ensure that the needs of the family are met. If the child welfare agency changes the manner of visitation for a child and a parent or legal guardian in reunification, or for the child and a sibling(s), or a hearing is pending under Welfare and Institutions Code section 366.26, the child welfare agency must notify the attorneys for the children and parents within 5 court days of the change. All changes in manner of visitation during this time period must be made on a case by case basis, balance the public health directives and best interest of the child, and take into consideration whether in-person visitation may continue to be held safely. Family time is important for child and parent well-being, as well as for efforts toward reunification. Family time is especially important during

1  times of crisis. Visitation may only be suspended if a detriment finding is
2  made in a particular case based on the facts unique to that case. A detriment
3  finding must not be based solely on the existence of the impact of the state of
4  emergency related to the COVID-19 pandemic or related public health
5  directives.

7  (A)  The attorney for the child or parent may ask the juvenile court to
8       review the change in manner of visitation. The child or parent has the
9       burden of showing that the change is not in the best interest of the child
10      or is not based on current public health directives.

12  (B)  A request for the court to review the change in visitation during this
13       time period must be made within 14 court days of the change. In
14       reviewing the change in visitation, the court should take into
15       consideration the factors in (c)(7).

17  **(d)    Sunset of rule**

19  This rule will remain in effect until 90 days after the Governor declares that the
20  state of emergency related to the COVID-19 pandemic is lifted, or until amended or
21  repealed by the Judicial Council.

23  **Advisory Committee Comment**

25  When courts are unable to hold regular proceedings because of an emergency that has resulted in
26  an order as authorized under Government Code section 68115, federal timelines do not stop.
27  Circumstances may arise where reunification services to the parent, including visitation, may not
28  occur or be provided. The court must consider the circumstances of the emergency when deciding
29  whether to extend or terminate reunification services and whether services were reasonable given
30  the state of the emergency. (Citations: 42 U.S.C. § 672(a)(1)–(2), (5); 45 CFR § 1355.20; 45 CFR
31  § 1356.21 (b) – (d);  45 C.F.R. § 1356.71(d)(1)(iii); Child Welfare Policy Manual, 8.3A.9 Title
32  IV-E, Foster Care Maintenance Payments Program, Reasonable efforts, Question 2
33  (www.acf.hhs.gov/cwpm/public_html/programs/cb/laws_policies/laws/cwpm/policy_dsp.jsp?citI
34  D=92)]); Letter dated March 27, 2020, from Jerry Milner, Associate Commissioner, Children's
35  Bureau, Administration for Children and Families, U.S. Department of Health and Human
36  Services.)

39  **Emergency rule 7.  Emergency orders: juvenile delinquency proceedings**

41  **(a)    Application**

This rule applies to all proceedings in which a petition has been filed under Welfare and Institutions Code section 602 in which a hearing would be statutorily required during the state of emergency related to the COVID-19 pandemic.

**(b)** **Juvenile delinquency hearings and orders during the state of emergency**

(1) A hearing on a petition for a child who is in custody under Welfare and Institutions Code section 632 or 636 must be held within the statutory timeframes as modified by an order of the court authorized by Government Code section 68115. The court must determine if it is contrary to the welfare of the child to remain in the home, whether reasonable services to prevent removal occurred, and whether to place temporary placement with the probation agency if the court will be keeping the child detained and out of the home.

(2) If a child is detained in custody and an in-person appearance is not feasible due to the state of emergency, courts must make reasonable efforts to hold any statutorily required hearing for that case via remote appearance within the required statutory time frame and as modified by an order of the court authorized under Government Code section 68115 for that proceeding. If a remote appearance is not a feasible option for such a case during the state of emergency, the court may continue the case as provided in (d) for the minimum period of time necessary to hold the proceedings.

(3) Without regard to the custodial status of the child, the following hearings should be prioritized during the state of emergency related to the COVID-19 pandemic:

(A) Psychotropic medication applications.

(B) All emergency medical requests.

(C) A petition for reentry of a nonminor dependent.

(D) A hearing on any request for a warrant for a child.

(E) A probable cause determination for a child who has been detained but has not had a detention hearing within the statutory time limits.

(4) Notwithstanding any other law, and except as described in (5), during the state of emergency related to the COVID-19 pandemic, the court may continue for good cause any hearing for a child not detained in custody who is subject to its juvenile delinquency jurisdiction until a date after the state of

emergency has been lifted considering the priority for continued hearings in (d).

(5)   For children placed in foster care under probation supervision, a judicial determination of reasonable efforts must be made within 12 months of the date the child enters foster care to maintain a child's federal title IV-E availability. If a permanency hearing is continued beyond the 12-month date, the court must nevertheless hold a review to determine if the agency has made reasonable efforts to return the child home or place the child permanently. This finding can be made without prejudice and may be reconsidered at a full hearing.

**(c)**   **Proceedings with remote appearances during the state of emergency.**

(1)   A court may hold any proceeding under this rule via remote technology consistent with rule 5.531 and emergency rule 3.

(2)   At the beginning of any hearing conducted with one or more participants appearing remotely, the court must admonish all the participants that the proceeding is confidential and of the possible sanctions for violating confidentiality.

(3)   The court is responsible for giving notice of remote hearings, except for notice to a victim, which is the responsibility of the prosecuting attorney or the probation department. Notice is required for all parties and may include notice by telephone or other electronic means. The notice must also include instructions on how to participate in the hearing remotely.

(4)   During the state of emergency, the court has broad discretion to take evidence in the manner most compatible with the remote hearing process, including but not limited to taking testimony by written declaration. If counsel for a child or the prosecuting attorney objects to the court's evidentiary procedures, that is a basis for issuing a continuance under (d).

**(d)**   **Continuances of hearings during the state of emergency.**

Notwithstanding any other law, the court may for good cause continue any hearing other than a detention hearing for a child who is detained in custody. In making this determination, the court must consider the custody status of the child, whether there are evidentiary issues that are contested, and, if so, the ability for those issues to be fairly contested via a remote proceeding.

**(e)**     **Extension of time limits under Welfare and Institutions Code section 709**

In any case in which a child has been found incompetent under Welfare and Institutions Code section 709 and that child is eligible for remediation services or has been found to require secure detention, any time limits imposed by section 709 for provision of services or for secure detention are tolled for the period of the state of emergency if the court finds that remediation services could not be provided because of the state of emergency.

**(f)**     **Sunset of rule**

This rule will remain in effect until 90 days after the Governor declares that the state of emergency related to the COVID-19 pandemic is lifted, or until amended or repealed by the Judicial Council.

<strong>Advisory Committee Comment</strong>

This emergency rule is being adopted in part to ensure that detention hearings for juveniles in delinquency court must be held in a timely manner to ensure that no child is detained who does not need to be detained to protect the child or the community. The statutory scheme for juveniles who come under the jurisdiction of the delinquency court is focused on the rehabilitation of the child and thus makes detention of a child the exceptional practice, rather than the rule. Juvenile courts are able to use their broad discretion under current law to release detained juveniles to protect the health of those juveniles and the health and safety of the others in detention during the current state of emergency related to the COVID-19 pandemic.

**Emergency rule 8.  Emergency orders: temporary restraining or protective orders**

**(a)**     **Application**

Notwithstanding any other law, this rule applies to any emergency protective order, temporary restraining order, or criminal protective order that was requested, issued, or set to expire during the state of emergency related to the COVID-19 pandemic. This includes requests and orders issued under Family Code sections 6250 or 6300, Code of Civil Procedure sections 527.6 , 527.8, or 527.85, Penal Code sections 136.2, 18125 or 18150, or Welfare and Institutions Code sections 213.5, 304, 362.4, or 15657.03, and including any of the foregoing orders issued in connection with an order for modification of a custody or visitation order issued pursuant to a dissolution, legal separation, nullity, or parentage proceeding under Family Code section 6221.

**(b)  Duration of orders**

(1)  Any emergency protective order made under Family Code section 6250 that is issued during the state of emergency must remain in effect for up to 30 days from the date of issuance.

(2)  Any temporary restraining order or gun violence emergency protective order issued or set to expire during the state of emergency related to the COVID-19 pandemic must remain in effect for a period of time that the court determines is sufficient to allow for a hearing on the long-term order to occur, for up to 90 days.

(3)  Any criminal protective order, subject to this rule, set to expire during the state of emergency, must be automatically extended for a period of 90 days, or until the matter can be heard, whichever occurs first.

(4)  Upon the filing of a request to renew a restraining order after hearing that is set to expire during the state of emergency related to the COVID-19 pandemic, the current restraining order after hearing must remain in effect until a hearing on the renewal can occur, for up to 90 days from the date of expiration.

*(Subd (b) amended effective April 20, 2020.)*

**(c)  Ex parte requests and requests to renew restraining orders**

(1)  Courts must provide a means for the filing of ex parte requests for temporary restraining orders and requests to renew restraining orders. Courts may do so by providing a physical location, drop box, or, if feasible, through electronic means.

(2)  Any ex parte request and request to renew restraining orders may be filed using an electronic signature by a party or a party's attorney.

*(Subd (c) amended effective April 20, 2020.)*

**(d)  Service of Orders**

If a respondent appears at a hearing by video, audio, or telephonically, and the court grants an order, in whole or in part, no further service is required upon the respondent for enforcement of the order, provided that the court follows the requirements of Family Code section 6384.

**(e)** **Entry of orders into California Law Enforcement Telecommunications System**

Any orders issued by a court modifying the duration or expiration date of orders subject to this rule, must be transmitted to the Department of Justice through the California Law Enforcement Telecommunications System (CLETS), as provided in Family Code section 6380, without regard to whether they are issued on Judicial Council forms, or in another format during the state of emergency.

*Emergency Rule 8 amended effective April 20, 2020.*

**Emergency rule 9.  Tolling statutes of limitations for civil causes of action**

**(a)** **Tolling statutes of limitations over 180 days**

Notwithstanding any other law, the statutes of limitations and repose for civil causes of action that exceed 180 days are tolled from April 6, 2020, until October 1, 2020.

*(Subd (a) amended effective May 29, 2020.)*

**(b)** **Tolling statutes of limitations of 180 days or less**

Notwithstanding any other law, the statutes of limitations and repose for civil causes of action that are 180 days or less are tolled from April 6, 2020, until August 3, 2020.

*(Subd (b) amended effective May 29, 2020.)*

*Emergency Rule 9 amended effective May 29, 2020.*

**Advisory Committee Comment**

Emergency rule 9 is intended to apply broadly to toll any statute of limitations on the filing of a pleading in court asserting a civil cause of action. The term "civil causes of action" includes special proceedings. (See Code Civ. Proc., §§ 312, 363 ["action," as used in title 2 of the code (Of the Time of Commencing Civil Actions), is construed "as including a special proceeding of a civil nature"); special proceedings of a civil nature include all proceedings in title 3 of the code, including mandamus actions under §§ 1085, 1088.5, and 1094.5—all the types of petitions for writ made for California Environmental Quality Act (CEQA) and land use challenges]; see also Pub. Resources Code, § 21167(a)–(e) [setting limitations periods for civil "action[s]" under CEQA].)

The rule also applies to statutes of limitations on filing of causes of action in court found in codes other than the Code of Civil Procedure, including the limitations on causes of action found in, for example, the Family Code and Probate Code.

**Emergency rule 10.  Extensions of time in which to bring a civil action to trial**

**(a)    Extension of five years in which to bring a civil action to trial**

Notwithstanding any other law, including Code of Civil Procedure section 583.310, for all civil actions filed on or before April 6, 2020, the time in which to bring the action to trial is extended by six months for a total time of five years and six months.

**(b)    Extension of three years in which to bring a new trial**

Notwithstanding any other law, including Code of Civil Procedure section 583.320, for all civil actions filed on or before April 6, 2020, if a new trial is granted in the action, the three years provided in section 583.320 in which the action must again be brought to trial is extended by six months for a total time of three years and six months. Nothing in this subdivision requires that an action must again be brought to trial before expiration of the time prescribed in (a).

**Emergency rule 11.  Depositions through remote electronic means**

**(a)    Deponents appearing remotely**

Notwithstanding any other law, including Code of Civil Procedure section 2025.310(a) and (b), and rule 3.1010(c) and (d), a party or nonparty deponent, at their election or the election of the deposing party, is not required to be present with the deposition officer at the time of the deposition.

**(b)    Sunset of rule**

This rule will remain in effect until 90 days after the Governor declares that the state of emergency related to the COVID-19 pandemic is lifted, or until amended or repealed by the Judicial Council.

**Emergency rule 12.  Electronic service**

**(a)** **Application**

    **(1)** Notwithstanding any other law, including Code of Civil Procedure section 1010.6, Probate Code section 1215, and rule 2.251, this rule applies in all general civil cases and proceedings under the Family and Probate Codes, unless a court orders otherwise.

    **(2)** Notwithstanding (1), the rule does not apply in cases where parties are already required by court order or local rule to provide or accept notices and documents by electronic service, and is not intended to prohibit electronic service in cases not addressed by this rule.

**(b)** **Required electronic service**

    **(1)** A party represented by counsel, who has appeared in an action or proceeding, must accept electronic service of a notice or document that may be served by mail, express mail, overnight delivery, or facsimile transmission. Before first serving a represented party electronically, the serving party must confirm by telephone or email the appropriate electronic service address for counsel being served.

    **(2)** A party represented by counsel must, upon the request of any party who has appeared in an action or proceeding and who provides an electronic service address and a copy of this rule, electronically serve the requesting party with any notice or document that may be served by mail, express mail, overnight delivery, or facsimile transmission.

**(c)** **Permissive electronic service**

Electronic service on a self-represented party is permitted only with consent of that party, confirmed in writing. The written consent to accept electronic service may be exchanged electronically.

**(d)** **Time**

    **(1)** In general civil cases and proceedings under the Family Code, the provisions of Code of Civil Procedure section 1010.6(a)(4) and (5) apply to electronic service under this rule.

    **(2)** In proceedings under the Probate Code, the provisions of Probate Code section 1215(c)(2) apply to electronic service under this rule.

1 **(e) Confidential documents**

2

3       Confidential or sealed records electronically served must be served through

4       encrypted methods to ensure that the documents are not improperly disclosed.

5

6 **(f) Sunset of rule**

7

8       This rule will remain in effect until 90 days after the Governor declares that the

9       state of emergency related to the COVID-19 pandemic is lifted, or until amended or

10       repealed by the Judicial Council.

11

12 *Emergency Rule 12 adopted effective April 17, 2020.*

13

14

15 **Emergency rule 13. Effective date for requests to modify support**

16

17 **(a) Application**

18

19       Notwithstanding any other law, including Family Code sections 3591, 3603, 3653,

20       and 4333, this rule applies to all requests to modify or terminate child, spousal,

21       partner, or family support. For the purpose of this rule, "request" refers to *Request*

22       *for Order* (form FL-300), *Notice of Motion (Governmental)* (form FL-680), or

23       other moving papers requesting a modification of support.

24

25 **(b) Effective date of modification**

26

27       Except as provided in Family Code section 3653(b), an order modifying or

28       terminating a support order may be made effective as of the date the request and

29       supporting papers are mailed or otherwise served on the other party, or other

30       party's attorney when permitted. Nothing in this rule restricts the court's discretion

31       to order a later effective date.

32

33 **(c) Service of filed request**

34

35       If the request and supporting papers that were served have not yet been filed with

36       the court, the moving party must also serve a copy of the request and supporting

37       papers after they have been filed with the court on the other party, or other party's

38       attorney when permitted. If the moving party is the local child support agency and

39       the unfiled request already has a valid court date and time listed, then subsequent

40       service of the request is not required.

41

42 **(d) Court discretion**

43

1    Nothing in this rule is meant to limit court discretion or to alter rule 5.92 or 5.260
2    regarding which moving papers are required to request a modification of support.
3
4    **(e)    Sunset of rule**
5
6    This rule will remain in effect until 90 days after the Governor declares that the
7    state of emergency related to the COVID-19 pandemic is lifted, or until amended or
8    repealed by the Judicial Council.
9
10   *Emergency Rule 13 adopted effective April 20, 2020.*
11
12   *Appendix I amended effective August 13, 2020; adopted effective April 6, 2020; previously*
13   *amended effective April 17, 2020, April 20, 2020, and June 20, 2020.*

AGN. NO._____

MOTION BY SUPERVISORS SHEILA KUEHL AND      September 28, 2021
HILDA L. SOLIS

## Convert the County's Eviction Moratorium to the County's COVID-19 Tenant Protections Resolution, and Update the Resolution to Extend, Clarify, and Gradually Phase Out Temporary Emergency Protections that Serve as Affirmative Defenses for Commercial and Residential Tenants

In March 2020, the County of Los Angeles adopted the County's Eviction Moratorium, which enacted affirmative defenses against evictions for residential and commercial tenants in particular instances. In April 2020, the Judicial Council of California (JCC) instituted a prohibition on the issuance of a summons or entering of default judgments in eviction cases for residential or commercial tenants, except in instances where tenant actions cause serious health or safety impacts to the tenants, units, or community. The State also adopted residential protections for nonpayment of rent due to COVID in September 2020. State tenant protections preempt the County from reenacting local nonpayment of rent protections through March 2022. Since the JCC lifted the prohibition on eviction filings in September 2020, property owners have been able to resume eviction filings with the Courts and tenants can use the State and local protections as affirmative defenses against these fillings.

The County of Los Angeles continues to make significant progress in slowing the

<u>MOTION</u>

MITCHELL      _____

KUEHL      _____

HAHN      _____

BARGER      _____

SOLIS      _____

spread of the novel coronavirus (COVID-19). However, while the County continues its efforts to increase vaccination rates and prevent the spread of the virus, the Board of Supervisors (Board) should consider options that will protect its residents and small business owners from highly-contagious variants of COVID-19 and the oncoming cold and flu season.

The impacts of COVID-19 continue to be felt by households and businesses across the County. More Californians have lost their jobs during the past 18 months than during the entire Great Recession. Many businesses have permanently closed or can only partially reopen with reduced staffing capacity. Thousands of residential tenants have faced housing uncertainty because they are unable to pay some or all of their rent due to lost wages or hours of work. In response to the serious health and economic impacts of the COVID-19 pandemic, the Board has issued a series of emergency orders to provide timely and necessary relief to tenants, including the County's Executive Order placing a Temporary Eviction Moratorium (Eviction Moratorium) on certain types of evictions for residential and commercial tenants impacted by the COVID-19 pandemic. The Eviction Moratorium has been extended multiple times by the Board and is currently set to expire on September 30, 2021.

On August 31, 2020, Governor Newsom signed Assembly Bill (AB) 3088 into law to provide, among other things, eviction protections to residential tenants who were unable to pay rent due to the COVID-19 emergency, subject to certain requirements. The protections offered under AB 3088 have been subsequently expanded and extended by Senate Bill (SB) 91, AB 81, and AB 832 (collectively, State's eviction protections). Additionally, the State of California (State) manages a federally-funded rent relief program to support property owners and income-qualified residential tenants who have been unable to pay rent due to financial hardships caused by the pandemic.

97

On June 22, 2021, the Board amended the County's Eviction Moratorium to allow limited owner move-ins into single-family homes where the tenant(s) have not suffered financial impacts from COVID-19. This provision is in line with the Board's intent to balance the needs of County residents, to remain housed during the pandemic to minimize the spread of COVID-19, with the needs of property owners who have found themselves in need of a permanent place to live during the pandemic.

This motion expands the exception for owner move-ins to: (1) include single family homes, condominium units in multi-family housing developments, mobilehome spaces, and units within a duplex or triplex where the owner owns at least 50% of the duplex or triplex (collectively, "Units"); and (2) allow the owner and/or owner's qualifying family member to use and occupy up to two Units in total as the owner's and/or owner's family member's principal residence(s), subject to certain conditions.

Most importantly, the County is preempted under the State's new eviction statue, through March 31, 2022, from enacting new or amending existing protections for residential tenants related to nonpayment of rent due to COVID-19. The County is only allowed to continue protecting its commercial tenants from such evictions for the time being. Therefore, this motion maintains existing protections offered to commercial tenants under the Resolution and a continuation of the residential protections not preempted by the State including protections against nuisance, unauthorized occupants or pets whose presence are necessitated by COVID, denial of entry by landlords, no-fault, and specific instances of owner move-ins.

While the State nonpayment of rent protections are scheduled to sunset on September 30th, 2021, it is prudent that the County continue to extend our local emergency tenant protections allowable under State law. By extending the COVID-19 tenant protections and expanding the owner move-in exception, the County can

continue to protect the health, safety, and welfare of its constituents during the COVID-19 pandemic, while recognizing the importance of allowing property owners to move into their properties, if needed. To avoid confusion, the County should change the name of the Resolution from the County Eviction Moratorium to the County COVID-19 Tenant Protections as the Resolution provides tenants with affirmative defenses against evictions; it does not prohibit property owners from filing.

**WE, THEREFORE, MOVE** that the Board of Supervisors approve and direct the Chair of the Board to execute the attached Resolution, approved as to form by County Counsel, which is being further amended and restated to do the following:

1. Change the name of the Resolution to the County COVID-19 Tenant Protections.

2. Extend the County COVID-19 Tenant Protections Resolution through January 31, 2022.

3. Clarify provisions in the Resolution where not preempted by State law.

4. Expand the owner move-in exception to allow property owners and/or their qualifying family members to move into up to two Units, defined above, in total as their principal residence(s), if the single family home, condominium unit, mobilehome space, duplex and/or triplex was purchased by the property owner on or before June 30, 2021, and if the following conditions are met:

   a. The residential tenant has been and is able to pay rent and has not suffered financial impacts related to COVID-19

   b. The property owner may only terminate a tenancy if the property owner and/or property owner's family member who will reside in the Unit(s) are similarly situated to the residential tenant(s) or residential tenant's household members who are being displaced as follows:

i.     A tenant or tenant's household member who is 62 years of age or older may only be displaced by the property owner or property owner's family member if the property owner or property owner's family member is also 62 years of age or older;

ii.    A tenant or tenant's household member who is disabled may only be displaced by the property owner or property owner's family member if the property owner or property owner's family member is also disabled;

iii.   A tenant or tenant's household member who is terminally ill may only be displaced by the property owner or property owner's family member if the property owner or property owner's family member is also terminally ill; and

iv.   A tenant whose household is low-income may only be displaced by the property owner or property owner's family member if the property owner's or property owner's family member's household is also low-income.

c.  The property owner provides the tenant with at least 60 days' written notice that the property owner and/or property owner's family member will be occupying the Unit as their principal residence(s), thus requiring the tenant(s) to move out within 60 days, and the property owner provides a copy of this notice to the Department of Consumer and Business Affairs (DCBA) with proof of timely service on the tenant(s). The property owner shall provide an extension to this time period if anyone in the tenant's household residing in the Unit(s) and/or the property owner or property owner's family member who will be moving into the Unit has been

diagnosed with a suspected or confirmed case of COVID-19 within fourteen (14) days of the final date of the tenancy until all affected parties have been deemed to no longer be infectious;

d. The property owner pays the tenant(s) relocation benefits in accordance with the applicable local jurisdiction's requirements for such owner move-ins or, if none, in accordance with Chapter 8.52 of the County Code;

e. The property owner demonstrates good faith by moving into, and/or having property owner's family member who will principally reside in the Unit(s), move into the Unit(s) within 60 days of the tenant vacating the Unit(s) and live there for a minimum of thirty-six (36) consecutive months; and

f. Not less than sixty (60) days prior to the final date of the tenancy, the property owner must disclose to DCBA, on a form approved by DCBA, the name(s) of the eligible individuals who will occupy the Unit(s), consistent with Chapter 8.52 of the County Code, as may be amended from time to time. DCBA may contact the property owner and/or the property owner's family member at any time during the property owner's and/or property owner's family member's thirty-six (36) month occupancy to confirm that the property owner and/or property owner's family member resides in the recovered Unit(s) and to obtain written verification of residency.

S:RS_ConverttheCounty'sEvictionMoratoriumToTheCounty'sCOVID19TenantProtectionsResolution,UpdatingTheResolutionTo
Extend,Clarify,AndGraduallyPhaseOutTemporaryEmergencyProtectionsThatServeAsAffirmativeDefensesForCommercialAndReside
ntialTenants

**RESOLUTION OF THE BOARD OF SUPERVISORS OF THE COUNTY OF LOS ANGELES, HEREAFTER TO BE REFERRED TO AS "THE COUNTY OF LOS ANGELES COVID-19 TENANT PROTECTIONS RESOLUTION," FURTHER AMENDING AND RESTATING THE EXECUTIVE ORDER FOR AN EVICTION MORATORIUM DURING THE EXISTENCE OF A LOCAL HEALTH EMERGENCY REGARDING NOVEL CORONAVIRUS (COVID-19)**
**September 28, 2021**

**WHEREAS,** on March 4, 2020, the Chair of the Los Angeles County Board of Supervisors ("Board") proclaimed, pursuant to Chapter 2.68 of the Los Angeles County Code, and the Board ratified that same day, the existence of a local emergency because the County of Los Angeles ("County") is affected by a public calamity due to conditions of disaster or extreme peril to the safety of persons and property arising as a result of the introduction of the novel coronavirus ("COVID-19") in Los Angeles County;

**WHEREAS,** also on March 4, 2020, the County Health Officer determined that there is an imminent and proximate threat to the public health from the introduction of COVID-19 in Los Angeles County, and concurrently declared a Local Health Emergency;

**WHEREAS,** ensuring that all people in the County continue to have access to running water during this public health crisis will enable compliance with public health guidelines advising people to regularly wash their hands, maintain access to clean drinking water, help prevent the spread of COVID-19, and prevent or alleviate illness or death due to the virus;

**WHEREAS,** ensuring that all customers in the County that receive power services from Southern California Edison and Southern California Gas Company (collectively, "Public Utilities") continue to have access to electricity so they are able to receive important COVID-19 information, keep critical medical equipment functioning, and utilize power, as needed, will help to prevent the spread of COVID-19 and prevent or alleviate illness or death due to the virus;

**WHEREAS,** on March 13, 2020, the Public Utilities announced that they will be suspending service disconnections for nonpayment and waiving late fees, effective immediately, for residential and business customers impacted by the COVID-19 emergency;

**WHEREAS,** on March 16, 2020, Governor Newsom issued Executive Order N-28- 20 that authorizes local governments to halt evictions of renters, encourages financial institutions to slow foreclosures, and protects renters and homeowners against utility shutoffs for Californians affected by COVID-19;

**WHEREAS,** on March 19, 2020, the Chair of the Board issued an Executive Order ("Executive Order") that imposed a temporary moratorium on evictions for non-payment of rent by residential or commercial tenants impacted by COVID-19 ("Moratorium"), commencing March 4, 2020, through May 31, 2020 ("Moratorium Period");

**WHEREAS,** on March 21, 2020, due to the continued rapid spread of COVID-19 and the need to protect the community, the County Health Officer issued a revised Safer at Home Order for Control of COVID-19 ("Safer at Home Order") prohibiting all events

and gatherings and closing non-essential businesses and areas until April 19, 2020;

**WHEREAS,** on March 27, 2020, Governor Newsom issued Executive Order N-37-20 extending the period for response by tenants to unlawful detainer actions and prohibiting evictions of tenants who satisfy the requirements of Executive Order N-37-20;

**WHEREAS,** on March 31, 2020, the Board ratified the Chair's Executive Order and amended the ratified Executive Order to include a ban on rent increases in the unincorporated County to the extent permitted by State law and consistent with Chapter 8.52 of the Los Angeles County Code ("Code");

**WHEREAS,** on April 6, 2020, the California Judicial Council, the policymaking body of the California courts, issued eleven temporary emergency measures, of which Rules 1 and 2 effectively provided for a moratorium on all evictions and judicial foreclosures;

**WHEREAS,** on April 14, 2020, the Board further amended the Executive Order to: expand the County's Executive Order to include all incorporated cities with the County; include a temporary moratorium on eviction for non-payment of space rent on mobilehome owners who rent space in mobilehome parks; include a ban on rent increases in the unincorporated County to the extent permitted by State law and consistent with Chapters 8.52 and 8.57 of the County Code; and enact additional policies and make additional modifications to the Executive Order;

**WHEREAS,** COVID-19 is causing, and is expected to continue to cause, serious financial impacts to Los Angeles County residents and businesses, including the substantial loss of income due to illness, business closures, loss of employment, or reduced hours, thus impeding their ability to pay rent;

**WHEREAS,** displacing residential and commercial tenants who are unable to pay rent due to such financial impacts will worsen the present crisis by making it difficult for them to comply with the Safer at Home Order, thereby placing tenants and many others at great risk;

**WHEREAS,** while it is the County's public policy and intent to close certain businesses to protect public health, safety and welfare, the County recognizes that the interruption of any business will cause loss of, and damage to, the business. Therefore, the County finds and declares that the closure of these businesses is mandated for the public health, safety and welfare; the physical loss of, and damage to, businesses is resulting from the shutdown; and these businesses have lost the use of their property and are not functioning as intended;

**WHEREAS,** because homelessness and instability can exacerbate vulnerability to, and the spread of, COVID-19, the County must take measures to preserve and increase housing security and stability for Los Angeles County residents to protect public health;

**WHEREAS,** a County-wide approach to restricting displacement is necessary to accomplish the public health goals of limiting the spread of COVID-19 as set forth in the Safer at Home Order;

**WHEREAS,** based on the County's authority during a state of emergency, pursuant to Government Code section 8630 et seq. and Chapter 2.68 of the County Code, the County may issue orders to all incorporated cities within the County to provide for the protection of life and property, where necessary to preserve the public health, order, and safety;

**WHEREAS,** due to the continued, rapid spread of COVID-19 and the need to preserve life and property, the County has determined that continued evictions in the County and all of its incorporated cities during this COVID-19 crisis would severely impact the health, safety and welfare of County residents;

**WHEREAS,** loss of income as a result of COVID-19 may hinder County residents and businesses from fulfilling their financial obligations, including paying rent and making public utility payments, such as water and sewer charges;

**WHEREAS,** on May 12, 2020, the Board approved, and delegated authority to the Chair to execute, an Amended and Restated Executive Order that extended the Moratorium Period through June 30, 2020, unless further extended or repealed by the Board, and incorporated additional provisions;

**WHEREAS,** on May 12, 2020, the Board determined to reevaluate the Moratorium every thirty (30) days to consider further extensions;

**WHEREAS,** on June 23, 2020, the Board extended the Moratorium Period through July 31, 2020;

**WHEREAS,** on June 30, 2020, Governor Newsom issued Executive Order N-71-20, extending the timeframe for the protections set forth in Executive Order N-28-20, that authorized local governments to halt evictions for renters impacted by the COVID-19 pandemic through September 30, 2020;

**WHEREAS,** on September 1, 2020, Governor Newsom signed Assembly Bill ("AB") 3088 into law to provide immediate protections and financial relief to residential tenants, homeowners, and small landlords impacted by COVID-19, as follows:

1. Residential tenants, which includes mobilehome space renters, who are unable to pay rent between March 1, 2020, and January 31, 2021, due to financial distress related to COVID-19, including but not limited to, increased childcare or elderly care costs and health care costs, are protected from eviction as described below;

2. A landlord who serves notice on a residential tenant from March 1, 2020, through January 31, 2021, demanding payment of rent must also: (a) provide the tenant with an unsigned copy of a declaration of COVID-19-related financial distress; and (b) advise the tenant that eviction will not occur for failure to comply with the notice if the tenant provides such declaration, and additional documentation if the tenant is a high-income tenant, within fifteen (15) days;

3. A landlord may initiate an unlawful detainer action beginning October 5, 2020, if a residential tenant is unable to deliver the required declaration within the

statutory time period;

    4.  Until February 1, 2021, a landlord is liable for damages between $1,000 and $2,500 for violation of the certain requirements if the residential tenant has provided the landlord with the required declaration of COVID-19-related financial distress;

    5.  A residential tenant who has provided the landlord with a signed declaration must, by January 31, 2021, pay at least 25 percent of rent owed for the months of October 2020, through January 2021, inclusive; and

    6.  Actions adopted by local governments between August 19, 2020, and January 31, 2021, to protect residential tenants from eviction due to financial hardship related to COVID-19 are temporarily preempted, where such actions will not become effective until February 1, 2021;

**WHEREAS,** on January 29, 2021, Governor Newsom signed Senate Bill ("SB") 91 into law, which extends through June 30, 2021, eviction protections under AB 3088, as well as the temporary preemption of a local jurisdiction's ability to enact new or amend existing eviction protections for nonpayment of rent due to financial distress related to COVID-19;

**WHEREAS,** on February 23, 2021, Governor Newsom signed AB 81 into law, which further modified the eviction protections and the temporary preemption provisions of AB 3088 and SB 91;

**WHEREAS,** on September 1, 2020, the Board extended the Moratorium Period through October 31, 2020, and established the County's eviction protections as the baseline for all incorporated cities within Los Angeles County, including cities that have their own local eviction moratoria, to the extent the city's moratorium does not include the same or greater tenant protections as the County's Moratorium;

**WHEREAS,** on September 23, 2020, Governor Newsom issued Executive Order N-80-20, further extending the timeframe for the protections set forth in Executive Order N-28-20, authorizing local governments to halt evictions of commercial renters impacted by the COVID-19 pandemic, through June 30, 2021;

**WHEREAS,** the County's Moratorium protects residential tenants and mobilehome space renters who are unable to pay rent due to financial impacts related to COVID-19 for the period of March 1, 2020, through September 30, 2020, and rent not paid during that period must be repaid by September 30, 2021 under AB 81;

**WHEREAS,** in addition to other tenant protections, the County's Moratorium protects residential tenants and mobilehome space renters from eviction for nuisance on the basis of having unauthorized occupants or pets whose presence is necessitated by or related to the COVID-19 emergency, and commercial tenants from eviction who are unable to pay rent due to the COVID-19 pandemic, except where such occupancy is a threat to the public health or safety, as determined by a court of law;

**WHEREAS,** on January 5, 2021, the Board extended the Moratorium and its tenant protections, where not preempted, through February 28, 2021, provided greater clarity to

tenants and landlords regarding their rights and responsibilities under the Moratorium, such as harassment and retaliation protections, and added new protections to the Moratorium that would have become effective February 1, 2021; however, some of these actions were preempted by the extension of AB 3088 pursuant to SB 91 and AB 81;

**WHEREAS,** on February 23, 2021, the Board extended the Moratorium and its tenant protections, where not preempted, through June 30, 2021, it also removed certain tenant protections that were to take effect on February 1, 2021, due to preemption by the extension of AB 3088 pursuant to SB 91 and AB 81, authorized administrative fines and civil penalties pursuant to Chapters 8.52 and 8.57 of the County Code, temporarily increased administrative fines and civil penalties during the Moratorium Period, and provided aggrieved tenants a private right of action for violations of the Moratorium;

**WHEREAS,** since the start of the COVID-19 pandemic, the primary purpose of this Moratorium has been to ensure that tenants stay housed during the pandemic, thereby minimizing the risk of uncontrolled spread of COVID-19. However, this has also prevented owner move-ins where the tenant has not suffered financial impacts from COVID-19, because such tenants currently are not required to move out under the County's Moratorium;

**WHEREAS,** on June 22, 2021, the Board extended the Moratorium and its tenant protections through September 30, 2021, unless otherwise preempted, and has created a limited carve-out to permit owners to move into single-family homes for use and occupancy as their principal residence, subject to certain conditions, as set forth below;

**WHEREAS,** on June 22, 2021, this Board authorized the following additional protections for commercial tenants: (1) require landlords to give commercial tenants with nine (9) employees or fewer notice of their rights under the Moratorium; (2) expand affirmative defenses to include protection from enforcement of personal guarantees against any natural person for commercial rental debt accrued during the Moratorium Period for commercial tenants with nine (9) employees or fewer; and (3) specify that holdover and month-to-month commercial tenants, unless otherwise exempted, are protected by the Moratorium;

**WHEREAS,** on June 28, 2021, Governor Newsom signed AB 832 into law, which further modified the eviction protections and the temporary preemption provisions of AB 3088, AB 81, and SB 91 (collectively, "AB 3088, as amended") and extended eviction protections through September 30, 2021, as well as the temporary preemption of a local jurisdiction's ability to enact new or amend existing eviction protections for nonpayment of rent due to financial distress related to COVID-19 through March 31, 2022;

**WHEREAS,** while the County is ramping up its vaccination efforts to prevent the spread of the virus, the County has a continued need to protect its residents as the COVID-19 variants are increasing and prepare for the cold and flu season;

**WHEREAS,** in the interest of public health and safety, as affected by the emergency caused by the spread of COVID-19, it is necessary for the Board to adopt this Resolution Further Amending and Restating the Executive Order for an Eviction Moratorium ("Resolution") related to the protection of life and property; and

**WHEREAS,** while the State nonpayment of rent protections are scheduled to sunset on September 30, 2021, it is prudent that the County continue to extend our local emergency tenant protections not preempted by AB 3088, as amended. By extending the COVID-19 tenant protections, the County can continue to protect the health, safety, and welfare of its constituents during the COVID-19 pandemic. To avoid confusion, the County desires to change the name of the Resolution from the County Eviction Moratorium to "the County of Los Angeles COVID-19 Tenant Protections Resolution" as the Resolution provides tenants with affirmative defenses against evictions; it does not prohibit property owners from filing evictions in accordance with State law.

**NOW, THEREFORE,** THE BOARD OF SUPERVISORS OF THE COUNTY OF LOS ANGELES DOES HEREBY PROCLAIM, RESOLVE, DETERMINE AND ORDER AS FOLLOWS:

I.  **Amendment and Restatement.** This Resolution incorporates all aspects, restrictions, and requirements of the Moratorium adopted by the Board, as ratified and amended on March 31, 2020, April 14, 2020, May 12, 2020, June 23, 2020, July 21, 2020, September 1, 2020, October 13, 2020, November 10, 2020, January 5, 2021, February 23, 2021, June 22, 2021, July 14, 2021 and September 28, 2021, and shall hereafter be referred to as "the County of Los Angeles COVID-19 Tenant Protections Resolution."

II.  **Moratorium Period.** The Moratorium Period is hereby extended through January 31, 2022. The Board will reevaluate the need for further extensions or repeal of the Moratorium Period every thirty (30) days.

III.  **Definitions.** For purposes of this Resolution, the following terms are defined as follows:

A.  [Intentionally Left Blank.]

B.  "Duplex" means a multi-family home that has two units on the same property under the same legal title where each unit has a separate entrance, and there is no interior connection between the units.

C.  "Family Member" means Tenant's or Landlord's parent, child, spouse or registered domestic partner, grandparent, grandchild, aunt or uncle at least sixty-two (62) years of age, or other dependent over which the Landlord has guardianship, the spouse's or registered domestic partner's parent, child, grandparent, grandchild, aunt or uncle at least sixty-two (62) years of age, and other dependent over which the Tenant's or Landlord's spouse or domestic partner has guardianship.

D.  "Financial Impacts" means any of the following:

1.  Substantial loss of household income caused by the COVID-19 pandemic;

2.  Loss of revenue or business by Tenants due to business closure;

3.  Increased costs;

HOA.103411028.4    6

4.      Reduced revenues or other similar reasons impacting a Tenant's ability to pay rent due;

5.      Loss of compensable hours of work or wages, layoffs; or

6.      Extraordinary out-of-pocket medical expenses.

E.      "Landlord" includes all of the following or an agent of any of the following:

1.      An owner of real property for residential and/or commercial rental purposes ("rental unit" or "unit").

2.      An owner of a mobilehome park.

3.      An owner of a mobilehome park space.

F.      "Landlord's Family Member" means a Landlord's parent, child, spouse or registered domestic partner, grandparent, grandchild, aunt or uncle at least sixty-two (62) years of age, or other dependent over which the Landlord has guardianship, the spouse or registered domestic partner's parent, child, grandparent, grandchild, aunt or uncle at least sixty-two (62) years of age, and other dependent over which the Landlord's spouse or domestic partner has guardianship.

G.      "Moratorium Period" means the time period commencing March 4, 2020, through January 31, 2022, unless further extended or repealed by the Board.

H.      "Multi-family Home" means a property used for residential purposes that contains more than one separate residential unit, where each unit has a separate entrance, and there is no interior connection between the units.

I.      "Personal Guarantee" means, with respect to a commercial lease for a commercial Tenant who has nine (9) employees or fewer, a term that provides for an individual who is not the Tenant to become wholly or partially personally liable for the rent, charges, or other sums required to be paid by the commercial Tenant, upon the occurrence of a default in payment. The term "Personal Guarantee" includes the execution of a separate instrument that would otherwise qualify as a Personal Guarantee if it were included within the terms of the underlying commercial lease under which rent came due, and the individual held liable for the rent is a natural person rather than a business entity.

J.      "Protected Time Period" means the time period of March 4, 2020, through September 30, 2020, during which a residential tenant or a mobilehome space renter was unable to pay rent.

K.      "Related to COVID-19" means related to any of the following:

1.      A suspected or confirmed case of COVID-19, or caring for a household or family member who has a suspected or confirmed case of

COVID-19;

2.     Lay-off, loss of compensable work hours, or other reduction or loss of income or revenue resulting from a business closure or other economic or employer impacts related to COVID-19;

3.     Compliance with an order or recommendation of the County's Health Officer to stay at home, self-quarantine, or avoid congregating with others during the state of emergency;

4.     Extraordinary out-of-pocket medical expenses related to the diagnosis of, testing for, and/or treatment of COVID-19; or

5.     Child care needs arising from school closures in response to COVID-19.

L.     "Residential Tenant" means a residential tenant or a mobilehome space renter.

M.     "Single-Family Home" means a stand-alone, detached residential unit separate from any other residential dwelling unit or structure. For the purposes of this Resolution, single-family home does not include accessory dwelling units (ADUs) as defined in, but not necessarily in strict compliance with the requirements of, Section 22.44.1370 of the County Code.

N.     "Tenant" includes all of the following:

1.     Tenants of a rental unit.

2.     Tenants who rent space or a lot in a mobilehome park.

3.     Tenants of commercial property, as defined in subdivision (c) of Section 1162 of the Civil Code, including, but not limited to, a commercial tenant using a property as a storage facility for commercial purposes. The following tenants of commercial property are excluded from the protections of this Moratorium:

   a.     Effective June 1, 2020, commercial tenants that are multi-national, publicly-traded, or have more than 100 employees.

   b.     Effective September 1, 2020, commercial tenants of space or property located at airports.

O.     "Transition Protection Period" means the time period from October 1, 2020, through September 30, 2021, unless extended further by the State.

P.     "Triplex" means a multi-family home that has three units on the same property under the same legal title where each unit has a separate entrance, and there is no interior connection between the units.

IV.   **General Applicability of Moratorium.**

A.   Application. Consistent with the provisions of Paragraph V, VI, VII, and VIII, this Moratorium applies to nonpayment eviction notices, no-fault eviction notices, rent increase notices, unlawful detainer actions served and/or filed on or after March 4, 2020, and other civil actions, including, but not limited to, actions for repayment of rental debt accrued on or after March 4, 2020.

B.   Jurisdiction.

1.   Unincorporated County. This Resolution applies to all unincorporated areas of the County.

2.   Incorporated Cities within County. Effective September 1, 2020, this Moratorium applies to incorporated cities within the County of Los Angeles pursuant to Government Code section 8630 et seq. and Chapter 2.68 of the County Code.

a.   It is the intent of the County, in enacting this Moratorium, to provide uniform, minimum standards protecting Tenants during this local emergency.

b.   Nothing in this Moratorium shall be construed to preclude any incorporated city within the County from imposing, or continuing to impose, greater local protections than are imposed by this Moratorium if the protections are not inconsistent with this Moratorium and are not preempted by State or federal regulations.

c.   Examples of greater local protections include, but are not limited to, granting additional time for commercial Tenants to notify a Landlord of an inability to pay rent, removing a requirement that a commercial Tenant notify a Landlord of an inability to pay, removing a requirement for a commercial Tenant to provide a certification or evidence of an inability to pay rent, and expanding the prohibition on evictions of Tenants to include additional prohibited grounds for eviction.

V.   **Moratorium.** A temporary moratorium on evictions of Tenants impacted by the COVID-19 crisis is imposed as follows:

A.   Evictions. No Landlord shall evict a Tenant as follows:

1.   Nonpayment of Rent. A Tenant shall not be evicted for nonpayment of rent, late charges, interest, or any other fees accrued if the Tenant demonstrates an inability to pay rent and/or such related charges due to Financial Impacts Related to COVID-19, the state of emergency regarding COVID-19, or following government-recommended COVID-19 precautions, and the Tenant has provided notice to the Landlord within seven (7) days after the date that rent and/or such

related charges were due, unless extenuating circumstances exist, that the Tenant is unable to pay.

a. <u>Moratorium Period</u>. Commercial Tenants who are unable to pay rent incurred during the Moratorium Period are protected from eviction under this Moratorium, so long as the reason for nonpayment is Financial Impacts Related to COVID-19, and the commercial Tenant provides notice to the Landlord to this effect within the timeframe specified in this Paragraph V. Effective June 22, 2021, a Landlord is:

    i. Required to provide notice to commercial Tenants with nine (9) employees or fewer of their rights under this Moratorium;

    ii. Prohibited from enforcing a Personal Guarantee against a commercial Tenant with nine (9) employees or fewer, arising from commercial rental debt that is the result of Financial Impacts Related to COVID-19 accrued during the Moratorium Period; and

    iii. Precluded from evicting a commercial Tenant whose tenancy is currently in a holdover or month-to-month tenancy.

b. <u>Protected Time Period</u>. Residential Tenants who were unable to pay rent incurred during the Protected Time Period are protected from eviction under this Moratorium, so long as the reason for nonpayment was Financial Impacts Related to COVID-19, and the Residential Tenant has provided notice to the Landlord to this effect within the timeframe specified in this Paragraph V.

c. [<u>Intentionally Left Blank</u>.]

d. [<u>Intentionally Left Blank</u>.]

2. <u>No-Fault Termination of Tenancy or Occupancy</u>. A Tenant shall not be evicted where grounds for terminating the tenancy or occupancy is not based on any alleged fault by the Tenant, including, but not limited to, those stated in Code of Civil Procedure section 1161 et seq., and Chapters 8.52 and 8.57 of the County Code. No-Fault termination of tenancy or occupancy also includes the intent to demolish or to substantially remodel the real property.

3. <u>Owner Move-Ins</u>. As of July 1, 2021, a Landlord and/or a Landlord's Family Member may, in good faith, recover possession of up to two of the following: a single-family home, a mobilehome space, condominium unit, two units within a duplex, and/or two units within a triplex (collectively, "Units") from a Residential Tenant(s) and their household members for use and occupancy by the Landlord and/or the

Landlord's Family Member as the Landlord's and/or Landlord's Family Member's principal residence(s) for at least thirty-six (36) consecutive months. Such displacement of the current Residential Tenant and Residential Tenant's household members from the Units is subject to the following conditions:

a.      Residential Tenant has been and is able to pay rent and does not have Financial Impacts Related to COVID-19;

b.      Landlord purchased the single family home, condominium unit, mobilehome space, duplex, and/or triplex at issue on or before June 30, 2021;

c.      Landlord or Landlord's Family Member must first seek to occupy a vacant Unit(s) if there are three (3) or more Units on the rental property. If no such vacant Unit(s) is available, then Landlord or Landlord's Family Member may displace the most recently occupied Unit(s) so that the Landlord or the Landlord's Family Member may move into the Unit(s);

d.      Landlord Move-In Unit Limitation. In order to evict under this subsection V.A.3., the Landlord must be a natural person and possess legal title to at least fifty percent (50%) of the single family home, mobilehome space, condominium unit, duplex, and/or triplex at issue, or be a beneficiary with an interest of at least fifty percent (50%) in a trust that owns same. A Landlord with at least fifty percent (50%), but less than one hundred percent (100%), ownership interest in a duplex or triplex may occupy only one Unit within said duplex or triplex, and a Landlord with one hundred percent (100%) ownership interest in a duplex or triplex may occupy up to two (2) Units in said duplex or triplex, for use as the Landlord's and/or the Landlord's Family Member's primary residence(s). Landlord and/or Landlord's Family Member may use and occupy up to two (2) Units in total as the Landlord's and/or Landlord's Family Member's primary residence(s), regardless of the types of Units they are;

e.      Landlord may only terminate a tenancy if the Landlord or Landlord's Family Member who will reside in the Unit is similarly situated to the Residential Tenant or Residential Tenant's household members who are being displaced, as follows:

    i.      If the Residential Tenant or one of Residential Tenant's household members is at least sixty-two (62) years of age or older, then the Landlord or Landlord's Family Member who will reside in the Unit must also be sixty-two (62) years of age or older;

    ii.     If the Residential Tenant or one of Residential Tenant's household members is a person with a disability who

has a physical or mental impairment that limits one or more of a person's major life activities within the meaning of the California Fair Housing and Employment Act pursuant to California Government Code section 12926, then the Landlord or Landlord's Family Member who will reside in the Unit must also be a person with a disability;

iii. If the Residential Tenant or one of Residential Tenant's household members has a terminal illness as verified by a medical care provider, then the Landlord or Landlord's Family Member who will reside in the Unit must also have a terminal illness; or

iv. If the Residential Tenant is a low-income household (low-income household means a household whose income does not exceed the qualifying limits for lower income households as established and amended from time to time pursuant to Section 8 of the United States Housing Act of 1937, or as otherwise defined in California Health and Safety Code section 50079.5), then the Landlord or Landlord's Family Member who will reside in the Unit must also be a low-income household;

f. Landlord provides Residential Tenant with at least sixty (60) days' written notice that Landlord or Landlord's Family Member will be occupying the Unit as their principal residence, thus requiring Residential Tenant to vacate the Unit within sixty (60) days, and Landlord provides a copy of said notice to the Department of Consumer and Business Affairs ("DCBA") with proof of timely service on the Residential Tenant. The Landlord shall provide an extension to this time period if anyone in the Residential Tenant's household residing in the Unit and/or anyone in the Landlord's or Landlord's Family Member's household who will be moving into the Unit has been diagnosed with a suspected or confirmed case of COVID-19 within fourteen (14) days of the final date of the tenancy until all affected parties have been deemed to no longer be infectious. Landlord demonstrates good faith by moving into, or having Landlord's Family Member who will principally reside in the Unit move into, the Unit within sixty (60) days of Residential Tenant vacating the Unit and living in the Unit as Landlord's or Landlord's Family Member's principal residence for at least thirty-six (36) consecutive months;

g. Landlord pays the Residential Tenant relocation assistance. The amount of relocation assistance shall be as set forth in the regulations, executive orders, or municipal code of the

local jurisdiction within which the Unit is located. If no such relocation assistance requirements exist for such owner move-ins, Landlord shall pay Residential Tenant relocation assistance as set forth in Section 8.52.110 of the County Code and DCBA's policies and procedures;

h. Not less than sixty (60) days prior to the final date of the tenancy, the Landlord must disclose to DCBA the name(s) of the eligible individuals who will occupy the Unit on a form approved by DCBA. DCBA may contact the Landlord at any time during Landlord's or Landlord's Family Member's thirty-six (36) month occupancy to confirm that the Landlord or Landlord's Family Member resides in the recovered Unit and to obtain written verification of residency; and

i. Landlord is in compliance with all requirements of Chapter 8.52 of the County Code for Units located in the unincorporated County.

4. <u>Nuisance or Unauthorized Occupants or Pets</u>. A Residential Tenant shall not be evicted for nuisance or for unauthorized occupants or pets whose presence is necessitated by or related to the COVID-19 emergency.

5. <u>Denial of Entry</u>. A Residential Tenant shall not be evicted on the ground that such tenant denied entry by the Landlord into the rental unit, subject to the following:

a. The following circumstances permit entry into the Residential Tenant's unit:

i. Remedying a condition that substantially endangers or impairs the health or safety of a Residential Tenant or other persons in, or in the vicinity of, the rental unit, or

ii. Residential Tenant is causing or threatening to cause substantial damage to the rental unit.

b. If a Landlord seeks entry pursuant to subdivision (a) above, the Landlord must:

i. Not permit entry by any person who is, or who the Landlord has good cause to believe is, a carrier of COVID-19.

ii. Ensure that appropriate social distancing, cleaning, and sanitation measures are taken to protect the Residential Tenant and members of the household from risk of transmitting COVID-19 as a result of

entry into the rental unit. Such measures must account for: the Residential Tenant notifying Landlord that the Residential Tenant, or a member of the household, has or believes in good faith to havebeen recently exposed to COVID-19; or the Residential Tenant notifying Landlord that the Residential Tenant, or a member of the household, is at a higher risk for more serious complications from COVID-19.

iii. A Landlord who enters the rental unit shall promptly leave the rental unit if the Residential Tenant revokes permission to enter because of the Landlord's failure to observe appropriate social distancing, cleaning, and sanitization measures.

c. For purposes of this subsection only, "Landlord" includes, but is not limited to, any person authorized by the Landlord to enter the rental unit, such as maintenance personnel, a prospective buyer, or a prospective tenant.

6. Notwithstanding (1) through (5), above, or any other provision of this Moratorium, this Moratorium shall not apply where the eviction is necessary to maintain compliance with the requirements of Civil Code section 1941.1, Health and Safety Code sections 17920.3 or 17920.10, or any other applicable law or government order concerning the safety or habitability of rental units, or where the Tenant's occupancy is otherwise a threat to the public health or safety as determined by a court of law.

B. <u>Tenant Certification</u>.

1. <u>Residential Tenants</u>. Residential Tenants seeking protection under this Moratorium, may provide, and Landlords must accept, a self-certification of inability to pay rent, and are required to provide notice to the Landlord to this effect within the timeframe specified in this Paragraph V, unless otherwise specified.

2. <u>Commercial Tenants</u>.

a. Commercial Tenants with nine (9) employees or fewer, may provide, and Landlords must accept, a self-certification of inability to pay rent, and are required to provide notice to the Landlord to this effect within the timeframe specified in this Paragraph V.

b. Commercial Tenants with ten (10) or more, but fewer than 100, employees must provide written documentation demonstrating financial hardship, along with notice of inability to pay rent, to the Landlord within the timeframe specified in this Paragraph V.

C.    <u>Repayment of Rent</u>. Unpaid rent incurred during the Moratorium Period shall be repaid pursuant to the following:

    1.    <u>Repayment by Residential Tenants</u>.

        a.    Residential Tenants who were unable to pay rent during the Protected Time Period shall have up to September 30, 2021, to repay unpaid rent incurred during the Protected Time Period, unless further extended by the Board.

        b.    Residential Tenants who are unable to pay rent during the Transition Time Period shall repay such rental debt pursuant to AB 3088 as amended, unless extended further through State legislation.

    2.    <u>Repayment by Commercial Tenants</u>. Commercial Tenants must adhere to the following repayment schedule at the end of the Moratorium Period:

        a.    Commercial Tenants with nine (9) employees or fewer shall have twelve (12) months from the expiration of the Moratorium Period to repay unpaid rent.

        b.    Commercial Tenants with ten (10) or more, but fewer than 100, employees, shall have six (6) months from the expiration of the Moratorium Period to repay unpaid rent, in equal installments, unless the commercial Tenant and Landlord agree to an alternate payment arrangement.

    3.    <u>Partial Payments and Payment Plans</u>. Tenants and Landlords are encouraged to agree on a payment plan during this Moratorium Period, and nothing herein shall be construed to prevent a Landlord from requesting and accepting partial rent payments, or a Tenant from making such payments, if the Tenant is financially able to do so.

    4.    <u>Failure to Pay Back Rent Not Ground for Eviction</u>. A commercial Tenant's failure to pay back unpaid rent under the terms of a payment plan, or at the end of the repayment period shall not be cause to evict the Tenant. Any term in a payment plan that allows eviction due to the Tenant's failure to comply with the terms of the payment plan is void as contrary to public policy.

    5.    <u>Application of Rental Payment</u>. Effective March 4, 2020, a Landlord is prohibited from applying a rental payment to any rental debt other than to the prospective month's rent, or such other month or rental debt that the Tenant specifies, unless the Tenant has agreed in writing to allow the payment to be otherwise applied.

**VI.**    **Rent Increases in Unincorporated County Prohibited.** Landlords shall not

increase rents for Residential Tenants in the unincorporated County during the Moratorium Period, to the extent otherwise permitted under State law and consistent with Chapters 8.52 and 8.57 of the County Code. **Nothing in this Resolution shall be construed to apply this limitation of rent increases in incorporated cities within the County.**

VII.    **Pass-Throughs or Other Fees Prohibited.** Landlords shall not impose any pass-throughs otherwise permitted under Chapters 8.52 and 8.57 of the County Code, or charge interest or late fees on unpaid rent or other amounts otherwise owed, during the Moratorium Period. Landlords are prohibited from retroactively imposing or collecting any such amounts following the termination or expiration of the Moratorium.

VIII.   **Harassment and Retaliation Protections.** Landlords, and those acting on their behalf or direction, are prohibited from harassing, intimidating, or retaliating against Tenants for acts or omissions by Tenants permitted under this Moratorium, and such acts by Landlord or Landlord's agent will be deemed to be violations of the Retaliatory Eviction and Harassment provisions as set forth in County Code Sections 8.52.130 and 8.57.100 and as expanded herein.   Harassing, intimidating, or retaliatory acts by Landlords, and those acting on their behalf or direction, include, but are not limited to:

A.    Interrupting, terminating, or failing to provide all services required to be provided by the Landlord related to the use or occupancy of a rental unit ("Housing Services") under the terms of a lease agreement or under federal, State, County, or local housing, health, or safety laws unless such Housing Services are closed due to Health Officer Orders;

B.    Failing to perform repairs and maintenance required by a rental agreement or by federal, State or local housing, health, or safety laws;

C.    Failing to exercise due diligence in completing repairs and maintenance once undertaken or failing to follow appropriate  industry repair, containment or remediation protocols designed to minimize exposure to noise, dust, lead, paint, mold, asbestos, or other building materials with potentially harmful health impacts;

D.    Abusing the Landlord's right of access into a rental unit. This includes entries, and attempted entries, for inspections that are not related to necessary repairs or services; that are excessive in number; that improperly target certain Residential Tenants; that are used to collect evidence against the occupant; or that are otherwise beyond the scope of a lawful entry;

E.    Abusing a Tenant with words that are offensive and inherently likely to provoke an immediate violent reaction. This includes words used during in-person conversations, through social media postings or messages, or other communications;

F.    Influencing or attempting to influence a Tenant to vacate a rental unit through fraud, intimidation or coercion, which shall include threatening to

report a Tenant to the United States Department of Homeland Security or any other governmental or law enforcement agency;

G.  Threatening a Tenant, by word, gesture, or with physical harm;

H.  Violating any law which prohibits discrimination based on race, gender, sexual preference, sexual orientation, ethnic background, nationality, religion, age, parenthood, marriage, pregnancy, disability, human immunodeficiency virus (HIV)/acquired immune deficiency syndrome (AIDS), occupancy by a minor child, or source of income;

I.  Taking action to terminate any tenancy including service of any notice to quit or notice to bring any action to recover possession of a rental unit based upon facts which the Landlord has no reasonable cause to believe to be true or upon a legal theory which is untenable under the facts known to the Landlord. No Landlord shall be liable under this subsection for bringing an action to recover possession unless and until the Tenant has obtained a favorable termination of that action;

J.  Removing from the rental unit personal property, furnishings, or any other items without the prior written consent of a Tenant, except when done pursuant to enforcement of a legal termination of tenancy or as otherwise authorized by law;

K.  Offering payments to a Tenant to vacate more than once in six (6) months, after the Tenant has notified the Landlord in writing that the Tenant does not desire to receive further offers of payments to vacate;

L.  Attempting to coerce a Tenant to vacate with offers of payment to vacate which are accompanied with threats or intimidation. This shall not include settlement offers made in good faith and not accompanied by threats or intimidation in pending eviction actions;

M.  Refusing to acknowledge receipt of a Tenant's lawful rent payment;

N.  Refusing to cash a rent check for over thirty (30) days;

O.  Requesting information that violates a Tenant's right to privacy including, but not limited to, residence or citizenship status, protected class status, or social security number, except as required by law or in the case of a social security number, for the purpose of obtaining information to determine qualification for tenancy, or releasing such information except as required or authorized by law;

P.  Interfering with a Residential Tenant's right to privacy including, but not limited to, entering or photographing portions of a rental unit that are beyond the scope of a lawful entry or inspection;

Q.  Interfering with a Residential Tenant's right to quiet use and enjoyment of a rental unit as that right is defined by State law;

HOA.103411028.4

17

R.   Other repeated acts or omissions of such significance as to substantially interfere with or disturb the comfort, repose, peace, or quiet of any person lawfully entitled to occupancy of such rental unit and that cause, are likely to cause, or are intended to cause any person lawfully entitled to occupancy of a rental unit to vacate such rental unit or to surrender or waive any rights in relation to such occupancy;

S.   Removing a Housing Service for the purpose of causing a Residential Tenant to vacate the residential unit or mobilehome. For example, taking away a parking space knowing that a Residential Tenant cannot find alternative parking and must therefore move; and

T.   Interfering with the right of a Residential Tenant to: organize and engage in concerted activities with other tenants for the purpose of mutual aid and protection; provide property access to tenant organizers, advocates, or representatives working with or on behalf of tenants living at a property; convene tenant or tenant organization meetings in an appropriate space accessible to tenants under the terms of their rental agreement; or distribute and post literature informing other tenants of their rights and of opportunities to involve themselves in their project in common areas, including lobby areas and bulletin boards.

**IX.   Administrative Fines.** A Landlord, who is determined by DCBA to have violated Paragraphs V, VI, VII or VIII of this Resolution, including those relating to the harassment protections enumerated above, shall be subject to administrative fines pursuant to Sections 8.52.160 and 8.57.130 of the County Code. The maximum administrative fine for violations of Paragraph VIII of this Resolution is temporarily increased for the duration of this Moratorium from $1,000 to up to $5,000 per violation for each day the violation continues, and if the aggrieved Tenant is disabled or sixty-five (65) years of age or older, an additional fine of up to $5,000 per violation per day may be assessed.

**X.   Remedies.**

A.   <u>Civil Liability</u>. Any Tenant, or any other person or entity acting on behalf of the Tenant who will fairly and adequately represent the Tenant's interests, including the County, may enforce the provisions of Paragraphs V, VI, VII or VIII of this Resolution by means of a civil action seeking civil remedies and/or equitable relief. Landlords shall be subject to civil penalties pursuant to Sections 8.52.170 and 8.57.140 of the County Code. The maximum civil penalty for violation of Paragraph VIII of this Resolution is increased from $1,000 to up to $5,000 per violation for each day the violation continues, and if the aggrieved Tenant is disabled or sixty-five (65) years of age or older, the court may award an additional penalty of up to $5,000 per violation per day. No administrative remedy need be exhausted prior to filing suit to enforce this Moratorium.

B.   <u>Criminal Liability</u>. Violation of Paragraphs V, VI, VII or VIII of this Resolution shall be punishable as set forth in Section 2.68.320 of the County Code.

C.    <u>Affirmative Defense</u>. Effective March 4, 2020, any Tenant protection provided under this Moratorium shall constitute an affirmative defense for a Tenant in any unlawful detainer action brought pursuant to California Code of Civil Procedure section 1161, as amended, and any other civil action seeking repayment of rental debt. Said affirmative defenses shall survive the termination or expiration of this Moratorium.

D.    <u>Nonexclusive Remedies and Penalties</u>. The remedies provided in this Moratorium are not exclusive, and nothing in this Moratorium shall preclude Tenant from seeking any other remedies or penalties available at law or in equity.

XI.    This Moratorium addresses the County's public policy and intent to close certain businesses to protect public health, safety and welfare, and the County recognizes that the interruption of any business will cause loss of, and damage to, the business. Therefore, the County finds and declares that the closure of certain businesses is mandated for the public health, safety and welfare, the physical loss of, and damage to, businesses is resulting from the shutdown, and these businesses have lost the use of their property and are not functioning as intended.

XII.    Grocery stores, gas stations, pharmacies and other retailers are requested to institute measures to prevent panic buying and hoarding essential goods, including, but not limited to, placing limits on the number of essential items a person can buy at one time, controlling entry to stores, and ensuring those at heightened risk of serious complications from COVID-19 are able to purchase necessities.

XIII.    **Guidelines and Board Delegations.**

A.    The Director of the DCBA, or his designee, shall issue guidelines to aid in the implementation of the Moratorium, including, but not limited to, guidance regarding the ways in which Tenants can certify they are entitled to protection under the Moratorium, appropriate supporting documentation for Tenants not entitled to self-certify under the Moratorium, notice requirements, and procedures for utilizing dispute resolution services offered by DCBA, among other clarifications.

B.    The Los Angeles County Development Authority ("LACDA"), acting in its capacity as a local housing authority for the County, shall extend deadlines for housing assistance recipients and applicants to deliver records or documents related to their eligibility for programs, to the extent those deadlines are within the discretion of the LACDA.

C.    The Director of DCBA, in collaboration with the Chief Executive Office ("CEO"), shall offer assistance to the State Department of Business Oversight to engage financial institutions to identify tools to be used to afford County residents relief from the threat of residential foreclosure and displacement, and to promote housing security and stability during this state of emergency.

D.    The Director of DCBA, in collaboration with the CEO and the Acting Director of Workforce Development, Aging, and Community Services ("WDACS"), shall convene representatives of utility and other service providers to seek a commitment from the providers to waive any late fees and forgo service disconnections for Tenants and small businesses who are suffering economic loss and hardship as a result of the COVID-19 pandemic.

E.    The Director of DCBA, the Acting Director of WDACS, and the Executive Director of LACDA shall jointly establish an emergency office dedicated to assisting businesses and employees facing economic instability as a result of the COVID-19 pandemic. The joint emergency office shall be provided all of the necessary resources by DCBA and WDACS, and should include opening a dedicated hotline to assist businesses and employees, web-based and text-based consultations, and multilingual services. The County shall provide technical assistance to businesses and employees seeking to access available programs and insurance, and shall work directly with representatives from the State and federal governments to expedite, to the extent possible, applications and claims filed by County residents.

F.    The Director of DCBA and the Executive Director of LACDA shall assist small businesses in the unincorporated areas in applying for U.S. Small Business Administration ("SBA") loans that the President announced on March 12, 2020. SBA's Economic Injury Disaster Loans offer up to $2 million in assistance for a small business. These SBA loans can provide vital economic support to small businesses to help overcome the temporary loss of revenue they are experiencing.

G.    The Executive Director of LACDA, or his designee, is hereby delegated authority to amend existing guidelines for any of its existing federal, State or County funded small business loan programs, including the Community Development Block Grant ("CDBG") matching funds, and to execute all related documents to best meet the needs of small businesses being impacted by COVID- 19, consistent with guidance provided by the U.S. Economic Development Administration in a memorandum dated March 16, 2020, to Revolving Loan Fund ("RLF") Grantees for the purpose of COVID-19 and temporary deviations to RLF Administrative Plans, following approvals as to form by County Counsel.

H.    The Acting Director of WDACS shall work with the State of California, Employment Development Department, to identify additional funding and technical assistance for dislocated workers and at-risk businesses suffering economic hardship as a result of the COVID-19 pandemic. Technical assistance shall include, but not necessarily be limited to: assistance for affected workers in applying for unemployment insurance, disability insurance and paid family leave; additional business assistance for lay-off aversion and rapid response; and additional assistance to mitigate worker hardship as a result of reduced work hours or job loss due to the COVID-19 pandemic.

I.    The Director of DCBA and the Acting Director of WDACS, in collaboration

with the CEO and the Executive Director of LACDA, shall create a digital toolkit for small businesses and employees to assist them in accessing available resources, including, but not limited to, disaster loans, unemployment insurance, paid family leave, disability insurance, and layoff aversion programs.

J.      The CEO's Center for Strategic Partnerships, in collaboration with the DCBA and its Office of Immigrant Affairs, and the Acting Director of WDACS, shall convene philanthropic partners to identify opportunities to enhance resources available to all small business owners and employees who may be unable or fearful to access federal and State disaster resources, including immigrants.

K.      The Executive Director of the Office of Immigrant Affairs, the CEO's Women+ Girls Initiative, and the Department of Public Health's Center for Health Equity shall consult on the above directives to provide an immigration, gender, and health equity lens to inform the delivery of services and outreach.

L.      The Director of DCBA, the Acting Director of WDACS, and the Executive Director of LACDA, or their respective designees, shall have the authority to enter into agreements with partner agencies and municipalities and hire and execute contracts for consultants, contractors, and other services, as needed, to provide consumer, tenant, and worker protections and support small businesses during the stated emergency to accomplish the above directives.

XIV.   This Resolution shall take effect immediately upon its passage. Except as otherwise indicated, all provisions stated herein shall apply commencing March 4, 2020, and shall remain in effect until January 31, 2022, unless extended or repealed by the Board of Supervisors. This Resolution supersedes all previously issued resolutions and executive orders concerning an eviction moratorium or rent freeze within the County.  It shall be superseded only by a duly enacted ordinance or resolution of the Board or a further executive order issued pursuant to Section 2.68.150 of the County Code.

XV.    **Severability.** If any provision of this Resolution or the application thereof to any person, property, or circumstance, is held invalid, such invalidity shall not affect other provisions or applications of this Resolution that can be given effect without the invalid provision(s) or application, and to this end, the provisions of this Resolution are declared to be severable.

XVI.   **Waiver Prohibited.** Any waiver of rights under this Moratorium shall be void as contrary to public policy.

The foregoing County of Los Angeles COVID-19 Tenant Protections Resolution was adopted on the  28th  day of  September   2021, by the Board of Supervisors of the County of Los Angeles.

Board of Supervisors of the
County of Los Angeles

By_____
     Chair

APPROVED AS TO FORM:

RODRIGO A. CASTRO-SILVA
County Counsel

By: *Behnaz Tashakorian*
   Deputy

**ATTEST: CELIA ZAVALA**
**EXECUTIVE OFFICER**
**CLERK OF THE BOARD OF SUPERVISORS**

**By**_____, **Deputy**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-55013

I am the attorney or self-represented party.

**This brief contains** | 11,827 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Jonathan H. Eisenman | **Date** | July 14, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**        *Rev. 12/01/22*