23-55013

IN THE

# United States Court of Appeals

## FOR THE NINTH CIRCUIT

◆◆◆

GHP MANAGEMENT CORPORATION; 918 BROADWAY ASSOCIATES, LLC, a California Corporation, DBA Broadway Palace Apartments; LR 9TH & BROADWAY, LLC, a California limited liability company, DBA Broadway Palace Apartments; PALMER TEMPLE STREET PROPERTIES, LLC, a California limited liability company, DBA The Da Vinci Apartments; PALMER/CITY CENTER II, LP; PALMER BOSTON STREET PROPERTIES I, LP, a Delaware limited partnership, DBA The Orsini; PALMER BOSTON STREET PROPERTIES II, LP, a Delaware limited partnership, DBA The Orsini; PALMER BOSTON STREET PROPERTIES III, LP, a California limited partnership, DBA The Orsini; BRIDEWELL PROPERTIES, LP, a California limited partnership, DBA Pasadena Park Place; PALMER ST. PAUL PROPERTIES, LP, a California limited partnership, DBA The Piero Apartments;

*(Caption continued on inside cover)*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES

## BRIEF FOR INTERVENOR-DEFENDANTS-APPELLEES

KATHRYN A. EIDMANN
TARA FORD
FAIZAH MALIK
MARK ROSENBAUM
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, California 90005
(213) 385-2977

DAVID PALLACK
NEIGHBORHOOD LEGAL SERVICES
  OF LOS ANGELES COUNTY
13327 Van Nuys Boulevard
Pacoima, California 91331
(818) 834-7520

HALLEY W. JOSEPHS
ROHIT D. NATH
KRYSTA K. PACHMAN
MARC M. SELTZER
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
(310) 789-3100

*Attorneys for Intervenor-Defendants-Appellees*

PALMER/SIXTH STREET PROPERTIES, LP, California limited partnership, DBA The Visconti Apartments; FIGTER, LTD., a California limited partnership, DBA Skyline Terrace Apartments; WARNER CENTER SUMMIT, LTD., California limited partnership, DBA Summit at Warner Center; PALMER/THIRD STREET PROPERTIES, LP, California limited partnership, DBA The Visconti Apartments,

*Plaintiffs-Appellants,*

—v.—

CITY OF LOS ANGELES,

*Defendant-Appellee,*

STRATEGIC ACTIONS FOR A JUST ECONOMY;
COALITION FOR ECONOMIC SURVIVAL;
ALLIANCE OF CALIFORNIANS FOR COMMUNITY EMPOWERMENT ACTION,

*Intervenor-Defendants-Appellees.*

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................1

QUESTIONS PRESENTED....................................................................4

    I.      STATEMENT OF THE CASE ...........................................5

    II.    THE COVID-19 PANDEMIC'S IMPACT ON PUBLIC HEALTH AND HOUSING SECURITY IN THE CITY OF LOS ANGELES ...................................................................6

    III.   GOVERNMENT EFFORTS TO PROTECT PUBLIC HEALTH AND CURB THE HOUSING AND HOMELESSNESS CRISIS IN THE WAKE OF THE PANDEMIC ...................................................................8

    IV.   INTERVENORS' ROLE IN ADVOCATING FOR AND DEFENDING THE ORDINANCE.....................................11

          A.    Intervenors are dedicated to protecting vulnerable tenants' rights.................................................11

          B.    Intervenors have a stake in defending the constitutionality of the Ordinance and eviction moratoria throughout California. .............................13

    V.    PROCEDURAL HISTORY ...............................................15

SUMMARY OF ARGUMENT ..............................................................16

STANDARD OF REVIEW ...................................................................18

ARGUMENT ....................................................................................19

    I.      GHP CANNOT ESTABLISH THE ORDINANCE CONSTITUTED A PHYSICAL TAKING .........................19

          A.    GHP's *per se* physical takings claim fails as a matter of law................................................19

          B.    Under *Yee*, regulations of landlord-tenant relationships do not constitute *per se* takings. ..........................21

i

C.  *Yee*, not *Cedar Point*, controls challenges to regulations governing preexisting landlord-tenant relationships. ............................................................22

D.  GHP's reliance on *Heights Apartments* rather than *Yee* invites error. ................................................27

E.  GHP's reliance on two non-Takings Clause cases does not change the controlling impact of *Yee* ................................28

II.  GHP FAILED TO PLAUSIBLY ALLEGE A REGULATORY TAKINGS CLAIM ..............................................................30

A.  Regulatory takings claims are routinely dismissed under Rule 12(b)(6) ................................................31

B.  Plaintiffs failed to plausibly allege a diminution in the value of their properties. ..........................................34

C.  GHP failed to allege interference with objectively reasonable investment-backed expectations. ...........................36

D.  The Ordinance was essential to promoting the common good ..........................................................39

III.  THE DISTRICT COURT PROPERLY GRANTED THE MOTION TO INTERVENE. .............................................42

A.  The District Court correctly granted intervention as of right. ................................................................43

1.  Intervenors have a significant protectable interest in the Ordinance which may as a practical matter be impaired if the Court determines the Ordinance effect a taking. ......................44

2.  Intervenors' interests are not adequately represented by the City. .................................................49

B.  The District Court did not abuse its discretion in granting permissive intervention. ...........................................53

CONCLUSION ................................................................55

CERTIFICATE OF COMPLIANCE ........................................................................56

CERTIFICATE OF SERVICE ...............................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*301, 712, 2103 and 3151 LLC v. City of Minneapolis*,
  27 F.4th 1377 (8th Cir. 2022) ............................................................25

*Alabama Association of Realtors v. Department of Health and Human Servs.*,
  141 S. Ct. 2485 (2021)................................................................28, 29

*Allen v. Oakland Police Officers Ass'n*,
  825 F. App'x 450 (9th Cir. 2020).......................................................18

*Apartment Association of Los Angeles County, Inc. v. City of Los Angeles*,
  No. CV2005193DDPJEMX, 2020 WL 4501792 (C.D. Cal. Aug. 5, 2020) .............................................................................................6, 14

*Apt. Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*,
  10 F.4th 905 (9th Cir. 2021) .....................................................6, 7, 41

*Arakaki v. Cayetano*,
  324 F.3d 1078 (9th Cir. 2003) ....................................................50, 51

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................18, 33

*Auracle Homes, LLC v. Lamont*,
  478 F. Supp.3d 199 (D. Conn. 2020)..................................................41

*Bafford v. Northrop Grumman Corp.*,
  994 F.3d 1020 (9th Cir. 2021) ...........................................................18

*Ballinger v. City of Oakland*,
  24 F.4th 1287 (9th Cir. 2022), *cert denied sub nom.* 142 S. Ct. 2777........................................................................22, 24, 25, 42

*Baptiste v. Kennealy*,
  490 F.Supp.3d 353 (D. Mass. 2020)...................................................41

i

*Bldg. & Realty Institute of Westchester & Putnam Cnties., Inc. v. New York*,
No. 19-CV-11285 (KMK), 2021 WL 4198332 (S.D.N.Y. Sept. 14, 2021) ................................................................................26

*Block v. Hirsh*,
256 U.S. 135 – 57 (1921)................................................................27

*Bridge Aina Le'a, LLC v. Land Use Comm'n*,
950 F.3d 610 (9th Cir. 2020) ...........................................2, 16, 31, 37

*Britton v. Keller*,
851 F. App'x 821 (10th Cir. 2021) ...................................................34

*by Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ...........................................................30

*California ex rel. Lockyer v. United States*,
450 F.3d 436 (9th Cir. 2006) ......................................................17, 46

*Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*,
152 F.3d 1184 (9th Cir. 1998) .........................................................51

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021)............................................................*passim*

*Citizens for Balanced Use v. Montana Wilderness Ass'n*,
647 F.3d 893 (9th Cir. 2011) ..........................................................50

*Colony Cove Props., LLC v. City of Carson*,
888 F.3d 445 (9th Cir. 2018) ....................................................*passim*

*Community Housing Improvement Program v. City of New York*,
59 F.4th 540 (2d Cir. 2023) ..................................................22, 24, 25

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
508 U.S. 602 (1993).......................................................................35

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
508 U.S. 602,645 (1993)................................................................37

ii

*Conn. Ass'n of Heath Care Facilities, Inc. v. Bremby*,
    519 F. App'x 44 ..................................................................................24

*Connolly v. Pension Ben. Guar. Corp.*,
    475 U.S. 211 (1986)............................................................................56

*Constr. Laborers Trust Funds*, 2020 WL 410176, at *2 ........................47

*Cooper v. Newsom*,
    13 F.4th 857 (9th Cir. 2021) ..........................................................4, 43

*El Papel LLC v. Durkan*,
    2021 WL 4272323 (W.D. Wash. Sept. 15, 2021), appeal docketed,
    No. 22-35656 (9th Cir. 2022) ...........................................................26

*Elmford Apt. Assocs., LLC v. Cuomo*,
    469 F. Supp. 3d 148 (S.D.N.Y. 2020) .........................................41, 57

*Evans Creek, LLC v. City of Reno*,
    2022 WL 14955145 (9th Cir. Oct. 26, 2022) ........................2, 33, 37

*Farhoud v. Brown*,
    No. 3:20-cv-2226-JR, 2022 WL 326092 (D. Or. Feb. 3, 2022) .......26

*FCC v. Fla. Power Corp.*,
    480 U.S. 245 (1987)......................................................................20, 27

*Freedom from Religion Found., Inc. v. Geithner*,
    644 F.3d 836 (9th Cir. 2011) ..............................................................56

*Gallo v. District of Columbia*,
    2023 WL 2301961 (Mar. 1, 2023)......................................................26

*Gingery v. City of Glendale*,
    831 F.3d 1222 (9th Cir. 2016) ............................................................55

*Golf Village North, LLC v. City of Powell, Ohio*,
    14 F.4th 611 (6th Cir. 2021) ..............................................................26

*Heights Apartments, LLC v. Walz*,
    30 F.4th 720 (8th Cir. 2022) .........................................................27, 28

*Horne v. Department of Agriculture*
   576 U.S. 350 (2015)..................................................................29, 30

*Idaho Farm Bureau Fed. v. Babbit*,
   58 F.3d 1392 (9th Cir. 1995) ...............................................45

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) .............................................30

*Jevons v. Inslee*,
   561 F. Supp. 3d 1082 (E.D. Wash. 2021)............................26

*Kagan v. City of Los Angeles*,
   2022 WL 16849064 (9th Cir. 2022) ..............................24, 25

*Kaiser Aetna v. United States*
   444 U.S. 164 (1979)..............................................................20

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
   480 U.S. 470 (1987)...........................................32, 35, 36, 41

*League of United Latin American Citizens v. Wilson*,
   131 F.3d 1297 (9th Cir. 1997) ..........................18, 52, 53, 55

*Lingle v. Chevron USA, Inc.*,
   544 U.S. 528 ..............................................................3, 17, 40

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*,
   140 S. Ct. 2367 (2020)..........................................................44

*Loretto v. Teleprompter Manhattan CATV Corp.*,
   458 U.S. 419 (1982)........................................................20, 29

*Moore v. Trader Joe's Co.*,
   4 F.4th 874 (9th Cir. 2021) ..................................................18

*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*,
   960 F.3d 603 (9th Cir. 2020) ...............................................53

*Orange v. Air Cal.*,
   799 F.2d 535 (9th Cir. 1986) ...............................................55

*Penn Central Transp. Co. v. City of New York*,
438 U.S. 104 (1978) .................................................................................*passim*

*Prete v. Bradbury*,
438 F.3d 949 (9th Cir. 2006) ...............................................................43

*Rancho de Calistoga v. City of Calistoga*,
800 F.3d 1083 (9th Cir. 2015) ..........................................31, 32, 35, 57

*S. Cal. Rental Housing Ass'n v. Cnty. of San Diego*,
550 F. Supp. 3d 853 (S.D. Cal. 2021), *appeal dismissed as moot*,
2022 WL 16832819 (9th Cir. Nov. 9, 2022) ........................................14

*S. Cal. Rental Housing Ass'n v. Cnty. of San Diego*,
550 F. Supp. 3d (S.D. Cal. 2021).........................................................26

*S. Cal. Rental Housing Ass'n v. Cty. of San Diego*,
2021 WL 3171919 (S.D. Cal. July 26, 2021) ..............................41, 42

*San Remo Hotel v. City & Cnty. of San Francisco*,
27 Cal. 4th 643 (2002) ........................................................................19

*Stuart Mills Props., LLC v. City of Burbank*,
No. 2:22-cv-04246-RGK-AGR, 2022 WL 4493573 (C.D. Cal.
Sept. 19, 2022) .....................................................................................26

*Sw. Ctr. for Biological Diversity v. Berg*,
268 F.3d 810 (9th Cir. 2001) ..........................................44, 45, 47, 52

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
535 U.S. 302 (2002)......................................................................19, 30

*Tan Phu Cuong Investment LLC v. King Cnty.*,
831 F. App'x 235 (9th Cir. 2020) .......................................................35

*Taylor v. United States*,
959 F.3d 1081 (Fed. Cir. 2020) ..........................................................34

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, (2007)............................................................................36

*United States v. City of Los Angeles*,
288 F.3d 391 (9th Cir. 2002) ..............................................................44

v

*Wash. State Bldg. & Constr. Trades Council, AFL-CIO v. Spellman*,
    684 F.2d 627 (9th Cir. 1982) ...............................................................45

*Whole Woman's Health v. Jackson*,
    Order on App. For Injunctive Relief, 141 S. Ct. 2494 (2021)
    (Kagan, J., dissenting)........................................................................28

*Williams v. Alameda Cnty.*,
    --- F. Supp. 3d ---, 2022 WL 17169833 (N.D. Cal. Nov. 22, 2022) ...........15, 26

*Willowbrook Apt. Ass'n v. Mayor & City Council of Baltimore*,
    No. 20-CV-1818-SAG, 2021 WL 4441192 (D. Md. 2021) .............................42

*Yee v. City of Escondido*,
    503 U.S. 519 (1992)......................................................................*passim*

**Statutes**

Cal. Civ. Code § 1946.2........................................................................38

Cal. Civ. Code § 1947.12(a)(1)................................................................39

Cal. Mun. Code §§ 49.99.2(A) .................................................................9

Cal. Mun. Code §§ 49.99.6, 49.99.7 .......................................................10

L.A. Cnty. Code § 8.52.050(C)................................................................39

L.A. Cnty. Code § 8.52.090 ....................................................................39

L.A. Mun. Code § 151.09 .......................................................................38

L.A. Mun. Code § 151.23(B) ...................................................................39

Ordinance No. 186585 ....................................................................1, 5, 8

Ordinance No. 186606 .............................................................................1

Ordinance No. 186606 .............................................................................5

Ordinance No. 187736 ...........................................................................10

**Rules**

Fed. R. Civ. P. 12(b)(6)..........................................................................32

vi

Fed. R. Civ. P. 19 .................................................................................44

Fed. R. Civ. P. 24 ............................................................................43, 44

Fed. R. Civ. P. 24(a) ...............................................................47, 49, 52

Fed. R. Civ. P. 24(a)(1) .......................................................................44

Fed. R. Civ. P. 24(a)(2) .......................................................................49

**Constitional Provisions**

California Constitution Takings Clause.........................................*passim*

**Other Authorities**

https://housing.lacity.org/erap (accessed July 14, 2023) ........................................10

## **INTRODUCTION**

This appeal is about whether the City of Los Angeles's emergency action to protect the housing of vulnerable tenants during the COVID-19 pandemic. The District Court properly dismissed Plaintiff-Appellants Takings Clause challenge because the City's action was exactly the type of landlord-tenant regulation that the Supreme Court has long held does not require just compensation. *Yee v. City of Escondido*, 503 U.S. 519 (1992).

In March 2020, the City enacted Eviction Ordinance No. 186585 (later amended as Ordinance 186606) (the "Ordinance") to protect the housing stability of the City's most vulnerable residents and to promote public health for all by temporarily pausing certain evictions—but not all evictions—for the duration of the City's Local Emergency Period. The Local Emergency order expired on January 31, 2023, and so did the Ordinance; tenants who qualified for the Ordinance's protections must pay past due rent by August 1, 2023 or February 1, 2024, depending on when the debt accrued. Plaintiffs-Appellants GHP Management Corporation ("GHP"), a group of landlords and management companies, allege that the Ordinance violated the federal and state Takings Clauses.

The District Court's order dismissing the complaint should be affirmed. The District Court correctly rejected the two takings theories raised in GHP's complaint: that the City's Ordinance is (1) a *per se* physical taking and (2) a regulatory taking.

1

*First*, the District Court properly held that GHP's *per se* takings theory is foreclosed as a matter of law under *Yee v. City of Escondido*, 503 U.S. 519 (1992), which held that regulations of the pre-existing landlord-tenant relationship do not amount to *per se* takings. GHP tries to escape *Yee* by mischaracterizing the Ordinance as "indefinitely" requiring landlords to house tenants. ER-206–07 (Compl. ¶ 61). But the District Court properly recognized that the Ordinance did not indefinitely prohibit evictions for *any* tenants, let alone all. Under *Yee*, GHP's voluntary invitation of tenants into its properties is dipositive.

*Second*, the District Court correctly dismissed GHP's regulatory takings theory under *Penn Central Transp. Co. v. City of New York (*"*Penn Central*"*)*, 438 U.S. 104 (1978). *Penn Central* requires a plaintiff to plead "(1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action." *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 625 (9th Cir. 2020).

GHP's complaint is deficient as to each *Penn Central* factor, but this Court need not even reach the second or third factors given GHP's utter failure to plead economic impact. *Evans Creek, LLC v. City of Reno*, 2022 WL 14955145 (9th Cir. Oct. 26, 2022) (mem. disp.) (affirming dismissal of takings claim for failure to adequately plead first and second factors and not reaching third). GHP failed to plead

any specific diminution in value in its complaint, instead asserting that the economic impact of the Ordinance was "severe and ruinous" and referencing "over $20 million" in losses, a figure that is meaningless without context. ER-208–09 (Compl. ¶ 71); *see Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018) (plaintiff must plead facts sufficient to allow court to "compare the value that has been taken from the property with the value that remains in the property").

The complaint includes window dressing about investment-backed expectations of the plaintiff-landlords but stops well short of plausibly alleging that those expectations were "objectively reasonable," given the long-standing history of rental regulations dictating when and for what reasons a landlord may evict a tenant. ER-209 (Compl. ¶ 72). On appeal, GHP fails to seriously engage with the character of the regulation, pivoting instead to the "invasive" nature of the Ordinance. Appellants' Br. 40–42; *see also* ER-209–10 (Compl. ¶ 74). But this factor examines whether a regulation "adjust[s] the benefits and burdens of economic life to promote the common good." *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 539. The Ordinance was squarely designed to do (and did) just that during a national crisis. GHP's allegations did nothing to rebut the fundamental "common good" at the core of the City's action to protect public health and housing stability during the pandemic. The District Court correctly held that the relevant *Penn Central* factors weigh "heavily against" a determination that the Ordinance constitutes a regulatory taking. ER-22.

3

GHP also appeals the District Court's order granting Intervenors' motion to intervene. For starters, the Court need not reach this issue—it is immaterial and irrelevant if this Court affirms the District Court's order dismissing the complaint and entering judgment against the Plaintiff. *Cf. Cooper v. Newsom*, 13 F.4th 857, 864 (9th Cir. 2021) (where "underlying litigation was entirely resolved we [have] held the appeal [from the court's order on intervention] moot"). In any event, the District Court's intervention order easily passes muster. The record leaves no room for doubt that Intervenors—low-income tenant organizations that speak for the population of Angelenos that the Ordinance was designed to protect—have a sufficiently concrete interest in the outcome of this lawsuit to justify their involvement. ER-25–33.

Intervenors respectfully submit that this Court should affirm the dismissal of all claims with prejudice and dismiss the appeal from the District Court's order granting Intervenors' motion to intervene as moot or, in the alternative, affirm.

## **QUESTIONS PRESENTED**

1.      Did the District Court correctly dismiss GHP's *per se* physical Takings Clause challenge to the Ordinance that temporarily altered landlords' ability to evict previously invited tenants under *Yee v. City of Escondido*, 503 U.S. 519 (1992)?

2.      Did the District Court correctly hold that that GHP's bare allegations of "severe and ruinous" economic harm and "physical invasion" resulting from the

Ordinance fell short of plausibly alleging a regulatory taking under *Colony Cove Properties, LLC v. City of Carson*, 888 F.3d 445 (9th Cir. 2018), and *Penn Central Transp. Co. v. City of New* York, 438 U.S. 104 (1978)?

3.    Did the District Court correctly grant Intervenors' Motion to Intervene as of right or, in the alternative, properly exercise its discretion to grant permissive intervention?

**I.    STATEMENT OF THE CASE**

The COVID-19 pandemic gave rise to an unprecedented public health emergency. In March 2020, California Governor Gavin Newsom declared a state-wide emergency and issued several regulations to address critical issues plaguing business owners, renters, and ordinary citizens in the wake of the pandemic. Similarly, the City of Los Angeles issued essential ordinances aimed at addressing issues of homelessness and housing instability, specifically Ordinance No. 186585, later amended by Ordinance No. 186606 (collectively "the Ordinance"). SER-13-26. The Ordinance temporarily altered the ability of landlords to evict tenants for failure to pay rent due to COVID-related hardship. With limited exceptions, the Ordinance did not pause evictions for any other reasons, including for nonpayment of rent unrelated to a COVID hardship. These regulations were narrowly tailored to prevent housing displacement at a time when residents were plagued by disruptions to income, increases in healthcare costs, and other emergency expenses.

Intervenors represent many of the Los Angeles residents whom the Ordinance was designed to protect. Intervenors are membership organizations comprised of thousands of Los Angeles's most vulnerable tenants. The Ordinance has been critical to their members' ability to maintain shelter during the pandemic.

## II.  THE COVID-19 PANDEMIC'S IMPACT ON PUBLIC HEALTH AND HOUSING SECURITY IN THE CITY OF LOS ANGELES

In a November 2020 order later affirmed by this Court, the District Court documented the health and economic devastation experienced by Americans, Californians, and residents of Los Angeles:

> [The state of emergency measures required by the pandemic,] in conjunction with other coronavirus-related concerns, have had devastating economic consequences. By one estimate, over 16 million California households have lost employment income as a result of the coronavirus. Over the last six months, the unemployment rate in the Los Angeles area has ranged from 15 to 20 percent.

*AAGLA I*, 500 F. Supp. 3d at 1091–92 (footnotes omitted), *aff'd*, 10 F.4th 905 (9th Cir. 2021); *see id.* at 1091 (documenting death toll of over 230,000 Americans, including 18,000 in California and 7,000 in Los Angeles, by November 2020).

A year after the *AAGLA I* ruling, when the intervention motion was before the District Court, COVID-19 continued to ravage the United States. Nationally, authorities recorded over 730,000 COVID-19 deaths. ER-101. The death toll included, at that point, over 70,000 Californians and 26,000 people in Los Angeles County. *Id.* As of October 2021, approximately 100 Californians were dying of

COVID-19 daily. *Id.* These rates were comparable to the average daily statewide death rates that followed the summer 2020 COVID-19 surge. *Id.* Los Angeles County was reporting nearly 1,000 new coronavirus cases per day. *Id.* "California, for all its progress, is still classified as having 'substantial' community transmission, the second-worst category on the four-tier scale set by the U.S. Centers for Disease Control and Prevention." *Id.* (citing, *inter alia*, ER-147 (Mishori Decl. ¶ 17)). The City of Los Angeles remained in a state of emergency. ER-101. And Black and Latino people continued to experience outsized health and economic devastation from the pandemic, including the highly contagious Delta variant. *Id.* (citing, *inter alia*, ER-151–55 (Mishori Decl. ¶¶ 28, 33-35, 37)).

To support their intervention motion, Intervenors submitted uncontested evidence establishing that the ongoing public health crisis and resulting economic fallout resulted in devastating effects on low-income renters, including research showing that COVID-19 cases and deaths spiked in states that lifted eviction moratoriums and that even with the gradual reopening of businesses, the "recession and recovery" from COVID-19 "disproportionately hit lower-income Californians, exacerbating inequality in the state." ER-101–02 (citing, *inter alia*, research from UCLA Anderson School of Management).

### III.     GOVERNMENT EFFORTS TO PROTECT PUBLIC HEALTH AND CURB THE HOUSING AND HOMELESSNESS CRISIS IN THE WAKE OF THE PANDEMIC

In response to COVID-19, state and local officials took steps to prevent the spread of the coronavirus and avoid exacerbating the housing and homelessness crisis. The City enacted the initial Ordinance challenged here in March 2020, which was followed by emergency action by the State Judicial Council and the State Legislature.

The initial Ordinance was originally signed into law on March 31, 2020, and amended on May 6, 2020. SER-19, -23. The City's interest in enacting the Ordinance is clearly laid out in the preamble, which states: "WHEREAS, during this local emergency and in the interest of protecting the public health and preventing transmission of COVID19, it is essential to avoid unnecessary housing displacement to protect the City's affordable housing stock and to prevent housed individuals from falling into homelessness."[1] SER-14.

The Ordinance implemented a temporary prohibition on certain types of evictions during the "Local Emergency Period" declared by then-Mayor Eric Garcetti. The Ordinance prohibited:

---

[1] Ordinance No. 186585 (March 27, 2020).

- Residential evictions of a "tenant for non-payment of rent . . . if the tenant is unable to pay rent due to circumstances related to the COVID-19 pandemic," L.A., Cal. Mun. Code §§ 49.99.2(A);

- Residential evictions "for a no-fault reason," *id.* § 49.99.2(B); and

- Residential evictions "based on the presence of unauthorized occupants" and pets "or for nuisance related to COVID-19," *id.* § 49.99.2(C).

The Ordinance deferred but did not relieve qualifying tenants of the obligation to pay rent. *Id.* 49.99.2(A) ("Nothing in this article eliminates any obligation to pay lawfully charged rent."). It provided that qualifying tenants would "have up to 12 months following the expiration of the Local Emergency Period to repay any rent deferred during the Local Emergency Period." *Id.* The Ordinance's protections were limited. Under the Ordinance, a landlord could still evict tenants on a variety of grounds, including, *inter alia*, for: (1) nonpayment of rent for tenants with the ability to pay; (2) nonpayment of rent if the inability to pay was unrelated to COVID-19; (3) nuisances unrelated to COVID-19; and (4) illegal activity. The Ordinance preserved a landlord's ability to bring an unlawful detainer action to adjudicate eviction claims, and tenants could invoke the protections of the Ordinance as an affirmative defense in such an action. The Ordinance also allowed tenants to seek

injunctive relief and civil penalties for violations of the Ordinance. L.A. Cal. Mun. Code §§ 49.99.6, 49.99.7.

The Ordinance was set to expire in connection with the end of the Local Emergency Period. Mayor Garcetti issued the Declaration of Local Emergency on March 4, 2020, *see* SER-9-11, and the emergency declaration expired as of February 1, 2023, *see* Ex. B to Appellants' Request for Judicial Notice (MJN-11). *See* Appellants' Br. 7. On January 20, 2023, the City enacted Ordinance No. 187736, which established a timeline for tenants who did not pay rent due to COVID-19 hardship to make up their rental arrears, with (a) unpaid rent from March 1, 2020 to September 30, 2021 due by August 1, 2023, and (b) unpaid rent from October 1, 2021 and January 31, 2023 due by February 1, 2024. *See* Ex. A to Appellants' Request for Judicial Notice (MJN-5).

In conjunction with its tenant protections, the City created the Emergency Rental Assistance Program, with funding from the State of California and federal government. Under this program, the City allowed both landlords and tenants to apply for assistance in paying back unpaid rent to landlords owed. To date, the City's records reflect that over $221 million in back-rent has been paid or is in progress to be paid. *See* Report Dashboard for ERAP, online at https://housing.lacity.org/erap (accessed July 14, 2023).

## IV. INTERVENORS' ROLE IN ADVOCATING FOR AND DEFENDING THE ORDINANCE

The Alliance of Californians for Community Empowerment Action ("ACCE Action"), Strategic Actions for a Just Economy ("SAJE") and Coalition for Economic Survival ("CES") (collectively, "Intervenors") are membership organizations comprised of thousands of Los Angeles's most vulnerable tenants whose housing and health were endangered by GHP's attempt to undermine the City's emergency eviction protections. Intervenors are dedicated to housing justice and tenants' rights in Los Angeles. They work to help families stay in their homes, preserve affordable housing, and advance equitable housing practices.

Intervenors all lobbied and advocated for the passage of the Ordinance, in some cases petitioning for stricter eviction protections than the City ultimately adopted. ER-121 (Delgado Decl. ¶ 5); ER-130 (Strathmann Decl. ¶¶ 5-6); ER-138 (Gross Decl. ¶ 5). ACCE Action, for example, lobbied for a "broad eviction moratorium that covers all grounds of eviction." ER-121 (Delgado Decl. ¶ 5).

### A. Intervenors are dedicated to protecting vulnerable tenants' rights.

ACCE Action is a 501(c)(4) statewide multi-racial, grassroots membership organization dedicated to raising the voices of everyday Californians to fight and stand for economic, racial, and social justice. ER-120 (Delgado Decl. ¶ 2). ACCE's campaigns center around housing justice, worker justice, and sustainable communities, and their members engage in rallies, town halls, and other actions to

make their voices heard. *Id*. The organization's housing justice work focuses on helping families stay in their homes, preserving affordable housing, and pushing for equitable housing practices across California, including in Los Angeles. *Id*. Statewide, ACCE has over 16,000 dues-paying members, and about 6,000 of those members live in the Los Angeles area. ER-120–21 (*Id.* ¶ 3). ACCE organizes citywide, but predominantly in low-income and very low-income communities of color. *Id.* Their membership is predominately Black and Brown, including a significant number of undocumented Californians. *Id*. Through clinics and organizing, ACCE has assisted thousands of tenants throughout the pandemic. ER-121–22 (*Id.* ¶¶ 6-8).

Founded in 1996, SAJE is a 501(c)(3) Los Angeles-based membership organization dedicated to securing economic justice and building community power in South Los Angeles by advocating for tenant rights, healthy housing, and equitable development. ER-129 (Strathmann Decl. ¶ 2). SAJE's work gives it a unique perspective on the relationship between public health and housing. *Id.* SAJE also engages in tenant organizing and in 2019, had approximately 650 members and served over 3,400 predominantly low-income people of color in Los Angeles. ER-129–30 (*Id.* ¶ 3). Its membership is comprised primarily of non-Black Latinx immigrants as well as older, single Black individuals. ER-130 (*Id.* ¶ 4). SAJE has

assisted thousands of tenants during the pandemic, advising them of their rights and connecting them to legal services. ER-131–33 (*Id.* ¶¶ 7-12).

CES is a 501(c)(4) multi-racial, multicultural organization that has served the greater Los Angeles area for nearly 50 years. ER-137 (Gross Decl. ¶ 2). CES organizes low- and moderate-income people on economic and social justice issues, with a singular focus on housing and tenants' rights. *Id.* It conducts tenants' rights clinics and advocates for the creation and protection of affordable housing, rent control, anti-displacement, housing code enforcement, and against illegal evictions. ER-137–38 (*Id.* ¶ 3). Since the COVID-19 pandemic began, CES has seen a significant increase in the number of Angelenos seeking its assistance; in the first year of the pandemic, its tenants' rights clinics received 40-60% more requests for assistance from economically vulnerable renters – primarily Black and Brown individuals and families – than ever before. ER-137–38 (*Id.* ¶¶ 3-4). While inability to pay ranks as the top concern for the renters it assists, CES has also noted a marked increase in the number and severity of complaints tenants have made about landlord harassment and habitability issues since the COVID-19 pandemic began. *Id.*

**B.     Intervenors have a stake in defending the constitutionality of the Ordinance and eviction moratoria throughout California.**

Intervenors submitted declaratory evidence in support of their intervention motion establishing the critical need to maintain the Ordinance's protections, *see* ER-124-25 (Delgado Decl. ¶ 14), ER 133-34 (Strathmann Decl. ¶ 14); the grave

impact that any rollback to the tenant protections in the Ordinance would have on vulnerable Angelenos, *see* ER-122-24 (Delgado Decl. ¶¶ 9, 12), ER 131-32 (Strathmann Decl. ¶¶ 7, 10), ER 138 (Gross Decl. ¶ 4); and how Intervenors would be also be harmed, *see* ER-125 (Delgado Decl. ¶¶17-18), ER-134 (Strathmann Decl. ¶ 16); ER-139 (Gross Decl. ¶7).

In addition to their advocacy efforts and their members' specific interests in the Ordinance, Intervenors' stake in defending the constitutionality of pandemic-related housing protections has repeatedly been recognized by courts in this Circuit. Two of the three Intervenors—ACCE Action and SAJE—were granted permission to intervene in *Apartment Association of Los Angeles County, Inc. v. City of Los Angeles* ("*AAGLA*"), No. CV2005193DDPJEMX, 2020 WL 4501792 (C.D. Cal. Aug. 5, 2020) ("*AAGLA* Intervention Order"), which also involved a takings challenge to the City's Ordinance. *Id.* at *2–3 (recognizing that tenants represented by Intervenors have a "significant protectable interest relating to the Ordinance[]," namely the substantial, legally protected property interest in remaining in their homes, and that "their interests are not adequately represented by either" the government defendants or the landlord association plaintiff).

Likewise, courts in this Circuit have permitted ACCE Action to intervene in two other pending cases involving takings challenges to the constitutionality of eviction moratoria enacted by the County of San Diego and Alameda County. *See S.*

14

*Cal. Rental Housing Ass'n v. Cnty. of San Diego*, 550 F. Supp. 3d 853, 857, 864–67 (S.D. Cal. 2021), *appeal dismissed as moot*, 2022 WL 16832819 (9th Cir. Nov. 9, 2022); *Williams v. Alameda Cnty.*, --- F. Supp. 3d ---, 2022 WL 17169833, at *4 (N.D. Cal. Nov. 22, 2022).

## V.    PROCEDURAL HISTORY

Plaintiffs-Appellants ("GHP") filed this lawsuit against the City of Los Angeles on August 4, 2021, alleging violations of the Fifth Amendment's Takings Clause, as well as the California Constitution's Takings Clause, under *per se* and regulatory takings theories. ER0186–ER0212.

On October 25, 2021, Intervenors moved to intervene in the lawsuit as of right or permissively in the alternative, to advocate for the distinct legal interest low-income tenants have in defending the constitutionality of the City's eviction protections. ER-89–185. GHP opposed. ER-67–88. The District Court held argument and granted Intervenors' motion on November 22, 2021, granting intervention as of right and permissive intervention in the alternative. ER-25–44.

Intervenors and the City separately moved to dismiss the case. Following oral argument, the District Court granted the motions to dismiss on November 17, 2022, granting GHP leave to amend its deficient pleadings. ER-9–23. GHP chose to stand

on its complaint, ER-6–8, and the District Court dismissed the complaint with prejudice. ER-4–5. GHP now appeals.

## SUMMARY OF ARGUMENT

**1.** GHP's physical takings claim is squarely precluded by *Yee*, 503 U.S. at 529, which holds the regulations of the landlord-tenant relationship do not amount to *per se* takings. Because the Ordinance is a mere temporary bar to a particular category of evictions, this is classically the type of landlord-tenant regulation that is not a *per se* taking under *Yee*.

**2.** The District Court correctly dismissed GHP's regulatory takings claim. A regulatory takings claim is judged according to the three *Penn Central* factors: "(1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action." *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 625 (9th Cir. 2020).

GHP's complaint failed to allege sufficient allegations as to each of the *Penn Central* factors. As to the first factor, this Court has consistently held that a takings plaintiff must allege factual matter sufficient to establish the diminution of value and the value that remains on the property. *See, e.g., Colony Cove*, 888 F.3d at 450 Plaintiff has failed to allege either, relying exclusively on conclusory allegations of harm without any attending description of the economic value remaining on their

16

properties. GHP's complaint similarly fails under the second factor, as the Ordinance—a mere temporary pause on evictions—is just one drop in the bucket when viewed in light of the fluctuating patchwork of state, local, and federal regulation of the landlord-tenant relationship. Lastly, for the third factor, courts assess whether the government action "amounts to a physical invasion or instead merely affects property interests through 'some program adjusting the benefits and burdens of economic life to promote the common good.'" *Lingle*, 544 U.S. at 539 (quoting *Penn Central*, 438 U.S. at 124). As the District Court correctly held, an emergency ordinance designed to protect vulnerable tenants during a global pandemic is meant to promote the common good.

**3.** GHP's appeal of the District Court's decision granting Intervenors' motion to intervene need not be addressed at all. If the Court properly dismissed GHP's case on the pleadings—which it did—then GHP's appeal of the intervention order is moot. Regardless, the District Court was correct in granting Intervenors' motion. As low-income tenant organizations that helped lobby for the Ordinance, Intervenors can easily establish that they have the requisite "significant protectible interest" necessary for intervention-as-of-right. *California ex rel. Lockyer v. United States*, 450 F.3d 436, 442 (9th Cir. 2006). Mandatory intervention aside, the District Court did not abuse its discretion in granting permissive intervention, given Intervenors'

members stake in the litigation, as the population of Angelenos that the Ordinance was designed to protect.

## STANDARD OF REVIEW

The Court reviews the district court's dismissal of the complaint *de novo*. *Moore v. Trader Joe's Co.*, 4 F.4th 874, 880 (9th Cir. 2021). The Court will "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Bafford v. Northrop Grumman Corp.*, 994 F.3d 1020, 1025 (9th Cir. 2021). To survive a motion to dismiss, a party must plead sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiffs must provide more than "[t]hreadbare recitals of the elements of a cause of action," and "mere conclusory statements do not suffice." *Id.*

The Court reviews the grant of a motion to intervene as of right *de novo*. *Allen v. Oakland Police Officers Ass'n*, 825 F. App'x 450, 452 (9th Cir. 2020). Given the "broad discretion" afforded district courts to grant permissive intervention, such rulings are reviewed "only for abuse of discretion." *League of United Latin American Citizens v. Wilson*, 131 F.3d 1297, 1307 (9th Cir. 1997).

## **ARGUMENT**

The District Court correctly held that GHP failed to state a claim under the Takings Clause.[2] Takings claims "fall within two distinct classes." *Yee v. City of Escondido*, 503 U.S. 519, 522 (1992). The first is a physical (or *per se*) taking, that is, "[w]here the government authorizes a physical occupation of property." *Id*. The second is a regulatory taking, which exists only where "a regulatory action is functionally equivalent to a classic taking." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002). Regulatory takings are analyzed under the *Penn Central* test, which looks to the economic impact and character of the government action. *Penn Central*, 438 U.S. at 124. GHP claims that the Ordinance constitutes both a physical and regulatory taking. Neither theory holds water.

## **I.   GHP CANNOT ESTABLISH THE ORDINANCE CONSTITUTED A PHYSICAL TAKING**

### **A.   GHP's *per se* physical takings claim fails as a matter of law.**

The *per se* or physical takings doctrine has no application to property owners, like GHP, who "decide[] to rent [their] land to tenants." *Yee*, 503 U.S. at 529 (citations omitted). Even prior to *Yee*, the Supreme Court ruled that "statutes regulating the economic relations of landlords and tenants are not per se takings."

---

[2] The California Constitution Takings Clause is analyzed "congruently" with the federal clause. *San Remo Hotel v. City & Cnty. of San Francisco*, 27 Cal. 4th 643, 664 (2002).

*FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987) (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982)). These rulings dispose of GHP's *per se* claim entirely. Here, the Ordinance merely regulated property owners' relationships with tenants "invited by [GHP], not forced upon them by the government," and thus there is no physical invasion for the purposes of the Takings Clause. *Yee*, 503 U.S. at 528. Accordingly, the District Court correctly dismissed GHP's *per se* takings claim.

A *per se* taking has long been defined as a "permanent physical occupation" or invasion of a property. *Loretto*, 458 U.S. at 426. Even as the Supreme Court has somewhat relaxed the "permanency" requirement, the dispositive question for a *per se* takings claim remains "whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072, 2080 (2021) (citing *Tahoe-Sierra*, 535 U.S. at 321– 23). Where, as here, a government regulation does not grant a right to invade private property, it will not give rise to a *per se* taking claim.[3] *Id.*

---

[3] GHP's reliance on *Kaiser Aetna v. United States*, Appellants' Br. 19, is inapposite for this reason; the Court held a physical taking occurred where the government's "attempt to create a right of public access" through "imposition of navigational servitude in this context will result in *actual physical invasion of the privately owned marina.*" 444 U.S. 164, 178, 180 (1979).

**B.     Under *Yee*, regulations of landlord-tenant relationships do not constitute *per se* takings.**

Under the controlling precedent of *Yee*, property owners, like GHP, who "voluntarily open their property to occupation by others," cannot claim subsequent government regulation of their landlord-tenant relationship is a *per se* taking requiring "compensation based on their inability to exclude particular individuals." *Yee*, 503 U.S. at 529. Rather, a *per se* taking only occurs where the government "*requires* [a] landowner to submit to the physical occupation of his land" in the first place or forces a landowner to "refrain in perpetuity from terminating a tenancy." *Id.* at 527–28 (emphasis in original). In *Yee*, the Supreme Court upheld a rent control ordinance against a physical takings challenge, reaffirming the longstanding principle "that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Id.* at 528–29. Where, as here, a landlord voluntarily rents its land to a tenant, subsequent government regulations limiting the terms on which a tenant may be evicted do not "require[] any physical invasion of [landlords'] property" because the "tenants were invited by [the landlords], not forced upon them by the government." *Id.* at 528. Here, the Ordinance did not force GHP to rent its units to tenants in the first instance, and therefore did not cause a physical taking.

Consistent with this long line of Supreme Court precedent, this Court has "consistently affirmed" the "broad power" of states to regulate housing conditions and landlord-tenant relationships, without giving rise to a takings claim. *Ballinger v. City of Oakland*, 24 F.4th 1287, 1292 (9th Cir. 2022), *cert denied sub nom.* 142 S. Ct. 2777 (citing *Loretto*, 458 U.S. at 440).[4] The temporary (and now expired) pause on evictions granted by the Ordinance "merely regulate[d]" the existing relationship between landlords and certain tenants, and only temporarily restricted GHP's ability to terminate certain tenancies. *Yee*, 503 U.S. at 528. This regulation did not constitute a *per se* taking, as defined by decades of precedent.

### C. *Yee*, not *Cedar Point*, controls challenges to regulations governing preexisting landlord-tenant relationships.

GHP's entire physical takings claim rests on the incorrect premise that *Yee* was abrogated *sub silentio* by the Supreme Court in *Cedar Point*. Appellants' Br. 26. But *Cedar Point* did not abrogate *Yee*, nor did it break any new ground regarding physical takings in the context of landlord-tenant relationships. *See* ER-15 (observing that *Cedar Point* did not discuss, let alone abrogate, "the principle that a regulation governing an existing landlord-tenant relationship is distinguishable from a regulation compelling physical occupation in the first instance, or in perpetuity.").

---

[4] *See also Community Housing Improvement Program v. City of New York*, 59 F.4th 540, 552 (2d Cir. 2023) (describing *Yee*'s principles as "exceptionally clear").

*Cedar Point* involved a California regulation that gave labor organizers the "right to take access" to private agricultural property. *Id.* at 2069. The Supreme Court concluded the regulation was a physical taking because it was a "government authorized invasion" that required property owners to grant access to labor organizers who were not previously invited. *Id.* at 2074. The regulation bore no relationship to "any risk posed to the public" and therefore "amount[ed] to simple appropriate of private property." *Id.* at 2080.

The sole mention of *Yee* in the *Cedar Point* decision has nothing to do with this case. The Court cited *Yee*—the second case in a string cite—to clarify that government regulations (as opposed to, for example, statutes) may give rise to a physical takings claim where there is a physical appropriation of property. *Cedar Point*, 141 S. Ct. at 2072 ("Our cases have often described use restrictions that go 'too far' as 'regulatory takings.' But that label can mislead. Government action that physically appropriates property is no less a physical taking because it arises from a regulation.") (citing *Yee*, 503 U.S. at 527). This passing mention of *Yee* in no way abrogates *Yee*'s holding regarding the government's ability to regulate landlord-tenant relationships without implicating the Takings Clause. ER-14 (citing *Cedar Point*, 141 S. Ct. at 2072).

GHP also argues that *Yee* should be strictly construed to be limited only to the specific facts of that case. Appellants' Br. 24. That argument is unavailing, because

this Court and other circuits have consistently, and correctly, relied on *Yee* in myriad cases dealing with takings claims brought by landowners over restrictions on the ability to exclude their previously invited guests, including tenants. *See, e.g.*, *Ballinger*, 24 F.4th at 1287 (applying *Yee* in a lease expiration and re-occupancy case); *Kagan v. City of Los Angeles*, 2022 WL 16849064, at *1 (9th Cir. 2022) (mem. disp.) (affirming dismissal of landlords' takings claim involving a rental ordinance that granted a tenant protected status and prohibited evictions as foreclosed by *Yee*); *Conn. Ass'n of Heath Care Facilities, Inc. v. Brembly*, 519 F. App'x 44 (holding that nursing homes' takings claims were foreclosed by *Yee* because the facilities had voluntarily invited the patients); *Community Housing*, 59 F.4th at 540. For example, in *Community Housing* the Second Circuit applied the "exceptionally clear" principles set forth in *Yee* to assess the constitutionality of a rent stabilization law that governed the relationship between landlords and their tenants. 59 F.4th at 550. The court in *Community Housing* held that because the tenants were invited by the landlords, rather than "forced upon them by the government," there was no physical taking. *Id.*

Contrary to GHP's argument that *Yee* only applies to the "unusual economic relationship between park and mobile home owners," *Ballinger*, *Kagan*, and *Community Housing* are three recent examples that dealt with the type landlord-tenant relationships at issue here. Appellants' Br. 25. GHP claims that courts,

including this Circuit, have "misunderstood" *Yee's* relevance in all landlord-tenant relationships, *id.*, but that argument depends on ignoring *Yee*'s clearly applicable principles which this Court and others have faithfully and consistently applied. GHP's attempt to distinguish *Ballinger* as a case allegedly involving only appropriation of *money*, not property, is unavailing. Appellants' Br. 29–30. *Ballinger* involved a takings challenge to a regulation conditioning landlords' ability to regain access to their homes through "evicting" or "ending tenancy" on payment of a reentry or relocation fee to tenants. *Id.* at 1291. This Court held the regulation temporarily restricted owners' access to and control of their property based on a preexisting landlord-tenant relationship. *Id.* So too here, as in *Ballinger*, *Kagan*, *Community Housing*, and many others—the regulation at issue governs the preexisting relationship between landlords and their tenants. *Yee* unambiguously supports the "wide latitude" states have to regulate preexisting relationships between landlords and tenants. *Community Housing*, 59 F.4th at 550.

Conversely, it is *Cedar Point* that has been consistently limited, by courts in this Circuit and elsewhere, to situations where a government forces a landowner to allow an otherwise *uninvited* party onto their property. *See, e.g.*, *Ballinger*, 24 F.4th at 1292 (distinguishing *Cedar Point* and finding no *per se* taking occurred where the government did not physically take property for itself or someone else); *301, 712, 2103 and 3151 LLC v. City of Minneapolis*, 27 F.4th 1377 (8th Cir. 2022) (explaining

that *Cedar Point* distinguishes "between physical appropriations and use restrictions" and finding no *per se* taking where a regulation limited landlords' process for considering prospective tenants); *Golf Village North, LLC v. City of Powell, Ohio*, 14 F.4th 611 (6th Cir. 2021) (distinguishing *Cedar Point* and finding no *per se* taking where a regulation did not permit members of the public who otherwise would have been excluded to physically invade a property).[5]

Finally, GHP's mischaracterization of the tenants in this case as "interlopers with a government license" does not affect the *per se* takings analysis. Appellants' Br. 21 (citing *FCC*, 480 U.S. at 252–53). The tenants protected by the Ordinance are lawful residents who entered into contractual landlord-tenant agreements; the temporary suspension of their obligation to pay rent does not transform them into

---

[5] The overwhelming majority of COVID-19 eviction moratoria cases in this Circuit and beyond continue to rely on *Yee* in holding that these moratoria do not constitute a *per se* physical taking where they do not "require Plaintiffs to submit to physical occupation and did not appropriate Plaintiffs' right to exclude." *See Jevons v. Inslee*, 561 F. Supp. 3d 1082, 1102, 1106 (E.D. Wash. 2021); *El Papel LLC v. Durkan*, 2021 WL 4272323, at *16–17 (W.D. Wash. Sept. 15, 2021), appeal docketed, No. 22-35656 (9th Cir. 2022); *S. Cal. Rental Housing Ass'n v. Cnty. of San Diego*, 550 F. Supp. 3d at 864–67 (S.D. Cal. 2021); *Stuart Mills Props., LLC v. City of Burbank*, No. 2:22-cv-04246-RGK-AGR, 2022 WL 4493573, at *3 (C.D. Cal. Sept. 19, 2022); *Williams v. Alameda County*, No. 3:22-cv-01274-LB, 2022 WL 17169833, at *9 (N.D. Cal. Nov. 22, 2022); *Farhoud v. Brown*, No. 3:20-cv-2226-JR, 2022 WL 326092, at *9–10 (D. Or. Feb. 3, 2022); *see also Bldg. & Realty Institute of Westchester & Putnam Cnties., Inc. v. New York*, No. 19-CV-11285 (KMK), 2021 WL 4198332, at *22 n.26 (S.D.N.Y. Sept. 14, 2021). The District of Columbia similarly affirmed the application of *Yee* in a COVID eviction case earlier this year, emphasizing the dispositive grant of access to property by the landlord to a tenant that forecloses a successful *per se* takings challenge. *Gallo v. District of Columbia*, 2023 WL 2301961, at *3 (Mar. 1, 2023).

"interlopers." As the Court stated in *FCC v. Florida*, "it is the invitation, not the rent, that makes the difference." 480 U.S. at 252 (finding that mandating a significantly lower utility rental fee than was originally agreed to was not a *per se* taking). The distinction between a lessee and an interloper turns on invitation, and the tenants here were voluntarily invited by GHP. If GHP is correct that there is some "interloper" exception to *Yee*, then no regulation of evictions, such as those governing the timing of removal or prohibiting evictions to obtain higher rents, *see Block v. Hirsh*, 256 U.S. 135, 156 – 57 (1921), would be covered by *Yee* and all could be characterized as a *per se* taking. *Yee* is not an empty letter.

**D.**      **GHP's reliance on *Heights Apartments* rather than *Yee* invites error.**

In response to the overwhelming weight of authority correctly recognizing *Yee* as the binding, controlling authority on the questions presented here, GHP identifies a single decision mistakenly applying *Cedar Point* over *Yee* in analyzing eviction claims. *See* Appellants' Br. 14, 23, 26–27, 30–31 (relying on *Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022)). The root of the Eighth Circuit's error in *Heights Apartments* is simple. The Eighth Circuit distinguished *Yee* on the ground that the landlords "sought to exclude future or incoming tenants rather than existing tenants." *Id.* at 733. The Eighth Circuit's premise was mistaken. In *Yee*, the landlords sought to exclude *existing* tenants as well, challenging the rent control ordinance as improperly "granting to the tenants of mobile homes *presently*

*in The Park*, as well as the successors in interest of such tenants, the right to physically permanently occupy and use" the landlords' property. *Yee*, 503 U.S. at 525 (emphasis added). Judge Colloton, writing in dissent, identified the Eight Circuit's mistake in his dissent from the Eighth Circuit's order denying the petition for rehearing *en banc* in *Heights Apartments*. *See* 2022 WL 2167494, at \*1 (Colloton, J., dissenting) ("the panel . . . misreads the most analogous decision of the Supreme Court on the matter of *per se* takings"). The Court should not follow the Eighth Circuit's decision in *Heights Apartments*.

**E.    GHP's reliance on two non-Takings Clause cases does not change the controlling impact of *Yee*.**

GHP also argues that a single sentence in the Supreme Court's stay order in *Alabama Association of Realtors v. Department of Health and Human Servs.*, 141 S. Ct. 2485 (2021), effectively abrogated *Yee*.[6] Appellants' Br. 32–33. That order, which stayed the CDC's temporary eviction moratorium imposed without Congressional authorization, did not even involve a takings claim. The one sentence GHP hangs its hat on has nothing to do with *Yee* or the Takings Clause – it addressed whether the balance of equities in that case warranted a stay pending appeal, as the court of appeals had already concluded. Needless to say, the Supreme Court did not

---

[6] That stay order was issued on the Supreme Court's "shadow docket" and was not the product of the normal appellate process involving merits briefing, argument, and decision. *See generally Whole Woman's Health v. Jackson*, Order on App. For Injunctive Relief, 141 S. Ct. 2494, 2500 (2021) (Kagan, J., dissenting).

upend the nearly three decades of takings jurisprudence following *Yee* in a stay order from a case that had nothing to do with the Takings Clause.

Nor is there anything earth-shattering about *Alabama Realtors*' acknowledgment of the longstanding principle that the "right to exclude" is "one of the most fundamental elements of property ownership." *Alabama Realtors*, 141 S. Ct. at 2490 (citing *Loretto*, 458 U.S. at 435); *see* ER-14 ("*Yee* acknowledged the very same principle"). *Alabama Realtors'* supposedly game-changing sentence mirrors language in *Yee*, in which the Court considered, but ultimately rejected, a *per se* physical takings challenge to a regulation involving the landlord-tenant relationship. *See Yee*, 503 U.S. at 528 (the right to exclude is doubtless . . . one of the most essential sticks in the bundle of rights that are commonly characterized as property"); *contra* Appellants' Br. 20 (identifying "right to exclude" as "touchstone" of takings analysis). To establish a physical takings claim, a plaintiff must show that the government action "effectively destroy[ed]" *each* strand "in an owner's bundle of property rights"—not just one of them. 458 U.S. at 435. There are no "tea leaves to read," Appellants' Br. 33, regarding the continued vitality of *Yee*.

Nor does *Horne v. Department of Agriculture*, which involved physical appropriation of property, affect the analysis here. 576 U.S. 350, 362 (2015) (cited in Appellants' Br. 28–29). *Horne* involved a government "demand that the Hornes turn over a percentage of their raisin crop without charge," an "actual taking of

possession and control" of the property propety at issue, which "gives rise" to a *per se* taking. *Id.* The Court concluded the law was a taking because "[r]aisin growers subject to the reserve requirement thus lose the entire 'bundle' of property rights in the appropriated raisins—'the rights to possess, use and dispose of' them." *Id.* at 361–62 (quoting *Loretto*, 458 U.S. at 435). *Horne* is inapposite because the Ordinance's temporary restrictions on landlords' use of their property did not involve either physical appropriation or cause the loss of GHP's "entire bundle of property rights" in its properties.

## II.    GHP FAILED TO PLAUSIBLY ALLEGE A REGULATORY TAKINGS CLAIM.

GHP's regulatory takings theory fares no better than its physical takings claim. The District Court's order dismissing this claim should be affirmed and GHP should not be granted any further opportunity to amend as it declined the District Court's invitation to do so. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1098 (9th Cir. 2002), *abrogation on other grounds recognized by Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) ("When given the opportunity, the plaintiffs declined to say what additional facts they might plead if given the chance to amend. Such a failure is a strong indication that the plaintiffs have no additional facts to plead.").

A regulatory taking exists only where "a regulatory action is functionally equivalent to a classic taking." *Tahoe-Sierra*, 535 U.S. at 322 (citations and internal

quotation marks omitted). This inquiry is judged by reference to the three *Penn Central* factors: "(1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action." *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 625 (9th Cir. 2020). "[C]ompensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." *Yee*, 503 U.S. at 522–23.

Each *Penn Central* factor weighs against a finding that the Ordinance constituted a regulatory taking. First, GHP cannot (and has not even attempted to) show that the economic impact of the Ordinance is anywhere close to the threshold for a regulatory taking. *See, e.g.*, *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083 (9th Cir. 2015). Second, the Ordinance did not upset "investment-backed expectations" because the rental-housing industry is highly regulated. *Bridge Aina Le'a*, 950 F.3d at 634. Third, the "character of the government action" weighs against finding a taking where, as here, a government action is aimed at "what it perceives to be a significant threat to common welfare." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485 (1987).

**A. Regulatory takings claims are routinely dismissed under Rule 12(b)(6).**

As a threshold matter, GHP asserts that regulatory takings should "rarely be susceptible to dismissal under Rule 12(b)(6)" because of the fact-based analysis required under *Penn Central*. Appellants' Br. 33; *id.* at 20. This Court has repeatedly held otherwise, where, as here, a plaintiff has failed to plausibly allege factual matter to establish the *Penn Central* factors.

For example, in *Rancho de Calistoga*, this Court affirmed the dismissal of a complaint for failure to state a regulatory takings claim. The Court determined that the plaintiff's alleged 28.53% diminution in market value, and lost income, as a result of the City of Calistoga's rent control regulation was simply "economic impact [that] is an inevitable consequence of the rent-control scheme but not an unconstitutional one." 800 F.3d at 1090–91. Unlike the plaintiff in *Rancho de Calistoga*, GHP did not even try to allege diminution in market value, instead touting "$20 million" in losses, an amount that is meaningless without context sufficient to compare it to the overall value of their properties. *See* ER-18; *Colony Cove*, 888 F.3d at 450. GHP declined the District Court's invitation to provide that necessary context in an amended pleading. ER-6–8.

Similarly, in *Evans Creek, LLC v. City of Reno*, 2022 WL 14955145 (9th Cir. Oct. 26, 2022) (mem. disp.), this Court affirmed the dismissal of a takings claim for failure to "sufficiently plead the first *Penn Central* factor" where the complaint was devoid of facts making it "possible for this Court to determine what the economic

impact to the property is, even taking the allegations in the complaint as true". The Court explained that "[i]n considering the economic impact of an alleged taking, we 'compare the value that has been taken from the property with the value that remains in the property.'" *Id.* at *1 (quoting *Colony Cove*, 888 F.3d at 450). Absent allegations about a change in value, it is "not possible for this Court to determine what the economic impact to the property is, even taking the allegations in the complaint as true." *Id.* Without factual matter sufficient to determine the "value that remains in the property" after the alleged diminution, a complaint—like GHP's here—fails to state a plausible regulatory takings claim. *See id.* at *1–2

    This Court's holdings are in accord with the law of other circuits and the *Twombly* and *Iqbal* standard. As the Tenth Circuit explained in rejecting the argument that a district court must permit the parties to develop a factual record in discovery before ruling on a regulatory takings claim:

> [U]nder the *Twombly* and *Iqbal* pleading standard, [appellant] needed to plead facts sufficient to plausibly suggest she could show a non- *per se* regulatory taking under *Penn Central*. Further factual development is unnecessary because the allegations in the amended complaint are taken to be true. If the factual content in the amended complaint does not allow at least a plausible inference that a regulatory taking occurred, under *Penn Central*, dismissal is appropriate.

*Britton v. Keller*, 851 F. App'x 821, 825 (10th Cir. 2021) (affirming dismissal); *see also Taylor v. United States*, 959 F.3d 1081 (Fed. Cir. 2020). GHP appears to suggest

that a court may never test the pleading sufficiency of a regulatory takings claim against the *Penn Central* factors. That is simply not the case.

### B. Plaintiffs failed to plausibly allege a diminution in the value of their properties.

The District Court correctly held that GHP's complaint fails to allege a diminution in property value sufficient to sustain a regulatory takings claim. ER-17–18. To state a viable regulatory takings claim, a plaintiff must allege adverse economic impact that goes beyond "mere loss of income." *Colony Cove*, 888 F.3d at 451. The central focus of this factor is diminution of value, and that means a plaintiff must allege the loss in value of the "parcel as a whole," comparing the value taken from the property with the value that remains. *Keystone*, 480 U.S. at 497. GHP's failure to sufficiently allege economic impact is dispositive.

The Supreme Court has "long established that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993) (citing *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384 (1926) (approximately 75% diminution); and *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (92.5% diminution)). Consistent with this longstanding directive, which establishes a "high threshold" for economic impact, the Ninth Circuit has observed that even "diminution in property value because of governmental regulation ranging from 75% to 92.5% does not constitute a taking." *Colony Cove*, 888 F.3d at 450; *see*

*also Rancho De Calistoga*, 800 F.3d at 1090–91 (affirming dismissal of regulatory takings claim where pleaded 28.53% diminution in market value and "lost income" may be "economic impact [that] is an inevitable consequence of the rent control scheme but not an unconstitutional one"); *Tan Phu Cuong Investment LLC v. King Cnty.*, 831 F. App'x 235, 238 (9th Cir. 2020) (affirming dismissal of regulatory takings claim where plaintiffs failed to allege facts to allow value comparison).

Even taken as true, GHP's allegations would not entitle it to relief, because its complaint is devoid of any facts that would enable the Court to compare the value that has been taken from the property with the value that remains in the property as a whole. *Keystone*, 480 U.S. at 497. Nothing in the complaint specifies any pre-Ordinance property value or the "value that remains in the property" after the alleged diminution, let alone the percentage diminution in value of each of the thirteen properties at issue in this case. *See* ER-205 (Compl. ¶ 56) (baldly alleging "severe diminution in value"). Instead, the complaint merely alleges that some unspecified fraction of tenants across its properties is behind on rent, ER-204 (Compl. ¶¶ 50–51), and states that GHP has suffered losses in "excess of $20 million" and "severe and ruinous" economic harm. ER-190, ER-208–09 (Compl. ¶¶ 7, 71). This lone figure and threadbare allegation, presented without any point of comparison, does not plausibly allege the requisite economic impact.

GHP argues that the District Court erected an impermissibly high burden on pleading economic. Appellants' Br. 37. Not so. The District Court merely required Plaintiff to plead facts that would "nudge a claim across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). As the District Court correctly held, GHP's threadbare assertions of "severe" economic loss do nothing to allege the factual matter required under *Colony Cove*—namely, the alleged diminution and the value remaining on GHP's property after the alleged diminution. *Colony Cove*, 888 F.3d at 450. The deficiency in GHP's complaint is not for lack of opportunity: When the District Court granted GHP leave to amend to include further factual matter related to the first factor, GHP declined the District Court's invitation and took this appeal. *See supra* note **Error! Bookmark not defined.**.

### C. GHP failed to allege interference with objectively reasonable investment-backed expectations.

Under the second factor, courts consider the interference, if any, of a regulation with "investment-backed expectations." *Penn Central*, 438 U.S. at 124. To state a colorable claim under this factor, the plaintiff's "purported distinct investment-backed expectation must be objectively reasonable." *Colony Cove*, 888 F.3d at 452. Intervenors respectfully disagree with the District Court's holding that this factor weighs in GHP's favor at the pleading stage; as discussed below, GHP

<u>cannot</u> adequately plead this factor because the rental market is a highly regulated field. *Bridge Aina Le'a*, 950 F.3d at 634.

GHP asserts that the Ordinance went further than what may reasonably be expected in the landscape of housing regulations. Appellants' Br. 39. In such fields, however, "[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993).

While the Ordinance temporarily limited the timing of evictions and the scope of evictable acts, GHP misstates the Ordinance's impact. First, the Ordinance did not eliminate the landlords' ability to "charge rent for units and have legal recourse if tenants failed to pay rent," as the complaint alleges. ER-209 (Compl. ¶ 72). The Ordinance temporarily paused evictions for tenants who were unable to pay rent due to COVID-19 related hardship, during the City's official Local Emergency Period. Now that the Ordinance has expired, tenants no longer have eviction protections for COVID-19 related hardship and landlords are free to initiate eviction proceedings and seek back payment for rent if tenants do not comply with the repayment deadlines the City has put in place.

Second, the Ordinance itself was firmly rooted in the City's longstanding regulation of the Los Angeles rental market. Long before the pandemic, state and

local laws dictated when and for what reasons a landlord could evict a tenant. For example, state and local laws require landlords to base an eviction on an enumerated "just cause," which limited the permissible basis for at-fault evictions to a set of evictable acts. *See* Cal. Civ. Code § 1946.2 (requiring "just cause" for evictions for certain residential rental properties); L.A. Mun. Code ("LAMC") § 151.09 (requiring an eviction to be based on an enumerated "just cause" for rent-controlled apartments); L.A. Cnty. Code ("LACC") § 8.52.090 (same). Pre-existing regulations also dictated the timing of evictions. Even without the Ordinance, for example, many tenants are entitled to between 90 days and a full year before facing eviction. *See, e.g.*, LAMC § 151.23(B) (requiring a minimum of 120-days' notice to tenant if landlord intends to remove unit from market; one-year notice for tenants at least 62 years of age who lived in the unit one year or more).

The now-expired Ordinance was an incremental adjustment to this existing, lawful regulatory patchwork and did not unreasonably interfere with GHP's investment-backed expectations. The Ordinance shrank the list of evictable acts, but only for the duration of the COVID-19 emergency. Its temporary impact pales in comparison to the litany of *permanent* landlord regulations that are no doubt constitutional. For example, rent control statutes in California prohibit many landlords from raising tenants' rent more than a nominal amount by state or local rent stabilization ordinances. *See, e.g.*, Cal. Civ. Code § 1947.12(a)(1) (limiting

38

allowable yearly rent increases to specific percentages); LACC § 8.52.050(C) (limiting annual rent increases for most unincorporated rent-controlled residential units to a maximum of 8 percent).

### D. The Ordinance was essential to promoting the common good.

Even if GHP's complaint passed muster under the first and second *Penn Central* factors (it does not), the final factor – the "character of the government action" – is fatal to GHP's claims. GHP's only allegation on this factor is the conclusory statement that the Ordinance is so "invasive" as to effectively be a *physical* taking. Appellants' Br. 40–41 (citing ER-209–10, alleging that the regulation is "tantamount to a physical invasion of private property" and "effectively requires that Plaintiffs allow their tenants to occupy their properties free of charge and requires Plaintiffs to allow their tenants to remain in possession for the foreseeable future"); *see* ER-21 (District Court observing that "Plaintiffs largely reiterate their argument, rejected above, that the Moratorium is a per se taking"). GHP is wrong on the facts as the Ordinance only protected tenants experiencing COVID-19 hardship, expressly did not eliminate the obligation to pay rent, and did not prohibit all or even most evictions in perpetuity—and those facts overlook the common good served by the program in any event.

In evaluating this factor, courts consider whether the government action "amounts to a physical invasion or instead merely affects property interests through

'some public program adjusting the benefits and burdens of economic life to promote the common good.'" *Lingle*, 544 U.S. at 539 (quoting *Penn Central*, 438 U.S. at 124). As the District Court correctly stated, there is "little doubt" that the Ordinance was intended to promote the common good. ER-21; *see Apt. Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles* ("*AAGLA*"), 10 F.4th 905, 908 (9th Cir. 2021) (noting the Ordinance has "the stated purposes of ensuring housing security and promoting public health during the pandemic"). GHP cannot and does not contest that the City's adoption of the Ordinance was aimed at "what it perceives to be a significant threat to common welfare." *Keystone*, 480 U.S. at 485. And, albeit in the context of a Contracts Clause challenge, this Court previously held that "given the challenges the COVID-19 presents, the moratorium's provisions constitute an appropriate and reasonable way to advance a significant and legitimate public purpose." *Apt. Ass'n of Los Angeles Cnty., Inc* 10 F.4th at 913 (affirming denial of preliminary injunction challenging the City's Ordinance on Contract Clause grounds) (internal quotation marks omitted).

Courts across the country have repeatedly upheld COVID-19 eviction moratoria as precisely the type of programs contemplated by the third *Penn Central* factor. *See, e.g.*, *Elmsford*, 469 F. Supp. 3d at 168 (noting that governments can constitutionally "in times of emergency or otherwise, reallocate economic hardships between private parties, including landlords and their tenants, without violating the

Takings Clause."); *Baptiste v. Kennealy*, 490 F.Supp.3d 353, 390 (D. Mass. 2020); *Auracle Homes, LLC v. Lamont*, 478 F. Supp.3d 199, 223 (D. Conn. 2020); *S. Cal. Rental Housing Ass'n v. Cty. of San Diego*, 2021 WL 3171919 at *9 (S.D. Cal. July 26, 2021); *Willowbrook Apt. Ass'n v. Mayor & City Council of Baltimore*, No. 20-CV-1818-SAG, 2021 WL 4441192, at *7 (D. Md. 2021). These decisions are consistent with Ninth Circuit jurisprudence, which has held, time and again, that the character of housing regulations weighs against a regulatory taking. *See, e.g.*, *Colony Cove*, 888 F.3d at 454–55. In short, courts are consistent: ordinances like the eviction moratorium which "create a temporary shift in the burdens and benefits of the landlord-tenant relationship with the stated purpose of advancing the common good" do not constitute takings.

Against this backdrop, GHP's bald claim of "physical invasion" is unavailing. It is not enough to show that the Ordinance "intrudes on Appellants' 'right to exclude,'" Appellants' Br. 40, as the same could be said of many constitutional regulations governing the landlord-tenant relationship, but rather whether the adjustment of benefits and burdens promotes the common good. And to the extent GHP is attempting an end-run around *Penn Central* by repeating the same arguments for its unsuccessful *per se* takings claim, this Court has rejected that strategy elsewhere. *Cf. Ballinger*, 24 F.4th at 1292 n.2 ("courts may not apply principles of physical takings claims to regulatory takings claims").

41

GHP's failure to sufficiently plead any one of the three *Penn Central* factors is dispositive. But the combined analysis weighs inexorably in favor of affirming the district court's ruling.

## III.   THE DISTRICT COURT PROPERLY GRANTED THE MOTION TO INTERVENE.

Because the District Court's order dismissing the complaint should be affirmed, this Court need not reach GHP's remaining ground for appeal: whether Intervenors were properly granted leave to intervene as of right and permissively in the alternative under this Court's liberal approach to intervention. ER-25–33. *Cooper v. Newsom*, 13 F.4th 857, 864 (9th Cir. 2021) (where "underlying litigation was entirely resolved we [have] held the appeal [from the court's order on intervention] moot"); *Prete v. Bradbury*, 438 F.3d 949, 959–60 (9th Cir. 2006) (in affirming lower court's merits ruling rejecting constitutional challenge, declining to vacate judgment of lower court where grant of intervention deemed erroneous but harmless).

But even if this Court opts to reach the issue, GHP's cited authorities confirm that the District Court properly construed Federal Rule 24 in favor of intervention: "A liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts. By allowing parties with a *practical* interest in the outcome of a particular case to intervene, we often prevent or simplify future litigation involving related issues; at the same time, we allow an additional interested

party to express its views before the court." *United States v. City of Los Angeles*, 288 F.3d 391, 397–98 (9th Cir. 2002) (cleaned up) (emphasis in original) (cited in Appellants' Br. 49). For these reasons, "[n]o specific legal or equitable interest need be established," *Berg*, 268 F.3d at 210 (internal quotation marks omitted),[7] and an intervenor that does not add new claims or seek new relief need not establish Article III standing to participate in the suit, *see Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020).

In deciding intervention requests, courts are "guided primarily by practical and equitable considerations." *United States v. City of Los Angeles*, 288 F.3d 391, 397 (9th Cir. 2002) (internal quotation marks omitted). Courts accept as true the non-conclusory allegations made in support of an intervention motion, particularly where "the propriety of intervention must be determined before discovery." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 819–20 (9th Cir. 2001).

Consistent with Rule 24 and this Court's guidance, the District Court properly granted Intervenors' request. ER-25–33.

## A. The District Court correctly granted intervention as of right.

An order granting intervention-as-of-right is reviewed *de novo*. *See generally Berg*, 268 F.3d at 819–20.[8] The District Court correctly applied Rule 24(a)(1)'s four-

---

[7] Were the law otherwise, would-be intervenors would be required to seek *joinder* under Rule 19 or 20. The Federal Rules, however, contemplate varying degrees of connection to a particular case.

[8] Intervenors note this because their arguments in support of intervention were made

part test to grant intervention as of right: (1) the application for intervention is timely;[9] (2) the applicant has a "significantly protectable" interest relating to the property or transaction that is the subject of the action; (3) the applicant is so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest is not adequately represented by the existing parties in the lawsuit. *Berg*, 268 F.3d at 818–19.

### 1. Intervenors have a significant protectable interest in the Ordinance which may as a practical matter be impaired if the Court determines the Ordinance effect a taking.

As to the second and third factors, Intervenors' role in advocating for passage of the Ordinance conclusively establishes that they have a significant protectable interest which may, as a practical matter, be impaired by an adverse ruling. In this Circuit, "[a] public interest group is entitled as a matter of right to intervene in an action challenging the legality of a measure it has supported." *Idaho Farm Bureau Fed. v. Babbit*, 58 F.3d 1392, 1397 (9th Cir. 1995); *Wash. State Bldg. & Constr. Trades Council, AFL-CIO v. Spellman*, 684 F.2d 627, 630 (9th Cir. 1982) (same). At the outset of the pandemic, Intervenors lobbied the City to pass an eviction

---

when the Ordinance was still in effect; as such, they centered on a concern that GHP's lawsuit, if successful, could prematurely end the Ordinance's tenant protections. Intervenors would make related, but slightly revised, arguments if they were to file their motion today, with the Ordinance no longer in effect.

[9] GHP does not dispute the timeliness of Intervenors' motion. *See generally* Appellants' Br. 44.

moratorium, in some cases advocating for broader protections than the City ultimately adopted. ER-121 (Delgado Decl. ¶ 5); ER-130 (Strathmann Decl. ¶¶ 5-6); ER-138 (Gross Decl. ¶ 5).

Once a court finds that intervenors "have a significant protectable interest, we have little difficulty concluding that the disposition of this case may, as a practical matter, affect it." *California ex rel. Lockyer v. United States*, 450 F.3d 436, 442 (9th Cir. 2006). *Lockyer* involved an intervention request to a constitutional challenge to a federal appropriations rider that restricted access to federal funds for governments that discriminated against health care providers that refused to provide abortion coverage. *Id.* at 439. The district court denied intervention to some of the very same health care providers the rider was designed to protect. Reversing that decision, this Court explained that "[i]f, as a result of this litigation, the Weldon Amendment is struck down, or its sweep is substantially narrowed, the proposed intervenors will have no alternative forum in which they might contest that interpretation of the Amendment." *Id.* at 443; *id.* at 442 (holding that the constitutional challenge "is proof in itself of [the law's] significance to the proposed intervenors" seeking to defend the law's validity). This reasoning applies equally here: if the Ordinance is found to be a *per se* or regulatory taking, Intervenors and their members—for whose benefit the Ordinance was enacted—will have no alternative forum in which to contest that interpretation.

GHP ignores this binding authority in principally arguing, as below, that an intervenor must show its rights will "actually" be impaired by resolution of the lawsuit, and that Intervenors' rights are too speculative. Appellants' Br. 44–46. This argument is inconsistent with the Ninth Circuit's liberal construction of Rule 24(a)—which itself requires only that interests "may, as a practical matter" be "impair[ed]." For example, in *Berg*, the Ninth Circuit determined that the intervenors identified a "legally protectable interest" to support intervention as of right by showing that their "***interests could be affected*** if the [agreement] were invalidated." *Berg*, 268 F.3d at 820, 822 (emphasis added). As the District Court explained in another case, "a requirement that a proposed intervenor conclusively demonstrate that a resolution of the pending matter would, regardless of outcome, necessarily affect the intervenor's interest would conflict with the Ninth Circuit's guidance that this Court construe the four-part test broadly in favor of intervenors, with an emphasis on practical considerations." *Constr. Laborers Trust Funds*, 2020 WL 410176, at *2 (citing *McGough*, 967 F.2d at 1394).

GHP's suggestion that Intervenors' interest is "wholly remote and speculative" is belied by the record. Appellants' Br. 45–46. Intervenors represent low-income tenants with legally protected property interests in remaining in their homes. Beyond Intervenors' advocacy efforts in support of the Ordinance, which are dispositive here, the District Court correctly held that Intervenors' other interests in

the legality and continued viability of the Ordinance bore sufficient relationship to this lawsuit.

Intervenors established that a Takings ruling would have the practical effect of opening the floodgates to Takings claims—not only through their record evidence but through GHP's own admission. *See* ER-77 n.1 (GHP argued below that "[t]he takings litigation is coming, not just from Plaintiffs in this action, but from landlords throughout the City"). At the time of filing, GHP owned or managed approximately five thousand of the hundreds of thousands of rental units in Los Angeles – and they alone were seeking compensation in excess of one hundred million dollars. Intervenors' concerns that the City might very well prioritize minimizing its financial exposure, which included not only "just compensation" but landlords' attorneys' fees and the City's own litigation costs, and end the Ordinance prematurely by cutting off the 12-month trailing protections that were critical to keeping low-income tenants housed while they try to get back on their feet economically, were founded and credible. *See* ER-124–25 (Delgado Decl. ¶ 14); ER-133–34 (Strathmann Decl. ¶ 14).

Intervenors further provided considerable evidence of the impact that these changes would have, including declaratory evidence that landlords were trying to evict tenants even with the Ordinance in place, *see* ER-122–24 (Delgado Decl. ¶¶ 9, 12); ER-131–32 (Strathmann Decl. ¶¶ 7, 10); ER-138 (Gross Decl. ¶ 4); evidence

47

that such evictions would expose low-income tenants to COVID-19, *see, e.g.*, ER-155 (Mishori Decl. ¶ 39) (citing a peer-reviewed study that found the number of COVID-19 cases doubled and deaths increased fivefold in the four-month period after eviction moratoriums expired in states nationwide in 2020); and declaratory evidence establishing that evictions would strain Intervenors' resources, *see* ER-125 (Delgado Decl. ¶¶ 17–18); ER-134 (Strathmann Decl. ¶ 16); ER-139 (Gross Decl. ¶ 7).

In light of all of this argument and evidence, the District Court correctly found, consistent with Rule 24(a), that the obvious practical considerations the City will face (and the resulting impacts on Intervenors) if it is hit with GHP's desired $100 million-plus judgment are not the type of "speculative" concerns too remote to justify intervention as of right. *Compare* ER-32 ("To contend, therefore, as Plaintiffs do, that a declaratory judgment that the Moratorium constitutes an unconstitutional taking would do nothing more than give rise to a 'hyper-speculative' fear that the City might make adjustments to the Moratorium is naive, at best. Any argument that this matter presents a limited question pertaining only to a small number of litigants is not well-taken," in light of Rule 24(a)(2)'s directive" on practicality) (emphasis in original); *with* Appellants' Br. 15, 45–47.

**2. Intervenors' interests are not adequately represented by the City.**

The District Court also correctly found that Intervenors' interests would not adequately be represented by the existing parties to the suit. ER-30–31. There are three factors determining the adequacy of representation: "(1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervener's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervener would offer any necessary elements to the proceeding that other parties would neglect." *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003) (internal quotation marks omitted). "The burden of showing inadequacy of representation is 'minimal' and satisfied if the applicant can demonstrate that representation of its interests 'may be' inadequate." *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011). (quoting *Arakaki*, 324 F.3d at 1086).

While the participation of a government entity that shares a litigation position with Intervenors gives rise to a rebuttable "presumption of adequacy," *Arakaki*, 324 F.3d at 1086, the District Court correctly found that Intervenors soundly rebutted that presumption. ER-30–31. Intervenors' interests are singular compared to the broad range of interests encountered by the City, and they have crucial access to facts regarding the Ordinance's impact on Los Angeles's most vulnerable Black and Latino tenants. The District Court properly found that Intervenors established "their

49

interests and the City's diverge . . . in light of evidence that [Intervenors] advocated for broader COVID-19 emergency protections that the City refused to adopt." ER-31. Contrary to GHP's contention, Appellants' Br. 50, a showing that proposed intervenor's interests are narrower and more targeted than the conflicting interests of a government party is more than enough to rebut any presumption of adequacy of representation under Ninth Circuit precedent. *See Arakaki*, 324 F.3d at 1087 (noting that this Circuit in several other cases has "permitted intervention on the government's side in recognition that the intervenors' interests are narrower than that of the government and therefore may not be adequately represented").

The City will confront a range of considerations in litigating and potentially settling this action, including those of tenants and landlords, both of whom make up the City's constituency. Even where the government defendant "shares with Applicants the same 'ultimate objective,'" intervenors can satisfy the inadequacy of representation requirement where "the City's range of considerations [ ] is broader" than the interests of the applicants for intervention. *Berg*, 268 F.3d at 823 (reversing order denying motion to intervene as of right). GHP concedes that is the case here. Appellants' Br. 43 ("The City has far more at stake here…"). The City encounters a broad range of considerations in drafting, enacting, amending, implementing, and defending policies such as the Ordinance, including public feedback, time and costs, evolving public health recommendations, and the anticipated impact on all

50

constituents – including both landlords and tenants. The City also has to protect its financial solvency for the benefit of all constituents when facing a case seeking "just compensation" "in excess of $100,000,000," ER-190–91 (Compl. ¶ 8), and other follow-on cases certain to be filed if this one succeeds, *see* ER-77 n1. Intervenors, by contrast, have only one all-important consideration: prevent vulnerable tenants from loss of housing and exposure to COVID-19.

GHP's reliance on *League of United Latin American Citizens v. Wilson* is inapposite, as GHP concedes the language it relies on is *dicta*. Appellants' Br. 49. The Court expressly declined to reach the fourth element of the Rule 24(a) analysis because it resolved the intervention request exclusively on timeliness grounds. 131 F.3d 1297, 1307 (9th Cir. 1997). ("In light of our conclusion regarding timeliness, we need not, and do not, address the remaining three factors of the intervention-as-of-right standard.").

Similarly, GHP's reliance on *Oakland Bulk* for the principle that a proposed intervenor's narrower interest cannot suffice to overcome the presumption is inaccurate—as the District Court recognized in granting the motion to intervene. ER-30–31. As the District Court explained, "the *Oakland Bulk* court concluded only that the proposed intervenors there had not met their burden to demonstrate that the governmental entity would or could not represent the intervenors' narrow set of interests." *Id. See Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960

F.3d 603, 620 (9th Cir. 2020). Intervenors easily satisfied the evidentiary standard by introducing evidence documenting tenants' narrow, specific interest in this litigation, as distinct from the City's broader role to consider the interests of multiple competing stakeholders. *See* ER-121 (Delgado Decl. ¶ 5); ER-130 (Strathmann Decl. ¶¶ 5-6); ER-138 (Gross Decl. ¶ 5).

The promulgation and amendment of policies responsive to COVID-19, including the Ordinance itself, demonstrates that the City arrived at its own position through a process of weighing, balancing, and seeking to accommodate the competing interests of landlords, tenants, and the general public. Intervenors provided the District Court with ample non-conclusory allegations and declaratory evidence of some of the numerous occasions where the interests of the City and Intervenors have diverged, including, namely that Intervenors directly petitioned Defendant City Council of the City of Los Angeles for a broad moratorium covering all grounds for eviction, as well as other provisions which City Council declined to enact. ER-121 (Delgado Decl. ¶ 5); ER-130 (Strathmann Decl. ¶¶ 5-6); ER-138 (Gross Decl. ¶ 5).

Finally, Intervenors were properly granted intervention as of right because they offer necessary elements to the proceeding, as they have access to evidence that the City does not. As membership organizations representing thousands of tenants impacted and protected by the Ordinance, Intervenors were, and are, singularly

situated to provide the District Court with evidence regarding the protection that the Ordinance has provided to low-income tenants, as well as the harm that would result from a judgment in this action being used against tenants. *See* ER-123–25 (Delgado Decl. ¶¶ 11–17); ER-133–34 (Strathmann Decl. ¶¶ 13–16); ER-139 (Gross Decl. ¶¶ 6–7).

### B. The District Court did not abuse its discretion in granting permissive intervention.

The District Court did not abuse its "broad discretion" in granting Intervenors' motion for permissive intervention. *League of United Latin American Citizens*, 131 F.3d at 1307; *see Orange v. Air Cal.*, 799 F.2d 535, 539 (9th Cir. 1986) (whether to grant permissive intervention "is committed to the broad discretion of the district court"). The Ninth Circuit applies three threshold requirements to a motion for permissive intervention: (1) the intervenor's claim must share a common question of law or fact with the main action; (2) the motion must be timely; and (3) the court must have an independent basis for jurisdiction over the applicant's claims. *Id.*

The District Court correctly determined that Intervenors satisfied all three requirements. Intervenors sought to intervene to litigate the lawfulness and enforceability of regulations they advocated for, GHP does not dispute the motion was timely, and standing is not required where, as here, an intervenor seeks only to respond to the claims advanced in GHP's complaint. *See Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011).

In addition to satisfying these requirements, Intervenors offer an invaluable perspective in this litigation—one that influenced the District Court's appropriate exercise of its broad discretion. As noted, Intervenors have access to evidence related to the actual impact and need for the Ordinances—from a tenant perspective—that Defendant does not. The Court's reasonably exercised its discretion in permitting the voices of the tenant population to be heard.

Courts have historically weighed the public interest advanced by public programs in takings claims, including in actions against various COVID-19 eviction moratoriums. *See, e.g.*, *Elmford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 168 (S.D.N.Y. 2020). This Court routinely analyzes the "common good" of a public program in assessing whether government action constitutes a regulatory taking and has "consistently given our imprimatur to the underlying public purpose of" ordinances that regulate the landlord-tenant relationship. *Rancho de Calistoga*, 800 F.3d at 1091 (construing character of government action at the pleading stage in rent-control case). Intervenors' perspective on the public health, housing, and economic crisis—and the eviction moratorium's impact on Los Angeles renters—is directly relevant to the Court's analysis of the character of the governmental action.

Finally, GHP also asserts, correctly, that permissive intervention may be allowed where it "will not 'unduly delay or prejudice the adjudication of the original parties' rights.'" Appellants' Br. 52 (quoting Rule 24(b)(1)(B)). GHP does not even

54

attempt to argue that Intervenors' participation did or could unduly delay or prejudice the case. *See id.* at 52–53. For good reason—there is zero evidence that Intervenors' participation would have or has had such an effect.

The District Court properly exercised its discretion to give Intervenors a voice in this litigation. GHP presents no reason for this Court to disturb that ruling.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the district court's dismissal of GHP's complaint and grant of Intervenors' motion to intervene should be affirmed.

Dated: July 14, 2023                   Respectfully submitted,

                                                  /s/ *Halley W. Josehps*

                                                  SUSMAN GODFREY L.L.P.
                                                  *Attorneys for Intervenor-Defendants-
                                                  Appellees*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Circuit Rule 32-1 and Fed. R. App. P. 32(a)(7)(B)(i) because it contains 13,503 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

Dated: July 14, 2023          */s/ Halley W. Josephs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of July, 2023, I electronically filed the foregoing document using the Court's CM/ECF System, which will send notice of electronic filing to all counsel of record.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: July 14, 2023          /s/ *Halley W. Josephs*