No. 23-55013

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

GHP MANAGEMENT CORP., *et al.*,

*Plaintiffs-Appellant*

v.

CITY OF LOS ANGELES,

*Defendant-Appellee,*

STRATEGIC ACTIONS FOR A JUST ECONOMY, *et al.*,

*Intervenor-Defendants-Appellees.*

On Appeal from the United States District Court for the Central District of
California
No. 2:21-cv-06311-DDP-JEM
Hon. Dean D. Pregerson

## BRIEF OF LAW PROFESSORS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE AND INTERVENOR-DEFENDANTS-APPELLEES

MARISSA ROY
**LAW OFFICES OF MARISSA ROY**
12100 Wilshire Blvd., Suite 800
Los Angeles, CA 90025
(323) 694-9788
marissaroylaw@gmail.com

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES.......................................................................... ii

STATEMENT OF AUTHORSHIP ............................................................... iii

INTERESTS OF AMICI .............................................................................. 1

INTRODUCTION ........................................................................................ 1

ARGUMENT................................................................................................ 4

    I.    The Supreme Court Has Maintained a Firm Distinction Between *Per Se* Takings and Regulatory Takings. ................................................................... 4

    II.    Appellants Mischaracterization of the City's Temporary Eviction Moratorium as a *Per Se* Taking Would Eliminate Meaningful Distinction from a Regulatory Taking............................................................................................ 11

    III.    Appellants Have Not Shown that the City's Temporary Eviction Moratorium Constitutes a Regulatory Taking. ................................................. 14

CONCLUSION ........................................................................................... 15

APPENDIX ................................................................................................. 17

CERTIFICATE OF COMPLIANCE............................................................ 18

CERTIFICATE OF SERVICE.................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ala. Ass'n of Realtors v. Dept. of Health & Human Servs.*, 141 S. Ct. 2485 (2021) ............11

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) ..................................................passim

*Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 452 (9th Cir. 2018)..................14

*Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964) ........................................8

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) ........................ 2, 6, 7

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) ................................................2, 6, 7, 13

*Pa. Coal Co. v. Mahon*, 260 U.S. 393 (1922) ................................................................... 4, 5, 7

*Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978) ..............................2, 4, 5, 14

*Pennell v. City of San Jose*, 485 U.S. 1 (1988) .........................................................................8

*Pumpelly v. Green Bay Co.*, 80 U.S. (13 Wall) 166 (1871).......................................................6

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002) . 7, 10, 12, 14

*United States v. Cent. Eureka Mining Co.*, 357 U.S. 155 (1958). ..........................................10

*United States v. Pewee Coal Co.*, 341 U.S. 114 (1951)..............................................................6

*Yee v. City of Escondido*, 503 U.S. 519 (1992)................................................................. 8, 9, 12

**Other Authorities**

USC Dornsife Equity Res. Inst., et al., *No Going Back: Policies for an Equitable and Inclusive Los Angeles* (Sept. 2020)...............................................................................................2

## <u>STATEMENT OF AUTHORSHIP</u>

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(e), *Amici* certify that no counsel for any party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparation or submission of the brief, and no persons other than *Amici* contributed money that was intended to fund preparation or submission of the brief.

## INTERESTS OF AMICI

*Amici* are law professors from around the country[1]–specializing in constitutional law, property law, and local government law–who believe in maintaining a balance between the individual property rights guaranteed by the Constitution and the public necessity and interest of regulating property–particularly in the area of landlord-tenant relations, where courts have recognized that regulation plays a valuable role.

*Amici* appreciate the robust doctrine that the Supreme Court and Ninth Circuit have developed to distinguish among the narrow *per se* takings where just compensation is guaranteed and regulatory takings evaluated through a finer balancing of factors. *Amici* are concerned that the current litigation threatens to blur this distinction as well as expand the doctrine of *per se* takings to absorb reasonable landlord-tenant regulations. *Amici* thus write to defend this fundamental distinction that has been developed under property law over the past century.

## INTRODUCTION

In March 2020, the COVID-19 pandemic presented a crisis of unimaginable proportions. Not only was a disease spreading that would eventually kill over 1 million people in the United States, but the economy had screeched to a near standstill, eliminating millions of jobs. In the City of Los Angeles ("LA"), unemployment

---

[1] A full list of Amici law professors is provided in the Appendix.

reached over 20% in the early months of the pandemic, a higher rate than California or the United States as a whole.[2] The combination of a high unemployment rate and high rate of rent-burden–where over 30% of income is spent on rent–put between 36,000 and 120,000 households in LA at risk of eviction and homelessness in 2020.[3] Grappling with a potential eviction crisis, the LA City Council passed a temporary eviction moratorium in March 2020. The moratorium temporarily suspended evictions for COVID-related nonpayment of rent, no-fault reasons, or the addition of new occupants or pets. ER 202-03. The eviction moratorium did not eliminate the remedy of eviction, nor did it cancel rent. Upon expiration of the moratorium in February 2023, tenants would owe landlords, including Appellants, the balance of any unpaid rent and Appellants' rights to evict for nonpayment have been fully restored. At this point, Appellants have lost no money; their payment has been delayed.

Even as the moratorium has expired and back-rent is owed, Appellants have filed this lawsuit, premised on arguments that threaten to unravel the Supreme Court's and this Circuit's careful distinction between regulatory takings evaluated under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978) ("*Penn Central*"), and the two narrow categories of *per se* takings recognized in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), and *Lucas v. South Carolina Coastal Council*, 505 U.S.

---

[2] *See* USC Dornsife Equity Res. Inst., et al., *No Going Back: Policies for an Equitable and Inclusive Los Angeles* 56 (Sept. 2020).

[3] *Id.*

1003 (1992). Although a century of precedent has construed restrictions on the landlord-tenant relationship under *Penn Central*'s standards for regulatory takings—a balancing test that considers the facts of each case—Appellants attempt to construe the City's eviction moratorium as a *per se* taking. The Court has identified *per se* takings as reserved for the most severe situations such as where government regulation or action amounts to a physical invasion or eliminates all economically viable use of a property. Recent case law has not broadened these well-settled categories.

*Amici* law professors from across the country write to defend the foundational tenets of property law from Appellants' attempt to rewrite the law of takings in their favor. If Appellants arguments are given credit, then the careful distinction between *per se* takings and regulatory takings subject to *Penn Central* analysis could be severely compromised. This could have implications for large swaths of landlord-tenant law, from notice periods to no-fault eviction protections, threatening well-settled norms. There is good reason to preserve the distinction between *per se* and regulatory takings. While the *per se* standard is reserved for the most severe situations, the regulatory standard recognizes that not all restrictions on property use constitute a taking. Some constitute warranted and common-sense regulation. In order to distinguish between warranted regulation and a regulatory taking, it is important to engage in the balancing test that has been prescribed and maintained by the Supreme Court for decades. If property-owners no longer need to make this showing, a vast array of landlord-tenant law and other property law would be thrown into question.

3

To preserve a century of well-settled property law precedent, *Amici* strongly urge this Court to reject Appellants' arguments and affirm the district court's order.

## ARGUMENT

### I. The Supreme Court Has Maintained a Firm Distinction Between *Per Se* Takings and Regulatory Takings.

Although the U.S. Constitution's Fifth Amendment provides protection for property rights, property is hardly immune from regulation. Courts have recognized that federal, state, and local governments need to make regulations that will have effects on property without being required to compensate for all of these effects, direct and tangential. Indeed, "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Penn Central*, 438 U.S. at 124 (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922)). Governments need to make decisions about land use and zoning to organize and build coherent neighborhoods with a place for residential property, commercial property, mixed-use property, and public space. Governments need to regulate property to protect natural resources and to ensure the even distribution of limited resources like water. Governments need to protect individuals from discrimination from property owners who would otherwise decline to sell or rent to them because of certain protected characteristics, like race, sex, ethnicity, national origin, or source of income.

All of these regulations have some impact on property, from dictating ways in which property owners must use or refrain from using their property, to shaping the right to exclude, to affecting property values–often with consequences for the remedies that owners would otherwise have to vindicate their property rights. But these regulations also advance important public interests.

Recognizing property owners' rights must be balanced with the governments' valid interest in regulation, courts have generally eschewed bright-line rules in evaluating takings claims. When deciding whether government regulation amounts to a taking, the courts "quite simply, ha[ve] been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Id.* Accordingly, to give appropriate credence to these competing interests, courts have generally evaluated regulatory takings claims as "ad hoc, factual inquiries" where three factors are particularly informative: 1) the economic impact of the regulation on the property-owner, 2) the extent to which the regulation has interfered with investment-backed expectations, and 3) the character of the government regulation. *Id.*; *see also Pa. Coal Co.*, 260 U.S. at 422 (noting that it is important that government regulation provide an "average reciprocity of advantage" between a restricted property owner and the rest of the community).

5

Only in two rare circumstances has the Court found a taking without engaging in the detailed factual inquiry required by *Penn Central*. First, the Court has consistently singled out certain physical invasions–rather than restrictions on use–and those regulations that deprive property of all economically beneficial use as the two rare situations where no balancing of factors is necessary. *See Lucas*, 505 U.S. at 1019 ("[W]hen the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking."); *Loretto*, 458 U.S. at 426. ("Our cases further establish that when [a] physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred.").

The circumstances under which courts will find a physical invasion that constitutes a *per se* taking are "very narrow." *See Loretto*, 458 U.S. at 441. When the government sanctions construction that indefinitely floods a person's property, *Pumpelly v. Green Bay Co.*, 80 U.S. (13 Wall) 166 (1871), seizes control of a private business, *United States v. Pewee Coal Co.*, 341 U.S. 114 (1951), or installs utilities on private property on a permanent basis, *Loretto*, 458 U.S. 419, these interminable occupations constitute *per se* takings. Recently, the Supreme Court in *Cedar Point Nursery v. Hassid*, found that a government requirement allowing unauthorized and uninvited organizers to physically occupy land closed to the public on an intermittent basis constituted a physical invasion that rises to the level of a *per se* takings. 141 S. Ct. 2063 (2021). The Court noted the difference between the situation in *Cedar Point*

*Nursery* and the situation when a business generally opens its land to members of the public. *Id.* at 2076-77. In such extreme situations, courts need not engage in further balancing of factors because "'the character of the government action' not only is an important factor in resolving whether the action works a taking but also is determinative." *Loretto*, 458 U.S. at 426. However, the Court's doctrine of *per se* takings does not abrogate "a State's broad power to impose appropriate restrictions upon an owners' *use* of his property." *Id.* at 441.

Second and similarly rare are the situations in which the Court will find that government regulation has deprived land of all economically beneficial use. In *Lucas*, the Court found a *per se* taking where a property-owner had bought property in South Carolina with the intention of building two single-family homes only to have the state pass a regulation that prohibited all construction of permanent, habitable structures on the land, with no exceptions. 505 U.S. at 1006. Because there was no economically beneficial use left for the property, the Court found a *per se* taking. *Id.* at 1019. However, the Court's doctrine of *per se* takings does not include government regulation that merely diminishes profits, *Pa. Coal Co.*, 260 U.S. at 124, or temporarily pauses economically beneficial use of the land, *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 306 (2002) ("*Tahoe-Sierra*") (upholding a 32-month development moratorium). Accordingly, most takings claims will be evaluated under the balancing test articulated in *Penn Central.*

Regulation of the landlord-tenant relationship does not fall within the "very narrow" categories of *per se* takings because these regulations are essentially restrictions on *use*. The Supreme Court has consistently held that landlord-tenant regulations like rent control ordinances or anti-discrimination ordinances do not constitute *per se* takings. *See Pennell v. City of San Jose*, 485 U.S. 1, 12 n.6 (1988); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 261-62 (1964); *cf. Cedar Point Nursery*, 141 S. Ct. at 2076 (citing tenant anti-discrimination ordinances as inappropriate for *per se* analysis).

*Yee v. City of Escondido* is and remains the controlling case rejecting the *per se* test in the landlord-tenant context. In *Yee*, the Supreme Court considered whether California laws regulating the rental of plots to mobile home owners constituted a taking. 503 U.S. 519 (1992). California restricted the grounds upon which owners of a mobile home park could evict tenants to non-payment of rent, violation of park rules, or an owner's desire to change the use of the land. *Id.* at 524. California further restricted owners from requiring removal of a mobile home upon its sale by a tenant. *Id.* Many municipalities in California then enacted rent control ordinances for mobile home parks. *Id.* These state and local regulations operated in combination to allow mobile home owners who had rented plots of land in a mobile home park to sell their mobile home to a new tenant who would assume the tenancy on the mobile home park's land at a rent-controlled rate. *Id.* at 526-27.

8

Mobile home park owners argued that this was a *per se* taking because they could not control to whom their land was rented and the laws allowed tenants to transfer the right to occupy the land at submarket rent. *Id.* The Supreme Court roundly rejected the argument that these landlord-tenant regulations constituted *per se* takings. *Id.* at 527. The Supreme Court emphasized that "[b]ecause they voluntarily open their property to occupation by others, [landlords] cannot assert a *per se* right to compensation based on their inability to exclude certain individuals." *Id.* at 531. The Supreme Court noted that California maintained the ability of landlords to change the use of their land, meaning that tenants were not given a right to occupy the property permanently. *Id.* at 528. The Court noted that "[a] different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or refrain in perpetuity from terminating a tenancy." *Id.* But, because a landlord had chosen to use the property for rental and maintained avenues for eviction, even if limited, evaluating the state and municipal regulations under the framework for *per se* takings instead of the *Penn Central* test was inappropriate.

The *per se* takings analysis is not appropriate for temporary moratoria on certain uses of land, either. The Supreme Court has recognized that government necessity may justify temporarily prohibiting certain uses of land without compensation to the landowner. During World War II, the United States was suffering a grave shortage of metals essential for wartime production, most notably copper, and thus the government halted the activity of gold mines to redirect labor to mine for needed

metals. *See United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 157 (1958). The Court held that this was not a *per se* taking, particularly because the restriction was temporary in nature during a time of extreme need. *Id.* at 168-69. Even without the dire circumstances of war, the Court has noted that prohibitions on land use that are temporary in nature are not suitable for the *per se* framework.

In *Tahoe-Sierra*, the Supreme Court considered whether to evaluate a municipal planning agency's 32-month moratorium on development pending the creation of a comprehensive plan under the framework for a *per se* taking. 535 U.S. at 306. Noting that *per se* takings are "relatively rare," the Court held that such a temporary land use restriction would not qualify as a *per se* taking, but should be evaluated under the *Penn Central* framework for regulatory takings. *Id.* at 324, 332.

Recent case law has not abrogated the distinction between *per se* takings and regulatory takings subject to the *Penn Central* balancing test. Indeed, the courts' default remains to evaluate most restrictions on property under the *Penn Central* framework. In *Cedar Point Nursery v. Hassid*, the California law that the Court found to constitute a *per se* takings had guaranteed labor organizers access to private land for a set number of hours per week without invitation or consent from the landowner. 141 S. Ct. 2063. What contributed to this circumstance presenting a *per se* taking was that the challenged law "grant[ed] a right to invade property closed to the public." *Id.* at 2077. Unlike restrictions on uses of land that a property owner has chosen to engage in, this government had forced the owner to accept an unauthorized presence on their

property, similar to *Loretto*. Additionally, it was important in *Cedar Point Nursery* that the right of physical occupation was granted indefinitely, rather than temporarily, even if the physical invasion was intermittent. *Id.* at 2075.

The Court has been careful to emphasize that its recent case law does not upset "traditional background principles of property law." *Id.* at 2078-80. The Court cited landlord-tenant regulations, such as anti-discrimination ordinances, as ineligible to be considered *per se* takings. *Id.* at 2076. Even in *Alabama Association of Realtors v. Department of Health and Human Services*, the Court did not revise its narrow *per se* takings doctrine; there, its relevant holding addressed the scope of authorized agency action. 141 S. Ct. 2485, 2489 (2021). The Court certainly has not overruled *Penn Central* and its progeny. The well-settled distinction between the default *Penn Central* analysis for regulatory takings and the rare *per se* takings analysis remains intact.

## II. Appellants Mischaracterization of the City's Temporary Eviction Moratorium as a *Per Se* Taking Would Eliminate Meaningful Distinction from a Regulatory Taking.

Appellants invite this Court to evaluate the City's temporary eviction moratorium as a *per se* taking, rather than a regulatory taking subject to *Penn Central* analysis, threatening to eradicate this doctrinal distinction. The City's eviction moratorium does not resemble the narrow and relatively rare circumstances under which the Supreme Court has found *per se* takings. The City's eviction moratorium merely limited the grounds for lawful eviction on a temporary basis during the

COVID-19 pandemic. This eviction restriction is even more innocuous than the one upheld in *Yee* because it was always temporary. The City's moratorium did not compel Appellants to "refrain in perpetuity from terminating a tenancy," which would be a different case, because other grounds for eviction (such as lease violations not related to COVID or additional pets or occupants) remained. *Cf. Yee*, 503 U.S. at 528. Nor did it compel Appellants to use their property as a rental because California's Ellis Act always afforded them an opportunity to change the use of their land, just as was afforded the landlords in *Yee*. *Cf. id*. Unlike in *Cedar Point Nursery*, where the government authorized physical invasion of land to people who had not been invited by the private landowner, here Appellants had invited tenants to rent and signed a lease with them. The City's eviction moratorium temporarily restricted the way that Appellants could use eviction procedures, but it did not compel a physical invasion to qualify as a *per se* taking.

The temporary nature of the City's eviction moratorium further underscores that *per se* takings analysis is inappropriate here. In *Tahoe-Sierra*, the Supreme Court declined to evaluate a 32-month development moratorium as a *per se* taking because it recognized that governmental necessity sometimes demands such temporary measures. *See* 525 U.S. at 324. Here, the City's 35-month eviction moratorium is comparable to *Tahoe-Sierra* in duration but less severe because Appellants could still profit from paying tenants, unlike the property-owners in *Tahoe-Sierra* who had to put projects entirely on hold. Furthermore, whatever rent was unpaid during the eviction moratorium is still

owed, thus Appellants' right to recover the full measure of any rent due has been delayed, but not taken. Thus, unlike in *Lucas*, Appellants were not deprived of "*all economically beneficial uses*" of their property because they still profited from many tenants who had the means to pay during the pandemic and are still owed back-rent. *Cf.* 505 U.S. at 1019. The City's temporary eviction moratorium is not a *per se* taking under either of the Court's narrow categories.

If this Court evaluates the City's temporary eviction moratorium as a *per se* taking, the Supreme Court's careful distinction between *per se* takings and regulatory takings subject to the *Penn Central* framework will be greatly obscured. Appellants put forth a theory that assumes that any regulation that restricts the landlord's right to evict their tenant takes away the most important stick in the bundle of property rights–the right to exclude people from their property. Such regulations on eviction cannot be automatically characterized as a *per se* taking, rather they must be evaluated under the careful factual analysis articulated in *Penn Central*. Accepting Appellants' misplaced characterization of the law would disturb many other important, common-sense landlord-tenant regulations. Under Appellants' theory, property-owners could argue that reasonable eviction protections–such as prohibitions on no-fault evictions, eviction notice periods, penalties for tenant harassment, and tenant rights of action against landlords, such as the implied warranty of habitability–bear on their right to exclude and thus constitute a *per se* taking. Further Appellants' theory opens the door to property-owners challenging laws that prevent discrimination against prospective

13

tenants because of race, color, national origin, religion, disability, gender, gender identity, familial status, veteran or military status, sexual orientation, or source of income. Foundational laws like the federal Fair Housing Act and similar state and local laws could be attacked as *per se* takings. Appellants' theory would "transform [landlord-tenant] regulation into a luxury few governments could afford." *Tahoe-Sierra*, 535 U.S at 324. Maintaining the boundary between *per se* takings and regulatory takings subject to *Penn Central* sets the default that courts will engage in careful, fact-bound analysis.

### III. Appellants Have Not Shown that the City's Temporary Eviction Moratorium Constitutes a Regulatory Taking.

Without a *per se* analysis, Appellants have also not made an adequate factual showing under *Penn Central.* Appellants needed to allege that the City's temporary eviction moratorium had a sufficiently significant economic impact on them, interfered with their reasonable investment-backed expectation, and has a character similar to regulations found to be takings. *Cf. Penn Central*, 438 U.S. at 124.

Appellants pleaded no allegations to demonstrate that they can meet this high bar established by the Supreme Court. First, they have pleaded no facts to show any diminished in value as a result of the City's temporary eviction moratorium. *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 452 (9th Cir. 2018). To the extent they plead that they have lost $20 million in rent, this does not show what they lost relative to what they continued to make in rent, nor does it account for the fact that back-rent continues to be owed. Thus, they did not adequately plead economic impact, let alone

economic impact sufficient to satisfy the *Penn Central* test. Without this pleading, Appellants have not shown a regulatory taking.

Questions could be raised about the latter two factors as well. At this point, back-rent is still owed to Appellants and may yet be paid. The federal, state, and local governments also provided billions to landlords like Appellants in emergency rental assistance to address delayed rent because of the pandemic. Thus, while their return on investment has been delayed, their reasonable investment-backed expectations have not yet been denied–to the extent it is even possible to form reasonable expectations given the heavy regulation and time involved in processing evictions. As to the third factor, the moratorium is most similar to regulations upheld in *Yee* and *Tahoe-Sierra*, regulations that advanced the public good. As the district court found, "[t]here can be little dispute that, absent the Moratorium's protections, significant numbers of tenants with COVID-related loss of income would have been evicted, resulting not only in the harms typical of mass displacements, but exacerbating the spread of COVID-19 as well, to the detriment of all." ER 21. Appellants have not made an adequate showing of a regulatory taking.

## **CONCLUSION**

Because Appellants cannot make the showing that the City's eviction moratorium is a regulatory taking, they invite this Court to unravel the careful, settled distinction between *per se* takings and regulatory takings evaluated under *Penn Central*. This Court should reject that invitation and affirm the district court's order.

Dated: July 21, 2023                          LAW OFFICES OF MARISSA ROY

                                              /s/ Marissa Roy

                                              Marissa Roy
                                              Attorney for *Amici Curiae*

## <u>APPENDIX</u>

List of *Amici Curiae* Law Professors

**Richard Briffault**
Joseph P. Chamberlain Professor of
Legislation
Columbia Law School

**Erwin Chemerinsky**
Dean
Jesse H. Choper Distinguished
Professor of Law
UC Berkeley School of Law

**Sarah Fox**
Associate Professor of Law
Northern Illinois University
College of Law

**John Infranca**
Professor of Law
Director of Faculty Scholarship &
Research
Suffolk University Law School

**Shelley Ross Saxer**
Laure Sudreau Chair in Law
Caruso School of Law
Pepperdine University

**Sarah Schindler**
Professor of Law
Maxine Kurtz Faculty Research Scholar
Sturm College of Law
University of Denver

**Richard C. Schragger**
Walter L. Brown Professor of Law
Martha Lubin Karsh and Bruce A.
Karsh Bicentennial Professor of Law
University of Virginia School of Law

**Christopher Serkin**
Elisabeth H. and Granville S. Ridley Jr.
Chair in Law
Director, Master of Legal Studies
Program
Vanderbilt Law School

**Rick Su**
Professor of Law
University of North Carolina
School of Law

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-55013 _____

I am the attorney or self-represented party.

**This brief contains** 3848 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** /s/ Marissa Roy _____ **Date** 7/21/23 _____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**        *Rev. 12/01/22*

**CERTIFICATE OF SERVICE**

I, Marissa Roy, hereby certify that I electronically filed the following document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 21, 2023.

Dated: July 21, 2023                          LAW OFFICES OF MARISSA ROY

/s/ Marissa Roy

Marissa Roy
Attorney for *Amici Curiae*