Case No. 23-55013

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

GHP MANAGEMENT CORPORATION, et al.,
*Plaintiffs-Appellants*,

v.

CITY OF LOS ANGELES, et al.,
*Defendants-Appellees*.

---

## REPLY BRIEF

---

On Appeal from the United States District Court
for the Central District of California
Honorable Dean D. Pregerson, District Judge
Case No. 2:21-cv-06311-DDP-(JEMx)

---

Douglas J. Dennington (SBN 173447)
ddennington@rutan.com
Jayson A. Parsons (SBN 330458)
jparsons@rutan.com
**RUTAN & TUCKER, LLP**
18575 Jamboree Road, 9th Floor
Irvine, CA  92612
Telephone:  714-641-5100

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................ 1

ARGUMENT ...................................................................................... 5

I.     APPELLANTS' PHYSICAL TAKINGS CLAIM FINDS CLEAR SUPPORT IN SUPREME COURT AUTHORITY ........................................................................ 7

        A.     *Yee v. Escondido* and Other Rent Control Decisions Do Not Immunize the City from Physical Takings Liability ........................................ 7

        B.     The Supreme Court has Expressly Linked Pandemic-Era Eviction Moratoria to the Court's Lodestar Decision on Physical Takings ................................. 13

        C.     The One-Judge Dissental In *Heights Apartments* is Neither Law Nor Persuasive ................................... 14

II.     *COLONY COVE* DOES NOT AND CANNOT COMPEL THE PLEADING OF SPECIFIC EXPERT APPRAISAL TESTIMONY ........................................................................ 15

        A.     The District Court Incorrectly Applied *Colony Cove* ........................................................................ 15

        B.     In Any Event, *Colony Cove* is Wrongly Decided as it Imports Inapposite Authority for its Holding Regarding Economic Impacts under *Penn Central* ............... 19

III.     The District Court Improperly Granted the Motion to Intervene ........................................................................ 22

        A.     The Intervenors Fail to Demonstrate a Protectable Interest that Could be Practically Impaired by the City Paying a Just Compensation Award Based on a Now-Defunct Ordinance ..................................... 22

**Page**

        B.     The District Court Abused its Discretion by
Allowing Permissive Intervention in the
Alternative ................................................................................ 26

   IV.    Appellants Do Not Have a Justiciability Problem ........................... 28

CONCLUSION ..................................................................................... 34

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ........................... 35

CERTIFICATE OF SERVICE ............................................................ 36

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
  141 S. Ct. 2485 (2021) ......................................................................3, 13

*Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*,
  10 F.4th 905 (9th Cir. 2021) ................................................................24

*Ariz. Christian School Tuition Org. v. Winn*,
  563 U.S. 125 (2011) ............................................................................23

*Arkansas Game & Fish Comm'n v. United States*,
  568 U.S. 23 (2012) ...........................................................................6, 8

*Armstrong v. United States*,
  364 U.S. 40 (1960) ................................................................................6

*Block v. Hirsh*,
  256 U.S. 135 (1921) ..........................................................7, 8, 9, 10, 11

*Bush v. Viterna*,
  740 F.2d 350 (5th Cir. 1984) ...............................................................25

*Cal. ex rel. Lockyer v. United States*,
  450 F.3d 436 (9th Cir. 2006) ...............................................................24

*Callahan v. Brookdale Senior Living Cmtys.*,
  42 F.4th 1013 (9th Cir. 2022) ..............................................................25

*Cedar Point Nursery v. Hassid*,
  141 S. Ct. 2063 (2021) ..........................................................................8

*Colony Cove Properties, LLC v. City of Carson*,
  888 F.3d 445 (9th Cir. 2018) ...........................................3, 4, 15, 16, 19, 20

*Edgar A. Levy Leasing Co. v. Siegel*,
  258 U.S. 242 (1922) ................................................................9, 10, 11

**Page(s)**

**FEDERAL CASES (CONT.)**

*FCC v. Florida Power Corp.,*
    480 U.S. 245 (1987)...................................................................10, 11

*Gallo v. District of Columbia,*
    610 F. Supp. 3d 73 (D.D.C. 2022)....................................................14

*Haw. Legal Short-Term Rental All. v. City & Cnty. of Honolulu,*
    No. 22-cv-247-DKW-RT, 2022 WL 17585851
    (D. Haw. Dec. 12, 2022)...................................................................25

*Heights Apartments, LLC v. Walz,*
    30 F.4th 720 (8th Cir. 2022) ..............................................2, 3, 13, 14

*Hodel v. Irving,*
    481 U.S. 704 (1987)....................................................................19, 21

*Home Building & Loan Ass'n v. Blaisdell,*
    290 U.S. 398 (1934).............................................................8, 9, 10, 11

*Idaho Farm Bureau Fed. v. Babbitt,*
    58 F.3d 1392 (9th Cir. 1995) .............................................................24

*Iten v. Cnty. of Los Angeles,*
    No. 22-55480, 2023 WL 5600292 (9th Cir. Aug. 30, 2023).............29

*Iten v. Cnty. of Los Angeles,*
    No. CV 21-00486 DDP, 2022 WL 1127880
    (C.D. Cal. Apr. 15, 2022) ...................................................28, 29, 30

*Keystone Bituminous Coal Ass'n v. DeBenedictis,*
    480 U.S. 470 (1987)..........................................................................20

*Knick v. Twp. of Scott,*
    139 S. Ct. 2162 (2019)....................................................4, 23, 32, 33

*Lingle v. Chevron U.S.A. Inc.,*
    544 U.S. 528 (2005)..........................................................6, 18, 20, 24

*Loretto v. Teleprompter Manhattan CATV Corp.,*
    458 U.S. 419 (1982)...............................................................3, 11, 13

**Page(s)**

**FEDERAL CASES (CONT.)**

*Lucas v. South Carolina Coastal Council,*
    505 U.S. 1003 (1992) .................................................................20, 21

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................33

*MHC Financing Ltd. P'ship v. City of San Rafael,*
    714 F.3d 1118 (9th Cir. 2013) ........................................................21

*Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.,*
    15 F.4th 885 (9th Cir. 2021) ...........................................................18

*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland,*
    960 F.3d 603 (9th Cir. 2020) .....................................................26, 27

*Penn Central Transportation Co. v. New York City,*
    438 U.S. 104 (1978) ..........................................................18, 19, 20, 21

*Perry v. Proposition 8 Official Proponents,*
    587 F.3d 947 (9th Cir. 2009) .....................................................25, 27

*Prete v. Bradbury,*
    438 F.3d 949 (9th Cir. 2006) .....................................................26, 27

*Sw. Ctr. for Biological Diversity v. Berg,*
    268 F.3d 810 (9th Cir. 2001) ..........................................................24

*Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.,*
    609 F.3d 975 (9th Cir. 2010) ..........................................................27

*Wash. State Bldg. & Constr. Trades Council ALF-CIO v. Spellman,*
    684 F.2d 627 (9th Cir. 1982) ..........................................................24

*Y.Y.G.M. SA v. Redbubble, Inc.,*
    75 F.4th 995 (9th Cir. 2023) ...........................................................27

*Yee v. City of Escondido,*
    503 U.S. 519 (1992) ...........................................2, 3, 7, 12, 13, 15

**Page(s)**

**STATE STATUTES**

L.A. Municipal Code
  section 49.99 ..................................................................................1
  section 49.99.1(E) .........................................................................31
  section 49.99.2 ...............................................................................1
  section 49.99.2(A) ..............................................................1, 30, 31
  section 49.99.6 ..............................................................................31
  section 49.99.7 ..............................................................................31
  section 49.99.8 ..............................................................................32

**RULES**

Federal Rules of Civil Procedure
  rule 8(a)(2) ...................................................................................18
  rule 12(b)(6) .................................................................................18
  rule 24(a) ......................................................................................26
  rule 24(b) ......................................................................................27

**CONSTITUTIONAL PROVISIONS**

Fifth Amendment ................................................................4, 6, 7, 24, 33

**PERIODICALS**

Michael Allan Wolf, *Superfluous Judicial Activism:*
  *The Takings Gloss*, 91 Geo. Wash. L. Rev. 287, 349 n. 328 (2023) ..................14

**NON-PERIODICAL PUBLICATIONS**

Betty Yu, *Oakland landlord stands to lose everything after tenant*
  *fails to pay rent for 3 years*, CBS San Francisco (Apr. 18, 2023),
  https://www.cbsnews.com/sanfrancisco/news/oakland-landlord-
  tenant-eviction-moratorium-no-rent-back-pay/. ................................................11

## INTRODUCTION

In a stunning act of legal legerdemain, the City boldly proclaims that its Eviction Moratorium, embodied in section 49.99 of its municipal code, does not, and never once did, "prevent a landlord from evicting *anyone*." City of Los Angeles's Answering Br. ("CAB") at 10 (emphasis in original). If only that were so.

The Court should not be fooled by the City's sleight of hand. After all, section 49.99.2—the first substantive provision after the law's recitals and definitions—is titled "Prohibition on Residential Evictions." L.A. Mun. Code § 49.99.2(A) (2020); Appellants' Opening Br. ("AOB") Add. at 58. The plain text of that section betrays the City: "During the Local Emergency Period and for 12 months after its expiration, *no Owner shall endeavor to evict or evict* a residential tenant for non-payment of rent . . . if the tenant is unable to pay rent due to circumstances relating to the COVID-19 pandemic." *Id.* (emphasis added). Void for vagueness, this ordinance is not.

Now on appeal, the City kicks up dust to obscure its actions. One of its arguments goes something like this: Because tenants could assert an affirmative defense to an unlawful detainer action (assuming a landlord can bring one at risk of crippling civil penalties), the City's law prohibiting residential evictions didn't *by itself* prohibit any evictions. This is sophistry.

But more fundamentally, why should this distinction even matter? The City

contorts itself in arguing that its Eviction Moratorium does not do what its plain text says it does.  However, if the City is to be believed on another of its arguments, then once a landlord invites a tenant through the door, any subsequent regulation of that relationship—up to and including its functional destruction—is permissible under the City's capacious reading of a case about mobile home rent control, *Yee v. City of Escondido*, 503 U.S. 519 (1992).  If the City is right after all, then it should be of no moment that its ordinance actually precluded evictions within its jurisdiction.  Instead, that would be a "regulatory adjustment" as the City styles it, a mere tinkering with landlord-tenant relationships in furtherance of the public weal.  Yet in its briefing, the City both ambivalently clings to, and runs from, its Eviction Moratorium.

In suggesting that the Eviction Moratorium offers nothing more than an affirmative defense to tenants facing an unlawful detainer action, the City seeks to downplay the effects of its own ordinance.  But the fact remains that the City, by dint of its Eviction Moratorium, appropriated Appellants' right to exclude defaulting, holdover tenants who refused to pay rent.  This is a per se taking deserving of just compensation.  The City's desperate clutching of *Yee* should not give this Court pause.  Indeed, the only circuit court authority to have considered the issue at the time of filing this reply brief—*Heights Apartments, LLC v. Walz*—held *Yee* to be inapposite on functionally identical facts and posture as here.  30 F.4th

720, 733 (8th Cir. 2022). Instead, the City argues that the Eighth Circuit is "just wrong," and demands this Court to follow a mishmash of lower federal and state court opinions, or, even less moving, a one-judge dissental from the Eighth Circuit's denial of rehearing en banc in *Heights Apartments*. Seeing no other circuit authority on point, this Court should follow *Heights Apartments* lest a circuit split erupt.

The Court may also properly look—as incredibly strong persuasive authority—to the statements of six Justices of the Supreme Court on the matter, affirmatively linking COVID-19-era eviction moratoria with *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), the Court's lodestar opinion for categorical physical occupation takings. *See Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021). Contrary to the City's claims, Appellants have never once stated that this language abrogated *Yee* sub silentio. Rather, Appellants have consistently argued that this is evidence of where the Supreme Court is headed on its reading of *Yee* and its interaction—or non-interaction, as it were—with regulations like the City's Eviction Moratorium.

The balance of Appellees' briefing devoted to Appellants' "regulatory taking" claim likewise fails to persuade. Both the City and Intervenors attempt to justify the district court's dismissal of Appellants' regulatory takings claim by treating the holding in *Colony Cove Properties, LLC v. City of Carson*, 888 F.3d 445 (9th Cir. 2018)—a case that arrived in this Court after an evidentiary jury trial at which the

parties' retained experts offered opinions on the "economic impact" of the City's rent control regulation—as somehow dictating the minimum "pleading" requirements for a regulatory takings claim. While Appellants do believe *Colony Cove* is inconsistent with binding Supreme Court precedent, *Colony Cove* has no application to the minimum pleading requirements for such a claim. At bottom, *Colony Cove* does not stand for the proposition that a regulatory takings claimant must plead specific expert valuation evidence concerning the pre- and post-deprivation values of the properties at issue. But that is precisely how the district court applied it in this case, which would necessitate a pre-filing appraisal analysis for each of the properties at issue in this case.

For their part, Intervenors largely parrot the City's objections. They do, however, address the intervention questions raised by Appellants. But after all this time, Intervenors still cannot articulate what their actual interest *is* in this case. Intervenors suggest that this case is like another that challenged the City's Eviction Moratorium in which they successfully intervened; but that case was brought principally under Contracts Clause and substantive due process grounds with the express goal of enjoining the Moratorium. Here, per *Knick v. Township of Scott*, there is simply no way for Appellants to enjoin anything. 139 S. Ct. 2162 (2019). Takings claims cannot be used to invalidate laws. Rather, the Fifth Amendment only requires that the City pay for what it takes, but the City retains its authority as the

sovereign to take in the first instance. Intervenors' fig leaf of an argument wilts away once the Court considers that the Eviction Moratorium is no longer in prospective effect and will sunset—finally—in January 2024. Despite Intervenors' hollow argument in a footnote that they would make slightly revised arguments for intervention today if pressed, they do not say what those arguments might be. Appellants deduce no reason for Intervenors to remain involved in a case concerning a takings claim over a now-defunct ordinance. They should be removed on remand.

At bottom, Appellants state facts sufficient to state plausible claims under the liberal pleading standards afforded litigants by the Federal Rules. The district court should be reversed and the case remanded so that Appellants may seek their just compensation.

## ARGUMENT

The City engages in a familiar appeal to this Court. Ever since the Fifth Amendment's takings provisions were incorporated to the states, local governments have decried the imposition of its protections claiming that if just compensation is awarded this time, then municipal authority is sure to fail under a deluge of takings claims. But as Justice Ginsburg once opined:

> Time and again in Takings Clause cases, the Court has heard the prophecy that recognizing a just compensation claim would unduly impede the government's ability to act in the public interest. . . . We have rejected this argument when deployed to urge blanket exemptions from the Fifth Amendment's instruction. While we recognize the importance of the public interests the Government advances in this

case, we do not see them as categorically different from the interests at stake in myriad other Takings Clause cases. The sky did not fall after *Causby*, and today's modest decision augurs no deluge of takings liability.

*Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 36–37 (2012) (cleaned up) (citing *United States v. Causby*, 328 U.S. 256, 275 (1946) (Black, J., dissenting); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 455 (1982) (Blackmun, J., dissenting)).

To be clear, nothing in this case threatens the authority of the City, or any other municipality for that matter, to respond to emergencies.

As its text makes plain, the Takings Clause does not prohibit the taking of private property, but instead places a condition on the exercise of that power. In other words, it is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking.

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536–37 (2005) (quoting *Lutheran Church of Glendale v. Cnty. of Los Angeles*, 482 U.S. 304, 314–15 (1987) (quotations omitted) (emphasis in original). If fairness is the ultimate purpose behind the Fifth Amendment's Takings Clause (and it is—*see Armstrong v. United States*, 364 U.S. 40, 49 (1960)), then it is manifestly unfair to ask a discrete class of persons, including landlords like Appellants, to uniquely bear the burden of a purported social benefit. With the COVID-19 pandemic decidedly in the rearview mirror, the City now fights to foist the costs of its pandemic response onto others,

including Appellants. The Fifth Amendment proscribes such parsimony.

Appellants will not rehash what has already been said in the Opening Brief. A few points asserted by the City and Intervenors are worth addressing, however.

## I. APPELLANTS' PHYSICAL TAKINGS CLAIM FINDS CLEAR SUPPORT IN SUPREME COURT AUTHORITY

### A. *Yee v. Escondido* and Other Rent Control Decisions Do Not Immunize the City from Physical Takings Liability

The City invites the Court to meander down a yellow brick road of case law that, it posits, ends with the ineluctable conclusion that not only does *Yee* apply here, but that the act of opening a property for rent per se legitimizes any and all subsequent regulations against the property owner, including those regulations approximating physical occupation. CAB at 48–49. Not so. The City glosses over the fact that at all times the regulated property owners in each case cited were ensured continued payment of rent or its equivalent. The City's Eviction Moratorium is not "of a piece" with these prior regulations, and neither does it "fit comfortably" among them. Rather, the City's ordinance goes well beyond anything this Court or the Supreme Court has had occasion to yet consider.

Let's first consider *Block v. Hirsh*, 256 U.S. 135 (1921). *Block*, says the City, "holds that combined rent and eviction controls do not amount to takings." CAB at 38. To be sure, the City misses no opportunity to squeeze the opinion for its every Holmesian meditation. "But the first rule of case law as well as statutory

interpretation is: Read on." *Arkansas Game & Fish*, 568 U.S. at 36. The legislation challenged in *Block* allowed tenants the right to continue occupancy past the expiration of their lease term at the previously agreed rent amount "so long as he *pays the rent* and performs the conditions as fixed by the lease". *Block*, 256 U.S. at 153 (emphasis added). So, while the City nearly trips over itself to quote language suggesting that temporary laws adopted "to tide over a passing trouble" might pass constitutional muster (*but see Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2074 (2021)), the City ignores the opinion's very next sentence: "Machinery is provided to secure the landlord a reasonable rent." *Id.* at 157. Thus, at base, *Block* is a rent control case—a concept Appellants do not quarrel with in this litigation. Nothing in the opinion addresses a law that allows a tenant to retain their occupancy *and* stop paying rent.

The same can be said for other decisions cited by the City. In *Home Building & Loan Ass'n v. Blaisdell*, it is true that a law extending the time period in which mortgagors could repay debts owed to lenders was upheld under a claim that it violated the Contracts Clause. 290 U.S. 398, 417 (1934). But the law assailed in *Blaisdell* provided that the mortgagor could only seek such an extension where he or she paid "all or a reasonable part of such income or rental value" in the meantime: "While the mortgagor remains in possession, he must pay the rental value as that value has been determined, upon notice and hearing, by the court . . . . While the

mortgagee-purchaser is debarred from actual possession, he has, so far as rental value is concerned, the equivalent of possession during the extended period." *Id.* at 416–17, 425. This was a key distinction from an earlier case that struck down a similar law: "It will be observed that in the Bronson Case, . . . the extension of the period of redemption was unconditional, and there was no provision, as in the instant case, to secure to the mortgagee the rental value of the property during the extended period." *Id.* at 432.

*Edgar A. Levy Leasing Co. v. Siegel* is also an early rent control case. 258 U.S. 242 (1922). There, the challenged law granted certain tenants "the legal right to continue in possession [of an apartment] . . . by the payment, or securing the payment, of a reasonable rental, to be determined by the courts." *Id.* at 243. The tenant there who refused to pay the new rent amount on account of it being "'unjust, unreasonable, and oppressive,'" nonetheless "offer[ed] to pay the same rent that he had paid" while retaining his occupancy—which the Court found to present "[s]uch a case fall[ing] within the precise terms" of the law challenged. *Id.* at 244, 248. In other words, continued payment of rent by the tenant was part and parcel of the regulations under review. Again, like *Block*, there is nothing in the opinion suggesting that a tenant could both dispute the new rental amount *and* stop paying

rent going forward.[1]

Next is *FCC v. Florida Power Corp.*, 480 U.S. 245 (1987). Acting under its federal authority, the FCC reduced the rents certain utilities could charge cable companies for use of their infrastructure, reducing rents from approximately $5 to $7 per pole to $1.79. *Id.* at 248–50. While not arising under the residential landlord-tenant context, *Florida Power* is no less a rent control case. At the end of the day, the FCC's regulations did not allow cable companies to simply refuse to stop paying the pole rental fees, nor did the FCC restrict the utilities' right to eject the cable companies upon such an eventuality. Once again, *nothing* in the opinion suggests that the Court would place its imprimatur on a law or regulation that simply allowed cable operators to stop paying the pole rents while continuing to use the utilities' infrastructure. *Florida Power*'s statement that "it is the invitation, not the rent, that makes the difference" cannot be stretched so far as to conclude, as the City urges, that a rent of zero[2] is sufficient so long as the property owner extended the initial

---

[1] Furthermore, unlike the City's Eviction Moratorium, each regulatory regime just discussed allowed for the courts or commissions to independently determine whether the property owner was still receiving some form of reasonable rent, *i.e.*, a fair return. *See Block*, 265 U.S. at 153–54; *Blaisdell*, 290 U.S. at 416; *Edgar A. Levy*, 258 U.S. at 243–44.

[2] The City cites extra-record opinion articles to suggest that there "are reasons to doubt GHP" that "tenants will never repay the debt at all." CAB at 50 n.6. Appellants are skeptical of this practice. But should the Court allow it, then Appellants respectfully point to other articles suggesting the opposite. *See, e.g.*,

invitation to the tenant.  *Id.* at 252.

The City discusses these cases because the Supreme Court in *Loretto* identified *Block*, *Edgar A. Levy*, and *Blaisdell* as purportedly "substantial authority" for the government's "broad power" to regulate landlord-tenant relationships.  CAB at 41.  But *Loretto*'s citation of this authority doesn't move the needle for the City very much.  As immediately clarified by the *Loretto* Court:

> In none of these cases, however, did the government authorize the permanent occupation of the landlord's property by a third party. Consequently, *our holding today in no way alters the analysis governing the State's power to require landlords to comply with building codes and provide utility connections, mailboxes, smoke detectors, fire extinguishers, and the like in the common area of a building.*  So long as these regulations do not require the landlord to suffer the physical occupation of a portion of his building by a third party, they will be analyzed under the multifactor inquiry [under *Penn Central*].

458 U.S. at 440 (emphasis added).  Indeed, it is clear that the statements in *Loretto* that the City asks this Court to stretch so far were focused on reaffirming the validity of laws like those requiring "smoke detectors, fire extinguishers, and the like."  *Id.* These regulations are not "of a piece" with the City's law legitimizing indefinite holdover tenancies in default for nonpayment of rent.

---

Betty Yu, *Oakland landlord stands to lose everything after tenant fails to pay rent for 3 years*, CBS San Francisco (Apr. 18, 2023), https://www.cbsnews.com/sanfrancisco/news/oakland-landlord-tenant-eviction-moratorium-no-rent-back-pay/.

Finally, there is *Yee*, a mobile home rent control case. Appellants won't belabor the Court with what has already been said in prior briefing. The City charges that Appellants believe *Yee* applies only in the "strange world" of mobile home parks. CAB at 51. Why take Appellants' word for it? That is what the Supreme Court said. *Yee*, 503 U.S. at 526 ("their argument is predicated on the unusual economic relationship between park owners and mobile home owners").

Anyway, the City once again—as before—whistles past the graveyard regarding the facts underlying *Yee*'s reasoning. Recall that the regulatory regime in *Yee* was dependent on the continued payment of rent by park tenants. *Id.* at 524 (noting that the overarching state law "limits the bases upon which a park owner may terminate a mobile home owner's tenancy . . . includ[ing] the nonpayment of rent"). "A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection . . . to refrain in perpetuity from terminating a tenancy." *Id.* at 528. "The Escondido rent control ordinance, even considered against the backdrop of California's Mobilehome Residency Law, does not authorize an unwanted physical occupation of petitioners' property. It is a regulation of petitioners' use of their property"—*i.e.*, rent control—"and thus does not amount to a per se taking." *Id.* at 532.

Any claim that *Yee*'s language regarding the landlord's "invitation" to the tenant cannot extend as far as the City demands based on the facts motivating *Yee*'s

holding for the reasons expressed in Appellants' Opening Brief.  *See* AOB at 28–29.

**B. The Supreme Court has Expressly Linked Pandemic-Era Eviction Moratoria to the Court's Lodestar Decision on Physical Takings**

The City and Intervenors both charge Appellants with arguing that the Supreme Court's opinion in *Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485 (2021), overruled *Yee* sub silentio.  CAB at 53; Intervenors' Answering Br. ("IAB") at 22.  The problem with this claim is that Appellants have never said any such thing, neither here nor below.  As Appellants made clear in their Opening Brief, it is no coincidence that six Justices signed an opinion which directly links *Loretto* with COVID-19-era eviction moratoria like the City's ordinance here, and that they "merely read the *per curiam* opinion of the Court that may very well have the last word on the subject."  AOB at 33.  Given that this case presents the Ninth Circuit with open questions of law, Appellants believe that *Alabama Ass'n of Realtors* serves as a strong indicator of where the Supreme Court is headed on the issues raised in this appeal.

The City wonders, "what is this Court supposed to do with GHP's observation?"  CAB at 55.  Simple.  Follow the Eighth Circuit's lead in *Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022).  The Supreme Court has licensed this approach, at least if the Eighth Circuit is to be believed.  *See id.* at 735 ("Considering the Supreme Court's recent pronouncement regarding the now-

defunct CDC eviction moratorium, we are unconvinced that as a matter of law the [executive orders] are permissible non-compensable takings." (citing *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489)).

### C. The One-Judge Dissental In *Heights Apartments* is Neither Law Nor Persuasive

Speaking of *Heights Apartments*, it is worth noting once more that the Eighth Circuit's opinion presents the *only* circuit authority to review and consider the precise issues raised here on a functionally identical factual and procedural posture.

The City chides Appellants for not considering what it dubs "*Heights Apartments II*," which is unusually authoritative nomenclature for a one-judge dissental to the Eighth Circuit's denial of rehearing the case en banc. CAB at 60. In any event, it remains entirely unclear that this dissental "has proven more persuasive than the opinion itself," as the City contends, in light of its having been discussed only once by a court since its publication in June 2022. CAB at 56; *see Gallo v. District of Columbia*, 610 F. Supp. 3d 73, 88 (D.D.C. 2022). In fairness to the City, the dissental was cited in a law review article. Michael Allan Wolf, *Superfluous Judicial Activism: The Takings Gloss*, 91 Geo. Wash. L. Rev. 287, 349 n.328 (2023).

In attempting to deflect the persuasive force of *Heights Apartments*—a published opinion that the Eighth Circuit refused to reconsider en banc—the City instead attempts to lure this Court into following a hodgepodge of lower state and federal court orders that lack any precedential value whatsoever. CAB at 25 n.3.

Since this Court has only persuasive authority to aid it at this time, the Court should look to its counterparts rather than lower court decisions that wrongly conclude that *Yee* applies to landlord-tenant regulations writ large. There is simply no way to square the circle that is COVID-19-era eviction moratoria with *Yee*—a rent control case based on the "unusual" economic interaction between owners of immovable chattel housing and the underlying owners of real property.

## II. *COLONY COVE* DOES NOT AND CANNOT COMPEL THE PLEADING OF SPECIFIC EXPERT APPRAISAL TESTIMONY

### A. The District Court Incorrectly Applied *Colony Cove*

Appellants do not contend that *Colony Cove Props., LLC v. City of Carson* must necessarily be revisited in order to reverse the court below. 888 F.3d 445 (9th Cir. 2018). Appellants argue, rather, that the district court improperly applied *Colony Cove* by insisting that Appellants not only plead evidence (*i.e.*, a specific "before" and "after" evaluation of the properties' values or, in eminent domain parlance, "severance damages"), but also plead expert appraisal evidence.

Intervenors mischaracterize *Colony Cove* as holding that "a takings plaintiff must allege factual matter sufficient to establish the diminution of value and value that remains on the property." IAB at 16. But *Colony Cove* arrived at the Ninth Circuit by virtue of an appeal of a denial of the city's motion for judgment as a matter of law, after a jury trial that returned a verdict awarding a mobile home park owner over $3 million in damages. 888 F.3d at 449. At trial, the claimant introduced expert

testimony demonstrating that it would lose rental income of approximately $5.7 million as a result of the City's rent control ordinance. *Id.* No expert testimony, however, was offered concerning the diminution in value of the mobile home park, which the Ninth Circuit held to be necessary evidence concerning the "economic impact" component of Colony's regulatory takings claim. *Id.* at 451 (emphasizing that while evidence of the "pre-deprivation" value could be pinned to the recent purchase price of the park, there was "no evidence, expert or otherwise, about the Property's post-deprivation value").

While Appellants question the merit of *Colony Cove*'s holding (more on that later), nothing in that opinion should be read to require a regulatory takings claimant to *allege in a complaint* any specific pre- or post-deprivation value. Nor could it. Diminution in value analyses must come from expert witnesses, typically appraisers, demonstrating a detailed multi-factor methodology as well as supporting evidentiary foundation. Only after engaging in this complex analysis may an appraiser reach a conclusion concerning the pre- and post-deprivation value. To make matters even more difficult in this case, the appraisals would be performed on several large apartment communities with varying income streams, all the further muddled by the City's Moratorium that directly interfered with those income streams. As of the filing of the Complaint, the Moratorium was also still in effect and any appraisal analyses conducted prior to filing would be valid for perhaps a month at best, or at

least until a new batch of tenants also elected to withhold payment of rent under the Moratorium.

The court below improperly insisted that Appellants must plead a specific percentage diminution in value as a prerequisite to making it past the court's front door. The City and Intervenors scoff at Appellants' stated difficulty in alleging such specific property values and suggest that pre- and post-deprivation values could be easily asserted "on information and belief." CAB at 63–66; IAB at 34–35. Perhaps they might feel comfortable alleging specifics "on information and belief" without much more, but Appellants feel constrained to only allege facts "on information and belief" when they, in fact, have such information and belief.

As noted, Appellants allege that their properties suffered severe diminutions in value. In the Complaint, it is alleged that "[t]he Eviction Moratorium has resulted in a severe diminution in value of Plaintiffs' properties in an amount to be proven at trial." ER-205, at ¶ 56. It is further alleged that "the economic impact of the Eviction Moratorium is severe and ruinous to Plaintiffs, who are contractually entitled to receive rent from tenants on a monthly basis and cannot long survive if tenants are permitted to continue occupying the properties rent-free for a sustained and indefinite period of time." ER-208, at ¶ 71. At the time of filing the Complaint, Appellants also specifically alleged that "Plaintiffs' tenants [we]re over $20 million in arrears, to date." *Id.*

As this Court is well aware, so far as pleadings are concerned, the Federal Rules only require a "short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). This Court is also aware that the standard for gauging this is "plausibility," and that courts must construe all non-conclusory allegations in a light most favorable to the plaintiff. Thus, it must be assumed for purposes of a Rule 12(b)(6) motion that general allegations necessarily encompass more specific allegations, and that plaintiffs will be able to prove particular evidence (in this case, highly specialized valuation evidence), leaving the ultimate adjudication of the merits to another day. *See Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 889 (9th Cir. 2021).

More broadly, consider the analysis under *Penn Central Transportation Co. v. New York City*, which remains the Supreme Court's principal case concerning non-categorical regulatory takings. 438 U.S. 104 (1978). In *Penn Central*, the Supreme Court made clear that the inquiry is "essentially ad hoc" and identified three factors that evince "particular significance" given the Court's prior precedent, including the regulation's economic impact on the claimant, the extent to which the regulation interferes with investment-backed expectations, and the character of the government action. *Id.* at 124; *see also Lingle v. Chevron U.S.A, Inc.*, 544 U.S. 528, 539 (2005). No single factor is controlling, and what's more, *Penn Central* does not appear to preclude future courts from considering other factors, as well.

Under *Penn Central*, even if there is absence of evidence of any one factor,

that is not determinative. If that were so, then the Supreme Court—operating under the *Penn Central* framework—would have not affirmed a finding of a regulatory taking in *Hodel v. Irving* where the claimants provided no evidence of pre- and post-deprivation values and failed to point to "any specific investment-backed expectations." 481 U.S. 704, 714–16 (1987). Nonetheless, the Court found a regulatory taking because of the "extraordinary" character of the government action, likening the effect of the regulation there (the "abrogation of the right to pass on a certain type of property . . . to one's heirs") to regulations that "destroy[] 'one of the most essential sticks in the bundle of rights that are commonly characterized as property—the right to exclude others.'" *Id.* at 716 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)).

Here, the district court believed that *Colony Cove* and other authority instead instructs that courts treat the *Penn Central* factors not as the guideposts that they are, but as hard and fast pleading requirements. ER-18. But as *Hodel* shows, the fact that evidence of one factor might be minimal cannot, as a matter of law, preclude the finding of a taking where evidence of other factors exists.

**B.** **In Any Event, *Colony Cove* is Wrongly Decided as it Imports Inapposite Authority for its Holding Regarding Economic Impacts under *Penn Central***

*Colony Cove* should not govern the analysis of this case for the reasons just discussed. *See also* AOB at 35–37. However, if the Court believes that *Colony Cove*

applies, then Appellants respectfully submit that *Colony Cove* needs to be revisited because its holding, particularly with regards to the economic impact factor analysis of *Penn Central*, is based on a fundamental misunderstanding of takings law.

The reason for *Colony Cove*'s error is simple—it cites inapposite case law to conclude that a denominator must eventually be shown when analyzing economic impact under a *Penn Central* takings theory. The offending line in the opinion is this: "In considering the economic impact of an alleged taking, we 'compare the value that has been taken from the property with the value that remains in the property.'" *Colony Cove*, 888 F.3d at 450 (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987)).

However, the case cited for this proposition—*Keystone Bituminous*—is the predecessor case to per se "total" takings as explicated in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). Indeed, *Lucas* makes its heritage quickly known: "The second situation in which we have found categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land. *See . . . Keystone Bituminous*, 480 U.S. [at] 470." 505 U.S. at 1016; *see also Lingle*, 544 U.S. at 539 ("The *Penn Central* factors—though each has given rise to vexing subsidiary questions—have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or *Lucas* rules.").

It is, of course, completely sensible to demand that a property owner eventually prove a denominator where she is claiming that a regulation deprived her of all economic value from a property. But that is not an inquiry that would—nor should—concern *Penn Central* claims, as it would be more easily asserted (and properly cognizable) under *Lucas*.

The problem is that courts, including this one, have now conflated the *Lucas*-style inquiry with the economic impact factor from *Penn Central*, thus wrongly mixing precedent. In turn, the *Lucas* rule is beginning to swallow *Penn Central* claims, and regulatory takings claimants are being locked out of court if they cannot eventually prove that a regulation has deprived them of upwards of 95% of the value of their property, even when they are not otherwise asserting a *Lucas*-style claim. *See, e.g.*, *MHC Financing Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127–28 (9th Cir. 2013) (noting upwards of 95% loss in value as insufficient to establish requisite economic impact under *Penn Central*). In other words, even if the character of a regulatory action is "extraordinary," under *Colony Cove*'s approach, if that regulation does not deprive the owner of at least 95% of the property's value, then a regulatory takings claim does not lie. *But see Hodel*, 481 U.S. at 714–16. This issue must eventually be addressed by this Court or another.

**III.** **The District Court Improperly Granted the Motion to Intervene**

    **A.** **The Intervenors Fail to Demonstrate a Protectable Interest that Could be Practically Impaired by the City Paying a Just Compensation Award Based on a Now-Defunct Ordinance**

Intervenors fail to demonstrate how their intervention was proper—both when the Eviction Moratorium was in effect, and now. Intervenors continue to speculate that an award of just compensation in this case could negatively impact their members' interests vis-à-vis an independent decision by the City to end the Eviction Moratorium prematurely. IAB at 47. This is a feeble argument because, as Intervenors concede, the Moratorium is no longer in prospective effect. IAB at 43 n.8. Indeed, at the time this Court hears oral argument in this case, the Eviction Moratorium will very likely have been conclusively phased out.[3] Accordingly, other than simply saying it is so and asking this Court to believe them, Intervenors cannot actually articulate what their current protectable interest *is* in this case, or how that interest could potentially be impacted by a finding that the City took Appellants' property without just compensation.[4] Appellants can only deduce one motive at

---

[3] While the City's Eviction Moratorium's prohibitions are no longer in prospective effect for rents coming due on February 1, 2023, its protections continue to extend to certain tenants through January 31, 2024. Appellants' Motion for Judicial Notice, Ex. B at 10–11.

[4] Equally peculiar is Intervenors' empty assertion that they "would make related, but slightly revised, arguments if they were to file their motion today, with the Eviction Moratorium no longer in effect." IAB at 43 n.8. Intervenors do not elaborate on what "slight revisions" they would advance to still claim intervention

play—especially now as the Eviction Moratorium winds down years later—and that is to save the City some money. If that "interest" is a permissible standard for intervening in federal litigation as a matter of right, then that is no standard at all, but instead is an unintended loophole to the Supreme Court's repeated admonitions against municipal taxpayer standing in federal courts. *Cf. Ariz. Christian School Tuition Org. v. Winn*, 563 U.S. 125, 136 (2011) ("claims of taxpayer standing rest on unjustifiable economic and political speculation"). If a municipal taxpayer cannot bring a claim through a federal court's doors, then it should follow that a group seeking to save a municipality from having to pay just compensation would be equally odious.

Intervenors also suggest that they sought intervention to defend legislation that they sponsored. IAB at 44–45. This is a red herring. It is worth emphasizing once more that takings claims cannot be used to invalidate local ordinances. *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2179 (2019). There is simply no possibility that the Eviction Moratorium could have been (or, at this point, will be) set aside by this lawsuit. It is of no relevance that the same Intervenors here successfully intervened in a prior lawsuit regarding the City's Eviction Moratorium because that suit sought to invalidate and enjoin the Eviction Moratorium on Contracts Clause and

---

as a matter of right into a takings case against a municipal entity regarding a now-defunct ordinance.

substantive due process grounds. *See Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 908 (9th Cir. 2021). Here, Appellants only seek an award of just compensation. This distinction matters because the Fifth Amendment does not preclude the use of the sovereign's power to take, it merely conditions the exercise of that power on the payment of just compensation to the owner of the property taken. *Lingle*, 544 U.S. at 536–37.

More broadly, Intervenors do not point this Court to any authority holding that the specter of future litigation against the City—here, takings claims by similarly situated landlords—could practically impair the Intervenors' alleged protectable interest (whatever it is). Indeed, all of the authority Intervenors rely upon involve efforts to overturn or set aside laws or regulations. *See, e.g.*, *Cal. ex rel. Lockyer v. United States*, 450 F.3d 436, 440 (9th Cir. 2006) (lawsuit to set aside congressional rider in which intervenors were the intended beneficiary); *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 819–20 (9th Cir. 2001) (suit to overturn incidental take agreement where intervenors were intended third-party beneficiaries); *Idaho Farm Bureau Fed. v. Babbitt*, 58 F.3d 1392, 1395 (9th Cir. 1995) (challenge brought to de-list an endangered species that intervenor worked to have listed); *Wash. State Bldg. & Constr. Trades Council ALF-CIO v. Spellman*, 684 F.2d 627, 629 (9th Cir. 1982) (public interest group intervening in a lawsuit to overturn legislation it sponsored). Instead, Intervenors here only offer speculative fears that the City might

abandon the Eviction Moratorium in its twilight.

The standard advocated for by Intervenors would have this Court turn every district court into an extension of the town hall. Every commenter, advocate, or opponent of an ordinance would be entitled to intervene in any lawsuit implicating an ordinance's application. Amicus briefing is one matter, but intervention—with its far-reaching effects on discovery, trial, and settlement—is a very different animal. *See Bush v. Viterna*, 740 F.2d 350, 359 (5th Cir. 1984) ("Where he presents no new questions, a third party can contribute usually most effectively and always most expeditiously by a brief amicus curiae and not by intervention.").

Further, Intervenors' argument that their interests may be impaired by the City's desire to limit financial exposure, which could result in prematurely settling this case or terminating trailing protections in the ordinance, has been explicitly rejected by this Court. "Disputes over litigation strategy, including potential settlement, are insufficient to demonstrate a party may intervene as of right." *Callahan v. Brookdale Senior Living Cmtys.*, 42 F.4th 1013, 1021 (9th Cir. 2022); *see also Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 954–55 (9th Cir. 2009). Additionally, courts in this circuit have found that this argument is precisely the kind of speculative concern inappropriate for intervention. *Haw. Legal Short-Term Rental All. v. City & Cnty. of Honolulu*, No. 22-cv-247-DKW-RT, 2022 WL 17585851, at *10 (D. Haw. Dec. 12, 2022) (whether the named defendant "would

settle this case 'more readily' than proposed intervenors is a matter of guesswork, not fact").

Finally, Intervenors' argument that intervention is permissible because of purportedly specialized knowledge or additional information about the issues raised in this case has been repeatedly rejected by this Court. *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 621 (9th Cir. 2020) (rejecting the intervenors' claim that specialized knowledge into "environmental issues warrants intervention of right"); *Prete v. Bradbury*, 438 F.3d 949, 958–59 (9th Cir. 2006) (holding that intervenors' claim of specialized knowledge did not warrant intervention). To prevail on this argument, Intervenors must demonstrate that the "government could not obtain that knowledge through discovery or experts." *Oakland Bulk*, 960 F.3d at 621 (citing *Prete*, 438 F.3d at 958–59). Here, Intervenors do not even try to make such a showing, probably because they cannot. Indeed, there is no reason the City could not introduce similar evidence (including witness testimony of the very declarants relied upon by the Intervenors) through normal discovery tools.

### B.  The District Court Abused its Discretion by Allowing Permissive Intervention in the Alternative

Finally, Intervenors cannot prevail on their permissive intervention claim. The district court based the entirety of its analysis on intervention as of right under Rule 24(a). Only in a passing footnote at the end of its decision did the district court

state that "[e]ven if Proposed Intervenors could not intervene as of right, this Court would grant permission to intervene pursuant to [Rule 24(b)]." ER-33 n.2. But Rule 24(b) "*requires* that the court 'consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.'" *Perry*, 587 F.3d at 955 (quoting Fed. R. Civ. P. 24(b)(3)) (alteration in original). This Court has regularly held that "failure to consider a relevant factor is an abuse of discretion." *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1007 (9th Cir. 2023). The district court thus abused its discretion by failing to consider all relevant factors. *Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 979 (9th Cir. 2010) ("If the trial court applied an incorrect legal standard, we must conclude that it abused its discretion.").

The only grounds Intervenors cite to support their claim that permissive intervention was proper is the fact that "Intervenors' perspective on the public health, housing, and economic crisis—and the eviction moratorium's impact on Los Angeles renters—is directly relevant to the Court's analysis of the character of the government action" regarding Appellant's regulatory takings claim. IAB at 54. As explained above, Intervenors' arguments related to their alleged possession of additional evidence has been roundly rejected by this Court as grounds for intervention. *Oakland Bulk*, 960 F.3d at 621; *Prete*, 438 F.3d at 958–59. As a result, there is no legal basis for Intervenors' participation in this matter and this Court

should order removal of Intervenors as a defending party from this litigation on remand.

### IV.    Appellants Do Not Have a Justiciability Problem

As it did in the court below, the City devotes many pages attempting to confect standing or ripeness problems to dodge a ruling on the merits. The district court thought so little of the City's argument that it did not bother addressing it in its order granting the City's motion to dismiss. To be perfectly clear, this is not because Judge Pregerson has a reputation for ignoring Article III standing requirements; indeed, in an earlier case challenging the County of Los Angeles's own eviction moratorium, Judge Pregerson ruled, *sua sponte*, in favor of the County and dismissed a plaintiff's Contract Clause challenge on the exclusive grounds that the plaintiff lacked standing to challenge the moratorium. *See Iten v. Cnty. of Los Angeles*, No. CV 21-00486 DDP, 2022 WL 1127880, at *4 (C.D. Cal. Apr. 15, 2022) ("*Iten I*").

In *Iten I*, Judge Pregerson reasoned the plaintiff failed to allege the requisite injury-in-fact because it failed to allege that the tenant at issue had provided the required notice (or extenuating circumstances) to obtain protection under the County's moratorium. *Id.* In so ruling, Judge Pregerson necessarily assumed that an unlawful detainer court would strictly apply the notice requirements in the County's moratorium and allow the eviction to move forward based on this procedural misstep. *See id.* at *3. Judge Pregerson also assumed that landlords

should be required to pursue unlawful detainer actions absent such notice as a condition to federal court relief, even if doing so could result in liability to the landlord for stiff civil penalties. *See id.* at *3–4.

While briefing in the present case was pending, this Court reversed Judge Pregerson's decision. *See Iten v. Cnty. of Los Angeles*, No. 22-55480, 2023 WL 5600292, at *10 (9th Cir. Aug. 30, 2023) ("*Iten II*"). In doing so, this Court called into question *Iten I*'s rationale and held that the district court improperly conflated the standing requirement with a determination on the merits. *Id.* As this Court held:

> To show injury and causation for standing purposes, Iten need not allege that he would have been able to evict his Tenant "but for" the Moratorium. Nor need he show that his Tenant qualifies for the affirmative defense provided by the Moratorium. Rather, Iten need only allege that the Moratorium imposed additional rights, remedies, conditions, or procedures that impair the obligations to which he and his Tenant had contracted.

*Id.* at *7.

The standing argument raised by the City in this case is even more specious than the argument raised by the County of Los Angeles in *Iten I*. Unlike the County's moratorium which ostensibly required tenants to provide seven days' notice before invoking the moratorium's protections, the City's Eviction Moratorium contains no notice requirements at all. Because the City cannot make a similar argument pertaining to lack of notice in this case, the City actually goes much further and argues that landlords subject to the Moratorium have no standing unless and until

the landlord actually violates the terms of the Moratorium and files an unsuccessful unlawful detainer action. *See* CAB at 34 ("because the landlord's putative injury . . . comes from operation of [the Moratorium], the landlord has no injury-in-fact unless the tenants invoke, and the unlawful-detainer court applies, [the Moratorium]"). To fabricate this argument, the City necessarily (and falsely) claims that its Moratorium only created an affirmative defense in favor of tenants and had no independent force outside the unlawful detainer context. Further, the City claims that notwithstanding the Moratorium's blanket prohibition on evictions, a landlord's "right to exclude" could only be impaired if an unlawful detainer judge follows the dictates of the Moratorium. The argument is wrong on multiple levels.

First, the City intentionally misrepresents the nature and plain terms of its own Moratorium. Unlike the County Moratorium that was the subject of *Iten*, the City's Moratorium did not simply create an affirmative defense for tenants. Its principal ban outright prohibits landlords—under penalty of law—from "evicting" or "endeavoring to evict" tenants impacted by the pandemic. Section 49.99.2(A), which contains the blanket prohibition on evictions and is distinct from the Moratorium's provision on "affirmative defenses," reads in pertinent part:

> During the Local Emergency Period and for 12 months after its expiration, no Owner shall endeavor to evict or evict a residential tenant for non-payment of rent during the Local Emergency Period if the tenant is unable to pay rent due to circumstances related to the Covid-19 pandemic.

L.A. Mun. Code § 49.99.2(A) (2020); AOB Add. at 58.

This is not an affirmative defense. It is a prohibition backed by force of law that directly applies to any "Owner" (defined as "any person, acting as principal or through an agent, offering residential or Commercial Real Property for rent"). *Id.* § 49.99.1(E); AOB Add. at 58. While Section 49.99.6 of the Moratorium *also* allows tenants to "use the protections afforded in this article as an affirmative defense in an unlawful detainer action," the plain text of the City's Eviction Moratorium directly prohibits landlords from exercising their fundamental right to exclude defaulting tenants through the unlawful detainer process.

Second, the Moratorium creates a "private right of action" for residential tenants where a landlord violates the prohibition. L.A. Mun. Code § 49.99.7; AOB Add. at 59. The private right of action dangles a significant financial carrot in front of tenants to sue their landlords where the landlord violates the prohibition. Any violation can subject the landlord to a $10,000 penalty and, if the tenant is elderly or disabled, to an additional $5,000 penalty. *Id.* Because tenants have no obligation to provide notice or documentation supporting their invocation of the Moratorium, landlords are left to guess whether their tenants would actually qualify for protection. As noted, guessing wrong would expose the landlords to extraordinarily high penalties which were no doubt designed to disincentivize landlords from even considering eviction of their defaulting tenants. If the private right of action was not

enough, the Moratorium also exposes landlords to "administrative citations" under Article 1.2 of Chapter 1 of the City's Municipal Code, which calls for severe civil penalties and are cumulative to any other remedies. *See* L.A. Mun. Code § 49.99.8. The City's position that landlords should be required to gamble exposure to massive civil penalties—and then lose—as a condition to filing a takings complaint in federal court is facially absurd.

Finally, the City's argument that landlords must file unlawful detainer actions "before a taking can occur" flies in the face of very recent Supreme Court precedent holding that a "taking" is not dependent upon the post-taking filing of any state court litigation. *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2172 (2019) (holding that property owner may bring federal takings lawsuit as soon as property was taken [in this case, when government prevents owner from exercising fundamental right to exclude defaulting tenants through unlawful detainer proceeding] and that owner's "irrevocable right" to just compensation ripens "immediately upon a taking"). Because the City's Moratorium directly forbade landlords from exercising their fundamental right to exclude defaulting tenants from their properties through unlawful detainer proceedings, the taking alleged in this case cannot possibly be contingent upon landlords first violating the Moratorium to pursue post-taking unlawful detainer proceedings. As the Supreme Court reasoned in *Knick*, "[a] bank robber might give the loot back, but he still robbed the bank" and the "availability

of a subsequent compensation remedy for a taking without compensation no more means there never was a constitutional violation in the first place than the availability of a damages action renders negligent conduct compliant with the duty of care." 139 S. Ct. at 2172.

Appellants' Complaint certainly establishes the necessary standing to assert a taking in violation of the Fifth Amendment:

> The Eviction Moratorium requires that Plaintiffs continue furnishing their properties—indefinitely—to defaulting and nonpaying tenants. Plaintiffs have no effective ability to mitigate losses or oust those in default. By precluding Plaintiffs' historic right to institute unlawful detainer proceedings, Defendants have deprived Plaintiffs of the means to physically remove defaulting tenants from their properties. Defendants have thus stripped from Plaintiffs the fundamental right to exclude—a right that "is 'one of the most treasured' rights of property ownership."

ER-206–07 at ¶ 61.

Appellants have alleged that they suffered millions of dollars in lost rent from non-paying tenants, as well as lost refinancing, interest and late fees, as a direct result of the City's Moratorium. ER-190 ¶ 7. This is sufficient to establish the requisite injury-in-fact and causal connection components of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In addition, Appellants seek a monetary remedy in the form of "just compensation," which no doubt establishes the "redressability" component to standing. *Id.*

Put simply, Appellants were not required to file and lose a multitude of

unlawful detainer actions, exposing themselves to astronomical civil penalties, as well as private rights of actions by tenants, in order to satisfy Article III standing, or, for that matter, to succeed on the merits of their takings claims.

## CONCLUSION

For the reasons set forth above, and for those included in Appellants' Opening Brief, the district court should be reversed. Appellants deserve their day in court.


Dated:  September 5, 2023                RUTAN & TUCKER, LLP
                                         DOUGLAS J. DENNINGTON
                                         JAYSON A. PARSONS


                                         By:      s/ Douglas J. Dennington
                                              Douglas J. Dennington
                                              *Attorneys for Plaintiffs-Appellants*

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

# FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**      20-55013

I am the attorney or self-represented party.

**This brief contains 8,400 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[**x**] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [**x**] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Douglas J. Dennington          **Date September 5, 2023**
*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

Case Name: *GHP Management Corporation v. City of Los Angeles, et al. Case No. 23-55013*

I hereby certify that on September 5, 2023, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## REPLY BRIEF

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on September 5, 2023, at Irvine, California.


Patricia Johnson                          /s/ Patricia Johnson
Declarant                                 Signature